IN THE UNITED STATES COURT OF FEDERAL CLAIMS

H & R SERVICES, INC.,
an Alabama corporation,

Plaintiff,

vs. No. 06-582 C

THE UNITED STATES OF AMERICA,

Defendant.

DEPOSITION OF CARL RIEMER

TAKEN ON BEHALF OF THE PLAINTIFF

ON NOVEMBER 7, 2007, BEGINNING AT 9:15 A.M.

IN FT. SILL, OKLAHOMA

REPORTED BY: Jean Baysinger, CSR RPR RMR



64d2a841-150d-4018-94d6-d65d31712b93

APPEARANCES

On behalf of the PLAINTIFF:
William H. Hickman, Attorney at Law
HICKMAN & FITZPATRICK
119 N. Robinson, Suite 250
Oklahoma City, Oklahoma 73102
(405)605-2375
hickman@hickmanfitzpatrick.com

On behalf of the DEFENDANT:
Sean B. McNamara, Attorney at Law
U.S. Department of Justice
Civil Division
1100 L Street N.W.
Washington, DC 20530
(202)305-7573
sean.mcnamara@usdoj.gov

Joe Alford, Attorney at Law
U.S. Army
Building 4621, Room 208
Ft. Sill, Oklahoma 73503
(580)442-1096



INDEX

Page
Direct Examination by Mr. Hickman............. 6

Exhibits
1 Contract DABT39-00-C-4032.................. 12
2 Bid abstract.............................. 12
3 Modification list......................... 12
4 H & R letter dated 3/1/05 -- Request for adjustment/training utilization increase... 12
5 DOC letter dated 3/14/05 -- Response to revised request for adjustment............ 12
6 H & R e-mail dated 3/14/05 -- Mr. Hall's comments................................. 12
7 H & R letter and attachments dated 4/12/05 -- Claim for $165,851.24........... 12
8 DOC letter dated 4/27/05 -- Response to request for claim submitted 4/14/05........ 12
9 H & R letter and attachments dated 6/15/05. 12
10 E-mail from Carl Riemer, COR, dated 4/10/05 12
11 DOC letter dated 8/11/05 -- Final decision to contractor certified claim submitted 7/5/05.................................... 12
12 H & R claim dated 3/14/06 for $37,359.76... 12
13 DOC letter dated March 28, 2006 -- Reply to William H. Hickman (Request for Equitable Adjustment)............................... 12



EXHIBITS (Continued)

Page
14 H & R attorney's letter dated 5/12/06...... 12
15 DOC letter dated 6/20/06 -- Final decision to contractor claim submitted 3/14/06 and 5/12/06.................................. 12
16 Technical Exhibit 6 (Supply Items)........ 14
17 Government estimate regarding scope of work, bid schedule & technical exhibits... 19
18 Memorandum dated 6/5/00 from Sharel McAdoo to the Directorate of Contracting......... 28
19 Solicitation No. W9124J-05-R-1003 relating to the follow-on contract................. 89



STIPULATIONS

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys, that the deposition of CARL RIEMER may be taken pursuant to agreement and in accordance with the Rules of the Court of Federal Claims on November 7, 2007, at Ft. Sill Army Base, Directorate of Contracting, Building 1803, Ft. Sill, Oklahoma, before Jean Baysinger, CSR RPR RMR.

WHEREUPON,
CARL RIEMER,
after having been first duly sworn, deposes and says in reply to the questions propounded as follows, to-wit:
DIRECT EXAMINATION
BY MR. HICKMAN:
Q Please state your name for the record.
A Carl Riemer.
Q Can you spell that last name?
A R-i-e-m-e-r.
Q Okay. Mr. Riemer, what is your home address?
A 3022 Northwest Euclid, Lawton.
Q And the zip?
A 73505.
Q Okay. And a home phone number?
A 580-355-3724.
Q Okay. And a work address?
A Building 1950, DPW.
Q And what does "DPW" stand for?
A Directorate of Public Works.
Q And is that here on Ft. Sill --
A Yes.
Q -- Army Base?



A Yes.
Q And what's a work number?
A 580-442-4620.
Q And by whom are you currently employed?
A DOD, Army, civil service.
Q So you're a civil servant working for the Department of Defense?
A Yes.
Q And in particular, what, you work for the Department of Army?
A Yes.
Q And what do you do here at Ft. Sill?
A Job description is architectural technician.
Q Okay. What are the duties of an architectural technician?
A Well, I do small design projects, renovations, but with the other jobs that I do are the service contracts, such as this one here.
Q Okay. So am I correct in understanding that you're a civil servant?
A Yes.
Q What is your grade? Is that the proper term?
A GS-11.



Q GS-11. And how long have you been an architectural technician?
A Since about '91 or '92. That's probably about 17 years.
Q And would I be correct in saying that you are an architectural technician working for the Directorate of Public Works for Ft. Sill Army Base?
A Yes.
Q I want to link all those different pieces together. Sorry. And have you been the architectural technician for the Department of Public Works for Ft. Sill Army Base for all 17 years, or have you been in different positions?
A Same office, same door every morning.
Q Prior to your position as an architectural technician, were you -- what was -- how were you employed?
A I came to work out here in '82 as a draftsman and just kind of worked my way up through that to the architectural technician.
Q And as a draftsman, you were still working at the -- is it director or directorate?
A Directorate.
Q Directorate of Public Works.
A Same place, same door, same office



building.
Q In general, what is the Directorate of Public Works? What does that group do?
A They take care of the maintenance on the facility here at Ft. Sill all the way from anything underground to above ground. All the utilities.
Q Have you had your deposition taken before?
A No.
Q Did you do anything to prepare for this deposition today?
A No.
Q Did you look over any documents or anything?
A Just kind of looked over, kind of familiarized, you know, the contract.
Q Okay. Did you look at anything besides the contract?
A No.
Q Did you have any meetings with anybody?
A Came up here yesterday and talked to these guys.
Q Okay.
A They just kind of filled me in what you were going to say.
Q And your -- I don't want to know about

your conversation with your lawyers because that would be privileged, but besides your conversations with your attorneys, did you talk to anybody else?
A No.
Q Can you give me a summary of your educational background?
A High school plus, oh, about two-and-a-half years of college.
Q Where did you go to high school?
A Eisenhower here in Lawton.
Q And you understand that we're here today concerning the janitorial services contract that H & R Services had with Ft. Sill Army Base?
A Yeah.
Q And if I refer to "the contract," you'll understand I'm referring to the custodial or janitorial contract with H & R Services, with the Ft. Sill Army Base?
A Yes.
Q And if I say, "H & R," you understand that I'm referring to the contractor H & R Services that had the contract that we're talking about?
A Yes.
Q With regard to the contract, what was your relationship or involvement?



A I put together the scope of work and the bid schedule, government estimate, tech exhibits, the body of the contract, what the contractor is supposed to do.
Q You said scope of work, bid schedule, government estimate.
A Tech exhibits.
Q Technical exhibits. Anything else?
A No.
Q You said you did prepare the government estimate, though?
A Yeah.
Q Did anybody assist you in your work on these topics you described for me relating to the contract?
A No.
Q And the things you described to me relate directly to the contract. How about your involvement once the contract was awarded and performance commenced by H & R?
A Once it's -- once it's been awarded, I don't have anything to do with it anymore.
Q Okay. So you're not involved in monitoring of the performance or service under the contract by the contractor.



A No.
Q Who steps in at that point?
A It would be the inspection branch.
(Exhibits 1 - 15 marked for identification.)
Q (By Mr. Hickman) Okay. Let me kind of put in front of you here -- this is a large three-ring binder that has 15 tabs in it, and I'll represent to you, and Counsel can correct me if I say something incorrectly, that these are documents provided by the government pursuant to H & R's request for documents relating to this lawsuit.
I'm going to give you a minute to basically, at least, look at this index page. I'm not going to ask you about all these tabs because it doesn't sound like you're going to probably know about all of them, but for the record, at least, I want to have these 15 exhibits identified, to the extent that you can, as being true and correct copies of the documents from the government, and then I may go through some of them with you to the extent that you were involved in those parts of the contract. Is that okay?
A Yeah.
Q Why don't you take a minute and look at



this index, and then when you're ready, let me know.
A I do see my name on there.
Q So have you had a chance to look over those 15 sets of documents that are marked Exhibits 1 through 15?
A That's what all this is. Okay.
Q And to the best of your knowledge, do those appear to be true and correct copies from the government's files?
A I guess.
MR. McNAMARA: Objection. Just for the record, he's looked at the index to the documents. He hasn't looked at the documents themselves.
THE WITNESS: Yeah.
MR. HICKMAN: Okay.
Q (By Mr. Hickman) Of the description on the index page of the tabs 1 through 15, which of those sets of documents were you involved in that phase of the contract?
A Well, I get -- this one right here, where it has e-mail from me, Carl Riemer.
Q Okay. And you're referring to tab 10?
A Yes. Yeah. All the rest of them, I have no idea. I may have seen them, may not have. I don't know. And I don't remember the e-mail,

Page 14

either.
Q Okay. Let's back up and we'll go at this a little different way, and if need be, I'll have somebody else identify these exhibits. Before the contract that we're here for today was awarded to H & R, was there a prior custodial or janitorial services contract here at Ft. Sill?
A Yes.
Q Who was the contractor on that contract?
A Who was the contractor?
Q Yes.
A I don't know. I don't remember.
Q Were you involved in any fashion with regard to the prior janitorial services contract?
A The contract before this one?
Q Correct.
A Yeah. I did the scope of work for it, also.
Q So would it be fair to say that you prepared the same information for the prior contract as you did for the H & R contract?
A Basically, the same, with a few minor changes.
MR. HICKMAN: Got a sticker?
(Exhibit 16 marked for identification.)

Page 15

Q (By Mr. Hickman) Let me hand you what I marked as Exhibit 16.
A Uh-huh.
Q Would this be the type of technical exhibit that you would have prepared for the janitorial services contract?
MR. McNAMARA: Objection. Vague.
Q (By Mr. Hickman) The janitorial services for the prior contract, the contract number, I believe -- or maybe this is -- I believe this is actually the solicitation number DABT 39-95-B-0026?
A This "95" tells me it was for the contract before H & R. Yeah, this was in there.
Q Okay.
A Tech Exhibit 6.
Q And are you the one that came up with these estimated number of supplies for this solicitation?
A I probably took these from a previous contract.
Q Okay. And is that generally how the process might've worked?
A Yeah.
Q Would you typically do anything to confirm if those supply estimates need to be updated from

Page 16

the prior contract?
A I have no idea. You know, with the square footage, you know, you could, you know, maybe tell by that.
Q But you didn't do any additional research or work to try to update the supply item listing.
A No.
Q Or the supply item estimates, I guess I should say.
A No.
Q And as part of your preparation of the information for the solicitation, did you do a similar supply item estimate for the solicitation that resulted in the H & R contract?
A I don't remember. I didn't see one, a tech exhibit like this, in the solicitation for that contract, for H & R's contract.
Q Okay. Do you know if one was provided to bidders if they requested that information?
A I wouldn't have give it to one. I don't have anything to do with that. It comes over here. DOC people hand out stuff, solicitations, to the prospective bidders.
Q Did you participate or have you participated in any pre-award on-site visits or

Page 17

meetings that might have been held?
A If they had a site visit, I would go with them.
Q Okay. Do you know, on this prior contract, the one that was awarded in 1995, whether or not a on-site meeting was held?
A That was 15 years ago. No, I don't remember.
Q Okay. How about for the solicitation that resulted in the H & R contract? Do you recall if, in the approximate year 2000, an on-site visit was conducted?
A I don't remember that one, either.
MR. McNAMARA: Is this our copy or is this yours?
MR. HICKMAN: This will be an exhibit.
MR. McNAMARA: Oh, okay.
MR. HICKMAN: Okay.
Q (By Mr. Hickman) Are you -- do you have any knowledge of whether or not, on this prior contract, if there were any claims made by that contractor with regard to pricing?
A The one before H & R?
Q Yes, sir.
A No.





64d2a841-150d-4018-94d6-d65d31712b93

Page 18

Q You're not aware, or no, there were not?
A I don't know. I'm not aware of any, you know.
Q Okay. And how about the contract after H & R? Are you aware of any claims for additional pricing or monies made by that contractor?
A No.
Q Okay. Do you have any specific knowledge of H & R's claims under the contract for additional monies?
A No.
Q Okay. Well, let's fast forward, if you will, and talk a little bit about what I refer to as the pre-award period, meaning the time prior to the award of the contract to H & R. Are we on the same page?
A Okay.
Q Basically, the solicitation time frame.
A Uh-huh.
Q When I say "solicitation" now, I'm referring to the solicitation that resulted in the H & R contract.
A Okay.
Q And is there a -- are you familiar with the form -- DA Form 3953?

Page 19

A I try not to remember these things. You know, you show me the form, I'll look at it.
Q No problem.
A There are so many forms that the government has.
MR. HICKMAN: These are copies I just got yesterday.
(Exhibit 17 marked for identification.)
Q (By Mr. Hickman) Mr. Riemer, let me hand you what I have marked as Exhibit 17, and I'll represent to you that these are documents that I retrieved from the contract file, the H & R contract file. I'll give you a minute to look through those documents and familiarize yourself, and then we'll talk about them a minute.
Have you had a chance to look at Exhibit No. 17?
A Yeah.
Q And is your name indicated in box number ten? Right here.
A Yeah.
Q And so what was your role with regard to Exhibit No. 17?
A This is the -- this is the government estimate, the scope of work, and the bid schedule,

Page 20

the tech exhibits. Yeah, that's what I put together.
Q So Exhibit 17 represents your work product, essentially, on behalf of the government?
A Yeah. Yes.
Q And is the information contained in Exhibit 17 the type of information that's typically provided to potential bidders for a contract, to give them information about the government's requirements?
A Yes.
Q Do you know if these documents, in particular, Exhibit 17, were provided to potential or interested bidders for the solicitation that resulted in the H & R contract?
A I guess they were. I didn't see the solicitation package when it went out.
Q Okay. Would it be typical for this type of information that's marked as Exhibit 17 to be provided to an interested party that was trying to get a government contract, if they requested it?
A Yeah.
Q And it may very well have been included in the solicitation itself.
A Yeah.

Page 21

Q But you don't directly communicate with potential bidders --
A No.
Q -- that are soliciting the government for work?
A No. They go between the contracting officer. I talk to the contracting officers.
Q Okay. But Exhibit 17 represents the government's estimated requirements that's being solicited that resulted in the H & R contract.
A Yes.
Q And when was this purchase request and commitment prepared?
A Oh, gosh, I don't know.
Q Looks like in --
A March.
Q -- March 22 -- March of 2000. Does that sound right?
A Yeah. There close, thereabouts, yeah.
Q And then the second page of Exhibit 17 appears to be a memorandum dated March 7, 2000. Do you see that?
A Yeah.
Q And at the top, it has the name Sharel McAdoo.





64d2a841-150d-4018-94d6-d65d31712b93

A McAdoo.
Q M little C capital A-d-o-o. Who is Ms. McAdoo?
A She was the contracting officer. She's the one I sent all of this to for her to prepare it and get it out.
Q Okay. And you're identified as the point of contact on paragraph four of page two of Exhibit 17?
A Yes.
Q And who is Donald W. Price?
A He's my boss.
Q Is he still your boss?
A Yes.
Q And then the next set of pages in Exhibit 17 begin at the top with the heading, "Government Estimate," and I believe there's five pages.
A Yeah.
Q And you prepared these government estimates?
A Yes.
Q What did you utilize to come up with these government estimates? What information?
A The previous contract.
Q And am I correct to understand that that



would be the contract that would've been awarded in 1995 to the --
A Yeah. The contract prior to this one, yes.
Q -- the prior janitorial contract?
A Yes.
Q And that would refer to the Exhibit 16 we talked about that was -- at least as to the supply estimated items? Correct?
A Yes. Yeah.
Q Okay. In addition to the supply estimates relating to the prior contract that went into your government estimate for the information contained here in Exhibit 17, what else did you consider?
A Could you repeat that again? What was --
Q Well, I'm trying to -- I'm trying to get a list, if there is a list. When you sit down and come up with these government estimates, things that you would consider, and you told me the previous contract, and I'm wondering -- I'm assuming -- I think you told me that one of those things related to the previous contract would've been the supply estimates that we talked about initially --
A Yeah.
Q -- that was Exhibit 16.



A Uh-huh.
Q Would you have considered other information in coming up with the government estimate here in Exhibit 17, like if the square footage changed, for example?
A Uh-huh.
Q Do you know if the square footage changed from the prior contract to the H & R contract for this government estimate here?
A Yeah, we keep a running total of the square footages there.
Q Okay. Let me back up and ask this question. Do you recall if the government estimate that's contained in Exhibit 17 is different from the government estimate that you prepared for the contract solicitation in 1995?
A It would be different, yes.
Q Would it be different in price per square foot or just in the estimated square foot?
A The quantities would change, plus the price per square foot goes up along with -- you know, it's five years later.
Q Okay. And I guess what I'm wondering is, did you just take the price per square foot you had in 1995 and just bump it up based on some inflation



factor, or did you actually -- did you look at any type of --
A Yeah.
Q -- usage situation --
A No.
Q -- as far as the amount of supplies used?
A No. Just for the estimate, and that's all it is. It's just an estimate, you know, so I just added a little bit for inflation, and when the bids come in, I'm usually right in the middle. Have some high and some low.
Q Okay. And then the next set of documents in Exhibit 16 has at the top, "Bid Schedule," and I believe there are six pages. Does that sound correct?
A Okay. Yeah.
Q And generally, what is the bid schedule?
A It's what the contractor uses to prepare his bids.
Q Okay. And then the next set of documents has at the top, "Scope of Work," and I believe there are nine pages. Does that sound correct?
A Yes.
Q Generally, can you tell me what the scope of work is?





64d2a841-150d-4018-94d6-d65d31712b93

Page 26

A It tells the contractor what he's supposed to do, what we want him to do.
Q Do you know or do you recall any changes you made in the bid schedule and the scope of work from the prior contract awarded in 1995 to the information contained here in Exhibit 17?
A Not without comparing them.
Q In general, would they have been probably pretty similar?
A Very similar, yes.
Q With regard to the follow-on contract, the contract that followed the H & R contract, would the scope of work and the bid schedule be very similar, as well?
A Pretty close.
Q Can you tell me, in general, the type of work or the categories of work required by the scope of work as you set it out here in Exhibit 17?
A The type of work? Custodial work, housekeeping, cleaning.
Q Let's look over at page six under the scope of work. See where it says, "Custodial Services"?
A What paragraph?
Q Paragraph 28.1.

Page 27

A Yeah.
Q I guess it begins with paragraph 28, "Specific Tasks to be Performed." Is this kind of where the meat of the scope of work begins, defining the specific tasks?
A Specific tasks, yes.
Q Are there certain tasks or services that are to be provided more frequently than others?
A Yes. Like right there in paragraph 28.3 of that Tech Exhibit 2, "Tasks and Frequency Chart." Some places require more.
Q And that refers to one of the technical exhibits?
A Yes.
Q And so is it anticipated by the government that the contractor will rely upon these technical exhibits for information?
A Well, yes.
Q And with regard to Technical Exhibit No. 2, does that tell them how frequently to do certain of these services?
A Yeah, what buildings to work in, yes.
Q And then as a part of Exhibit 17, there's a Technical Exhibit No. 4. Do you see that a few pages back?

Page 28

A Yeah.
Q What is Technical Exhibit No. 4?
A Supply items.
Q Is Technical Exhibit No. 4 the supply item estimated monthly usage?
A Yes, estimated monthly usage.
Q Okay. Technical Exhibit 7 is a contract discrepancy report?
A Yes.
Q Were you involved -- are you involved -- let me ask the question that way -- in the preparation of any contract discrepancy reports?
A No.
Q I didn't think so, but I wanted to make sure.
(Exhibit 18 marked for identification.)
Q (By Mr. Hickman) Hand you what I've marked as Exhibit No. 18. Can you tell me what Exhibit 18 is?
A Can I tell you what it is?
Q Does Exhibit 18 appear to be -- I don't know if you call it a letter or a memorandum dated June 5th, 2000, from Sharel McAdoo, contracting officer, to the Directorate of Contracting. Is that what it appears to be?

Page 29

A Yes.
Q And you see the solicitation up there, solicitation number DABT 39-00-B-1001, custodial services?
A Yes.
Q Would it be your understanding that that solicitation number corresponds to or was the result of the information that we've talked about in Exhibit 17?
A I don't know. You're saying this is the same as this?
Q Well, what I'm -- what I'm asking is, did the requirement, the government requirement identified in Exhibit 17 that you prepared -- it resulted in a solicitation being sent out for potential bidders. Correct?
A Uh-huh, this was.
Q Correct?
A Yeah.
Q And so what I'm trying to ascertain is, the governmental requirement identified in Exhibit 17, was it then put into the format of a solicitation, and was that solicitation number DABT 39-00-B-1001?
A I have no idea what that number is or what





64d2a841-150d-4018-94d6-d65d31712b93

it stands for.
Q Okay. Let me have you look at Exhibit No. 2, see if we can maybe link these together. On Exhibit No. 2, there's a page 183.
A Uh-huh.
Q If you see the solicitation number in box five, and then in box two, it refers to a contract number. The contract number is DABT 39-00-C-4032.
A Okay.
Q And that being the contract number with H & R Services for janitorial services. Does it appear to you that the solicitation number that we talked about on Exhibit 18 is the solicitation that resulted in the contract awarded to H & R?
A I guess. I don't know.
Q Okay.
A You know, I don't have anything to do with this part of it, and how they do this over here in DOC, I don't know. I don't know what this has to do in relation -- if this is the one, you know, the previous contractor, what it has to do with this.
Q Okay. And I guess what I'm wanting to find out from you, since you're the technical guy, is, if you look at the middle part of Exhibit 18 where it says, "The new solicitation differs from



the current contract in the following areas" -- right here.
A Oh.
Q And has an A, B, and a C.
A Okay.
Q I guess let me ask the question as an assumption. Assuming that Exhibit 18 refers to a solicitation for the follow-on contract to the Pure Services Corporation contract that's discussed in Exhibit 18 for janitorial services, do you have any reason to disagree that the only three differences from the new solicitation from the current contract are those identified in numbers A, B, and C?
A If they're the only differences? No, I don't know.
Q Do you recall attending any pre-performance conference for the H & R contract?
A I don't remember. That's how many years ago, and this is not the only contract I work on, so I don't remember.
Q I understand. Is that something that you -- you might typically do as part of your job duty, is attend a pre-performance conference with a new contractor starting work?
A Yeah. A pre-performance after he starts



work?
Q After the contract's awarded, but before they start work.
A Oh. Sometimes, yes, maybe, you know. Sometimes, I do. Sometimes, I don't.
Q I think you've told me already that you don't remember attending a pre-award conference with any of the potential bidders prior to the --
A Like a site visit or something, no.
Q Correct.
A I don't remember any of that.
Q But prior to the award of this H & R contract, you don't remember any of those?
A Huh-uh.
Q Are you consulted or talked to when it comes time for a renewal or exercising an option on a contract such as the H & R contract that we've been talking about?
A Talked to by who?
Q By --
A My boss will say, yeah, "The last one's, you know, about to end. We need a new contract."
Q What I'm wondering is, like the janitorial services contract that we've been talking about, the H & R contract --



A Uh-huh.
Q -- you understand it was a five-year contract.
A Yeah.
Q And it had a one-year base and then four one-year option years.
A One-year options.
Q And each time prior to an option ever being exercised, the government has to make a determination to exercise that option. You understand that?
A Uh-huh.
Q When they're going through that process of -- the government's going through that process of deciding whether or not to exercise the option, are you consulted by the contracting officer? Do they contact you?
A It's not my call.
Q You don't provide any technical input to them, like, "We still have that need," or, "The prices look reasonable for the next option year"?
A No, not really.
Q Okay. I guess let me ask a generic question. In the four years that the -- for the four option years that were exercised under the





64d2a841-150d-4018-94d6-d65d31712b93

Page 34

H & R contract, do you recall having any conversations with anyone at contracting about exercising of each of those options?
A No.
Q And are you involved when additional buildings were added to the H & R contract?
A No.
Q Let me have you look at Exhibit 3, in particular, pages 260 and page 261, which I believe is just a summary of the modifications to the H & R contract, and after you get a chance to look at it, let -- my question is whether or not you were involved in any of those modifications in any form or fashion. I'm trying to be very broad in my question here so we can maybe expedite this.
A Usually, it's not my job to add or delete buildings from the contract or anything else.
Q I understand. There might be some additional types of mods in there, and I wanted to give you a chance to look them over and see if anything jumps out at you that you might have been involved in for any of these modifications in Exhibit 3.
A Not that I can see.
Q Let me have you look at Exhibit No. 1, and

Page 35

it's my understanding that this is the contract, the H & R contract, that we've been referring to in some of our discussions. Are you familiar with the contract?
A Yes.
Q In the -- I guess what I need you to do is explain for me, if you will, the process that happens within the government to take the governmental requirement identified in Exhibit 17 and it resulting in the contract that's marked as Exhibit 1. And I'm not talking about the contracting portion of that as far as getting bidders and that process. I'm talking about the requirement specification part of it.
What is your involvement in turning this government requirement marked Exhibit 17 into the actual contents of this contract marked Exhibit 1?
A When I get all of this done, when I get it all prepared and get it typed up, get it all done, like that first letter right there, I send it over here to DOC. They prepare it and they send it out for solicitation. After I send it over here to them -- over there -- over here to them, I have nothing else to do with it.
Q I guess that was sort of my question. Are

Page 36

there -- is the solicitation put together, the language that's going to end up being the contract --
A That's all done --
Q -- put together, then is it sent to you to look at? I mean, if they make changes to -- let me back up. Strike that question.
In a standard or typical process, are you given the solicitation to review and comment on?
A A technical review, I guess. Yeah, they'll send it back over there to me, ask me to look at it, and I'll go through my portion of it, and I'll look at that and send it back.
Q Okay. Now, on this H & R contract process, do you recall seeing a draft of the solicitation that you reviewed and commented on?
A I -- you know, they send them all to me. Look at it, technical review, and then send it back. So I don't recall it, but, you know, I probably did.
Q Okay. Do you maintain a file at your office of contracts that you are involved in?
A Just about this much of it right here, yeah. Not what, you know, they're working from, no.
Q If they sent you something to review and you reviewed it, would you have kept a copy in your

Page 37

file?
A No.
Q So you would have marked it up, if you had markups, and just sent that back to them and not kept a copy?
A Yeah.
Q And if you received documents, I assume it would be from the contracting office. Is that correct?
A Uh-huh.
Q If you received documents from the contracting office that you had a question about, how would you communicate that question? By e-mail, a memo, phone call?
A Any of those. If I had a -- you know, if something really stood out, you know, I'd probably call them.
Q Do you retain your e-mails?
A No.
Q Not for any period of time?
A A few, you know, but no. Basically, no.
Q Okay.
A There's too many of them.
Q Are there meetings, technical review meetings, where you would actually have a sit-down


64d2a841-150d-4018-94d6-d65d31712b93

Page 38

meeting with the contracting people and maybe others?
A At this point, yes. We'd go through this and, you know, I'd change that, and then that's when they would do this, but, you know, I never sat down with them when they've got all their -- whatever they do to it.
MR. McNAMARA: For the record, we may want to clarify the "thises" and "thats" here.
THE WITNESS: Yeah.
A I do my scope of work in all this. We'll go over that, and that's all we'll do. When it goes out for solicitation --
MR. McNAMARA: The witness is pointing to Exhibit 17 when he's talking about "that."
A What I review with contracting.
Q (By Mr. Hickman) Yes. You provide to contracting what we've marked as Exhibit 17. Then you'll sit down and go over with them the governmental requirements and estimates that you've identified that are required by the government, and we've marked it here Exhibit 17 with regard to the --
A Uh-huh.
Q -- custodial services requirements that

Page 39

resulted in the H & R contract. Correct?
A Yes.
Q Okay. And I guess what I'm trying to understand, and I think I'm getting there, but I want to make sure that I do, is, if there are changes to what you've prepared as the government requirement that we marked as Exhibit 17 to what actually ends up in the solicitation that goes out to bidders, which then ultimately becomes the contract -- and I'm referring here to the technical part of it. When I say "technical," I'm referring to the specifications and the technical exhibits, those things. Where would I find those changes and that information?
A The markups that I had?
Q Correct.
A I -- I send them back over here. I have no idea what they do with them.
Q Okay. And just by way of example -- I guess, actually, the copy of the contract that I have doesn't even have a Technical Exhibit No. 1 to it.
Okay. In Exhibit 17, in the scope of work that you prepared, there's a paragraph eight that talks about, "Contract shall prepare and submit

Page 40

reports and other data incidental to the performance of services as specified in Technical Exhibit No. 1." Technical Exhibit No. 1 is a part of Exhibit 17, refers to deliverables of reports, and it has two pages.
A Uh-huh.
Q Now, do you know if, in the resulting contract, there was a Technical Exhibit No. 1 requiring reports be provided?
A No.
Q You don't know?
A No.
Q Okay. Let's look at Exhibit No. 1, which is the contract, and if you can briefly, to the extent you can, look over these few pages of the scope of work and let me know if you see a requirement in the scope of work for deliverables of reports in similar format or requirement as in your Exhibit 17.
A So you're wanting to know if this paragraph is in here.
MR. McNAMARA: Let the record reflect the witness is pointing to paragraph eight.
A Exhibit 17, paragraph --
Q (By Mr. Hickman) Eight.

Page 41

A Eight.
Q As a part of the scope of work. Not the exact wording necessarily, but --
A Is that in here?
Q -- in general, that requirement that you identified in paragraph eight of Exhibit 17 still a requirement in the resulting contract that's marked as Exhibit 1.
A I don't even see Tech Exhibit 1 in this.
MR. McNAMARA: In this --
A I don't see a similar paragraph in this.
MR. McNAMARA: When you say "this," you're talking about Exhibit No. 1.
MR. HICKMAN: The contract.
THE WITNESS: This, yes.
MR. McNAMARA: The contract.
A I don't -- I don't see a paragraph in here, Exhibit No. 1, like this one here.
Q (By Mr. Hickman) Like exhibit (sic) eight from Exhibit 17.
A Yeah, paragraph eight. I don't see that in here.
Q Okay. Now, let's use that as an example where, in your specifications and requirements that we've marked as Exhibit 17, you set out a

Page 42

requirement that reports be provided to the government, and you've identified that further in Exhibit 17 as in Technical Exhibit No. 1. How did that not end up in the ultimate contract marked as Exhibit No. 1?
A I don't know.
Q Would there be notes, minutes from meetings, e-mails, other types of documents that would discuss the decision to not include the requirement from Exhibit 17 for these reports not to be in the contract marked Exhibit 1?
A Not that I would have any knowledge of.
Q Do you recall why the requirement of the reports that you initially identified in Exhibit 17 was not a requirement in the contract marked Exhibit No. 1?
A No.
Q Okay. Also with regard to Technical Exhibit No. 4, the supply item estimated usage from Exhibit No. 17, can you look at Exhibit No. 1, the contract, and see if such an estimate or such an Exhibit No. 4 is contained within the contract marked Exhibit No. 1?
A See if something like this is in here?
Q Yes, sir. When you're saying "in here,"

Page 43

you're referring to the contract.
A Yes.
Q Exhibit 1.
A Right here, paragraph 18.
Q Does paragraph 18, Exhibit 1, identify the types of supplies that may need to be provided under the contract?
A Yes.
Q But does it provide a estimated usage as contained in Technical Exhibit No. 4, which is attached to Exhibit 17?
A No.
Q Do you recall why an exhibit such as Technical Exhibit No. 4 from Exhibit 17 would not have been included with the contract?
A No.
Q Do you know why, if the government had information concerning the estimated usage of supply items, it would not have advised potential bidders on the contract of that information?
A No.
Q And I think you told me that you don't know if the information on Exhibit No. 4, the estimated supplies, were provided to contractor -- to potential bidders or not. Correct? You don't

Page 44

know if it was given to them or not?
A No.
Q Let's assume that it was not given to them. Okay? That the estimated supply usage that you prepared that's Exhibit No. 4 to Exhibit 17, let's assume that information was not provided to potential bidders. Wouldn't you agree that that information would be helpful to those bidders in pricing and preparing to bid to the government?
MR. McNAMARA: Objection. Speculation.
Q (By Mr. Hickman) You can answer.
MR. McNAMARA: You can answer.
A Would it be helpful to them?
Q (By Mr. Hickman) Yes, sir.
A It could, but I -- if I was the contractor, I wouldn't rely on what somebody else is saying, you know, and this says "estimated."
Q No, I understand. I mean, they are estimates, and I understand that, but even when you're preparing the government estimate, if you knew that there was going to be a change, for example, in the estimates, that could affect your estimated pricing for the government. Correct?
A Could have.
Q I mean, if you knew, for example, that you

Page 45

were going to have to have a considerably larger number of -- or larger volume of toilet paper. Let's use that as an example. A larger volume of toilet paper is going to be required over the next five years because a new dorm is being built, and then you were putting out a new contract that involved the supply of toilet paper, you would take that into account in pricing that requirement for the government. Correct?
A Yes.
MR. McNAMARA: Objection. Vague. So who does "you" refer to?
MR. HICKMAN: I think I was referring to the witness.
Q (By Mr. Hickman) Did you understand the question?
A You're asking me would this be helpful in preparing a bid.
Q Yes. Would the estimated supplies, the government's estimated supplies, be helpful to a bidder in preparing their bid?
A If they were accurate, yeah.
Q Okay. And in doing your work for the government, the estimated amount of supplies the government's using is helpful --





64d2a841-150d-4018-94d6-d65d31712b93

Page 46

A These.
Q Yes. And you're referring to Exhibit No. 4, the supply items. Your knowledge as a government employee of the estimated supplies used by the government is helpful to you in preparing your government estimate for the requirements identified in Exhibit 17.
A I really didn't use these to come up with an estimated price. I used these prices right here from the previous contract. These are just -- these quantities are just estimates.
Q Okay.
A And I didn't use that to come up with a price. I used the previous contract.
Q Okay. And I guess to close the loop here, that previous contract also had estimated supplies associated with it. Correct?
A Yeah.
Q And so to --
A That's probably where I got this one from.
Q Okay. So to the extent that those estimated supplies, which may be -- strike that.
To the extent those estimated supplies relating to the prior contract, the contract before H & R, are the same as these supplies that's marked

Page 47

as Exhibit No. 4, they are a factor in the pricing here in Exhibit No. 17 because they would have been a factor in the pricing on the prior contract. Correct?
A I guess so, yeah.
Q But you don't recall or you don't know how it came to be that some of the requirements in Exhibit 17 did not end up in the contract marked as Exhibit No. 1.
A Huh-uh.
Q Okay. Who do you think I should ask that question?
A The contracting officer or whoever put all this together and sent it out.
Q Okay. Would there be something in the file from either you or maybe Mr. Price signing off on the solicitation in its final form of, "Okay. This looks good to us. It's going to satisfy our government requirement"?
A Not from Don Price, no.
Q Let me ask the question in a generic way. Before a solicitation is sent out to potential bidders --
A Uh-huh.
Q -- does the office -- and that may not be

Page 48

the right word, either. I'm trying to think of the right word -- does the office that has the requirement or that's identified the requirement sign off in the sense of approving the solicitation with whatever changes have been made to it, sign off on the solicitation saying, "Yes, this solicitation is going to still satisfy our government requirements even with the changes you made"?
A In our office, my office?
Q Yes. Would your office be involved in that?
A No. "Carl Riemer for Don Price." He probably never seen it.
Q I guess here's my question or what I'm wondering. Your office identifies the requirements of the government. Correct?
A Uh-huh.
Q And in regard to the requirements that resulted in the H & R contract, those were identified as Exhibit 17. Correct?
A Uh-huh.
Q Okay. So if you guys -- when I'm saying "you guys," I'm referring to your office -- identifies the government requirement, the contracting office sends out the solicitation which

Page 49

is how bidders, potential contractors, bid on the contract, how does the government ensure that what the requirement is is still reflected in the solicitation?
A Well, that's from the inspection branch. They, you know, keep a running track of the -- of the square footage.
Q No, my -- I'm not talking about after the contract is awarded and performance. I'm talking about at the time of the identification of the government requirement to the solicitation being put on the street.
A I still don't understand what you're asking here.
Q Okay. Let me back up. I'm sorry. I'm doing my best. I apologize. I think we've identified that there were differences between Exhibit 17, the government requirement --
A Uh-huh.
Q -- and Exhibit No. 1, the contract --
A Yeah.
Q -- for the custodial services. Correct?
A Yeah.
Q Okay. And let's assume, because I don't have the actual solicitation, I don't believe, that

the solicitation -- if I could read this number here. DABT 39-00-B-1001. Let's assume that that solicitation is materially the same, essentially the same, from a technical perspective, the scope of work, and the technical exhibits as the contract marked Exhibit No. 1. Okay?
A Okay.
Q Is it important to the government that when it puts out a solicitation to have a contractor provide supplies or services, that that solicitation is going to satisfy a governmental requirement or need?
A Yeah.
Q Okay. It would make sense that the government is not going to be putting out solicitations for contractors to come in and bid on supplies and services if it wasn't something the government needed. Right?
A Right.
Q And that need I refer to sometimes as "the requirement" to which we've talked about here as Exhibit 17. Correct?
A Okay.
Q Okay. Now, if the solicitation that ends up going out to the contractor world is different



than what has been identified internally by government personnel as their requirement or their need, how do we know, how does the government know, if the supplies and services that are going to be provided are still going to satisfy the requirements or needs of the government?
A How do we know they're going to be satisfied? I don't know.
Q Okay. And I guess this comes back around to what my question was a little while ago. If your office is the one identifying the government requirement, do you have any final review or input on the solicitation that is ultimately sent out in its final form to contractors?
A That's what this one was, sent over to me for technical review, and I signed off on it and said, "Yeah. Go for it."
MR. McNAMARA: And when you say "this one," you're referring to --
THE WITNESS: Tech -- or Exhibit 1.
A You want to know what happened between here and here. I don't know.
Q (By Mr. Hickman) So between Exhibit 17, the requirements, and Exhibit 1, the contract, you don't know exactly the process or the decisions of



things that were taken out or put in. Is that right?
A And I don't remember how it went about.
Q Okay. But --
A I don't remember why something would've been said or something wouldn't have been said. I don't remember that.
Q Okay. And would there be a piece of paper in the file, the contract file or maybe your file, where you would have signed off --
A No.
Q -- on the solicitation in its final form as being approved to go out to bidders?
A There may have been. You know, they send over -- like I said earlier, they send it over for my technical review. I look at it briefly, send it back, and they go with it.
Q And in this particular contract, do you recall approving or signing off on the solicitation that went out to bidders?
A No.
Q Do you recall seeing it before it was sent out?
A No.
Q And I'm referring to -- and I'm referring



to the solicitation.
A No.
MR. McNAMARA: Bill, could we just take a real quick --
MR. HICKMAN: Yeah, yeah. I'm sorry.
MR. McNAMARA: -- bathroom break?
MR. HICKMAN: Yes. Yeah, definitely.
(Recessed from 10:36 a.m. to 10:53 a.m.)
Q (By Mr. Hickman) All right. Mr. Riemer, let's pick up again from where we were at, and just as a way of trying to expedite things, I want to further try to define or identify areas that you have knowledge. And if I understand from your prior testimony, what you've told me is that you were not involved in any negotiations involving changes in the amount of square footage covered by the contract. Is that correct?
A Yeah.
Q You have no knowledge of those negotiations changing square footage to the contract?
A No.
Q And in your job for the Directorate of Public Works, tell me what a typical day is like for you, to the extent that you can.





64d2a841-150d-4018-94d6-d65d31712b93

A Oh, gosh. I have no idea. Give me somewhere to start, you know.
Q Okay. Are you going to different buildings, in and out of different buildings, or do you pretty much work in your office?
A I do most of the work in the office. You know, it depends on whether I'm working on service contracts or if I'm working on a minor construction project. We have drawings, prints, files back there. I go back and do some research there to find out what's existing. I may go to the field, go out in one of the buildings. Say if I come over to this project over here, redoing windows in this building, I'll come over and take all the measurements off the windows in this building.
Q Okay.
A And do a project for that. If it's service contracts, you know, I'll sit there and work on them.
Q Okay. As a practical matter or typically, would you know when a building had a change in the use that it was being used for?
A A little bit.
Q Okay. Like I think I saw in here that one building was being -- somebody was in it and then



the chaplain was moving in, I think, to a building. Let's just take that as a hypothetical, I guess, if nothing else. Would that be something that you would be involved in or have knowledge of?
A As far as the custodial part of it, no.
Q Okay.
A That's the inspection branch.
Q What about just the change in use of a building like it was being used -- this is my hypothetical -- it was being used by contracting and now the chaplain is moving in. Would you be involved in the change of use of the building?
A No. That's, I guess, more or less master planning.
Q Okay.
A Don't have anything to do with that.
Q You wouldn't be involved in changing the facility in any fashion or reconstruction?
A Oh, maybe not -- you know, I don't know who the boss is going to assign that to. Say if the chaplain moved in this building, and he wants a room set up for an office, then an engineer would come over and look at that and see what he wanted.
Q Okay. With regard to the buildings that were involved in the contract marked Exhibit No. 1,



do you have any knowledge concerning the uses -- the usage of those buildings?
A No.
Q Who was using it, what were they doing in those buildings contained in Exhibit No. 1, you have no knowledge of that?
A No. All I see is the -- the drawings there. It has the square footage on that building. That's all I'm concerned with, the square footage to be cleaned.
Q Okay.
A And once it's in inspection, it's not my call anyway.
Q Meaning once the contract's awarded and services are being performed --
A Yes.
Q -- if the use of that building changes, that's not your concern. That might be a concern of the inspector.
A I won't see that again till the next time it's being solicited.
Q Okay. So if the usage of the building changes during the period of a contract performance, your, I guess, Exhibit No. 1 contract, if the buildings identified in Exhibit 1, those uses



changed or they increased or decreased in usage within the buildings, you wouldn't be involved in that. You wouldn't have any knowledge of it. Is that correct?
A Yeah.
Q So if the number of occupants in the buildings identified in Exhibit No. 1 fluctuated during the term of the contract marked Exhibit No. 1, that's not something you'd have knowledge of or be involved in?
A No.
Q And you wouldn't necessarily worry yourself with the effect it may or may not have on the contract marked as Exhibit No. 1 during the performance of that contract. Is that correct?
A Doesn't make any difference to me until the next time it's being awarded.
Q Okay. And the next time that you are preparing the government's requirement, as we've talked about, it might factor into your government requirements, your estimated prices, price or cost to the government, the change in usage might come into play then. Would that be correct?
A Square footage, yes.
Q Well, you would agree with me that --





64d2a841-150d-4018-94d6-d65d31712b93

let's take a hypothetical. If you had a thousand-square-foot building, and there was one person in that building, that if you were preparing the government's estimate for the cost to provide janitorial services for that building, that the cost to clean and provide supplies, even, let's say, for that building for one occupant would be different than if it had a hundred occupants, even if it still was a thousand square feet for both examples?
A Don't even really look at that. I just look at the square footage.
Q Well, you would agree with me that it would be reasonable that that could affect the government's pricing. Correct?
A Yeah.
Q The number of occupants. Yes?
A Yes. But general knowledge of who's in what buildings, I don't know.
Q And I'm not even talking about necessarily the use of the buildings. I mean, if it's being used by the chaplain, it might have an effect on the price differently than if it's being used by the Marines and they're bringing in lots of dirt from the field. Correct?
A Uh-huh.



Q Yes? I'm sorry. She has a hard time, probably, taking down, you know, nods or "uh-huhs." You have to kind of say "yes" or "no," if you don't mind.
A Do I know who's in that building and what they're doing? No, I don't know. All I know is, you know, admin.
Q Okay. Take a look over at Exhibit No. 10 for me in the binder.
A (Complies.)
Q And I believe the first page of Exhibit No. 10, at the bottom, you can see it has the number 1060. Looks like it's a fax dated August 9, 2005, to you from Annette Arkeketa-Rendon. Do you see that?
A Yeah. This right here?
Q Yes.
A Yeah.
Q Who is Annette Arkeketa-Rendon?
A She's a contracting officer.
Q And do you have an understanding that she's the contracting officer or was the contracting officer on the H & R contract that we're here today about?
A Yes.



Q And do you see where she has, you know, "Subject," and I'll let you just read over that.
A Yeah. For the claim, yeah.
Q Yes, sir. And so did she ask you to look over a list of buildings that are related to this claim that's part of Exhibit No. 10?
A Yes.
Q At the time she made this request, did you have an understanding of what she was requesting?
A That the contractor's putting in for a claim, yes.
Q Well, what was your understanding of what she was asking you to do, I guess? Was she asking you to do something here in this facsimile?
A Look at the list of the buildings.
Q And then is page 1061 as a part of Exhibit No. 10, is that the list of buildings identified by H & R Services?
A Yeah. Yes.
Q And then page 1062 and 1063 is an e-mail from you to Arkeketa-Rendon or Annette Arkeketa-Rendon. Is that correct?
A Yes.
Q And you sent this e-mail to her, it appears, the very next day for when she made this



request to you?
A August 9th to August 10th, yes.
Q In fact, you sent it at 7:10 a.m. on August 10th, the very next morning. Is that correct?
A Okay.
Q Is that right?
A Yes, that's what it says.
Q And it looks like down at the bottom on page 1062, that she faxed this request over to you -- that's page 1060 -- at about 2:07 p.m. the day before. Is that correct?
A Okay. Yes.
Q What time do you typically leave the office on a normal day to go home for the day?
A 4:00.
Q Okay. And the first line of your e-mail says, "The list of buildings that you sent for review are admin buildings, and the work in these buildings have not changed without compensating the contractor from the time the contract started in 2000." Did I read that sentence correctly?
A Yes.
Q If you were not involved in any of the modifications that we talked about earlier, which I





64d2a841-150d-4018-94d6-d65d31712b93

believe was Exhibit No. 3, how would you know if work in these buildings changed?
A From the inspector.
Q So you don't have direct knowledge, yourself, if work in these buildings changed. Is that correct?
A No. I never go out to them.
Q Okay. Did you speak to -- is it Mr. Webb? Is that correct? Is he the inspector?
A Yeah.
Q What's his full name?
A Pete Webb.
Q Okay. Does he work in the same directorate as you?
A Same building, yeah. Yes.
Q Do you both have the same boss?
A Eventually, yes, yeah.
Q Is Mr. Donald Price Mr. Webb's boss, as well?
A There's a boss in between them.
Q Okay.
A Yeah.
Q Is Mr. Price your immediate boss, or is there someone --
A Yes.



Q Okay. So there's someone between Mr. Webb and Mr. Price, then?
A Yes.
Q Okay. Do you know that person's name?
A Pat Warner at that time. He's no longer with us.
Q Okay. Now, when you were preparing this e-mail that's a part of Exhibit No. 10, did you speak to Mr. Webb prior to sending this to the contracting officer?
A Either him or his boss.
Q And that's who you relied upon in the statement in here that, "the work in these buildings have not changed without compensating the contractor from the time the contract started in 2000"?
A Yes.
Q But you personally don't have any direct knowledge to confirm that statement. Correct?
A I never go out in the field or -- well, I won't say never. Hardly ever go out in the field. But this time, no, I didn't go out in the field and check on anything.
Q And I'm assuming, but I want to be clear, that from the time the contract started in 2000 to August 10th, 2005, when you sent this e-mail, you



weren't involved in any form or fashion with regard to the work performed by H & R in the buildings that were included in the contract marked Exhibit No. 1. Correct?
A Correct.
Q Okay. There's several buildings listed by H & R that are then addressed building by building in your e-mail. I believe it's 23 buildings. Does that sound right to you?
A You want me to count them?
Q Do you know?
A No, I don't.
Q Maybe it's 22.
A 22 buildings, yeah.
Q Now, on several of these buildings, as a part of your statement in your e-mail, you put, "No increase of service required by the contractor." Do you see where you made those statements with regard to several buildings?
A Yes.
Q What is your basis for making that statement?
A Let's just go down here and look at this one down here, 2868 and 2869, that's the CID building.



Q What does "CID" stand for?
MR. ALFORD: Criminal Investigative Division.
A Police.
Q (By Mr. Hickman) Okay.
A As part of the other things that I do in my job, is to renovate buildings, small renovations. That was one of them that I just happened to do. I renovated 2868 and 2869, so they moved from one building to another building. Same people, same operation. Basically, the same building. It's just down the street. Same type, same shape, everything. It's just a newer. There's no mold, it doesn't stink. It just a different building.
There was no increase in service. Nothing really changed at all in those two right there. Those two, I do know about, because that was the ones that I renovated as part of a architectural project. There was no difference in service right there. They just moved to a newer, cleaner, nicer building. Same shape, same number of people. They just moved down the street four or five buildings. No change in service at all.
Q Do you know if buildings 2874 and 2875 were a part of the contract?





64d2a841-150d-4018-94d6-d65d31712b93

Page 66

A I don't know who was in those buildings. I don't know. I don't think they were on the contract before.
Q Well, I guess my question is, CID, according to your e-mail here --
A Yeah.
Q -- moved from buildings 2874 and 2875.
A Okay. Yeah, they were in 2874, and so they moved out of that building to 2868.
Q Okay. And they moved out of Building 2875 to Building 2869?
A Yes, and they were on the contract then. I assume they were. I haven't looked to see if, you know --
Q You're saying Building 2868 and Building 2869 were on the contract?
A No. No, I'm saying that CID was in 2874 and 2875. They're down at the end of the row. They moved down to the middle of the block. That's where the CID is. Right here. Direct cost customers, 2874 and 2875, MP, something, CID.
Q Okay.
A They're already on the contract.
MR. McNAMARA: And the witness is referring to Exhibit 17.

Page 67

THE WITNESS: Well, it's just the building list.
Q (By Mr. Hickman) Would you know whether or not -- strike that.
Prior to CID moving into buildings 2868 and 2869 on April 1st, 2003, do you know who was in the buildings?
A In 68 and 69?
Q Yes, sir.
A No, I don't know.
Q Would you know whether or not CID had more people and used more supplies once they were in buildings 2868 and 2869 than those --
A It was -- it was the same people.
Q You've got to let me finish my question.
A Okay.
Q With regard to buildings 2868 and 2869 that were identified by H & R, would you know whether or not once CID moved into those buildings on April 1st, 2003, whether or not CID would've had more people in those buildings and used more supplies than the occupants of the building before CID?
A No.
Q You would not know. Is that correct?

Page 68

A Well, it was the same people. They probably used less supplies.
Q My question is, it wasn't the same people because CID was in a different building. They were in 2874 and 2875.
A Yes.
Q I'm saying the people that were in 2868 and 2869 before CID --
A Before they moved in there.
Q Correct. Would those people -- which I believe it was DCA, maybe.
A I don't know.
Q My question is, would you know if the occupants of buildings 2868 and 2869 prior to CID --
A No. Were they on the contract before, before the CID moved in there?
Q Let me back up and ask my question. Do you know whether or not, after CID moved into buildings 2868 and 2869 on April 1st, 2003, if the CID would have had more people in the building and used more supplies --
A Okay.
Q -- than the occupants of the building prior to April 1st, 2003? Do you know?
A No.

Page 69

Q Besides buildings 2868 and 2869, do you have any specific knowledge with regard to any of the other buildings that are identified on page 1062 as attached to -- or included in Exhibit 10?
A No.
Q So besides those two buildings we just talked about, 2868 and 2869, what was your basis for your statements with regard to the other buildings where you say, "No increase of service required by the contractor"?
A I was still talking about the CID. When they moved out of 74 and 75 and they moved into 68 and 69, their services, their requirements, shouldn't have -- didn't increase from when they were down here.
Q I understand. I'm asking now in a more broad sense. Besides those two buildings we've talked about on page 1062, on several of the e-mails at the -- on several of the descriptions associated with certain of the buildings, at the end of your description or statements, you have the words, "No increase of service required by the contractor." Do you see those words, "No increase in service required by the contractor," associated with Building 455?

Page 70

A Yes.
Q And I believe that you have the same statement for Building 700, Building 811, Building 1651, Building 2769, Building 2770, Building 2771, Building 3281, Building 4915, Building 4922, and Building 5030. As regards that group of buildings, what is your basis for your statement that, "No increase of service was required by the contractor"? You told me you didn't have personal knowledge, so did you talk to somebody? Did you look at documents?
A No. I was just -- you know, what are they doing in it? None of the job descriptions, none of the activities changed any, as far as I knew.
Q So it would be fair to say that your statement of, "No increase in service required by the contractor," was based on your assumption that the contractor, H & R, was just doing the same janitorial services as you would've described in Exhibit 17 setting forth the government's requirement initially?
A Just doing the same thing, as far as I know.
Q And when you say, "Doing the same thing," you mean providing the same service as you would

Page 71

have described in Exhibit 17. Correct?
A Yes.
Q Did you make any independent study or investigation to determine whether or not the contractor was doing anything different or if there had been any change in the use of the buildings --
A No.
Q -- prior to sending this e-mail to Ms. Arkeketa-Rendon?
A No. If anything was done or was said, I probably talked to either Pat Warner or Pete Webb. No, there's no change in service.
Q Who was the other person? Pete Webb or --
A Pat Warner. He doesn't even work for -- he's retired now.
Q Pat Warner?
A He used to be Pete Webb's boss.
Q But as you sit here today, do you recall if -- on August 9th, 2005, or August 10th, 2005, if you'd spoke with either of those gentlemen in preparing your e-mail that's identified on page 1062 of Exhibit 10?
A I don't remember anything specific.
Q Now, with regard to Building 2855, you put on here, "Added to the contract on May 14, 2003.

Page 72

Contractor has been compensated for additional work." How did you come to the understanding -- and you actually have it in parentheses, "P00013." Let me strike that. Let me start over.
What does the parenthetical "P00013" stand for? Do you know?
A That's a modification or change to the contract.
Q How did you come to have that information, that P00013 was a change to the contract? And I assume that relates to Building 2855.
A That would be in the contracting officer, the con -- Pete's file folder in his office. They have a list of all the modifications where they add or delete buildings, and that's what this is saying, that that was added to the contract. Okay. He's getting paid for the square footage that we're adding to the contract.
Q Okay. Is this -- do you recall going and pulling that file from Mr. Webb's office and looking at it to identify that Building 2855 was added to the contract based on modification number P00013? Do you actually remember going and doing that?
A No.
Q Pulling that file yourself?

Page 73

A No.
Q Do you know if Mr. Webb provided you that information?
A I don't remember.
Q And so your statement that the contractor has been compensated for additional work is just based on your assumption and understanding that they were paid the -- they were paid on some square footage basis?
A Yeah. Yes.
Q But you don't have any understanding whether or not there was more occupants within Building 2855 or more supplies used by those occupants in Building 2855, do you?
A No.
Q You don't have an opinion or an understanding one way or the other on that?
A No, just that it was added to the contract, square footage, and he was paid for it.
Q Let's hold our page there, and let's flip over to page 473, which is a part of Exhibit No. 3. Actually, we'll start at page 472. Look in the upper left-hand corner. Does this appear to be the amendment or modification number P00013 --
A Uh-huh.



64d2a841-150d-4018-94d6-d65d31712b93

Page 74

Q -- for the H & R contract?
A Yes.
Q And what's been provided to me here appears to be four pages long, on pages 472, 473, 474, and 475. Do you see that, regarding modification 13?
A Yes.
Q Do you recall having seen this modification 13 prior to today?
A No, I don't remember it. I'm not saying that I didn't see it, but I don't remember it.
Q Who was the contracting officer at this time on the H & R Services contract? Can you tell?
A Oh, gosh, Ray Dryz.
Q Do you know Mr. Dryz?
A Yes.
Q How do you know him?
A When I first met him, he used to be an architect in our office, and then he moved over here to contracting.
Q And is he still with the -- a government employee?
A No. No, he's not.
Q Okay. Let's look at page two of four of modification number 13. It's marked page 473 at the

Page 75

bottom as a part of Exhibit No. 3. Do you see paragraph number one?
A Yes.
Q Can you read that in the record for me, please?
A "Reason for this modification is to add the subject work to the contract added and subtracted previously by constructive acceptance."
(Off the record.)
Q (By Mr. Hickman) So am I correct in understanding that modification number 13, the reason for that modification was to add and subtract work to the contract added and subtracted previously by constructive acceptance?
A Yes.
Q What does "constructive acceptance" mean?
MR. McNAMARA: Objection. It calls for a legal conclusion.
A I don't know.
Q (By Mr. Hickman) Well, to the extent you understand it, do you have an idea of what was --
A They just want to add that to the contract.
Q Does it mean that the contractor was providing work and had already -- it had already

Page 76

been added or subtracted, as the case may be, and that that work was already accepted and that now we're just going back and doing the paperwork and cleaning it up?
A That, I don't know.
Q Is that a possibility?
A I have no idea.
Q Do you see, on page 472 next to Mr. Dryz's signature -- and Dryz is D-r-y-z -- it has a date signed of August 28, 2003?
A Yeah.
Q The building we were talking about was Building 2855. Correct?
A Yes.
Q Do you see it on page 474?
A Yes.
Q When was the addition of Building 2855 effective on this modification?
A On this modification?
Q Yes. When did -- when did Building 2855 become effectively a part of the contract through modification number 13?
MR. McNAMARA: Objection. Calls for a legal conclusion.
A I don't know.

Page 77

Q (By Mr. Hickman) Well, do you see where it says, "Effective May 13 -- May 14" --
A Oh, okay. Yes.
Q -- "2003"?
A Yes.
Q Would it be your understanding that effective May 14th, 2003, Building 2855 was added to the contract?
A Yes.
Q And is May 14th, 2003, earlier in time than August 28th, 2003?
A Is May -- is May earlier than August? Yes.
Q And if we go back to page 1062 in Exhibit No. 10, the next two buildings I want to talk to you about are buildings 2872 and 2873, and you have a similar comment as on the prior building we were talking about, saying the contractor has been compensated, and it appears you have in parentheticals "P00019."
A Yes.
Q Do you see that?
A Yeah.
Q And what does the "P00019" refer to?
A That was another modification of the



64d2a841-150d-4018-94d6-d65d31712b93

Page 78

contract.
Q So it's your understanding that these two buildings were added to the contract on November 30th, 2004?
A If that's what that 19 is.
Q And if I asked you the same --
A But yes.
Q I'm sorry. If I asked you the same -- well, let me actually skip on down here. It also looks like, with regard to buildings 3161, 3162, and 3164, you have a similar statement that the contractor has been compensated, and you have in parentheticals "P00019." Is that correct?
A Yes.
Q So with regard to those five buildings, is it your understanding that those buildings were added through modification number 19?
A Yes.
Q And your statement that the contractor has been compensated is simply based on your assumption that the contractor was paid the price per square foot that the contract would have provided for?
A Yes.
Q But you don't know or would not know if, in any of those buildings, there was any additional

Page 79

occupants or usage of those buildings or any additional usage of supplies in those buildings. Is that correct?
A Yes, correct. No, I don't know.
Q And you would not know whether or not the contractor was providing -- the contractor being H & R -- was providing the same services for those five buildings that were added in modification P00019 as you identified as the government's requirements in Exhibit 17. Is that correct?
A I got lost in there somewhere.
Q Okay. Do you know if the contractor, H & R, was providing the same services as you identified to be required by the government in Exhibit 17 for these five contracts -- or I'm sorry -- these five buildings added to the contract by modification number 19?
A They should have, yes.
Q Well, do you know?
A No.
Q Do you recall whether or not you personally looked at modification number 19 as a part of preparing your e-mail response contained in Exhibit No. 10?
A No.

Page 80

Q No, you don't recall?
A No, I don't.
Q Or no, you didn't look at it?
A I may have got it and looked at it. I don't remember. I don't know.
Q Okay. If we can hold that page again, let's flip over to page 374, which is a part of Exhibit No. 3, and does page 374 appear to be modification number 19?
A Yes.
Q And it appears, from what's been provided to me, that it's 12 pages?
A Yes.
Q Can you flip through there and make sure you have all 12 pages and they appear to be in proper order?
A They look to be.
Q Okay. Can you now look through modification number 19 and identify for me where buildings 2872, 2873, 3161, 3162, and 3164 were added to the contract?
A Well, I'm not seeing --
Q And if I represent to you that this was the modification number 19 provided to me by the government, these 12 pages, based on that

Page 81

representation and assuming it's accurate and complete as provided to me by the government, does it appear to you that those buildings were not added to the contract pursuant to modification number 19?
A Not to 19.
Q As you sit here today, do you know if those buildings were added to the contract by any modification or if maybe they were a part of the initial contract?
A I don't know.
Q Is it possible that you made a mistake in your e-mail on page 1062?
A That's possible.
Q Okay. Let's go back and look at page 1062. Flip back here again. With regard to Building 2934, if I understand what you're saying here, and I want to make sure I do, it appears that you're saying on November 30th, 2004, the chaplain took over the building. Is that your understanding?
A Yes.
Q How did you come to have that information or knowledge?
A Well, it used to be part of DEQ, and that's where we had all of our classes for environmental, and, you know, we'd go to that





64d2a841-150d-4018-94d6-d65d31712b93

building for those classes, and the chaplain took over. We had no longer use for that building. Wasn't our building anymore.
Q Do you know if the training police and security personnel were in Building 2934 at any time?
A The training police?
Q What is -- let me back up. What does "DEQ" stand for?
A Directorate Environmental Quality.
Q And what does "CEIHOT" stand for?
A I have no idea. That's just what they named the building. It's the CEIHOT building. I don't know what that stands for.
MR. ALFORD: Center for Environmental Initiatives Hands-On Training, I think.
THE WITNESS: Yeah.
A It was environmental. It was their training building.
Q (By Mr. Hickman) Okay. And why did you make the statement that now -- that the building now has less traffic than it did when DEQ was in charge?
A Well, like I say, when it was DEQ, it was their training building. That building was full all the time. And now that the chaplain took it over,



there was hardly anybody in that building.
Q And you thought that that was germane to the question posed by the contracting officer?
A Yes.
Q Okay. Then I think when I was talking to you before about modification number 19, I failed to include Building No. 3040 in that discussion, but it appears as if Building 3040, you've indicated, was also added to the contract on -- or through modification number 19. Do you see that?
A Yes. Yes.
Q And would your answers to Building 3040 be the same as your answers to the other five buildings we've already talked about with regard to modification number 19?
A Yes.
Q Okay. The next building is Building 4700. You indicate that additional work was added to the contract on May 15th, 2001, and then you cite, in parenthetical, modification number three. Do you see that?
A Yes.
Q And was it your assumption that Building 4700 was added to the contract through modification number three?



A Yes.
Q Do you recall actually looking at modification number three?
A No.
Q Do you know if the building was added through modification number three or if additional -- you say "additional work." Do you know -- or are you saying that maybe more square footage was added, or do you know?
A Part of the building may have been already on the contract and this modification may've added. It says, "Additional work was added to the contract," so I guess they added some square footage.
Q Well, I guess that's my question. I don't want you necessarily to assume.
A Yeah.
Q You wrote the words, "Additional work was added."
A Yeah.
Q And what I'm trying to ascertain is, did you mean additional work, like additional work within the building, or additional scope of services by the contract, or just the building itself was added, or do you recall or do you know?



A Well, apparently, the building was already on there, and they added -- in modification P0003, they added it. Now, what they added, I don't know without looking at that modification.
Q Okay. Let's look briefly at page 507, and is this modification number three?
A Yes.
Q And on page two of two of modification number three, which is number 571 at the bottom part of Exhibit No. 3, does it describe the added work, to use your term from your e-mail?
A Here, yes.
Q And it appears that the added work was that, "The contractor shall remove bagged, shredded paper at points specified on the attached floorplans"?
A Yes.
Q And then actually, I believe, over on page 579, it even talks about in subparagraph A that the additional work is outside the current scope of work in the contract. Do you see that?
A Yes.
Q But this modification doesn't address or concern any impacts on the contractor of any additional increased occupants or personnel or usage





64d2a841-150d-4018-94d6-d65d31712b93

Page 86

of the building by individuals or the use of supplies within the building, does it?
A No.
Q And you don't know if there was any increased usage, personnelwise or supplywise, of Building 4700. Correct?
A Correct.
Q Do you recall having any conversations with the contracting officer about your e-mail on page 1062? Do you recall talking to the contracting officer about the contents of your e-mail that's on page 160 --
A No.
Q -- 1062?
A I don't remember any of that.
Q Do you know if, after she got the e-mail on August 10th, 2005, if she picked you up -- picked up the phone and called you or sent you an e-mail back or anything?
A I don't remember.
Q Do you recall having any conversations with anybody about your e-mail on page 1062, part of Exhibit No. 10?
A No.
Q No, you don't recall any conversations

Page 87

about it?
A No, I don't remember anything.
Q And with regard to these buildings identified by H & R Services in Exhibit No. 10, do you know if there's been any increase in usage in those buildings?
A No.
Q No, you do not know?
A I don't know.
Q You made no determination in that regard?
A No.
Q Have you made any investigation or review to determine if there was any increased usage in those buildings identified in Exhibit No. 10?
A No.
Q Has anybody asked you to do such an investigation to determine the usage of those buildings identified in Exhibit 10?
A No.
Q How many buildings were covered by the contract in total? Do you have an understanding of that, approximately?
A No, I have no idea without just going through the tech exhibits and counting them up.
Q How many were identified by you in Exhibit

Page 88

No. 17 as being part of the government's requirements? Can you take a look at that for me and see?
A How many is a what?
Q How many buildings did you identify as the government's requirements in Exhibit No. 17?
A How many buildings were in this contract or -- I don't know.
Q I mean, I'm -- is there a list in here, in Exhibit 17, of buildings?
A Okay. These right here, yes, but I've never counted them up. I didn't go on how many buildings. I went on square footage.
Q Who is Larry Hovis, H-o-v-i-s?
A Steve Hovis. He's an inspector down there at engineering branch.
Q Does he work with Peter Webb?
A They had shared, across the hall, same office.
Q Are they equals or is one --
A Yeah.
Q Okay. You say his name is not Larry. It's --
A Well, his name is Larry. They go by -- he goes by Steve.

Page 89

Q Oh. During the course of contract performance, do you have any knowledge concerning the supplies provided by H & R to Ft. Sill?
A No.
Q During the course of contract performance, do you have any knowledge concerning the services provided by H & R pursuant to the contract to Ft. Sill?
A No.
MR. HICKMAN: Can we go off the record for a second?
MR. McNAMARA: Yes.
(Off the record.)
MR. HICKMAN: Can you mark that?
THE REPORTER: I need the stickers.
MR. HICKMAN: Oh, sorry.
(Exhibit 19 marked for identification.)
Q (By Mr. Hickman) Let me hand you, sir, what I've marked as Exhibit 19.
MR. HICKMAN: Sean, this should be part of the H & R documents that I gave to you with that transmittal letter.
Q (By Mr. Hickman) What is this -- what do these documents appear to be to you?
A I have no idea.





64d2a841-150d-4018-94d6-d65d31712b93

Q Let me ask these preliminary questions. Were you involved in the preparation and identification of the government's requirements for the solicitation that was issued by the government for the follow-on custodial contract, the contract that followed the H & R contract?
A Yes.
Q And you did a similar thing for the follow-on contract that you did for the H & R contract as far as preparing the government's requirements. Correct?
A Yes.
Q And provided that information to the contracting office?
A Yes.
Q Now, what I've marked as Exhibit No. 19, this is the solicitation, solicitation number W9124J-05-R-1003, relating to the follow-on contract for custodial services. Okay?
A Okay.
Q Do you recall if you saw this solicitation before it was sent out to potential bidders?
A I don't remember.
Q I've not had an opportunity to review the government's file on this contract yet, so the



documents I'm giving to you were the ones provided by my client, but what I'm wondering is, if I look at that file, am I going to find a document similar to Exhibit 17 that you would've prepared that would have set out the government's requirements on the Form 3953? Will I find a similar document as Exhibit 17 relating to the solicitation which is marked as Exhibit 19?
A I'm not sure. I don't know.
Q Do you recall preparing a Form 3953 with attached documents for the follow-on contract?
A I didn't prepare either one of them. If there was one for this one, I didn't do it, and I didn't prepare this one. The documents, yes.
Q That's what I meant.
A Yeah. Okay. No, I didn't do the form, and I didn't send it out.
Q Okay. The documents that are attached to Exhibit 17, you prepared those?
A Yes.
Q You didn't prepare the actual form itself.
A No.
Q Okay. Did you prepare the documents that would have gone with a Form 3953 to contracting that would've resulted in the solicitation marked as



Exhibit 19?
A Yes.
Q So if I look in the contract file, I should find documents similar to those attached to Exhibit 17 relating to the government's requirements --
A Yes.
Q -- for the follow-on custodial contract.
A Yes.
Q And if you look on page -- it's HR 0743 at the bottom, paragraph 16.
A Yes.
Q Do you see in paragraph 16 the reference to, "See Technical Exhibit E for an estimated monthly usage of the following supplies"?
A Yes.
Q Do you recall providing a Technical Exhibit E to the contracting office for the estimated monthly supplies as similar to the Schedule E you would've provided to -- attached to Exhibit 17?
A No, I don't remember it.
Q I mean, you're not disagreeing with what's said on page 40 -- or -- sorry. You're not disagreeing with what's in paragraph 16, are you?



A No. It's that I just don't remember doing it.
Q Okay. Do you remember if there's any difference in the estimated supplies identified in Exhibit No. -- or discussed in Exhibit No. 19 as the one that you attached to Exhibit 17?
A No.
Q You don't recall if there's any difference?
A (Shaking head.)
Q No?
A No.
Q But if I look through the contracting file -- I think you told me this, but I want to make sure -- I should find a Technical Exhibit E as referenced in paragraph 16?
A Well, if --
Q As a part of --
A -- it says, yeah, E here, it should be back here in Tech Exhibit E, if there's one there.
Q Well, what I'm saying is, the document I've marked as Exhibit 19 is what I got from my client, and I don't know if it contained all the attachments or not. I haven't looked at the official government file, so I'm assuming that the





64d2a841-150d-4018-94d6-d65d31712b93

Page 94

official government file will have all the exhibits and things in it, and so you provided the government's requirements to the contractor -- contracting office, so what I'm trying to confirm is, should I find in that government contracting file this Exhibit E that's referenced on page HR 0743 --
A Yes.
Q -- if the file's complete?
A You should.
Q Okay. Were you considered the COR for the H & R Services contract marked Exhibit No. 1?
A No.
Q You were not the contracting officer representative?
A No.
Q Do you know who was?
A No.
Q How does somebody become identified as being the contracting officer's representative?
A That's a contracting function. I have no idea. I don't work over here.
Q If I was told that you were the contracting officer's representative, would that maybe have been just a mistake or misunderstanding?

Page 95

A Yeah. Well, that may have been what Pete Webb -- I'm not sure which is what, if he's the -- he's not the contracting officer. I don't know if he's the contracting officer representative, the field officer, you know, if you want to say. I don't know. It's none of my call. I don't have anything to do with that.
Q But you're not aware or don't have the understanding as -- of being the contracting officer's representative for the H & R Services contract we've been talking about today that's marked Exhibit No. 1.
A Wasn't me.
Q During the course of performance of the H & R Services contract marked Exhibit No. 1, do you recall ever being contacted by any contracting personnel concerning any engineering or technical requirements of the government relating to the contract?
A No.
Q They never asked your opinion about the requirements under the contract or those kind of things?
A No.
Q No contracting personnel ever asked for

Page 96

your assistance in interpreting any provision of the contract?
A They may have. I don't remember.
Q Okay. Well, if they -- if they had made such a request of you, would you have kept any records of those requests?
A No.
Q And so those requests would've been in the contracting file?
A I guess. I -- I didn't have any.
Q Do you know if the government keeps any records on the number of individuals in a building, using a building?
A I don't know.
Q Do you have any ideas if there would be an office or an organization here on Ft. Sill that would maybe have that type of information?
A Master planning may have some. I don't know.
Q Master planning? Is that the office name?
A Yes.
Q Do you know who's in charge of master planning, the person's name?
A Frank Lepine.
Q Frank --

Page 97

A Lepine.
Q How do you spell that?
A L-e-p-i-n-e.
MR. ALFORD: I believe so.
Q (By Mr. Hickman) L-e-p-i-n-e?
A Uh-huh.
Q Is he a civil servant?
A Yes.
Q What building are they in?
A 1950.
Q And they do master planning for the entire base?
A Uh-huh, yes.
Q Do you know a person named John Reed?
A No.
Q You said you do some work on other service contracts. Is that correct?
A Yes.
Q During this time frame from 2000 through 2005, did you have an opportunity to work on other service contracts besides the H & R contract?
A Besides the custodial contract?
Q Yes, sir.
A Yes.
Q Do you recall any of those contracts, off

the top of your head?
A Washer and dryer contract, a refuge contract, a grease exhaust contract.
Q Okay. Would you have been involved in any of the modifications to those contracts?
A No.
Q You just would've been involved in identifying the government requirement prior to the award --
A Scope of work.
Q Pardon?
A Scope of work.
Q On those service contracts that you've talked about during this time period from 2000 to 2005, did the scope of work change on any of those contracts?
A They all vary a little bit. Basically, no.
Q Well, would the scope of work of any of those contracts be affected if there was additional personnel on Ft. Sill or processing through Ft. Sill?
A Not really.
Q Do you know if there is a contracting officer representative file?



A No.
Q You don't know?
A I -- no.
Q Is it fair to say, then, that as to the contract prior to the H & R Services contract, the H & R Services contract itself, and the contract that followed the H & R Services contract for custodial services, all three of those contracts, that you, as the individual identifying the government's requirements, provided to the contracting office an estimate of supply usage? That's true. Correct?
A Not usage. I don't know how much they used.
Q No, I'm saying you --
A And I don't have an estimate how much they used. I just took it from the previous contracts.
Q No, I'm asking -- let me ask my question again. Strike that.
In Exhibit 17, we identified Technical Exhibit 4, supply items. Correct?
A Yes, yes.
Q And you provided that to the contracting office. Correct?
A Yes.



Q I believe in your prior testimony, you told me that you did the same thing or had a similar exhibit identifying estimated monthly usage of supply items for the prior contract and for the follow-on contract for custodial services. Correct?
A Yes.
Q In all three of those instances, for all three of those contracts, you provided that information. And what I'm referring to is the information in Exhibit No. 4 to Exhibit 17, which contained estimated monthly usage of supplies. You provided that information to the contracting office.
A Yes.
Q But you don't know what the contracting office did with that information.
A No.
Q Is that correct? No, you don't know?
A No, I don't know.
MR. HICKMAN: Okay. I don't think I have any further questions at this time.
MR. McNAMARA: Okay.
MR. ALFORD: Thank you, Carl.
MR. HICKMAN: Thank you very much.
Do you want him to say on the record read and sign? We have that requirement. Or --



MR. McNAMARA: Yes, if he could -- if we could take a look at it and sign it, we'd like that opportunity.
(DEPOSITION CONCLUDED AT 12:18 p.m.)





64d2a841-150d-4018-94d6-d65d31712b93

Page 102

ERRATA SHEET
DEPOSITION OF CARL RIEMER
REPORTED BY: JEAN BAYSINGER, CSR RPR CMR
DATE DEPOSITION TAKEN: NOVEMBER 7, 2007
PR FILE NO. PR

PAGE LINE IS SHOULD BE

Page 103

JURAT

I, CARL RIEMER, do hereby state under oath that I have read the above and foregoing deposition in its entirety and that the same is a full, true and correct transcription of my testimony so given at said time and place.

________________________________
Signature of Witness

Subscribed and sworn to before me, the undersigned Notary Public in and for the State of Oklahoma by said witness, CARL RIEMER, on this ________day of__________________, 2007.

________________________________
NOTARY PUBLIC
MY COMMISSION EXPIRES:___________
(JB) PR FILE #

Page 104

C E R T I F I C A T E

STATE OF OKLAHOMA )
) SS:
COUNTY OF OKLAHOMA )

I, Jean Baysinger, Certified Shorthand Reporter within and for the State of Oklahoma, do hereby certify that the above-named CARL RIEMER was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth, in the case aforesaid; that the above and foregoing deposition was by me taken in shorthand and thereafter transcribed; and that I am not an attorney for nor relative of any of said parties or otherwise interested in the event of said action.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal this 14th day of November, 2007.

________________________________
Jean Baysinger, CSR RPR RMR





64d2a841-150d-4018-94d6-d65d31712b93

ERRATA SHEET

DEPOSITION OF CARL RIEMER

REPORTED BY: JEAN BAYSINGER, CSR RPR CMR

DATE DEPOSITION TAKEN: NOVEMBER 7, 2007

PR FILE NO. PR

| PAGE | LINE | IS | SHOULD BE |
|---|---|---|---|

AT THE TOP OF ALL PAGES
CHANGE "REIMER" to "RIEMER"

JURAT

I, CARL RIEMER, do hereby state under oath that I have read the above and foregoing deposition in its entirety and that the same is a full, true and correct transcription of my testimony so given at said time and place.

Carl L. Riemer

Signature of Witness

PURSUANT TO 28 U.S.C. § 1746.

Subscribed and sworn to before me, the undersigned Notary Public in and for the State of Oklahoma by said witness, CARL RIEMER, on this ________day of__________________, 2007.

NOTARY PUBLIC

MY COMMISSION EXPIRES:___________

(JB) PR FILE #

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

H & R SERVICES, INC.,
an Alabama corporation,

Plaintiff,

vs. No. 06-582 C

THE UNITED STATES OF AMERICA,

Defendant.

DEPOSITION OF PETER K. WEBB

TAKEN ON BEHALF OF THE PLAINTIFF

ON NOVEMBER 7, 2007, BEGINNING AT 1:12 P.M.

IN FT. SILL, OKLAHOMA

REPORTED BY: Jean Baysinger, CSR RPR RMR



886aa10b-347d-476f-9d24-47a59a1e2be8

APPEARANCES

On behalf of the PLAINTIFF:
William H. Hickman, Attorney at Law
HICKMAN & FITZPATRICK
119 N. Robinson, Suite 250
Oklahoma City, Oklahoma 73102
(405)605-2375
hickman@hickmanfitzpatrick.com

On behalf of the DEFENDANT:
Sean B. McNamara, Attorney at Law
U.S. Department of Justice
Civil Division
1100 L Street N.W.
Washington, DC 20530
(202)305-7573
sean.mcnamara@usdoj.gov
Joe Alford, Attorney at Law
U.S. Army
Building 4621, Room 208
Ft. Sill, Oklahoma 73503
(580)442-1096



INDEX

Page
Direct Examination by Mr. Hickman............. 5
Cross Examination by Mr. McNamara.............. 121
Redirect Examination by Mr. Hickman............ 125

Exhibits
20 Sign-in sheet for per-performance dated 9/19/00............................. 26
21 Fax dated 6/11/02 to H & R Services from Ray Dryz with attachments.................. 35
22 Fax dated 3/27/03 to H & R Services from Ray Dryz.................................. 46
23 Letter dated 10/19/04 to Patricia Highsmith from Roger Hall.................. 55
24 Solicitation No. DABT39-95-0026............ 67
25 Letter dated 10/20/04 to Vicki Highsmith from Roger Hall........................... 129



STIPULATIONS

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys, that the deposition of PETER K. WEBB may be taken pursuant to agreement and in accordance with the Rules of the Court of Federal Claims on November 7, 2007, at Ft. Sill Army Base, Directorate of Contracting, Building 1803, Ft. Sill, Oklahoma, before Jean Baysinger, CSR RPR RMR.



WHEREUPON,
PETER K. WEBB,
after having been first duly sworn, deposes and says in reply to the questions propounded as follows, to-wit:

DIRECT EXAMINATION

BY MR. HICKMAN:
Q Please state your name for the record.
A Peter K. Webb.
Q And what is your home address and phone number, Mr. Webb?
A It's 8196 Northwest Madische Road, M-a-d-i-s-c-h-e. It's Lawton, Oklahoma, 73507.
Q And your work address and number?
A It's Building 4700, 442-5225.
Q And by whom are you employed?
A Plans Analysis and Integration office, Garrison Commander Office.
Q Say that one more time.
A Plans Analysis and Integration, Office of the Garrison Commander.
Q And what is your position in the Plans Analysis and Integration Office?
A I'm a facility manager for Building 4700.
Q Okay. How long have you been in that





886aa10b-347d-476f-9d24-47a59a1e2be8

Page 6

position?
A Four months.
Q And what are your duties in that position?
A I -- the facility manager over the entire building.
Q And what is Building 4700?
A It's a one-stop for everything. For the post, in/out processing, ID cards, motor vehicle registration, stuff like that.
Q Okay.
A About 14 agencies.
Q Okay. And prior to your position with the Plans Analysis and Integration Office, where did you work?
A DPW, Directorate of Public Works.
Q You worked at the Directorate of Public Works?
A Yes.
Q Where, in particular, did you work at?
A Construction branch. The construction branch.
(Recessed from 1:14 p.m. to 1:30 p.m.)
Q (By Mr. Hickman) Okay. Mr. Webb, before we had our little break, you were telling me, I believe, that you worked for the construction branch

Page 7

in the DPW?
A Yes.
Q And "DPW" stands for?
A Directorate of Public Works.
Q And what was your title within the construction branch?
A Construction quality control rep.
Q And how long did you hold that position?
A Six years, seven years.
Q So from approximately 2001 to --
A Yeah.
Q -- four months ago?
A Yeah.
Q Who was in that position prior to you? Do you know?
A I don't know.
Q What was your position prior to being the construction quality control rep?
A I was in the maintenance branch at DPW.
Q What was your title there?
A Maintenance man, I guess.
Q And so you're a civil servant?
A Uh-huh.
Q What is your rank or title or --
A GS-9.

Page 8

Q GS-9? And in your position as the construction quality control representative, tell me your job duties.
A Oversee all the contract construction that's assigned to each person and quality control, the quality control of the -- a couple of service contracts, one being H & R.
Q Do you remember the period of time that you were the quality control representative on the H & R service contract?
A The entire length of the contract.
Q Okay. So when that contract was awarded in October of 2000 --
A Uh-huh.
Q -- you were in your position as the construction quality control representative?
A Right.
Q Okay. I'm just trying to get my -- my dates --
A Just -- I'd just got in there, so --
Q Okay. Did you have any period of time where you were the quality control representative over the contract preceding -- before the H & R contract?
A No.

Page 9

Q Besides the H & R service contract, did you have any other contracts you were the quality representative for?
A Yes.
Q Which ones?
A There was a UNICOR -- I mean a Wencor (phonetic) contract for the washers and dryers. There was a relocatable building maintenance contract with -- well, the name of the company escapes me, and I had a child use service contract to -- for a cleaning contract through MWR.
Q Okay. The washer and dryer contract, summarize for me what that contract was all about.
A There's several hundred machines all over Ft. Sill, and there's just the day-to-day -- make sure they were working, take service calls, and forward them to the contractor.
Q Okay.
A The units use the washer and dryer facilities all throughout the base.
Q Okay.
A And there was one primary washer and dryer contractor, and that was it.
Q Okay. And how was that contractor paid? Do you recall?





886aa10b-347d-476f-9d24-47a59a1e2be8

Page 10

A Invoice-type.
Q I mean, were they paid by the load?
A Each machine.
Q They were paid by the machine?
A Right.
Q It wasn't like going to a laundry?
A Per month, per machine.
Q It wasn't like going to a laundromat and each time you ran a cycle, you got paid?
A No, no. These didn't have any change capabilities on them. They were just strictly used by the units.
Q Okay. And these -- the other -- the second contract you mentioned was the relocatable building contract?
A Right.
Q Summarize for me --
A These were like trailer houses that were over in the 6000 area that were extra space available for the units to live in and to work out of.
Q Okay. Do you remember what period of time that contract was in existence?
A No, because I just took it over from another person --

Page 11

Q Okay.
A -- in that time frame.
Q Did it cover the entire time you were in your quality control position?
A It did, but I didn't have it. Someone else had it, and then when he left, it was given to me, the remainder of the contract.
Q Okay. And I guess my question is, when you took it over, did you have it for a year or all the way till the time you left?
A Till the time I -- till the time they got rid of them. They -- they finally got a contract and got rid of them, so about a year and a half ago, they got rid of them all.
Q Okay. Let me back up. What I'm envisioning is a contract where the government contracts with somebody to have them bring in like a portable building.
A These were on place for five years or six years, something like that.
Q Okay.
A And then we just maintained them. Monthly fee for the contractor, who installed them, to go ahead and maintain them, also, and we watched -- we kept lights on, windows in, that kind of stuff.

Page 12

Q Now, did the government eventually have those removed --
A Yes.
Q -- is what you're saying?
A Yes.
Q Okay. And why did they have them removed?
A They just didn't have a requirement for them anymore.
Q Okay. Or was -- do you know, was there a permanent building built instead?
A No.
Q Okay.
A No. These were just -- just extra buildings. While they were remodeling, they left them there, and then they used them, tore them up.
Q Okay. I guess what I'm trying to understand is, do you know why the government needed those temporary relocatable buildings?
A They were remodeling the 6000 area, was part of it.
Q Okay. So they were --
A They were just -- they were just a overflow for when they were remodeling those large barracks over there.
Q I see. Okay.

Page 13

A They were a temporary facility to house them when they were remodeling.
Q Okay. So they weren't being used because more people were coming --
A No.
Q -- to the base or anything like that?
A No, no.
Q It was just the building that would normally house or office these people was in some form of construction.
A Right. Exactly.
Q Okay. And for the benefit of our court reporter -- I'm bad about this. We probably -- we need to be careful about talking over each other. Wait till I finish my question before you answer.
A Okay.
Q And I'll try not to start talking when you're answering.
A Okay.
MR. HICKMAN: Will that help you?
Q (By Mr. Hickman) And then the third contract you mentioned was a child service contract. What was that contract about?
A Like the daycare on Ft. Sill, the daycares and the teen club.

Q Okay. With regard to the H & R contract, did you have any type of training for your position in quality control?
A No.
Q Tell me briefly your educational background.
A High school graduate.
Q Okay. And where did you go to high school?
A Here.
Q In Lawton?
A Uh-huh.
Q And with regard to training or seminars, have you attended any training seminars in regard to quality control?
A Yes.
Q Tell me, if you can, about some of those training classes you've been to.
A There was one at the University of Wisconsin when I started. It was a quality control construction. I attended one at vo-tech for a quality control -- it was like a brief, one-day class for quality control at vo-tech here.
Q Okay. I know the government loves certifications and things like that for different



career fields. Are there certifications for the quality control career field?
A In --
Q In general. Is -- can you get certified --
A You can get certified, yes.
Q Okay. And what is that certification called?
A I have no idea.
Q Okay. I assume you don't have that certification, then.
A I don't have that.
Q Okay. Have you had your deposition taken before?
A Have I had one before?
Q Yes, sir.
A Yes.
Q Okay. How many times?
A Once.
Q What was the circumstances?
A A car accident.
Q What did you do, if anything, to prepare for this deposition today?
A I just spoke with those folks, and they told me what was going to go on.



Q Okay. Now, I don't want to know about your conversations with your attorneys. Besides talking to the attorneys, did you talk to anybody else?
A No.
Q Did you look at any documents?
A No.
Q Is it fair to say you've gone to another job and you've kind of moved on down the road?
A Yes.
Q I appreciate your time, and I understand. You understand that we're here today because of a dispute, and I'm an attorney, and I represent H & R Services, a dispute between H & R Services and the government concerning the custodial services contract awarded to H & R. You understand that's why we're here?
A Yes.
Q Now, with regard to -- if I refer to "the contract" or "the H & R contract," you understand that I'm referring to the custodial services contract awarded to H & R?
A Yes.
Q And I'll have you look at -- I've put in front of you a black three-ring binder. It has 15



tabs in it, and I'll represent to you that these are documents produced to me by the government out of what I understand to be the contract file, and we'll talk about some of these tabs, but I want to first direct you to tab number one. It's my understanding that that is the H & R Services contract.
A Uh-huh.
Q Is that your understanding? I'll give you a minute to look at it.
A It looks like it.
Q With regard to Exhibit No. 1, the contract, tell me your -- your relationship or your role on behalf of the government. What did you do?
A I just oversaw the actual scope of work in the contract.
Q Okay. Before I explore that a little bit more detailed, let me ask you this question. Do you know Carl Riemer?
A Yes.
Q Okay. How would you compare and contrast your role with relationship to the contract marked Exhibit No. 1 versus his role in relationship with the contract?
A He was responsible for writing it up. I was responsible for administering it.

Q Okay. If I -- in some instances, I've seen you referred to as the inspector.
A Yes.
Q Were you given that -- is that an official title?
A It's like quality control inspector, yeah.
Q I mean, is that a designation that you're given on a particular service contract?
A No, not necessarily. It's just -- we're just -- we just go inspect the -- inspect the facilities and stuff.
Q Okay. I'm trying to make sure I understand the process within the government. When this contract's awarded -- I talked to Mr. Riemer this morning, and he basically told me that it goes to somebody else who administers it, like you said, and what I'm wondering is, how is that person identified? How did you get the lucky job of getting this H & R contract?
A It just went through the channels and I got it.
Q Okay. Who's your boss?
A Evans Warner.
Q Evans Warner?
A Uh-huh.



Q He was your boss at the time you were in quality control?
A Right, while this -- yes.
Q I mean, would a request come from contracting to the construction branch within DPW that, "We need an inspector to oversee the services of this contractor"?
A That was the function of that branch, was to oversee construction contracts and service contracts.
Q Okay. How many people worked in the construction branch?
A Seven.
Q Seven. And was Mr. Warner -- I mean -- and I'm talking about the pertinent time here during this H & R contract. Was Mr. Warner the construction branch manager during that time?
A Yes.
Q Okay. So there were six people that worked under him?
A Uh-huh.
Q You were one of those six?
A Yes.
Q Were you six individuals all construction quality control representatives?



A Yes.
Q Okay. So you were all on the same equal level?
A Pretty much.
Q Okay. And I guess it's just kind of the luck of the draw amongst you six who got what service contract?
A Yeah. The new guy got the service contracts, mostly the ones that weren't favorable to anybody else.
Q Okay.
A Not that any are any more favorable than others.
Q Okay. Now, I want to see if we can define a little bit more particularly. You said you oversaw the scope of the work in the contract as part of it being administered. Give me a little more detail what -- what you mean by that.
A Was there toilet paper, was there -- the toilets clean, was the floor mopped.
Q If I summarize it in a sense and say basically, you check to make sure that they did the work?
A Right.
Q Cleaning work in particular, I guess you



would say --
A Right.
Q -- as -- you know, as the contract might require that they -- you kind of follow around behind and make sure they did their job.
A Right.
Q Anything else?
A No.
Q With regard -- you're aware that before the H & R contract, there was a previous custodial contract.
A Yes.
Q Now, I want to ask a very broad question because I'm trying to save time, if possible, so hopefully, your counsel won't object, but I'm trying to -- I want to ask a very broad question. Do you have any knowledge, did you have any involvement, do you know anything about that prior janitorial services contract?
A Other than the people that came from it worked on this contract.
Q Like Wilbur Monroe, I believe?
A Right.
Q Besides some of the employees staying the same, is there anything about that, I guess, that





886aa10b-347d-476f-9d24-47a59a1e2be8

was a problem?
A When I came on board, I didn't know anything about the previous contractor. I started fresh with this bunch.
Q Okay. And let me back up. Was there any issues from an inspector or quality control issue or anything that concerned you about any of those employees that were with the prior contract being employed by H & R on the contract that you supervised?
A Might want to ask me that again.
Q What I want to make sure is, you said the only thing that you had any knowledge about with regard to the prior contract, the contract before H & R --
A Right.
Q -- was that the employees --
A Those people --
Q -- some of the employees that worked on that contract also worked on the H & R contract.
A Right.
Q Did that give you any problems or concerns or worries?
A No. No, I figured it'd be an easy transition.



Q Okay. So you didn't have any involvement in any negotiations or modifications or identification of problems with the prior contract?
A No.
Q And did you have any involvement of preparation of the government's requirements, estimated square footage, estimated supplies, any input into the government's requirements that went into the H & R Services contract?
A Other than requesting square footage.
Q You requested it, or it was requested of you?
A It was requested to me from another -- from the customers. They would add and subtract square footages, and I would turn in a request for proposal to the contracting office when they required modification.
Q Okay. Before the contract was even awarded --
A Right.
Q -- to H & R Services, did you have any input --
A No.
Q -- into identifying the government's requirement --



A No.
Q -- in the sense of the square footage of buildings that we're going to have covered by the follow-on contract, the H & R contract?
A No.
Q Any input into the estimated number of supplies needed?
A No, no.
Q No. Okay. Okay. Let me hand you what's been previously marked as Exhibit No. 17, and it's my understanding from talking to Mr. Riemer that this basically is the group of documents that identified the government's requirement that then led to the H & R Services contract that you were the inspector on, and what I want to know is if you'll look through these documents and see if you have any knowledge or understanding or were involved in preparing any of them.
A No.
Q Okay. Let me hand you what was previously marked as Exhibit No. 18. Have you seen that letter before, or do you have any knowledge or understanding of the items mentioned in that letter?
A No.
Q Okay. Would it be safe for me to assume



that prior to the official awarding of the contract to H & R Services, you would have no knowledge or understanding of any negotiations, discussions with H & R or any other potential bidder --
A No.
Q -- on the solicitation?
A No.
Q Okay.
A I basically got this handed to me after it was already awarded and everything, and I just administered it.
Q Did you participate -- yeah, you did. Your name's on the sign-in sheet, at least, so I'll try to --
A Pre-award.
Q -- jump ahead here. Did you participate in any pre-award on-site visits that might have been held by the government for interested bidders?
A No.
Q Did you participate in any post-award conferences, pre-performance conferences that might have been held by the government?
A Yes.
MR. HICKMAN: I'll take a quick break. I thought I had copies of this, but maybe I don't.





886aa10b-347d-476f-9d24-47a59a1e2be8

(Recessed from 1:55 p.m. to 1:56 p.m.)
(Exhibit 20 marked for identification.)
Q (By Mr. Hickman) Okay. Mr. Webb, let me hand you what I've marked as Exhibit No. 20, and can you tell me what Exhibit No. 20 is?
A That's where we were at a pre-award conference.
Q Okay. And is this where you met with some representatives of H & R --
A Yes.
Q -- Services concerning the contract we've been talking about?
A Yes.
Q And what is the purpose of this pre-performance contract -- or conference?
A To get out in the open what all the requirement is of the contractor.
Q Okay. Do you recall attending this conference?
A Yes.
Q What do you recall about the conference?
A Not much.
Q What -- what are the names on this sign-in sheet? I see Roger Hall, Hope Hall.
A Yes.



Q Can you tell me the other four names?
A It was Wilbur Monroe, Sharel McAdoo, and Laurie Wheeler.
Q And then the second page of Exhibit 20 appears to be maybe an agenda.
A Yes.
Q Which of the 11 or 12 items listed on the agenda were you involved in?
A One, two, three, six, seven, eight, nine, ten, and 11, and I don't know what number 12 was.
Q And the ones -- the numbers that you've identified, did you actually talk or have interaction or something?
A Yes.
Q Okay. Who led this conference?
A I believe Miss McAdoo did.
Q With regard to the deliverables, what was your involvement, item three?
A I would get the keys from the folks and issue them to Jeanette. The quality control plan, I would go over with her, their quality, what we expected, what they were going to provide. The monthly labor report, she gave me one of those at the first of each month, and I just needed to know the project managers prior to the ten days.



Q On the monthly labor report, you said that "she" gave it to you. Who are you referring to?
A Jeanette.
Q Jeanette Hairston with H & R?
A Yeah. She was like the bookkeeper, so she would give me the invoices and the labor reports.
Q Is Miss Hairston the person with H & R that you dealt primarily with --
A Yes.
Q -- during the course of the contract?
A Both. Jeanette and Wilbert Monroe, both. Jeanette was the quality control for H & R.
Q And with regard to 3E, proposed task and frequency chart in all women's latrines, I assume the reference in parentheses to, "Complete with Pete's name and phone number," is that you?
A Yes.
Q Tell me what that chart is.
A It goes in the back of the -- they put it in the restroom, and it tells the occupants what day they're going to get service, what service they're going to get. Some days, they got full service. Some days, they didn't get anything. So it just gave a breakdown day by day what the customer was going to get in that building, in that particular



building.
Q Okay. And is that something that H & R put in the women's restrooms?
A Yes.
Q Is that something that H & R would then fill out as they do their work?
A Yes.
Q And that's something you'd go, then, and look at that report and --
A And see.
Q -- make sure they were completing it?
A Right. If they had something on Wednesday, if I could tell if they'd cleaned or they'd missed, I would go behind them and see if it looked like they cleaned it.
Q Okay. On number seven, "Additional defense requirements," do you recall what that was?
A Defense was a special building. It had re -- they had their own refundable money-type thing, so they had a special two-day-a-week service, and then they had -- we added some shredding paper onto it and some other mods to it which should have been in the contract.
Q Okay. And tell me about number nine on this agenda.

Page 30

A On a monthly basis, I would add or delete at a customer request portions of buildings or add or delete portions of buildings as it required.
Q Okay. So would you have been the point of contact for a government person who wanted their building taken off the list or --
A Right.
Q -- added to the list?
A Right.
Q And you'd be the point of contact for the government person to go to if they wanted increased service?
A Right.
Q And once somebody advised you of -- once a government person advised you of their requested modification, what did you do?
A I went out and measured the square footage. I turned in a request for proposal to the contracting officer, and they processed the paperwork, processed the modification.
Q Were you involved in that modification process any further?
A No, other than the request, turn in the request and --
Q Did you -- did you review, for example,

Page 31

any submissions by H & R to comply with the mod?
A The mod was basically just a ten square foot times whatever. It was just a square footage issue. There was no special requirement.
Q Okay. I mean, if there were modifications for other things besides adding a square footage, like the service contract requires modifications to the wage rates, for example.
A Right.
Q Did you have any involvement with those types of modifications?
A I saw the documentation, but I didn't have any involvement in it.
Q Okay. Were there any issues or concerns that arose from this pre-performance conference?
A No. Nothing sticks out.
Q Okay. And then after this pre-performance contract (sic), did H & R begin providing services?
A Yes.
Q Before we move on, under tab number two, it's referred to on the index as "Bid Abstract." Do you have any knowledge, involvement with the documents under Exhibit No. 2? I believe these are all pre-award documents.
A No.

Page 32

Q No, you had no involvement with them?
A No.
Q Okay. Let's look under tab number three. I believe this is the -- referred to as the modification breakdown. It's a listing of the different mods made to the H & R contract. Do you see that?
A Yes.
Q Is that what is your understanding of what Exhibit No. 3 is?
A Yes.
Q Do you see mod number P0005, option period number one? I believe it's on page 261, down at the bottom.
A Yes.
Q Were you involved whenever an option year was being exercised, the determination made by the government to exercise that option?
A No.
Q It's my understanding that the government has to make certain decisions or determinations that, "We should exercise the option under the service contract and" --
A Correct, right.
Q -- "move forward."

Page 33

A There was no unfavorable reason for not to -- to go ahead with their next option.
Q Okay. But you weren't -- besides -- well, were you involved in making that decision?
A No.
Q Okay. Did anybody ask you, from a quality control perspective, whether or not we should exercise the option?
A No.
Q If H & R was not performing properly under the contract and you had quality control issues with them, would that potentially have factored into whether or not to exercise the options?
A Yes.
Q And so the fact that you weren't involved was more a reflection that there were no quality control issues with H & R?
A Correct.
Q And so all -- my understanding, there was a base year, then four option years.
A Yes.
Q It's your understanding that all those option years were exercised?
A Yes.
Q And you may have just answered this, but

from a general overview viewpoint of H & R and its services under the contract, did you have any quality issues with them?
A No, nothing major. It was just -- they would take care of their things within 30 minutes to an hour, just like the contract said.
Q Okay.
A There was no issues.
Q So if they were soliciting -- if they were attempting to get another government contract at another base, let's say, as a hypothetical, and someone came to you and asked you to evaluate their performance, would you give them a favorable recommendation --
A Yes.
Q -- for another government contract?
A Yes.
Q Have you had that opportunity to -- has that ever happened before, where people have asked --
A Yes.
Q -- your opinion about contractors?
A Yes.
Q Have you ever given a contractor a negative performance review or comment?



A I've given them a marginal one before.
Q Okay.
(Exhibit 21 marked for identification.)
Q (By Mr. Hickman) Let me hand you, sir, what I've marked as Exhibit No. 21. Give you a minute to take a look at that.
Have you had a chance to look at it?
A Yes.
Q What is Exhibit No. 21?
A It's where a request for modification to increase the service in the -- in a building for a five-day-a-week trash service.
Q Okay. And were you -- on page two appears to be a letter from a Ray Dryz.
A Yes.
Q Do you know who Ray Dryz was?
A Yes.
Q Who was he?
A He was a contracting officer for a while.
Q Okay. What was your relationship or interaction with Mr. Dryz with regard to this H & R contract?
A Just the -- he was contracting officer. I'd go to him with modifications and stuff.
Q Okay. And this letter that's dated



June 11th, 2002, page two of Exhibit 21, it says -- it looks like it's to the attention of the Directorate of Contracting, construction branch.
A Uh-huh.
Q And you were copied on it. Is that correct?
A Two?
Q Yes, page two. Were you copied on -- on the letter?
A Oh, okay. Yes.
Q And is this documentation that's marked Exhibit 21 typical of the type of paperwork, if I look through the contracting file, I would see for a modification to add square footage or to add a building or to --
A Yes.
Q -- add some sort of service under the contract?
A Yes.
Q Do you recall, was this a request that was initially provided to you that you passed on to the contracting officer?
A Yes.
Q And I believe the last page is an e-mail.
A This -- this one is not going with this



one because that's for Building 4700, and this is for Building 1651.
MR. McNAMARA: Let the record reflect you're talking about pages two and three of the exhibit, so you're --
THE WITNESS: Yeah.
A This was a -- my original e-mail was for me to add -- to request the trash cans for Building 1651, and the actual modification here is for Building 4700.
Q (By Mr. Hickman) So it looks like the e-mail for Building 1651. Does that correspond to the letter from Mr. Dryz dated June 11, 2002, that talks about Building 1651 in it? Do you see that? The letter itself --
A Yes.
Q -- does talk about 1651?
A Correct.
Q So I think it's just the one page, the memorandum page, that has a different building reference than to Building 4700. Right?
A Well, I thought it was associated with this --
Q Well, I think it was maybe just placed in --





886aa10b-347d-476f-9d24-47a59a1e2be8

Page 38

A Okay.
Q -- in here in the middle of these documents --
A Okay. I gotcha. I thought it was --
Q -- accidentally.
A Because that's not -- it would be written up the other way and would have "Building 1651," and the square footages would be out on this end.
Q I gotcha.
A It would be written just like this, only it'd be 1651.
Q I understand.
A And I thought maybe there was an error.
Q No, I think this memorandum was just inadvertently placed in here.
A Okay.
Q On page two, the letter, the second paragraph says, "Also consider this a verbal confirmation of the request to additional services described in the attached memorandum to me dated June 5, 2002, from Evans P. Warner."
A Uh-huh.
Q And so I think the letter maybe does refer to both the memorandum and the requested change to Building 1651, but what I'm wondering is, what was

Page 39

the verbal confirmation? Do you -- do you know?
A Sometimes we would give verbal confirmation before the modification processed through.
Q Sometimes you would direct the contractor to go ahead and do something before the mod was actually papered up?
A Right. The contracting officer would. We wouldn't.
Q I mean, do you know if, during the scope -- strike that.
Do you know if, during the period of performance, if H & R did work, provide services, prior to a written modification being put in place on a certain building or for certain services?
A Occasionally. Well, we'd move one person out of one, move it to the other in the middle of the month. We would tell them to stop in the middle of the month and start cleaning another building before we actually put the other building back into service so there would be no lapse in service for that building -- for that person.
Q Okay. And was H & R cooperative --
A Yes.
Q -- in doing those kinds of things?

Page 40

A Yes.
Q Okay. With regard to these modifications under Exhibit No. 3, are there any of them that you recall any specific issues or problems or concerns about?
A No.
Q Did you have any issues or problems with H & R in the execution and the -- ultimately the performance of any of these modifications?
A No.
Q And if I was to go through all these 27 modifications with you, would I be -- assuming I don't do that, would I be safe in understanding that your specific knowledge of those modifications would relate to the identification of the requirement by the customer, your measuring the square footage if they wanted square footage added and confirming that square footage, and then giving that information to the contracting officer?
A Yes.
Q But you weren't involved in any further discussions beyond that point with the contractor themselves --
A No.
Q -- or the contracting office about the

Page 41

mod?
A No.
Q Under tab one, the actual contract, were you ever consulted by the contracting office for your -- for assistance from you to them on the interpretation or the application of the contract to any services or issues with regard to H & R?
A You might want to ask that a little different.
Q I guess I can put it in a more generic sense. Did the contracting office ever call you up and say, "We're concerned that H & R is not complying with the contract pursuant to section such-and-such. What do you think?"
A I don't remember anything like that.
Q And so that's kind of the gist of my question, is, do you recall any times when the contracting office would've contacted you for your input on the interpretation of any of the scope-of-work requirements of the contract?
A Well, yeah. It would be a judgment call on -- some of them would be a judgment call.
Q Well, that's my question.
A I mean --
Q If there was a scope-of-work judgment call





886aa10b-347d-476f-9d24-47a59a1e2be8

question, did they ask your opinion, the contracting office here at Ft. Sill?
A No.
Q Okay. Did you participate in any of those judgment calls about the scope of work under the contract marked Exhibit No. 1?
A Yeah.
Q Well, how did you participate in those judgment calls?
A I would go out and see if they cleaned and did -- did the work on part of the scope. It was my judgment if they -- how clean it was. My judgment.
Q Okay. That's a good point. I understand. To the extent it was your judgment call if it was clean enough --
A Right.
Q -- that's what you're talking about.
A Right.
Q But if there was an interpretation of the contract issue as far as, I don't know, some provisions in the scope of work itself, were you involved in those --
A No.
Q -- type of judgment calls?
A No. Only after -- if there was something.



I don't ever remember anything coming down that was, you know, gray area or anything. We cleared it up or the contracting officer did. It was pretty cut and dried.
Q Did you maintain a file at your office for the H & R contract?
A Yes.
Q What would have been in that file?
A This, the floorplans. The contract and the floorplans, basically.
Q Would there have been any quality control checklists or sheets or inspection reports?
A No.
Q Would there have been any internal memorandums or things you might have prepared about H & R Services or about the contract?
A There probably would have been in my request for proposal that I would have turned in. I would have copied and stuck them in my binder.
Q You mean the actual solicitation itself?
A No, no, no. When I requested the square footage be done, my e-mail, I would have stuck it in there so I'd recall that month. We'd do two or three a month. I'd have to go back and see what we were adding, what we were subtracting.



Q And you're saying that would have been what you would have sent to the contracting office?
A Yeah.
Q Okay.
A I would've sent a document that looked like that one on Exhibit 21 or whatever.
Q You're talking about the memorandum that's --
A Yes.
Q -- page three of Exhibit 21?
A I would have typed that up, and I would have had my boss sign it, and then we would have -- I usually hand-carried it over here, and then they processed it.
Q Who was the contracting officer prior to Ray Dryz on this H & R contract?
A I think it was Sharel McAdoo.
Q Do you remember when Mr. Dryz was no longer the contracting officer --
A No.
Q -- on the H & R contract?
A No.
Q Who took over as the contracting officer after him?
A I think Laurie Wheeler did.



Q Okay. Did anyone take over after her? Do you know?
A I can't remember. I don't think so. Because it came back over here. We used to have a little in-house staff over there at DPW, in the contracting office, and then they all moved over here, so it was just -- it came over here and Annette was the -- I think the last one on it.
Q When did the people that were in DPW come back to contracting? Do you remember when that was, approximately?
A Oh, God. No.
Q Was it before the end of the --
A Yes.
Q -- H & R contract?
A Right.
Q Was Mr. Dryz -- was he in DPW or --
A Yes.
Q He was?
A Yes.
Q When he left, is that when it came back to contracting?
A I think so, right around that same time frame.
Q Okay. Why did that happen? I mean, why





886aa10b-347d-476f-9d24-47a59a1e2be8

did they do that restructure or no longer leave the contracting officer there?
A I think they just thought it was better suited over here or something. I think some people moved out. Some -- you know, there was a skeleton staff of two or three, and they just moved them back over here.
Q Did you notice any change in the treatment by the contracting office to the contractor, H & R, after that change?
A No.
(Off the record.)
(Exhibit 22 marked for identification.)
Q (By Mr. Hickman) Mr. Webb, let me hand you what I've marked as Exhibit No. 22.
Have you had a chance to look at those documents --
A Yes.
Q -- marked Exhibit 22?
A Yes.
Q In general, what does Exhibit No. 22 represent?
A It's a list of requests for modifications over a period of several months.
Q Okay. The second page of Exhibit 22 is



dated March 27, 2003, and appears to be a letter from Raymond Dryz to the construction branch. Do you see that?
A Uh-huh.
Q And were you copied on that letter?
A Yes.
Q And this was a letter -- actually, I guess it was a letter sent to H & R Services --
A Yes.
Q -- requesting a proposal from them to add these buildings, add and delete buildings, I guess.
A Right, yes.
Q In the second page of that letter, which is the third page of the exhibit, do you see the sentence that says, "Also, my purpose in requesting this proposal is to make a modification that definitizes some actions you have already taken. Therefore, if your effective date differs from the effective I show above, I request your proposal show the actual effective date"?
A Yes.
Q Was it your understanding -- is this another document that evidences the fact that H & R was doing work before the written modification was completed?



A Yes.
Q And the government knew they were doing that?
A Yes.
Q And authorized it or allowed it, so to speak?
A Yes.
Q And why was that happening?
A Contracting officer's call.
Q I mean, was there something about what was going on at the time or --
A No.
Q -- you know, you were getting -- you were maybe getting contacts from the building users that needed things done more quickly than could be done?
A Well, most every one of them would need to be -- you know, they'd give me a time frame when they e-mailed me or called me, and I would respond, and I would write the request for proposal, take it to Ray or whoever the contracting officer was, and then they would either verbally tell the contractor to start or write a modification and give them the paperwork to start.
Q Okay. And let's look at a few pages in here. There's an e-mail. That's your name at the



top, Peter Webb. I believe it's dated March 12, 2005. Do you see that e-mail? It's a chain of e-mails, actually.
A Yes. March 12th, 2003.
Q I'm sorry. 2003, yes. Is this e-mail evidence what you were just talking about as far as --
A Yes.
Q -- the colonel -- what does "CG" stand for?
A Commanding general.
Q Okay. "The commanding general wants Building 3161 added ASAP."
A Right.
Q What does "ASAP" stand for?
A They want it immediately.
Q And so is this the type of circumstances you were talking about where the contractor would, in trying to please the commanding general, provide services, provide supplies even maybe before they were formally on the contract?
A Yes.
Q With the expectation that the government was then going to paper up the mod and take --
A Yes.





886aa10b-347d-476f-9d24-47a59a1e2be8

Q -- care of them, so to speak?
A Yes, which is page number one -- or number two.
Q Yes. Why -- was there anything in particular going on in this time frame of March 2003 that would require or would necessitate the commanding general wanting things done ASAP?
A The commanding general wants everything done ASAP. Once the commanding general gives the word, things get done.
Q Well, in the -- the second e-mail below also on -- what appears to be on March 11, 2003, from -- appears to be Colonel George Steuber.
A Uh-huh.
Q S-t-e-u-b-e-r. And it looks like he sent it to a group of people. I'm not sure. Are you in that list of people who received that?
A I don't think I was.
Q Okay.
A I'm the end of the food chain.
Q In his first line, he says that, "The CG intends that anyone coming to the Ft. Sill CRC have a good impression of a professional -- have a good impression of a professional operation." What is the CRC?



A Which building is that? I'm not familiar with what that is.
Q And it goes on and says, "CRC processing," and it talks about Building 1603 and Building 3161. Is that some sort of processing facility?
A Those are -- yeah, those are the AG -- the adjutant general offices, the initial point when the soldier comes in. In-briefing. They change acronyms so much, I can't hardly keep up with them.
Q And during this time, March 2003 time frame, would there have been more people coming to Ft. Sill CRC for processing?
A I don't know.
Q You don't have an understanding about the usage of the buildings on the base?
A No.
Q And then the next page has e-mails dated March 18th, between you and Peggy Bailey. Who's Peggy Bailey?
A She's the adjutant general.
Q What does that mean? Was she actually a general in the military?
A No. She's like -- that's a title. She's like the main in-processing for the director, the human-resource-type person.



Q Okay. Do you know if -- was there more than one building where they did the in- and out-processing?
A Yes.
Q Do you remember those building numbers?
A 3162, 3164, 3166.
Q And I guess 3161 was one of them, as well.
A Yeah. There's a cluster of them there, but they moved around. They were moving offices back and forth, remodeling here, moving here. It was a constant battle.
Q Okay. And then it looks like through this series of e-mails, it was confirmed that Building 3161 was being added to the H & R Services cleaning contract?
A Yeah. I thought it was already on there. I'd have to look at the technicals, but I think it was already on there. It was just a different group of folks in it.
Q If you look at the letter, page two and page three of Exhibit No. 22, in the little box, it looks like effective March 24th, '03, Building 3161 is being added.
A 3161? 3161?
Q Yes, sir. Right here.



A Yes, yes.
Q Okay. So would it be fair for me to assume, then, that the documents within Exhibit 22 that we've talked about, in particular with regard to Building 3161, are typical --
A Yes.
Q -- of the kind of documents I would see and conversations I would see about adding of square footage, adding of buildings, or deleting buildings from --
A Exactly.
Q -- the contract?
A Exactly.
Q What does "RCF" stand for?
A The confinement facility, Regional Confinement Facility.
Q Is that the prisoners?
A Yes.
Q Did they also have a custodial/janitorial contract?
A Yes.
Q If you look at -- also within Exhibit 22, near the back, at the top, it has a date of 9 December, 2002.
A Yes.





886aa10b-347d-476f-9d24-47a59a1e2be8

Q Do you see a requested modification to add Building 700 --
A Yes.
Q -- to the contract?
A Well, it's a portion of building 700.
Q Okay.
A 700's huge.
Q And was this an example of where a user of a building wanted to go from the prisoner contract to the H & R contract?
A Yes.
Q If you look at number two?
A Yes.
Q Did those type of changes -- was this type of change uncommon, or was this the only instance, or did it happen --
A I think that was the only instance I ever came across.
Q Okay.
A The reason being, they moved a group in there that was very, very security-conscious. They had a lot of security issues, and they couldn't have those prisoners in there. I think that was -- and they couldn't get in there. They wouldn't access it, so that's why they moved to use H & R.



Q Okay. Did those security issues potentially make the providing of services more difficult?
A No, no. The prisoners couldn't get any, but custodial and the normal services people were -- had full accessibility.
(Exhibit 23 marked for identification.)
Q (By Mr. Hickman) Let me hand you what I've marked as Exhibit No. 23. Give you a chance to look at that group of documents.
Have you looked at the documents marked Exhibit 23?
A Yes.
Q Have you seen these documents prior to today?
A No.
Q Would it be fair to say that you're typically not involved in the process of looking at the dollars as they relate to any modification to the contract?
A Correct.
Q Now, the reason I give you Exhibit No. 23 is, in the file that I saw, the last page --
A Okay.
Q -- of Exhibit No. 23 had some handwriting



on it.
A I see it.
Q Do you recognize the handwriting?
A It's not mine.
Q Okay. Do you recall if you saw this last page --
A No.
Q -- prior to today?
A No.
Q So we don't know if that Pete name up there is you or not?
A It's not me because I don't remember seeing this.
Q Who is -- do you recognize the name Becky something?
A Carey, uh-huh.
Q Becky Carey?
A Uh-huh.
Q Who is she?
A She was up in the budget office at DPW.
Q What would her role be in relationship to a service contract like the H & R contract?
A This was probably a year-end deal or something. I don't know. Trying to see the dates on it. It was probably a year-end deal to try to



de-mod or try to get back money, see if there was any outstanding money left on the table, is all I can think.
Q Okay.
A Because Becky would be in charge of that at the year end, and she'd call and say, "Hey, you got any money left? Do we got -- how is it looking," kind of deal, so --
Q Okay.
A This is not -- there was never anything -- I never saw this before.
Q Okay.
A I mean, I've seen those, but those are their normal monthly payroll -- I mean their monthly hour.
MR. McNAMARA: By "those," you're referring to the documents --
THE WITNESS: Right, the payroll period documents.
A Those would come every month.
Q (By Mr. Hickman) And what did you --
A Jeanette would give me those.
Q And what did you do with the payroll documents?
A I just -- I just filed. There was -- they





886aa10b-347d-476f-9d24-47a59a1e2be8

came to the contracting office, and they were brought to me, too, so I just had a copy of them, put them in a file.
Q You didn't actually do anything with them?
A No.
Q Okay. On that last page, were you aware of any issues with regard to the statement there or the first line that says, "Supply increase since building used more supplies"?
A No.
Q You didn't have any knowledge or understanding one way or the other --
A No.
Q -- on that issue? Did you have any conversations with H & R about whether or not "Supply increase since building used more supplies"?
A It would be on a very sporadic basis where Monroe would say, "Hey, they ran out of toilet paper over here," and it would be maybe twice, three times a year.
Q But did anybody from H & R ever say anything to you like, "Man, we're using a lot more supplies than we used to"?
A They always said that.
Q Okay. Well, you said, "They always said



that." Did they say that from day one of the contract, or did it seem like that occurred -- can you pinpoint for me during the contract performance when those types of statements might have been made?
A Not really, no.
Q But you're not saying that they were occurring on day one of the contract.
A No.
Q It would have been a couple years or so, maybe, into the contract?
A Oh, probably the first year.
Q Okay. Would you have kept any notes on any of those types of conversations or comments?
A No, no. It would just be when I was doing QA's with Monroe or Jeanette. We'd walk through and they'd go, "Man, we're using, you know, four rolls instead of three," or something.
Q Okay. Was there ever any inventory or usage records kept by the government where --
A No.
Q -- H & R delivered ten rolls of toilet paper to a building that they marked it somewhere?
A No.
Q Logged it somewhere?
A No.



Q So did the government have any way of knowing the usage of various supplies provided by the custodial contractor?
A I kept no records of that.
Q Do you know if anybody did for the government?
A Nobody did for the government, that I was aware of, and I would have been the main guy on it, so --
Q So the only way you would have found out if there was an inadequacy of supplies being provided to the government would be if somebody complained.
A Right. And that was usually a customer taking a roll of toilet paper home or something. You know, that was commonplace. Somebody would take a roll here, but --
Q And if somebody did something like that and took a roll home and, therefore, there was no toilet paper left in the office, would you or somebody call H & R up and they would bring another roll out?
A Or have one already there.
Q Okay. I mean, they'd replace it.
A Yes.



Q And it also indicates that there was personnel increase, more occupants, I think, of the building. Do you have any knowledge about --
A No.
Q -- whether or not there were any additional occupants in any of the buildings covered by the contract?
A I saw nothing -- nothing in that regards.
Q Meaning that you -- do you know whether or not that happened, or are you saying you don't know?
A I don't -- I didn't look for it. Wasn't anything I was looking for.
Q Okay. So you don't really know for sure one way or the other if there were increased occupants in buildings?
A No.
Q I think you're agreeing with me, right, that you don't know?
A I don't know, yes.
Q Okay.
A I don't know.
Q Sorry.
When you would sometimes get requirements requested from building users, did they ever communicate to you, "We have more people using our





886aa10b-347d-476f-9d24-47a59a1e2be8

building now or processing through our building, so we need to really keep an eye on the janitorial services," or --
A No.
Q -- "We need more janitorial services"?
A They just added square footage.
Q Meaning if there was a thousand-foot building and they had more people coming, so now they were using 1,500 square feet of that building?
A More, yes. They would add additional space, as they would decrease it when they lost an activity.
Q Okay. But let's say, as a hypothetical, if there was a thousand-square-foot building that didn't have any more square footage, but there were now, instead of ten people in that building, that thousand-square-foot building, there were 20 people in that thousand-square-foot building, you wouldn't necessarily know about that increased occupancy.
A No.
Q Because they weren't asking for more square footage to be added.
A Right.
Q Did H & R ever say anything to you during their contract performance that it was taking more



time or harder for them to provide the services required by the contract because there were more people in buildings?
A No.
Q Does it make sense to you that if we had a thousand-square-foot building and there were ten people using that building, that the requirements or the time it would take to clean that building would be different if there were just those ten people versus maybe a hundred people using that same thousand square feet?
A Yes.
Q It'd make sense to you that it would probably take more time, be more intensive --
A Yes.
Q -- if there were more people using it?
A Yes.
Q And I assume, as well, that it would make sense to you that there very likely could be more supplies used if there were a hundred people using a thousand-square-foot building versus ten people using a thousand-square-foot building.
A Of course.
Q To your knowledge, were either of those issues ever discussed, the increased usage of



supplies or increased occupance of buildings were ever discussed within the government pool of people to compensate or take care of H & R?
A No.
Q Did H & R ever threaten or make any statements like, "We're not going to be able to keep that building as clean because it's just taking too much time because there's more people in there," and so they were backing off of their quality commitment?
A No.
Q Or did they ever make any statements or threats that they were not going to be able to keep the supplies stocked as much even though there were more being used?
A No.
Q At the bottom of that page, where it has under the word "Case," "Toilet paper increased weekly from five to six-and-three-quarters," and those other examples there, do you have an understanding -- well, strike that.
Do those numbers look reasonable to you, "those numbers" being where it might have been to where it's saying that it was increased to?
A I really didn't have any hands on as far



as the supplies. The contractor provided the supplies. I didn't know what he had on hand, what he carried. I just -- I know where they were and stuff, but I didn't -- didn't count them.
Q Okay.
A And I didn't know anything about the usage of them, the quantity of them.
Q Okay. Would the actual invoices, I guess -- do you know where H & R got their supplies from?
A They had a truck bring them, but I don't know exactly what the vendor was.
Q Okay. From what you know as far as the government's quality control over the supplies provided, would it be your understanding that the best way of ascertaining the supplies provided to the base would be from the invoice from the supplier that provided the supplies to H & R, assuming all those supplies went to the base?
A Exactly, yeah.
Q Okay. Let's assume that H & R had one supplier for these toilet paper and various supplies that were required by the contract. If that one supplier provided those supplies to H & R, and H & R turned around and provided all those supplies to the





886aa10b-347d-476f-9d24-47a59a1e2be8

base, would the invoice from that supplier be the best way of ascertaining the amount of supplies provided to the base?
A If it, indeed, went to the base, all went to the base.
Q I understand, and that's what I'm saying. Assuming that's the case.
A Yes.
Q If we looked at those invoices, would that be the best way of figuring out what was actually delivered to the base?
A That would be a pretty good assertion.
Q Did the government ever make any efforts to look at those documents, do you know?
A No.
Q When you took over the position, did you take over any files on the prior contract?
A No.
Q They went with somebody else, I guess?
A Yes.
Q So Mr. Dryz never asked you about additional occupancy of the buildings or additional usage of supplies?
A Not that I recall, no.
Q Do you want to take a break, or are you



okay?
A I'm good.
Q Okay. I thought these were all in order. I'm sorry.
(Exhibit 24 marked for identification.)
Q (By Mr. Hickman) Let me hand you what has been marked Exhibit No. 24. Take a look at that.
A (Complies.)
Q Have you had a chance to look at Exhibit 24?
A Yes.
Q Tell me generally what Exhibit 24 is.
A It's the payment where we're going to -- it goes over the payment of the 250's, what we put in when we processed the invoices. It goes over the -- that the contracting officer is the only one that will be able to put the -- tell the contractor what -- to start work.
Q Okay. It looks to me, based on the subject line -- and I appreciate what you said, and I just want to maybe expand upon it or clarify -- that there was a meeting conducted concerning the H & R Services contract.
A Uh-huh.
Q Is that correct? Yes?



A Yes.
Q Okay. And I'm assuming that meeting was around November 18th, 2004.
A Yes.
Q Do you know if there was any handouts, documents provided at that meeting by anybody?
A No, I don't remember.
Q And it looks like the people in attendance at that meeting was Annette Arkeketa-Rendon, the contracting officer; Patricia Vicky Highsmith, contract specialist; yourself, Pat Hicks, and Toni Pickens?
A Yes.
Q What -- who are Pat Hicks -- who is Pat Hicks?
A She's our secretary, the construction branch secretary.
Q Why was she at this meeting?
A Maybe to take minutes or notes or something, I'm assuming.
Q She's not -- didn't have any involvement with the actual H & R contract?
A She -- she does the paperwork for it. She actually does all the DPW -- the paperwork on our end of it, in our office.



Q So would she be the one that would prepare in Exhibit No. 22, as an example, the memorandum that's --
A No, I did that.
Q Okay.
A She would just file it. We'd go get it processed through, through the funds site, Toni Pickens, the budget people, and then it would be processed through. Pat Hicks would put it back in the folder, and that's how it would come back through contracting and everything.
Q Okay. But she basically performed secretarial duties?
A Yes.
Q And who was Toni Pickens?
A She's a budget person.
Q Why was she at this meeting?
A Because we're -- 250's is how they got paid.
Q Explain for me what you mean by "250's."
A It's a government-generated document, like an invoice paper, a government DD form, defense form.
Q Okay.
A That's how the contractor got paid.

Q And so were all the DD250's processed through DPW?
A Yes.
Q Whether they were direct reimbursable or not?
A Yes. It was a one monthly deal. The direct and the reimbursable cost was all on one invoice.
Q Okay. And did Ms. Pickens have any negative comments to say about H & R, from her experience with them?
A I don't even remember any conversation in that meeting.
Q That was my next question. Do you remember anything about this meeting?
A No.
Q And it looks like paragraph two addressed the process for customer requests and what documents were required to process customer requests?
A Yes.
Q Would this time frame, November of 2004, have been around the time that Mr. Dryz would've left his position and Miss Arkeketa-Rendon would have taken over as contracting officer?
A Yes, but I was looking on the previous



one. I think Miss -- Patricia Wilkinson took over after Ray Dryz in a short term, till they moved over here.
Q Are you -- is it Exhibit 23 when you're talking about where it was addressed to her attention, Patricia Highsmith?
A No.
Q No?
A Patricia Wilkinson was the contracting officer. She was over there at DPW after Ray Dryz left.
Q Was Patricia Highsmith --
A Patricia Wilkinson was -- that's on Exhibit 21, last page. Ray was there, and I was courtesy copying Miss Wilkinson along with that.
Q Okay. So Ray Dryz left, and Patricia Wilkinson took over for a period of time as the contracting officer for the H & R contract, and she was still co-located and worked with DPW?
A Right, until they moved over here. That was when the transition occurred. I'm going to have to assume that's when it occurred.
Q Okay. It would appear to me that part of the purpose of this meeting was for the contracting officer to rein in the customers and put more



tighter controls on changes to the contract, oral direction to the contractor to do work, those kind of things.
A Yes.
Q Was that part of the purpose of this meeting?
A I -- from what I've read, yes.
Q Do you know if a similar meeting or conversation occurred with the contractor?
A I do not.
Q Do you know if the contractor was advised that the course of performance, how -- the way of doing business under the contract was no longer the way we're going to be doing business?
A I don't -- I don't remember.
Q When you -- did you participate in any meetings with H & R after this November of 2004 meeting of the government employees?
A Just field meetings, site visits.
Q Okay.
A Not any meeting-meetings that I can remember.
Q I guess my question is, how would H & R know -- let's say after November 2004, if a customer requested them to do some additional work in their



building, they might -- H & R might assume that they'll go ahead and do that work and provide those supplies and they're going to get taken care of like they had in the past --
A No. What -- I -- what's happened here was when they -- they said we were going to start doing it on a per-month basis regardless. We changed our deal from -- our previous way of doing it, we would change it in the middle of -- in the middle of the month, and we'd pay for like days. We would pay like per day, like 12 of -- see, like if you look at the -- if you look at this one on Exhibit 21, the cleaning days, we only cleaned three of the four days. That's how we did it.
So it got so confusing, rather than starting one in the middle of the month and starting another one in the middle of the month, we just went to the last -- started on the first of the month. Made it easier for everybody, regardless. You just didn't get service for that month.
Q Okay. But there was still, it appears, direction and comments by the contracting officer about authorization for additional work and how that was to be handled to these other government employees. Correct?

Page 74

A No.
Q If you look at paragraph number five, it says, "A discussion was held regarding workload, waiting on the issue of a modification"?
A Yes.
Q "After discussing this issue with Linda Lankford, I would like to clarify my responsibility regarding this issue." Who is Linda Lankford? Let's pause there.
A Another contracting officer.
Q Well, what was her role with regard to the H & R Services contract? Do you know?
A She was probably the lead contracting officer, and Annette worked for her.
Q And was Ms. Lankford located here in the --
A Yes.
Q -- Directorate of Contracting? And then it goes on and says, "I want to be very clear and specific about workload that is not currently covered on this contract. The contracting officer is the only one authorized to request workload from the contractor. This authorization is done via mod to the existing contract."
A Right.

Page 75

Q "We discussed situations where workload is not yet on a modification. DPW cannot ask the contractor to continue work. If there is a workload not covered on the contract, DPW should make those requests immediately to the contracting officer and follow the steps outlined in paragraph number two of this memorandum."
Do you recall, beyond what's written here, any other comments by the contracting officer?
A No.
Q Do you -- is it your recollection, based on being refreshed from this e-mail, if nothing else, that the contracting officer was wanting to, like I said before, rein in the customers on asking the contractor to do work --
A No.
Q -- that was not a mod?
A No, no. What I take is, they -- they didn't want us -- H & R to perform anything until they got a written modification, regardless of the time frame.
Q I understand. Okay. And so if a customer wanted some additional services provided, trash taken out more often, whatever it might be, they did not -- the contracting officer wanted to make sure

Page 76

that the government individuals knew not to tell H & R to go ahead and do that work --
A They didn't tell them that anyway.
Q -- until --
A They didn't tell -- the government con -- the government doesn't tell them. The people -- the customer doesn't tell the contractor what to do. It goes through the contracting officer, through us, and then we initiate. The actual user in the building does not tell the contractor what to do or what to perform.
Q So you're telling me that it would've never occurred that a user in a building might've said something to the people coming through the building doing the work to take the trash out an additional time or go ahead and take the trash out this time even though this wasn't the time to take it out?
A It probably happened, but it shouldn't have happened.
Q Okay.
A And I don't know if it did. I never documented anything like that ever happening.
Q Okay. I just want to make sure that we're clear. You're not saying that it didn't happen.

Page 77

You're saying that's not the process for it to happen.
A Exactly.
Q But it's possible that a user in a building may have asked H & R to do something --
A That -- right.
Q -- outside of the actual requirements of the contract.
A Yes.
Q And then the last sentence or two of this e-mail says -- with regard to paragraph five in Exhibit 24, says, "We realize situations come up when there is an urgent need for services. Again, I emphasize we need to follow step two in processing your request. This process protects DPW from engaging in unauthorized slash illegal acts to obligate the government."
Were y'all given any further information regarding protecting DPW from engaging in unauthorized/illegal acts obligating the government?
A No.
Q Have you had any training on the obligation of the government under contracts or engaging in acts that might lead to obligating the government under a contract? Have you attended any





886aa10b-347d-476f-9d24-47a59a1e2be8

seminars or training --
A No.
Q -- on those type of issues?
A No.
Q In the last part of this paragraph, it makes reference to, "This meeting was held to bring the contract issues up to date and resolve problems cited." Am I correct in assuming that one of the problems that's cited that was attempted to be resolved by the contracting officer was that identified in paragraph five about authorization for additional work?
A I'm assuming, yes.
Q And then in paragraph three, it talks about invoice reconciliation. It appears here that the contracting officer is telling you that she expects you to verify the square footage, relay the square footage, and that total amounts are correct?
A Yes.
Q Was that something that you weren't doing before?
A No. I did it all throughout the contract.
Q Then why did Ms. Arkeketa-Rendon feel it necessary to tell you this?
A She was probably just wanting to reaffirm



it.
Q Is that part of the whole fact that it transitioned from being done from a contracting officer in DPW to now being done by --
A Could be, yes.
Q -- the contracting office?
A Could be.
Q So it sounds like some of the government processes with regard to the contracting office role -- or maybe I shouldn't say "the contracting office," but some of the processes relating to the contracting function with regard to the H & R contract changed once it went from being done by DPW to being done by the Directorate of Contracting.
A No. Not really, no.
Q In this paragraph, it goes on and says, "This contract does not have a designated COR on file. This was researched after our meeting. However, DPW does conduct the oversight to ensure the work is done and that DD250's are signed off by DPW quality assurance." Do you know anything about a COR on the H & R contract?
A No.
Q What is a COR?
A Contracting officer representative.



Q Do you know if there is one?
A There wasn't one in writing.
Q What does the COR typically do? Do you have any idea?
A They have different roles in different aspects of contracts.
Q Okay. Is it necessary to have a COR?
A Well, by law, I think it is. I don't know.
Q Okay. And then it goes on and says, "Mr. Webb has agreed to verify that the invoice for payment -- for payments is correct and a DD250 will be issued." Is that something you were not doing before?
A Nope. It's what I did from day one.
Q Okay. So as to some of these things that are being talked about in paragraph three with regard to your responsibilities, you were already doing them, but I guess this was just the new contracting officer working for the Directorate of Contract -- working for the Directorate of Contracting making herself comfortable that the job was being done?
A Yes.
Q And it says, "The DD250 and a copy of the



invoice will be sent to Contract Specialist Vicki Highsmith for review and verification that all documents are attached and correct. Then she will process for payment authorization." Is that something that was being done before?
A Yes.
Q The 250 was being sent to the contract specialist?
A Yes.
Q Who was the contract specialist before Vicki Highsmith?
A Laurie Wheeler, I think.
Q And was she in the DPW office?
A She was for a while.
Q Before it went -- before the contract went back to the Directorate of Contracting?
A Before that part of the contractor's -- I mean the contract came over here, yes.
Q Okay. Do you know if -- strike that.
After this meeting in November, did you advise any of the customers, the building customers, about the process identified by the contracting officer to be followed for requesting -- for customers to make requests and to get modifications --

A Yes.
Q -- made to the contract?
A Yes.
Q How did you communicate that to the customers?
A Whenever they had a request come in, I would tell them they had to start on the 1st of the month and they had to wait till there was a modification, actually physically modification in place.
Q Okay. I guess let me back up from that prior question. After this meeting in November of 2004 with the contracting officer, did you initiate prior -- before getting contacted by any customers for changes, did you send anything out to the building users advising them to make sure that they followed this process described by the contracting officer as opposed to maybe saying something to the contractor on their own?
A No.
Q Okay. Let's look at tab number four on Exhibit No. 4, and based on the index provided by the government, tab number four is described as the H & R letter dated March 1st, 2005, request for adjustment slash training, utilization increases,



and I just want you to look at Exhibit 4 sufficiently to tell me whether or not you have any knowledge about the documents contained in Exhibit No. 4, were involved in any negotiations or discussions involving the documents contained in Exhibit No. 4.
A No. This whole thing?
Q I think you can just see in the back a lot of it's just copies of invoices, but --
A Oh, okay.
Q -- if you flip through there, I think you'll see that --
A Better start from there. Haven't seen any of that.
Q Okay. Were you aware that in March of 2005, H & R had requested an adjustment to the contract to the contracting office?
A Yes.
Q How did you become aware of that?
A Somebody here told me. Arket -- Annette told me.
Q Do you remember what she told you?
A That they were wanting more money for more supplies.
Q Did she tell you anything else?



A That's about it.
Q Did she ask you for any assistance in making a decision in whether or not any additional money should be provided?
A No.
Q Or any adjustments made to the contract?
A Not that I'm aware of, no.
Q She didn't ask you for help?
A No.
Q And I assume, based on what you told me a minute ago, when this group of documents that's marked Exhibit No. 4 was received by her office, she didn't make a copy for you --
A No.
Q -- and have you look at it?
A No.
Q If you flip in Exhibit No. 4 to page 755 down there at the bottom, you see it looks like a couple sticky notes were copied.
A Uh-huh.
Q Do you recognize any of that handwriting?
A No.
Q No? And if you look at the next page, page 756, I believe that's an invoice from Empire Paper Company. First look at page 757. 756 is a



little bit hard to read, at least my copy is. You might recall our hypothetical before about figuring out the supplies provided to the base.
A Yes.
Q Would this -- assuming those -- making those same assumptions, that this one supplier provided all the supplies, provided those to H & R, and H & R provided them all to the base --
A Uh-huh.
Q -- would this be the kind of invoice that you were thinking of when you answered my question before that you could go and look at and see one-ply tissue, single-fold towels --
A Yes.
Q -- and figure out how much supplies were actually being delivered and provided to the base?
A On this one invoice, yes.
Q Yes. And I -- and there's several invoices contained --
A Right.
Q -- in Exhibit No. 4. Correct?
A Yes.
Q So if you had been provided these documents, could you have sat down, prepared a spreadsheet, and maybe come up with -- or come up

with the amount of supplies provided?
A Could have, but I didn't.
Q Okay.
A Wouldn't have the time, either.
Q Okay. Flip on over to tab number five, Exhibit No. 5, and if you look at the next page there, page 948 down at the bottom, have you seen this letter from the contracting officer to H & R before today?
A I don't think I have.
Q You're not indicated as being copied on the letter. I didn't know if maybe you were copied --
A No.
Q -- and it's just not on the letter.
A No. I don't recall -- I haven't see -- I never saw this.
Q Were you -- let me ask the question this way. Would it have been typical for you to be copied on communications, written communications -- let's start there -- by the contracting office with the contractor that you were the inspector on their contract?
A No.
Q So you typically weren't copied about --



on e-mails or letters being sent by the contracting office to the contractor?
A Not typically, no. Not saying it never happened, but I don't remember it, but I don't remember and I -- it wasn't typical.
Q Okay. So it sounds like it would be possible, then, for the contractor to be -- the contracting officer to be saying things to the contractor that you're not aware of.
A Exactly.
Q Do you know if that situation might have happened --
A I don't know.
Q -- with regard to this H & R contract?
A I have no idea.
Q Is it possible that that missing communication could create problems to the contractor?
A That I didn't get it?
Q No, no. That the contractor is maybe being told one thing by the contracting officer, and in the field, he's maybe being told other things, whether it's by you or other people --
A No.
Q -- in the sense that you may not know what



the contracting officer was telling them, and so you may be telling them something different than what she's saying.
A I only go by the contract. That's what I -- that's what I based everything on. Any correspondence or any of that stuff with the contracting officer, I had no knowledge of.
Q Well, my question is, to the extent that the contracting officer is communicating with the contractor and you're not aware of it, if she's making some interpretation or making some decision --
A I don't have any clue.
Q You wouldn't know whether or not what you were then saying to them after that comment -- after those comments by the contracting officer might cause a contradiction?
A No, I wasn't aware of any of that.
Q But you wouldn't know if there was one, would you?
A I wouldn't know if there was one.
Q When the contracting office was internal to DPW, was there additional communication between the contracting office and your office, then, when it went in-house to the Directorate of Contracting?



A Yes.
Q And how would those -- what type of communications would there have been?
A Walk next door. They were right next door.
Q So it was just easier to walk next door and --
A And talk and --
Q -- tell them real quick something?
A Right.
Q Make them aware of something?
A Right.
Q You're going to call the contractor and tell them this --
A Right.
Q -- and you just -- you tell -- they'd come by and tell you, as well?
A Right.
Q But those kinds of informal communications weren't frequent or didn't happen at all when the contracting office went in-house at the Directorate of Contracting?
A Right.
Q They didn't happen at all?
A I'm not going to say they didn't happen at





886aa10b-347d-476f-9d24-47a59a1e2be8

all, but they didn't --
Q Much less frequently.
A Exactly.
Q Okay. And if you look under tab six, this is an e-mail between H & R and the contracting officer. Have you seen it prior to today?
A No.
Q The last sentence of the e-mail from Mr. Hall to the contracting officer says, "Ft. Sill increased the population, extended usage of training buildings that we supported and maintained." Do you have any knowledge of whether or not the population of individuals on the Ft. Sill base changed one way or another?
A I do not.
Q If you look under tab seven, Exhibit No. 7, I believe this is referred to on the index as the H & R letter and attachments dated April 12, 2005, a claim made by H & R to the contracting officer. Give you a minute to look at these documents, and I think they're very similar, probably, to one of the prior exhibits we looked at, and see if you have any knowledge of those documents.
A No, I don't. No.
Q Do you recall any -- and I guess your



answer is no, you're not familiar with these --
A No.
Q -- documents marked Exhibit 7?
A No.
Q Okay. Do you recall -- if you'll look at document 950, page 950, this letter from Mr. Hall to the contracting officer, Annette Arkeketa-Rendon, in the second paragraph, he makes reference to a discussion with -- it says, "Miss Moody," but I believe she later clarified that to be Ms. McAdoo, at the time of award about supplies and labor hours and -- do you -- were you involved in any conversations like that?
A No.
Q Do you know whether or not Ft. Sill was involved in supporting the Iraqi war effort?
A Of course, they were.
Q And how were they -- how was Ft. Sill involved in that?
A It's a field artillery base.
Q Well, what does that mean, I mean, to a layperson like myself?
A We support with weapons and military folks, hospital.
Q Does each building have a responsible



building coordinator?
A No.
Q Well, if you needed to contact somebody at a building about your maybe checking on the services that H & R is providing, is there a person that would be your point of contact that you would call?
A No. I would just walk through and ask customers.
Q Meaning just the people sitting in the seats?
A Right, the people that -- the admin staff.
Q You would not disagree that there's been an increase in the use of certain buildings on Ft. Sill as a result of the Iraqi war effort, would you?
A I really wouldn't know. I would say there was a decrease because a lot of troops are gone.
Q But were there more people processing through?
A No. There was people on -- actually on base left.
Q Okay. Was -- is there providing -- is there -- sorry. Is there training or reserves, those kinds of services, provided at Ft. Sill?
A Yes.



Q Would that maybe have led to reserves coming to the base that maybe wouldn't have been here otherwise?
A Possibly.
Q Or people processing through the base that maybe -- at a higher rate than before because of going to the Iraqi war?
A Possibly. I don't know.
Q Okay. Did -- were you ever involved in any meetings or see any e-mails or other documents where there was any discussion about Ft. Sill's role with regard to the Iraqi war or its services it's providing for the war or its role with regard to the war in training people or reserves?
A No.
Q There was never something sent out, let's say, by the commanding general kind of rallying the troops like, "We need to -- we're Ft. Sill. We're going to have a big role in this Iraqi war. We're going to be doing this, this, and this"?
A We always try to do our best, I mean, regardless. We don't need anybody to tell us that.
Q Well, I understand, and I'm just trying to figure out if there's something somewhere that might show or have in writing what the base did with





886aa10b-347d-476f-9d24-47a59a1e2be8

regard -- I mean, you know, with regard to the war and its utility and -- you know, the base's utility and functions. Have you seen anything?
A I'd say it's out there, but I -- it's not anything I remember.
Q Okay. Would you know if the base or any facilities or, you know, organizations that are housed at the base would have received any awards or accommodations for their services related to the war?
A I'm sure I've read it in the Cannoneer or something, maybe.
Q Do you recall what maybe you might have read?
A No.
Q If you flip over to Exhibit No. 8, have you seen that letter previously?
A I don't think so, no.
Q So this was another letter you weren't copied on?
A No.
Q And April 27 of 2005, is that still during the period the contract is being performed by H & R?
A Yes.
Q And did the contracting officer ask you to



look at the documents submitted as Exhibit No. 7, the claim?
A No.
Q The claim documents that are under Exhibit 7?
A No.
Q She never asked you to look them over and say whether or not they look reasonable or appropriate?
A No. There was some discussion about that there was a lawsuit, and that's about -- it was just a verbal deal. I never looked at any -- I don't remember looking at any documentation on it.
Q Okay. And then the next exhibit is Exhibit No. 9. Is that correct? It appears that this is a letter from Mr. Hall to the contracting officer. Did you -- have you seen this?
A No.
Q -- document? If you look at page 1059, the second page of Exhibit No. 9, in particular, paragraph -- it's number one, and referring to paragraph number two in the letter of April 27, 2005. It makes -- or it makes the statement that, "We agreed and discussed supply usage factor with Ms. McAdoo and L. Wheeler. Supplies proposed and



amount discussed was determined by contracting to be adequate to support the installation. However, troop levels and usage increased substantially since that date." Were you involved in any discussions regarding a supply -- the supply usage estimates?
A No.
Q Or supply usage factor?
A No.
Q Who is L. Wheeler?
A Laurie Wheeler.
Q What was her position?
A She was the -- she processed the invoice over at DPW, and then she's a contracting officer over there now.
Q So for a while, she worked in the contracting office at DPW?
A Yes.
Q As the contract specialist that processed the invoices?
A Yes. Well, the -- she was the person on the contract for a while.
Q Was she an actual contracting officer or --
A Yes, she was a contracting officer and a specialist. There's -- everybody got promoted and



moved around a little.
Q The next exhibit, we'll look at Exhibit 10. Same type of questions. If you'll look at those documents, Exhibit No. 10, let me know if you've seen them before, if you know anything about the contents of those documents.
A No.
Q Is it fair to say that you don't have any knowledge about the usage, the type of usage of the buildings identified in the contract?
A Right. I have a little bit of what they are. They're mostly admin buildings.
Q Okay. Beyond knowing that they're admin buildings, do you have any understanding of the usage, the type of usage of the buildings?
A No.
Q Any understanding of the -- if there were any change in the usage of the buildings on the contract?
A No.
Q Any understanding if there was any change in the occupancy levels of those buildings up or down that are identified on the contract?
A No.
Q Okay. Let's look briefly at page 1062,

which I believe is an e-mail from Carl Riemer to the contracting officer, dated August 10, 2005. Do you recall having any conversations with Mr. Riemer about this e-mail and his comments on these buildings?
A I remember a little discussion with him in his office about it.
Q What do you recall?
A Basically, the same thing. "Did you remember anything increasing or decreasing?" I didn't -- we went down these lists of these buildings, and I didn't remember anything happening significant in any of the buildings.
Q Significant in the sense of the square footage changing?
A No. The square footage changed.
Q Okay.
A That always changed, but I mean as in usage change. I didn't monitor bodies in a building. I just monitored what was getting cleaned, what wasn't.
Q Okay. So when you say no usage changed, you're referring to changes like taking the trash out more often.
A Right.



Q Usage changes relating to the services being provided by H & R --
A Right.
Q -- pursuant to the contract.
A Right.
Q But you're not talking about necessarily services provided by H & R that maybe weren't reduced to a written modification. That might be one example of services they provided that maybe you weren't aware of?
A I was aware of all the written modifications.
Q I'm saying to the extent that H & R provided services that were not reduced to a written modification, never put in a written mod.
A No, I wouldn't know anything about that. If they did it, they did it on their own.
Q And you're not talking about any usage changes as might relate to the occupancy levels of the buildings or the additional supplies that might have been required for a building.
A Right.
Q You're not talking about that. Right?
A I --
Q You're not talking about -- you're not



talking about usage -- you said that there was no usage change -- no usage changed.
A No dramatic usage changed.
Q Okay. And what I want to clarify is that you're not talking about any usage changes resulting from any change in occupancy of the buildings or any usage change relating to any additional supplies that might have been required to be provided to the buildings.
A Right.
Q You're not talking about those kind of things, are you?
A No.
Q No?
A No.
Q And with regard to changes in the amount of square footage covered by the contract, you weren't involved in any negotiations with the contractor on those types of mods, right --
A No.
Q -- were you?
A No.
Q Your role was just as the facilitator of getting information from the customer to the contracting office?



A Right.
Q Okay. And let's look at Exhibit No. 11. I believe this is a letter from the Directorate of Contracting, dated August 11 of 2005, to H & R Services. Have you seen this letter prior to today?
A No.
Q During -- in August 11th of 2005, was H & R still performing services under the contract?
A Yes.
Q But you were not copied on this letter?
A I don't -- no.
Q Let's look at Exhibit No. 12. Have you seen this letter prior to today? This is another letter requesting an equitable adjustment.
A I think I might have seen it. I think Annette might have showed it to me or someone in contracting showed it to me.
(Off the record.)
(Recessed from 3:42 p.m. to 3:49 p.m.)
Q (By Mr. Hickman) Let's look now at Exhibit No. 13.
A Okay.
Q Well, actually, on Exhibit No. 12, you said you thought that Annette may have shown it to you before today or you might have seen it before

Page 102

today?
A I may have seen it before today.
Q Do you recall any conversations with anybody --
A No.
Q -- about Exhibit 12?
A No, no.
Q Let's look at Exhibit 13.
A Just the figure sticks in my head for some reason.
Q Okay. Do you recall seeing the letter contained in Exhibit No. 13 prior to today?
A I don't recall it.
Q Okay. Do you recall having any conversations with any government employee about the claims submitted by H & R for additional monies under the contract?
A Other than Annette, no.
Q What conversation with Annette do you recall about the claims by H & R under the contract?
A That there was one. That's all. There was a supply issue.
Q Well, you recall having a con -- was it one or more conversations with her?
A Just one. She just -- I think when I was

Page 103

up here one day dropping stuff off, she said, "There's a lawsuit and you might get called," or something like that.
Q Okay.
A That was basically it.
Q And you made the comment a minute ago about a supply issue. What do you mean by that?
A That the lawsuit was for supplies, a supply issue.
Q Okay.
MR. McNAMARA: Just to clarify, when you say "claim," you might just want to be sure that that doesn't just mean the claim in the lawsuit, I think, just to be clear. Is that what you're -- is that what you're intending?
MR. HICKMAN: Yes.
Q (By Mr. Hickman) What I was intending, really, was that there were -- these exhibits we just looked at, those were -- they were formal claims --
A Right.
Q -- submitted by the contractor to the contracting officer --
A Right.
Q -- for additional monies under the

Page 104

contract.
A Right.
Q And what I was wondering was, did you have any conversations about those claims? Not the lawsuit being filed. I'm kind of before that point in time.
A No. No, no, no.
Q Okay. Okay. But once the lawsuit was filed, she made you aware that a lawsuit had now been filed.
A Exactly.
Q And that the lawsuit, from, I guess, her perspective, involved some supply issues?
A Right.
Q Okay.
A Exactly.
Q Anything else you discussed with her --
A No.
Q -- about this --
A No.
Q -- dispute with H & R?
A No.
Q Okay. Let's look at Exhibit 14. And to kind of jump the gun here a little bit, but Exhibit 14 are additional documents that I provided on

Page 105

behalf of my client, H & R, to the contracting officer concerning one of the claims for additional monies, the amount of $37,000, approximately.
A Right.
Q And my question is, have you seen the backup documents that are a part of Exhibit 14 prior to today?
A No.
Q And if you look at page 1074, and there's several pages, these are the invoices from Empire Paper Company that we talked about previously.
A Yeah. Okay.
Q You weren't provided these invoices?
A No.
Q Had you been provided these invoices, could you have ascertained the supplies used by the base, based on those same assumptions we discussed before?
A Possibly.
Q Did you -- I think at one of the documents we looked at before, you made a comment about the payroll information from H & R. Is that something that you were provided?
A The hours, the manhours.
Q The manhours.

A Yes.
Q Okay. And if you look at, as an example, page 1113, down in the lower right corner --
A 1113?
Q Yes, sir. No, 1113. Three ones.
A Is it 31 or 13?
Q It's 1113. Sorry.
A Okay. Here we go. All right.
Q It's for a payroll summary, January 5th through 10th, 2005. Am I reading this printout correctly in that at the top, it has three individuals' names, Madlen Ballou, Charles Brown, and Ansel Coward. Do you see that?
A Yes.
Q Then under those names, there are headings of hours and rate.
A Right.
Q And you would've received a document similar to this that would've shown those hours worked by that person during that time frame?
A Not like this. I wouldn't have seen one like this. It would have just had -- it was on that other page. I think it was 20 -- one of those. It just has -- it just has the hours that they worked, the person's name and the hours, and that's it.



Q Okay. If you had been given this payroll summary information by the contracting officer at the time it was submitted with the claim, could you have taken the hours off of this sheet and gone and cross-checked it with other papers you received at the time the services were rendered?
A Probably, yes.
Q And confirmed that those were the hours worked during that time frame, at least as it was reported to you then?
A Yes.
Q And if the hours that were being worked, as you were being provided those documents, seemed abnormally high or abnormally low, I guess you could have commented on it.
A Yes.
Q Did you ever comment on the hours that H & R was --
A No.
Q -- working?
A No.
Q And if you'll look at Exhibit 15, have you seen this letter prior to today?
A No. No.
Q Okay. Do you know who John Reed is?



A No.
Q Did he have any involvement, to your knowledge, with regard to the H & R contract?
A I don't even know who he is.
Q Do you know whether it can be determined or if the government has any records of the total number of persons occupying the buildings covered by the contract?
A I'm sure there's some, but I don't have any.
Q Have you ever seen such documents?
A No.
Q And I think I've asked you this question, but to make sure -- I apologize in advance if I'm being redundant. Do you have any knowledge regarding the building usage during the course of the contract?
A No.
Q Do you know who Larry Hovis is?
A Yes.
Q Who is he?
A He's the quality control person on the previous contract.
Q Okay. Does he still work -- where does he work?



A DPW.
Q What's his position?
A He's a quality control.
Q He has the same position that you --
A Inspector, yes.
Q -- used to have?
A Yes.
Q Quality control representative?
A Yeah.
Q Did he have any involvement in the H & R contract --
A No.
Q -- to your knowledge?
A No.
Q On the H & R contract, there was -- I thought there was. Do you recall if there was a contractor discrepancy report form?
A Yes. Yes.
Q Do you recall if a contractor discrepancy report was ever filed on --
A H & R?
Q -- H & R?
A No. I didn't file one.
Q To your knowledge, there was never one filed?



886aa10b-347d-476f-9d24-47a59a1e2be8

Page 110

A No. I would've filed it.
Q Okay. So one was never filed.
A No.
Q Do you know if there was ever a discrepancy report filed on the prior contractor?
A Probably so. I think so, yes.
Q Do you have any recollection of what that discrepancy --
A No.
Q -- report might have involved?
A No.
Q Do you have any knowledge whether or not H & R provided supplies to the buildings covered by the contract in excess of those that may have been estimated in excess of the supply estimates?
A No, I don't.
Q You don't know if they did or did not?
A I don't know if they did or didn't.
Q Do you have any knowledge regarding the quantity or volume of supplies provided by H & R during the course of their contract performance?
A No.
Q I guess you would know the type of supplies they provided.
A Yes.

Page 111

Q And those would be those, I think, identified in the contract.
A Those folding towels and all that, yeah, mop -- yeah. Because I had to inspect their mop closets and see what was in there once in a while.
Q Okay. And the services provided by H & R during the course of contract performance, what can you tell me about those services? Are the -- would your -- if I asked you that question, would the answer be simply that they provided the services set out in the contract?
A They -- they provided the services set out in the contract.
Q And so from your perspective as inspector, H & R complied with the terms of the contract.
A Yes.
Q With the services they provided and supplies they provided.
A Yes.
Q Whether or not they went beyond that in the sense of providing additional supplies than maybe those estimated or anticipated or provided additional services because the user asked them to go ahead and do something or there were more services necessary because of more occupants in the

Page 112

building, you don't know about those circumstances.
A No.
Q Or if those type of things happened.
A I don't know that.
Q Okay. You do recognize that it is possible that --
A Absolutely.
Q -- that happened.
A Absolutely.
Q The subsequent contract for janitorial services, since that's the broad big-picture question, did you have any involvement in any form or fashion with the follow-on contract for janitorial services?
A The one that's in place now or the one that came after H & R?
Q Yes.
A Yes.
Q The one that came immediately after H & R.
A Yes.
Q It's my understanding that there was one after H & R and there is actually now another one.
A Another one, right.
Q Let's start with the one right after H & R.

Page 113

A Right.
Q What was your involvement?
A I helped the new guy that came on take care of it.
Q Okay. So once that new contract was awarded, it was brought back to your office, and you helped transition the new guy taking it over.
A Exactly.
Q Okay.
A He actually took it. I just showed him where things were. He was new to the base, kind of --
Q So you were able to --
A -- hand-hold.
Q You were able to dump it off on him before you even changed positions.
A Yes, right.
Q Well, good for you.
A Thank you.
Q Who is that person?
A His name is Joe Krachinsky.
Q Do you know how to spell that last name?
A K-r-a-c-h --
Q K-r-a --
A C-h-i-n-s-k-y.

Q And --
A That might be a letter or two off. I don't know.
Q Okay. And if I refer to him as the inspector for this contract -- custodial contracts after H & R, that would be appropriate?
A That's him.
Q Okay. What have you heard, just in general, about the performance of the contractor that obtained the contract after H & R?
A That he didn't do very well.
Q Any specifics that you heard beyond that?
A Yeah. Daily.
Q What were some of the type of complaints you would hear?
A Not doing the work. Not doing them in a timely fashion.
Q Not providing the services?
A Not providing services.
Q What about supplies?
A Same thing, not providing supplies.
Q So would you characterize it as a substantial decrease in services and supplies from what H & R was doing?
A Absolutely.



Q Did the customers, the users in the buildings, complain about it?
A Yes. Hourly.
Q What did the government do about those complaints?
A Filed CDR's and took them to the contracting officer.
Q What's a CDR?
A Contract deficiency reports.
Q What did the contracting officer do?
A I don't know.
Q Do you know if those complaints and those CDR's factored into options not being exercised on the contract?
A I would assume that's exactly why he didn't get renewed.
Q It's your understanding that the contract immediately after H & R's wasn't renewed for all option periods?
A Correct.
Q Do you know, was it just for one year --
A One year.
Q -- or two years? He just got one year?
A I think he just made one year. Maybe had an extension or something because they couldn't get



another contract in place.
Q What was the -- do you remember the name of the contractor?
A Crystal Clear.
Q Do you know anything about the prices of Crystal Clear's contract? Do you know how they compared to H & R's?
A No, I don't. I don't -- I guess I don't understand the question.
Q Well, do you know how the price -- prices on the Crystal Clear contract --
A Oh, I don't know.
Q -- compared to the H & R contract?
A I didn't see any dollar figures on any of that.
Q Okay. After the Crystal Clear contract, there was another contract that's in place today. Is that correct?
A Yeah.
Q Is Joe --
A Yes.
Q -- Krachinsky still the inspector for that contract?
A Yes.
Q Do you know who is the current contractor?



A I want to say it's -- UCI, I think, is the name of it.
Q Let's see. So they would have been in place -- do you know for approximately how long? Has it been a year?
A No. They were just -- I think they just came on board maybe last month.
Q Oh, okay. So this is a very recent --
A Yes.
Q -- change.
A Yes.
Q Okay. What's been the feedback on their performance? Has there been any so far?
A In my building, it's awesome.
Q Do you know if, after Annette took over as the contracting officer and that function moved back to the Directorate of Contracting, the FA contracting officer representative was identified for the H & R contract?
A I don't think so.
Q To your knowledge, was there ever one identified during the course of performance under the contract?
A No, I'm not -- I'm not sure. Nothing was ever put in writing, so -- I think it has to be in

writing, and nothing was ever --
Q Do you have any knowledge concerning any increase in personnel using the buildings identified in the contract?
A No.
Q So if I was to summarize your involvement -- after taking all this time of yours -- with regard to the H & R contract, it sounds to me like there was kind of two components. One was to be the go-between between the building users to identify any modifications, to add services or square footage that they might want, and provide that and facilitate getting that through contracting and that process completed.
A Exactly.
Q And then your second main function would've been basically to go and be the inspector and follow behind H & R and make sure they did their job.
A Exactly.
Q And deal with any complaints, to the extent there were any.
A Correct.
Q And with regard to that last function, it sounds like H & R did a very good job and the



government was satisfied, especially in light of how services changed after they left.
A Yes. Yes.
Q And just so I am sure, if I was to go through, under tab seven, page 1051, the list of buildings identified by H & R, go through each of those buildings and ask you specific questions about the uses in the buildings, the potential changes of occupancy of those levels, the maybe changes in supplies used in those buildings, you would tell me you don't know.
A I do not know.
Q And do you recall H & R's personnel, during the course of performance of the contract, talking to you about changes on the base, changes in certain buildings, maybe, as far as additional people in the building, harder to get work done, they're having to do more work or provide more supplies?
A There was probably conversation like that, but it's not anything -- it's common with contractors. They'll always say, "We're not doing right. We're not able to do this," and -- but, you know, I gave them a lot of leeway on their -- on their work, and a lot of buildings they just -- you



know, sometimes they didn't miss it -- I mean they missed it and -- and I gave them a little fudge factor on getting in there and getting it done right, so no. But as far as the usage, personnel usage in the building, I would have nothing -- would not know anything about it.
Q Okay. And just by way of an example, if, for example, there was a building where they didn't provide services for a day, and an H & R person testified that it might have been because there were so many people in the building, like let's say one of the processing buildings --
A Uh-huh.
Q -- we talked about earlier, one of the other exhibits -- I can't remember the exact number off the top of my head. I think it was 3161.
A 3162?
Q Or 62, those buildings. That they went to do the work and they couldn't run the vacuum cleaner, they couldn't do some of the services. Maybe they went and provided some supplies, but they couldn't --
A Right, right.
Q -- do the work, physically, because there were people standing outside, the building was so



crowded --
A Sometimes.
Q -- would that shock you?
A No.
Q And so that might explain -- if there were some instances where they didn't get the work done, it might have been because there were so many people in the building --
A Exactly.
Q -- they couldn't do the job.
A And that happens sometimes. Or the people had a class and they couldn't run a vacuum cleaner or they -- you know, just on a case-by-case basis, sometimes we just skipped something or did it the next day or whatever.
Q Okay.
MR. HICKMAN: I don't think I have any more questions for you right now, sir. I appreciate it.
MR. McNAMARA: I have a few.
MR. HICKMAN: Uh-oh.
MR. McNAMARA: Shouldn't take too long.
CROSS-EXAMINATION
BY MR. McNAMARA:
Q I believe you stated that H & R employees



886aa10b-347d-476f-9d24-47a59a1e2be8

complained about running out of supplies.
A Wilbert Monroe and Jeanette sometimes said, "Yeah, we -- we're out of toilet paper in this building," or something. Or, "We're out of paper towels and we put two boxes in there yesterday."
Q And how often did that happen?
A Very occasionally. Once or twice, maybe, a month. Maybe. And sometimes I never heard about it.
Q I believe you said that it started to happen about a year into the contract?
A Yeah. There's always, you know -- there was always a roll of toilet paper got missed, the person didn't put it in, didn't put it in the roller, missed the bathroom, stuff like that. I mean, it was a complaint -- it was a -- it was a complaint, but it got rectified almost immediately.
Q Well, but was it a complaint that was coming from H & R?
A No.
Q Or was it a complaint that was coming from a customer?
A Customers. That's basically all I did, was run customer complaints.
Q But did H & R also complain that they were



running out of supplies?
A Sometimes they would.
Q Okay. And that would happen occasionally.
A Occasionally.
Q Okay. And do you know what the basis was for those complaints?
A Most of them, the occupants would take a roll of toilet paper home or something. We'd have some thievery going on.
Q Did H & R ever complain about a large volume of supplies being short?
A No, not that I recall. You mean like cases or something?
Q Sure.
A No.
Q Did H & R ever complain about having to perform more services under the contract than they had in the past?
A No.
Q They never complained about that?
A I'm not going to say -- it was a nonchalant complaint, you know, "We're having to clean this a little more. We're having to look at this, you know, scrub it a little harder," or something, but --



Q Over the course of the contract, did H & R complain more about either supplies or services increasing --
A No. It was --
Q -- over the course of the contract?
A No. It was generally the same level of complaints.
Q To your knowledge, if H & R performed work outside of existing contract or existing modifications, did the government then issue a modification and --
A No.
Q -- pay for the work that H & R performed?
A No.
Q Did --
A They knew not to do anything outside the scope of the work or outside -- in case a customer came up and asked them to do something additional, I made it -- from the outset told them that that was a no-no. Anything had to come through contracting office before it was done on Ft. Sill, and that was in our pre-work.
Q If --
A That's in every pre-work.
Q If you or the contracting officer directed



H & R to perform work that was outside of the existing contract or existing modifications or existing square footage, was H & R eventually compensated --
A Yes.
Q -- for that work?
A Yes.
Q Were they compensated through a modification to the contract?
A Yes.
Q Did that happen frequently?
A Yes.
Q Was H & R always compensated for any --
A Yes.
Q -- such additional work?
A Yes. The paperwork caught up to the actual work.
MR. McNAMARA: Okay. I'm all right. No further questions.
MR. HICKMAN: I may have one or two.
MR. McNAMARA: Sorry.

REDIRECT EXAMINATION

BY MR. HICKMAN:
Q With regard to Counsel's last question regarding you or the CO asking H & R to do work





886aa10b-347d-476f-9d24-47a59a1e2be8

Page 126

outside of the contract and then H & R being ultimately compensated for that work, is that type of situation similar to what we discussed in Exhibit No. 22 on page --
A Yes.
Q -- three?
A Yeah, that's it.
Q Where, "We're doing a modification now to definitize some actions you've already taken"?
A Yes.
Q But that type of -- that compensation would not have compensated H & R to the extent that the work they had to perform, the services they had to perform, were more intensive or greater in scope because of additional use or occupation of a building if the square footage remained the same.
A No.
Q It would not have paid them for that. Right?
A No.
Q It would not have paid them for those extra rolls of toilet paper or supplies that they provided, whether it was a government employee taking a roll home with him or an extra soldier being in town, processing through on his way to

Page 127

Iraq, having to use a roll of toilet paper.
A Exactly.
Q They would not -- H & R would not have been paid in that type of a situation under the modification as we talked about on Exhibit 22. Right?
A No, but they were paid per square footage, and that included their supplies, regardless, in the contract.
Q I understand, but to the extent that those supplies were in excess of what maybe could have reasonably been estimated at the time the contract was put in place because of the Iraqi war effort --
A That could --
Q -- then it would not have maybe been factored into the square footage pricing.
A That could very well be, but I wouldn't --
Q You wouldn't know?
A I wouldn't know.
Q And my point just is, is that they would not -- H & R would not necessarily have been compensated, then, by a modification for those types of additional supplies. Right?
A They would have only been compensated for the square footage that they were cleaning. This

Page 128

is -- I think his question was, was it customary for us to go ahead and let them do the work and then the paperwork catch up to it, and your question is whether or not the supplies would be in excess because of this -- if they were compensated for excess supplies by this mod. Right?
Q Correct.
A No.
Q Yeah. They were not compensated.
A I don't know if they used excess supplies or not.
Q Okay. That's fair enough. Well, let me ask you the question this way, maybe. When was the contract expired? How long -- when did the contract run to?
A Till October of '05 -- September -- September.
Q Is it '05 or '06?
A '05, I thought.
MR. ALFORD: I think it was '05.
THE WITNESS: Yeah.
MR. ALFORD: I think.
A 2000 to '05.
(Exhibit 25 marked for identification.)
Q (By Mr. Hickman) Let me hand you what I

Page 129

marked Exhibit 25. Give you a minute to look at that.
Have you seen these documents marked Exhibit 25 prior to today?
A I don't think so. Don't look familiar.
Q Okay. Does it appear from the face of Exhibit 25 that Mr. Hall, on behalf of H & R, is requesting a price adjustment to the contracting office concerning the increase due to population and usage of the attached list of buildings?
A Yes.
Q Beginning the second quarter of 2002?
A Yes.
Q Do you recall ever being involved in any conversations with Miss Highsmith or any other contracting personnel about those statements in Exhibit 25 by Mr. Hall?
A No.
Q They never asked you about population increases or additional usage?
A No.
Q Do you know if Mr. Hall was ever given a written response to this letter of October 20th, 2004?
A I do not.

Q If Mr. Hall was not given any specific written response to this letter and continued to perform services to the government at the level and the quality that he had been, even with his complaints or his concerns about increased population, increased usage, based on the course of conduct between his company and the government, don't you think it's reasonable that he anticipated that he was maybe going to get taken care of and paid?

A Possibly, that's his anticipation. I would -- I would want to be compensated for it.

Q I mean, there was a pattern of conduct between him, his company, and the government to where he would provide these additional services and supplies, if necessary, and then a mod put in place as we talked about in Exhibit 22.

A But the only additional service was per-square-footage service. There wasn't -- there was never anything discussed about supply increases. That was never brought to my attention as far as a document, modification document, to compensate him for additional supplies or usage.

Q I understand it wasn't brought to your attention.



A No.

Q But obviously, here on Exhibit 25, he's bringing it to the contracting officer's attention in 2004.

A And that's as far as it got. I don't know. That's -- Mr. Dryz will have to answer that one.

Q Approximately a year before the contract expired or ended?

A Yeah. Yeah.

Q And so in follow-up to Counsel's questions, also, about H & R complaining of more services under the contract, and you said there was some nonchalant complaints, things of that sort, it's possible, also, that there might have been communications by H & R with the contracting folks that you weren't aware of --

A Exactly.

Q -- expressing concerns about services and supplies?

A Yes.

Q Just like the contracting people were talking to H & R and you didn't always know what they were saying.

A Right.



MR. HICKMAN: I don't have any further questions.

MR. McNAMARA: Okay. Me neither.

(Off the record.)

MR. McNAMARA: We'd request, also, if we could take a look at it and sign.

(DEPOSITION CONCLUDED AT 4:31 P.M.)



ERRATA SHEET

DEPOSITION OF PETER K. WEBB

REPORTED BY: JEAN BAYSINGER, CSR RPR CMR

DATE DEPOSITION TAKEN: NOVEMBER 7, 2007

PR FILE NO. 12464

| PAGE | LINE | IS | SHOULD BE |
|---|---|---|---|





886aa10b-347d-476f-9d24-47a59a1e2be8

JURAT

I, PETER K. WEBB, do hereby state under oath that I have read the above and foregoing deposition in its entirety and that the same is a full, true and correct transcription of my testimony so given at said time and place.

________________________________

Signature of Witness

Subscribed and sworn to before me, the undersigned Notary Public in and for the State of Oklahoma by said witness, PETER K. WEBB, on this ________day of___________________, 2007.

________________________________

NOTARY PUBLIC

MY COMMISSION EXPIRES:___________

(JB) PR FILE #12464



C E R T I F I C A T E

STATE OF OKLAHOMA )
) SS:
COUNTY OF OKLAHOMA )

I, Jean Baysinger, Certified Shorthand Reporter within and for the State of Oklahoma, do hereby certify that the above-named PETER K. WEBB was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth, in the case aforesaid; that the above and foregoing deposition was by me taken in shorthand and thereafter transcribed; and that I am not an attorney for nor relative of any of said parties or otherwise interested in the event of said action.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal this 15th day of November, 2007.

________________________________

Jean Baysinger, CSR RPR RMR



886aa10b-347d-476f-9d24-47a59a1e2be8

JURAT

I, PETER K. WEBB, do hereby state under oath that I have read the above and foregoing deposition in its entirety and that the same is a full, true and correct transcription of my testimony so given at said time and place.

______________________________

Signature of Witness

PURSUANT TO 28 U.S.C. § 1746

Subscribed and sworn to before me, the undersigned Notary Public in and for the State of Oklahoma by said witness, PETER K. WEBB, on this ________day of__________________, 2007.

______________________________

NOTARY PUBLIC

MY COMMISSION EXPIRES:___________

(JB) PR FILE #12464

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

H & R SERVICES, INC.,
an Alabama corporation,

Plaintiff,

vs. No. 06-582 C

THE UNITED STATES OF AMERICA,

Defendant.

DEPOSITION OF SHAREL SUE McADOO

TAKEN ON BEHALF OF THE PLAINTIFF

ON NOVEMBER 8, 2007, BEGINNING AT 10:02 A.M.

IN FT. SILL, OKLAHOMA

REPORTED BY: Jean Baysinger, CSR RPR RMR



25d4ffe5-a6bc-477b-b893-935a0b2820af

APPEARANCES

On behalf of the PLAINTIFF:

William H. Hickman, Attorney at Law
HICKMAN & FITZPATRICK
119 N. Robinson, Suite 250
Oklahoma City, Oklahoma 73102
(405)605-2375
hickman@hickmanfitzpatrick.com

On behalf of the DEFENDANT:

Sean B. McNamara, Attorney at Law
U.S. Department of Justice
Civil Division
1100 L Street N.W.
Washington, DC 20530
(202)305-7573
sean.mcnamara@usdoj.gov

Joe Alford, Attorney at Law
U.S. Army
Building 4621, Room 208
Ft. Sill, Oklahoma 73503
(580)442-1096



INDEX

Page

Direct Examination by Mr. Hickman............. 6

Exhibits

26 Solicitation No. DABT39-95-0026............ 36

27 Bid Summary for Solicitation No. DABT-39-95-0026....................... 41
28 Contract for DABT39-95-C-4021.............. 44
29 Letter dated 11/24/07 to Pure Service Corporation from Sharel McAdoo............ 50

30 Contract modification documents for DABT39-95-C-4021.......................... 53
31 E-mail to Nancy Smith from Laurie Wheeler regarding supplies........................ 55

32 Fax dated 12/22/99 to Pure Service from Laurie Wheeler regarding complaints........ 57
33 Letter dated 7/6/00 to Pure Service from Sharel McAdoo regarding contract discrepancy report........................ 57
34 Monthly statements reporting manhours performed by Pure Service Corporation...... 59

35 Pre-solicitation documents relating to H & R Services contract.................... 67
36 Solicitation No. DABT39-00-B-1001 dated 6/5/00.................................... 81



Exhibits (Continued)

Page
37 Letter dated 7/17/00 from Hope Hall to Ms. Wheeler regarding verification of bid.. 100

38 Fax dated 7/20/00 from Laurie Wheeler to H & R Services............................ 100

39 Response dated 7/20/00 from H & R Services to Exhibit 38............................. 103
40 Letter dated 5/22/01 to H & R Services from Ray Dryz regarding option renewal..... 120

41 Memorandum dated 6/13/01 regarding justification to exercise option........... 121
42 Letter dated 7/9/01 from Sharel McAdoo to H & R Services............................ 122

43 Memorandum dated 9/18/01 regarding determination to exercise option........... 123
44 Letter dated 7/25/01 to H & R Services from Ray Dryz regarding adjustment to pre-priced option year line item costs..... 123
45 H & R Services proposal for the Department of Labor wage revision..................... 123

46 Letter dated 11/8/01 to H & R Services from Ray Dryz regarding employee ID's...... 125
47 Memorandum dated 2/13/02 regarding option year two for H & R Services contract....... 128

48 Letter dated 7/25/02 to H & R Services from William Stark regarding option year two...................................... 128



Exhibits (Continued)

Page
49 Memorandum dated 3/14/02 regarding requested modification..................... 129
50 Memorandum from Donald Price regarding option year three.......................... 132

51 Fax dated 7/23/03 from Ray Dryz to H & R Services regarding option year three with

52 Memorandum dated 7/25/03 to Patricia Wilkinson regarding H & R Services request for modification for underpayment of custodial services......................... 133

53 Fax dated 7/19/04 from Ray Dryz to H & R Services regarding renewal for option year four...................................... 133





25d4ffe5-a6bc-477b-b893-935a0b2820af

STIPULATIONS

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys, that the deposition of SHAREL SUE McADOO may be taken pursuant to agreement and in accordance with the Rules of the Court of Federal Claims on November 8, 2007, at Ft. Sill Army Base, Directorate of Contracting, Building 1803, Ft. Sill, Oklahoma, before Jean Baysinger, CSR RPR RMR.



WHEREUPON,
SHAREL SUE McADOO,
after having been first duly sworn, deposes and says in reply to the questions propounded as follows, to-wit:

DIRECT EXAMINATION

BY MR. HICKMAN:
Q Will you please state your name for the record?
A Sharel Sue McAdoo.
Q Can you spell your last name?
A M-c capital A-d, as in David, o-o.
Q And what is your home address and phone number?
A My home address is 3333 Northeast 135th Street, Lawton, Oklahoma, 73507. My phone number is 580-355-4557.
Q And your work address and phone number?
A My work address is Building 467, Ft. Sill, Oklahoma. The phone number is 580-442-4279.
Q Okay. And can you tell me where you are currently employed?
A I am currently employed on the Garrison staff in the Plans Analysis and Integration Office, PAIO.



Q How long have you been in that position?
A 13 months.
Q So since October of last year, '06?
A Yes, sir.
Q Took me a minute to figure that out.
A May I correct any spelling of my first name because it's unusual.
Q Yes. That'd be great. Good idea.
A Thank you. S-h-a-r-e-l.
Q Thank you.
And prior to your position in the Plans Analysis Office, where were you employed?
A MWR, Morale, Welfare, and Recreation here at Ft. Sill. I was the child and youth services coordinator.
Q How long were you in that position?
A Approx -- four years.
Q So from about October of '02 to October of '06?
A It was December. Do you want an exact date?
Q No, just --
A Okay. The last of February '02 to October '06.
Q And prior to your position with the MWR --



MWR office, where were you employed?
A I was employed at the Directorate of Contracting, Ft. Sill, Oklahoma.
Q What was your position at the Directorate of Contracting?
A At a specific time?
Q Let's start with February '02 and go back in time.
A I was contracting officer.
Q Okay. How long were you --
A And chief of the co-located DOC at DPW.
Q Chief of co-located --
A Co-located, yes, sir.
Q DOC, you said?
A DOC, yes, sir.
Q And would that be you were the person in charge of the contracting personnel that were co-located in the Directorate of Public Works office?
A Yes, sir.
Q Is that what that means, essentially?
A Yes, sir.
Q It's my understanding that for a period of time, there were contracting personnel that worked in the Directorate of Public Works office. Is that

right?
A We had a desk -- we were assigned to the DOC here, but we had a desk in Building 1950.
Q That's what I -- you -- the contracting people physically worked in the DPW building.
A Yes, sir.
Q But you were still assigned under the Directorate of Contracting from a supervisory capacity?
A Yes.
Q And so you were in those positions from February of '02 to when?
A Approximately 1995.
Q You were a contracting officer for that entire period of time?
A Yes, sir.
Q And for that entire period of time, you were the chief of co-located DOC personnel?
A To the best of my recollection, that's when the time ended.
Q When you left the Directorate of Contracting in February '02, what -- why did you leave?
A A potential for promotion.
Q At the time you left in February of '02,



were there contracting personnel still co-located with DPW?
A Yes.
Q Why did the con -- strike that.
Why were there contracting people co-located with DPW?
A To better serve the DPW customer.
Q Was DPW one -- one of contracting's primary customers?
A I don't know.
Q How many contracting people, from approximately 1995 through February of '02, were co-located at DPW?
A Approximately six, to my best recollection.
Q How many contracting people, excluding those six, worked in the Directorate of Contracting, in the contracting building?
A I -- you'll have to ask that again because that's --
Q If there were six contracting personnel working in the DPW building, how many contracting people were working in the contracting building from approximately 1995 through February of '02?
A I don't recall an exact number.



Q Just an approximation. Was it six people in the contracting building, six people in DPW? Was it 60 people in the contracting building, six people in the DPW building?
A To the best of my recollection, there might have been 25, approximately, in the DOC proper.
Q Okay. So there was, then, approximately 31 people, total contracting people?
A That sounds like a good number.
Q Okay. And I assume you are a civil servant?
A I am employed by the federal government, yes.
Q And do you have a civil servant rank?
A I am a YA-2 under the new NSPS program.
Q In your current position with the --
A In my current position, I am a YA-2.
Q Okay. What was your position when you were with the MWR?
A That -- you have my position, the coordinator of child and youth services.
Q What was your civil servant --
A What was my grade?
Q Grade, yes. That was the word I was



looking for. I knew it wasn't "rank," and I couldn't think of the civil servant equivalent.
A I was a GS-12.
Q And how about while you were employed with the Directorate of Contracting? What was your grade?
A When I left?
Q Yes.
A GS-12.
Q And when you started?
A I was a GS-11.
Q During your time you worked at the Directorate of Contracting, did you work in any particular branches or portions of the Directorate of Contracting?
A Yes.
Q Can you explain those for me? Let's start with does the Directorate of Contracting have an organizational chart?
A Yes.
Q Okay. Let's start at the top. There's, I assume, a director.
A Yes.
Q Underneath the director, what do we have?
A An assistant director.

Page 14

Q Okay. Under the assistant?
A There would be team chiefs. I believe that they were -- I can't remember exactly what they were called, but it was something like a team chief.
Q Okay. Do you remember how many?
A Not exactly, no.
Q Okay. Were you a team chief at any time?
A Yes, I was.
Q For what team?
A For the co-located DOC team.
Q And so for the years that you worked in the Directorate of Contracting, were you always in this team of individuals who were co-located at DPW?
A No.
Q How long were you either the team chief or on the team that was co-located? For what period of time?
A That I was co-located with the DOC team? I don't remember exactly, but it was probably, to the best of my recollection, from like '93 to 2000.
Q Okay. And then after you were no longer on the co-located team -- but you still worked for the Directorate of Contracting for a couple of years. Is that right?
A Okay. I think -- I think you may have it

Page 15

just backwards.
Q Okay. I thought you left the Directorate of Contracting in February of 2002. Is that correct?
A 2002. That's right.
Q Okay. So from February 2002 until the year 2000 --
A Oh, okay. Then I misspoke.
Q Okay.
A Then it would have been from '93, approximately, to 2002. Sorry. My error.
Q Okay. What was the period of time that you were not on the co-located team?
A Okay. When I came to DOC, and that would have been in 1990, I believe, '90, I was cost and price analyst.
Q Okay. What types of things did you do as the cost and price analyst?
A Oh, did an analysis of the Ft. Sill water contract with the City of Lawton.
Q Anything else you recall?
A Just basically analysis of those kinds of actions.
Q Any other types of contracts you recall working on, besides the water contract?

Page 16

A No. It would have been whatever was -- no, I don't remember any others. That one was a significant one.
Q Okay. Do you remember how that contract was priced, how the pricing schedule was structured?
A Yes. It was by the hun -- by the thousands of cubic feet of water.
Q Okay. Tell me a little bit about your educational background.
A Okay. I have a Bachelor of Science from Oklahoma State University, granted in 1970. I have a Master of Education in counseling from Boston University, granted in 1979. Those are the degrees that I hold.
Q Okay. And I assume you've undergone some training in the contracting area?
A Yes.
Q Are there certifications in the contracting career field?
A Yes, there are certifications in the contracting career field.
Q Okay. Do you hold any certifications in the contracting career field?
A Not presently.
Q Did you when you worked in the contracting

Page 17

career field?
A Yes.
Q What certifications have you held in the contracting career field?
A I believe -- my recollection is that it was certification I and II.
Q Do you know how many levels or certifications there are in the contracting career field?
A As far as I know, there are three.
Q Have you obtained any professional certifications outside of those issued by the government in the contracting career field?
A I'm not sure exactly what you mean, but --
Q Are you familiar with an organization called the National Contract Management Association?
A Yes.
Q NCMA?
A Yes, I am, and no, I have -- I'm not certified by them.
Q You don't have a CPCM or CACM?
A I do not.
Q Are you a member of NCMA?
A Not anymore.
Q Were you when you were in the contracting





25d4ffe5-a6bc-477b-b893-935a0b2820af

field?
A I might have been.
Q Have you had an opportunity to have your deposition taken before?
A On other issues, yes.
Q How many times have you been deposed?
A Twice.
Q Tell me briefly, if you can, the circumstances of those depositions.
A Sure. Once I was a victim of sexual assault in the Alexandria, Virginia, federal courthouse, and I've -- in the Alexandria, Virginia, federal jurisdiction, and once I was deposed in an employee case.
Q Were you --
A A dispute.
Q A dispute between you and another employee?
A Yes.
Q Okay. What did you do today to prepare for this deposition? Anything?
A Oh, I talked to the contract law attorney here and the new representative.
Q Besides talking to the lawyers, did you look at any documents?



A Not today.
Q Had you previously, knowing that you were going to be deposed, go back and look at any notes or files relating to --
A Yes, I did.
Q Okay. What -- can you tell me generally what you looked at?
A When Mr. Alford told me that I would be a -- that a deposition would be taken, I came over here and talked to him about the case, the -- not the case, the contract file that was here and asked if I could review it.
Q So you looked at the H & R Services contract file that's maintained here in the contracting building?
A Yes.
Q Did you look at any other files or information?
A Yes, I did.
Q What else?
A I looked at a contract that had previously been a custodial contract here at Ft. Sill.
Q Do you remember who the contractor was in that prior contract?
A No, I don't.



Q Okay. Was it Pure Service? Ring a bell?
A That could have been who it was.
Q Were you involved in that prior contract?
A Yes, I was.
Q Is that why you tried to refresh yourself about it?
A Yes.
Q Any other files or documents you looked at?
A In relation to this deposition, no.
Q Okay. Did you talk to any of the other employees in the Directorate of Contracting in preparation for this deposition or in anticipation for it?
A Oh. No. I introduced myself to a person that hadn't been here when I was here and said hello to some of the people that I'd worked with years ago, but specifically to talk about this case, no.
Q Do you know Annette?
A I -- I do know who she is.
Q Was she here working for the Directorate of Contracting at the time you left in 2002?
A I don't believe she was.
Q So you didn't know her as a coworker in the time that you worked in the Directorate of



Contracting?
A That's right.
Q You've known her only recently, I guess, since you've come back over and visited and looked at documents --
A In the --
Q -- in preparation or in anticipation of this deposition?
A No. In the -- no.
Q When did you first meet Annette?
A I work on -- in the Plans Analysis and Integration Office. I have a responsibility to report the annual cost of a contract that she is the contracting officer on that's Training Services Center, and it was my responsibility to report that amount, and that's the reason I contacted her.
Q When did you take over the responsibility of reporting the annual cost of the Training Services Center contract?
A About the -- about the 12th of October in 2006.
Q How many reports have been filed on that contract since you've been involved with it?
A One.
Q Have you had an opportunity to look at any





25d4ffe5-a6bc-477b-b893-935a0b2820af

of the reports prior to the one that you were involved in the filing of?
A In the filing of the TSC contract?
Q Yes.
A Have I had the opportunity to look --
Q Let me try to clarify my question.
A Okay.
Q You were involved in the filing of one report for the Training Service Center contract. Correct?
A Right.
Q Have you had an opportunity to look at the file and look at any of the reports prior to the report you were involved in filing to see how those reports are done or the numbers that were on those reports?
A The -- the report is in a system that's called Department of Defense Contract Admini -- Commercial Activities Management Information System, and yes, I would have had to have looked at the prior year dollars before I entered the current information.
Q Do you know if the numbers are going up or down or staying the same as related to the Training Service Center contract?



A The numbers have changed, and they are going up.
Q Do you know why they're going up?
A Yes.
Q What is your --
A The information that I entered is that the mission has grown.
Q What mission is that?
A The Training Service Center mission.
Q Here on Ft. Sill?
A Here on Ft. Sill.
Q How many buildings does the Training Service Center utilize in their mission?
A To my knowledge, only one.
Q One? This might be a dumb question, but what does the Training Service Center do?
A They make training aids. They make posters, signs.
Q Do they actually train people? Do they have classrooms that they train people?
A No.
Q Or do they just do --
A As far as I --
Q -- documentation?
A As far as I know, all they do are the



posters and the training aids kind of mission.
Q Okay. As the plans analysis officer -- and I may not be saying that completely accurate, but when you're in that position that you currently hold, are you involved in reporting information on other contracts here on Ft. Sill?
A I'm a management analyst. That's what I do, so as a management analyst, I report information on four contracts that are under the commercial activities umbrella here on Ft. Sill.
Q And the Training Service Center contract is one of those?
A Is one of those.
Q What are the other three?
A The Directorate of Public Works.
Q That's what it's called, the Directorate of Public Works contract or --
A Yes, that's --
Q And what -- describe for me, if you can, in summary fashion, what is that contract.
A That contract is for the workforce that does the maintenance and repair on buildings here on Ft. Sill.
Q Okay. Do you have an understanding how that contract has changed over, let's say, the last



five years, based on these reporting requirements?
A Yes, I have an understanding of how that particular contract has changed.
Q And how has it changed over the last five years?
A One example is that they have added grass mowing, so that has changed, that contract.
Q Besides grass mowing, has the contract gone up or down or stayed the same?
A There has been an increase in the -- in the --
Q In the dollars being spent?
A In the dollars spent.
Q Okay. What's the next contract that you're involved in the reporting of?
A Okay. Now, TSC, the training center, and DPW are the only two of the A76 studies. The OMB A76 circular -- I don't want there to be a question about what I'm trying to describe.
Q Okay.
A Okay. The TSC and DPW studies were the only ones that resulted in a contract. The Directorate of Information Management and the AG, adjutant general, studies resulted in the government being successful, and they are what's called the





25d4ffe5-a6bc-477b-b893-935a0b2820af

most efficient organization, an MEO.
Q Meaning that those governmental requirements were not contracted out. They're being satisfied by government personnel?
A Yes.
(Off the record.)
Q (By Mr. Hickman) On these other two requirements, I think, you were telling me about where the decision was made for the government to go ahead and provide the services as opposed to contracting it out, is there information retained by the government on those requirements as to the resources, the dollars necessary to satisfy those requirements like there would be if it was provided -- if it was contracted out?
A No.
Q So do you do any reporting on those two?
A Yes.
Q What type of reporting do you do, then?
A I report on the full-time equivalents, FTE's. That's how that particular study results. It's not in dollars, per se, but in the number of personnel full-time that it takes.
Q Okay. And summarize for me, if you can, one of those topics or areas.



A Okay. DOIM, the Directorate of Information Management, is one of those, and those are the people who make sure that the internet is working here on Ft. Sill.
Q Okay.
A That the phones work on Ft. Sill, that records are stored properly on Ft. Sill, that the Freedom of Information Act and Privacy Act are complied with.
Q Okay. Since approximately 2002 -- sorry. Since approximately the year 2000 to present, do you have information with regard to the full-time equivalent necessary for each of those years?
A Not for the time from 2000 to 2007 because we haven't had the MEO functioning for that period of time, but there is a period of time.
Q Well, how far does it go back?
A 2000 and -- my best guess is it's 2003, without actually sitting down and looking at the documents.
Q And for that period of time, what is your understanding of the trend, if you will, of the full-time equivalent required to satisfy the Directorate of Information Management needs?
A It's within the guidance of the -- of the



A76 study, and so that's -- if they say that they're going to do that with 64 personnel, they're within that.
Q Has it been --
A They have -- they have not had to modify the -- the agreement.
Q Has it been going up or down or changing as far as the full-time equivalent hours necessary for the government to provide the services for this period of time?
A Not significantly, that I'm aware of.
Q Not significantly gone up or not significantly gone down?
A The -- no change, that I'm aware of.
Q Okay. Let me just clarify. Is the FTE reports or information from the Directorate of Information Management something you have familiarized yourself with?
A Yes.
Q You said that you're not -- there was no change that you're aware of. What I want to find out or understand is, do you know? Have you looked? Do you recall, or are you just not quite sure? You say not that you're aware of.
A That -- the report that I've seen is,



there is no change.
Q And when you're saying "no change," are you saying no change outside a particular range? Earlier, you were talking -- you described it as if there was no modification, but still within an acceptable range.
A Oh. The government bids or proposes that they can do the job for a certain number of FTE's.
Q And that's a range?
A No, it's -- no.
Q A specific amount?
A It's a specific amount.
Q Well, you made a comment earlier, and it's just my lack of understanding, I guess, of that process, that it hadn't changed significantly to where there had to be a modification or something done to update it still within the parameters of the circular.
A Uh-huh.
Q Do you recall saying something to that effect?
A Yes.
Q What did you mean by that?
A That a --
Q Is there a -- I'm using the word "range."

Page 30

Is there a range or an error factor that as long as -- if you say you can do it for a hundred hours and as long as you're within ten percent, you're okay, and that's not really a change? I'm trying to understand what you were saying.
A Okay. Full-time equivalent is reported as number of full-time employees, and the government can decrease the amount with no significant change in order to be a more efficient organization, and they can increase as long as they don't increase over a certain percentage at that -- yes.
Q And then it wouldn't -- it still would not be considered a significant change if they didn't increase over a certain percentage?
A Right, it wouldn't be considered significant, and you wouldn't have to -- but now, if the -- jeepers.
Q So --
A As anything, as anything, if there is a significant change in the statement of work, then yes, there would be a modification just as if it were a regular contract, so that's --
Q And so there's been no modification to the statement of work in the sense of any significant change in the work being provided.

Page 31

A Right.
Q Okay. Now, what I'm trying to make sure that I understand is, if I went and looked at the reports for the Directorate of Information Management, are the FTE numbers of the man -- manhours --
A Manpower.
Q -- manpower going to be exactly the same? Because you said there was no change.
A If you want to look at them, there would be -- there -- there might be a change. There could be a change.
Q So when you said there was no change, you were saying that there was no change outside of the acceptable range?
A Of the statement of work. Check.
Q Setting aside that there was no substantial change or no change outside of the statement of work, do you know if the numbers went up or went down within that range, the FTE numbers?
A I would have -- it would be a guess. I'd have to go look.
Q Okay.
A That's -- yes, I would just have to go look.

Page 32

Q And where are these records kept?
A They are on a management information system.
Q So they're electronically available?
A They're electronically available.
Q What is the fourth, the other FTE category?
A Oh. Did I not say?
Q There were two FTE's that you said.
A The adjutant general was the other.
Q Yes, that's it. What does that cover? What type of services?
A Military personnel records, primarily. ID cards, preparing a common access card, which is what I wear right here.
Q For what period of time do you recall are records available for FTE's for those services?
A Approximately the same amount of time as the DOIM. They started a couple of months apart. One of them started, I believe, in November, and one started in January.
Q Okay. Same question. I want to try to avoid the confusion.
A Okay.
Q Setting aside this acceptable range of

Page 33

increase and decreases and it not affecting the statement of work, do you know whether or not the FTE's changed at all with regard to the AG services?
A Yes.
Q What is your knowledge in that regard?
A They have changed.
Q How?
A They have gone up.
Q Have they gone up to what would fall into the category of substantial change or change that required amendment to the scope of work?
A There's been no change in the scope of work to -- for the -- for the MEO.
Q Do you know why they've gone up, the FTE's have gone up?
A Trying to remember what I reported last year. It's gone up due to -- due to deployment or mobilization records that had to be updated.
Q Okay. So the AG services would encompass deployment and mobilization records, those types of military personnel records?
A Right.
Q And that would be potentially people who were not full-time assigned to Ft. Sill?
A Or were full-time assigned to Ft. Sill.

Page 34

Q Okay.
A Incoming.
Q Both. It could be both, people that were assigned at Ft. Sill who were maybe being deployed someplace or people who were processing through Ft. Sill as a part of a mobilization effort?
A Correct, or people that retired.
Q In general, in a high-level manner, if you can, what was your involvement with the H & R Services contract that brings us here today?
A My involvement, I was the procuring contracting officer.
Q And in layman -- layman's terms, what does that mean?
A I was the contracting officer for the advertisement and award of that custodial contract.
Q So you oversaw the solicitation, the acceptance of the bidders, the evaluation, the determination of who was the successful bidder and the -- to be awarded the contract, what I might refer to sometimes as the pre-award phase?
A That is what it is. It's the pre-award phase.
Q Okay. And that was -- you were the CO for that pre-award process.

Page 35

A I was the contracting officer for that.
Q If I say the word -- if I say "CO," you understand that I'm referring to the contracting officer?
A Not the commanding officer, yes.
Q That would be CG, right, commanding general, or is that --
A Well, that's -- that's true.
Q When the contract, the H & R Services contract, was awarded, did you continue working with that contract for a period of time?
A No.
Q So when it was awarded, you handed the contract off to somebody else?
A To administer, correct.
Q Who did you -- who was the administrator of the contract?
A Mr. Ray Dryz.
Q Do you know for what period of time he was the administrator of the contract?
A He was the administering contracting officer until I left in '02.
Q Would that have been February of '02?
A Right.
Q And it may have been longer, you just

Page 36

don't know?
A May have been longer. I do not know.
Q And if I refer to H & R, you'll understand I'm referring to H & R Services, the company who was the contractor. Is that okay?
A That's okay.
Q If I refer to the contractor of the H & R contract, you'll understand that I'm referring to the contract that brings us here today that H & R Services was the contractor on with Ft. Sill, providing custodial/janitorial services? Is that okay?
A Yes.
Q And I understand that there was a prior janitorial/custodial services contract before the award of the contract to H & R Services.
A Yes.
Q Same question. From a general perspective, what was your involvement with that contract?
A To the best --
Q The prior contract.
A To the best of my recollection, I was the administering contracting officer on that.
Q And you said you familiarized yourself

Page 37

with the contract file for the prior contract, as well. Is that correct?
A I looked at it because it was in Mr. Alford's possession, and so I did look at it.
Q Okay.
(Exhibit 26 marked for identification.)
Q (By Mr. Hickman) Let me hand you what I've marked as Exhibit 26, and I'll represent to you that this is a copy of the solicitation for the prior contract that we've been talking about, solicitation number DABT39-95-B-0026 as maintained in the contracting file here at the Directorate of Contracting building. Have you seen this document that I've marked as Exhibit 26 prior to today?
A Yes.
Q Okay. As the administering contracting officer, did you familiarize yourself or have an opportunity to look at the Exhibit 26 document while performing those services?
A While performing the services as the administering contracting officer?
Q Yes, ma'am.
A Yes, yes.
Q Okay. Does Exhibit 26 appear to you to be a true and correct copy of what would be in the file



25d4ffe5-a6bc-477b-b893-935a0b2820af

maintained in the ordinary course of business by the government?
A No. What you have given me is the bid package. I don't see a signature awarding it, nor do I see square footage prices. Now, I haven't had a chance to look through the entire document, but --
Q No, ma'am. This -- this is not the actual contract, but it's the solicitation.
A I misunderstood your question, then.
Q Okay.
A Yes. This --
Q Does this appear to be the solicitation?
A This appears to be a true copy of the solicitation.
Q Okay.
A Okay.
Q Sorry about that, if I misspoke or was confusing.
If you can look over on page C-20 of Exhibit 26, what was the requirement for supplies as set forth in paragraph C.4.6?
A C.4.6?
Q On page 21.
A Oh, supplies, page 21. The document says that, "The contractor shall furnish supplies listed



at" -- a technical exhibit. In this case, 6 -- "necessary to perform services," and it has to be -- the samples that are submitted have to be approved prior to contract start.
Q Okay. And if we can flip over to Technical Exhibit 6, does Technical Exhibit No. 6 identify specific supply items and the estimated monthly usage of those supply items?
A Yes. That is a supply item list and an estimated monthly usage.
Q And as a typical procedure, would a document like Exhibit 26 be provided to companies interested in doing business with the government?
A Would you ask me that again?
Q Is it typical that a document marked Exhibit 26, the solicitation, would be provided to companies interested in doing business with the government?
A I can only conjecture that, you know, it would be typical for the government to provide something like that.
Q I mean, the practical purpose of a solicitation is to provide it to the public to invite companies to submit bids or solicitations or proposals to do work for the government. Correct?



A Right.
Q So it would be expected that companies in the marketplace would look at the information contained in a solicitation such as Exhibit 26 in determining how to price their -- how to price their bids or proposals. Correct?
A It's not always there, but in this case, here are some supply items, and the contractor could expect to at least make a shopping list based on that.
Q It's not just Exhibit -- I'm sorry. It's not just the Technical Exhibit --
A Okay.
Q -- 6-1. It's the entirety of the information contained within the solicitation.
A The entirety is to help the contractor prepare a price.
Q And when you were a contracting officer working in the Directorate of Contracting, is it not routine for -- when a follow-on contract is being put in place, for companies to ask for information about the prior contract in anticipation and preparation for the follow-on contract?
A I don't know whether it's routine, but it's certainly within the contractor's right to ask



to see things that are not -- I can't think of the right word, but it's, you know, proprietary, that it is certainly acceptable for a contractor to do that.
Q And in fact, when you were involved in the pre-award period relating to the H & R Services contract, you had individuals -- you had companies ask you for information about the prior contract.
A I don't remember that I did, but it would have been likely that some may.
Q And if information had been asked of the government, whether it was you or somebody else, about the prior contract, whether it was the solicitation of the prior contract, the contract itself, or the estimates such as those shown in Technical Exhibit 6-1, you would have provided the information to those interested companies. Correct?
A Right. Anything that was allowable under the Freedom of Information Act, we would have provided.
Q Okay. Was there a site conference, a pre-award site conference, do you recall, relating to the prior contract, the contract prior to the H & R Services contract? Do you know?
A I don't recall.
Q You weren't involved, if there was one?





25d4ffe5-a6bc-477b-b893-935a0b2820af

A I would have been, if there was one.
Q On the contract prior to the H & R Services?
A On the one prior to.
Q Okay. You just don't recall if there was or not.
A I just don't recall.
Q Do you recognize the name Ramon Rodriguez?
A Yes, I do.
Q And did you and Mr. Rodriguez work together for a period of time?
A Yes, we did.
Q Did he work for you for a period of time?
A He was a contract specialist working for me, yes.
Q And you were his contracting officer?
A I was his contracting officer.
(Exhibit 27 marked for identification.)
Q (By Mr. Hickman) Hand you what I've marked as Exhibit 27. Are you familiar with the document that I've marked as Exhibit 27?
A Not particularly familiar with it, but it is a document that we would've prepared.
Q A document that would've been maintained in the ordinary course of business in the



government's file for this contract?
A That is correct.
Q Does this appear to you to be a true and correct copy of those documents?
A It appears that way.
Q Can you tell me, first of all, why there's a difference in the dollars on these two different pages that is the bid schedule?
A That's what I was looking at, to see why there's a -- ah, yes. The second page says, "Recorded as read." When there is a public bid opening, the individual packages are opened and read at the face value of what the contractor presents, and then it's the responsibility of the contracting officer and specifically the contract specialist to go back and do the math. So on the top page, it's totals after checking.
Q And so would it be fair to say that the decision on the awarding of the contract from a low-price perspective would be based on page one of Exhibit 27 versus page two, the totals after checking --
A The top page, yes.
Q Okay.
A Yes.



Q And so I'm assuming, based on what I'm looking at here in Exhibit 27, the top page, that the contract was awarded to Klean-Rite Services in Knoxville, Tennessee?
A I can't guess that because this is simply a summary of the bid schedule and does not include information such as capability of the contractor to perform. This is strictly a listing of what the math was.
Q I guess what you're telling me is that the person who has the lowest price may not always get the contract if they're -- they have a bad past performance record or not a responsible type company?
A Or something else. In some cases, there are bid bonds that are required, so there might be several reasons why the initial low bid offered as calculated might not be the award.
Q And could one of those reasons why the low bidder isn't selected is because their price seems unreasonable or unrealistic?
A That might be a reason why, yes.
Q There is a government estimate completed prior to the award of the contract?
A That is correct.



Q As part of the pre-solicitation or pre-award phase?
A That is correct.
Q So an analysis is made of the bidder's dollars in comparison to the government estimate to determine whether it's realistic and reasonable that the services and supplies can be provided for the dollars indicated by the company?
A Yes.
(Exhibit 28 marked for identification.)
Q (By Mr. Hickman) I'll provide to you what I've marked as Exhibit No. 28.
MR. HICKMAN: I don't have an extra copy of this one.
Q (By Mr. Hickman) Does Exhibit 28 appear to you to be a true and correct copy of the contract, contract number DABT39-95-C-4021, which would be the janitorial/custodial services contract that preceded the H & R contract, and I believe on the first page, it has your signature.
A Oh, that is my signature on the first page.
Q Okay.
A This does appear to be a copy of an award document, yes.





25d4ffe5-a6bc-477b-b893-935a0b2820af

Q And I believe, based on your prior testimony, you indicated that you were the contracting officer that administered this contract that's marked Exhibit 28?
A To the best of my knowledge and remembering, this was mine.
Q And if you flip over to page C-21, does it appear that paragraph C.4.6 concerning supplies, that we looked at before in the solicitation marked as Exhibit 26, is incorporated into the contract that I have marked Exhibit 28?
A Yes, it appears that it is there.
Q And how about the Technical Exhibit 6 concerning the estimated supplies? Is it likewise incorporated from the solicitation we talked about marked Exhibit 26 into the contract we marked Exhibit 28?
A It appears to be there exactly as it was in the solicitation.
Q Is that typical, that information from the solicitation is incorporated exactly or directly, I think -- I can't remember what word you used -- exactly into the resulting contract?
A Typically, the documents that are in the bid package are, with a few exceptions, the same



documents that go into the contract.
Q And are there any specific types of exceptions that you have in mind? You mentioned that there might be some exceptions.
A Well, the definite exception just is over in section I -- L.
Q Are you referring to the section that would deal with the evaluation --
A Yes.
Q -- components of the solicitation?
A That's what I was looking for, is the part that says how the award is going to be evaluated.
Q I think that would be section K, maybe, but whatever section it is.
A Whatever section.
Q Besides that section dealing with evaluation considerations, are there other exceptions that you can think of where information that was in the solicitation would not be in the resulting contract?
A No, I can't think of -- no, I can't think of any -- I can't think of anything that would be taken out other than, you know, the criteria for award.
Q Have you seen a situation or could a



situation occur where, in the solicitation, there was an example report or an example exhibit provided to a contractor or a bidder, but because it was just a sample document, it was not included in the resulting contract because maybe the contractor is using their own form and the solicitation just provided them sort of an example to start with or to maybe utilize, but didn't have to follow it exactly? Do you understand my question?
A Please repeat that, would you?
Q Could there be a situation where, in the solicitation -- I'm using this as an example -- a form of a report is provided to the contractor or the bidders, but that form is not incorporated into the contract as being a mandatory form? It was only provided in the solicitation as an example of the type of form that would work, or report.
A I'm not familiar with that. The only thing that I can think of is perhaps an invoice, and then it would be married up with the -- with the Department of Army form, but I can't think of -- of an opportunity for a contractor to substitute their own, or I can't think of an opportunity for the contracting officer or the specialist to take a document out --



Q Okay.
A -- of what was in the solicitation package going into the -- the contract, with the exception of what's here on this amendment.
MR. McNAMARA: The witness is referring to the first page of Exhibit 28.
Q (By Mr. Hickman) Okay. How about let's use an example of where estimates are provided in the solicitation, and they're just that, they're estimates of the number of paper clips that we need, that we're maybe going to buy or something, and it's provided on some sort of attachment to the solicitation. It's not on the pricing structure. Would that information, those estimates, need to be incorporated into the contract?
A Yes.
Q Why?
A Because it was part of the bid package that was provided. That was your question, if it was in the bid package.
Q If it was in the solicitation.
A Uh-huh. If it was in the solicitation, with the exception of the evaluation factors and procedures, it should be in the award document.
Q Now, what if it was information provided





25d4ffe5-a6bc-477b-b893-935a0b2820af

to bidders, interested bidders, that was not formally in the solicitation package, like information provided at a site visit or information provided in just a phone conversation or information from a prior contract? Would that information need to be incorporated into the contract?

A If the information was provided during a site visit or through question and answer, the contractors are told specifically, "Only rely on this if it appears in the solicitation package," and if it is significant, it would've been added through amendment. So if it's -- if there's a document that a -- the contractor sees and it needs to be one that can be relied on, in other words, used to make a bid, it must be there.

Q Okay. In a overview summary fashion, as the administrator of the contract that we've been talking about, Exhibit 28, how did the contractor's performance -- how was their performance during the period of time that they performed under the contract? Do you remember?

A I'd have to -- I don't remember. I'd have to look at the contract file specifically for that. We're talking about a contract awarded in 1995. Correct?



Q Yes.

(Exhibit 29 marked for identification.)

Q (By Mr. Hickman) Hand you what I've marked as Exhibit 29. Does Exhibit 29 appear to be a true and correct copy of documents out of the contract file?

A Yes, it does appear.

Q Is Exhibit 29, the first page, at least, a letter from you to the contractor on the contract that's marked Exhibit 28?

A Yes, it is.

Q And did you send this letter based upon the memorandum that's marked -- that's page two of Exhibit 29?

A Yes. That would've been the basis for sending the -- the letter to the contractor, would've been that report from the chief of construction branch.

Q And is this -- is it essentially a complaint? I mean, it appears to me as if Mr. Roberts in the construction branch is complaining that the restocking of supplies at latrines has become a problem installation-wide. He goes on and says, "Our office presently receives numerous complaints on a daily basis, especially



from facilities with large concentrations of personnel." Is that your understanding of the complaint here?

A No. My understanding is, Mr. Roberts is reporting from his inspector in the field and passing on the information that there is a problem here with restocking of supplies.

Q I understand. It's not Mr. Roberts.

A Not necessarily him, correct.

Q It's not his complaint. It's actually --

A Right.

Q -- broader than just him. It's installation-wide and it's multiple offices that are complaining. Right?

A That there are multiple offices -- not listed here, so I can't tell you how many, but there is more than one, more than Mr. Roberts' complaint.

Q Okay. And do you have an understanding of why these complaints would be especially from facilities with large concentrations of personnel?

A Do you have what? Do I have a --

Q Do you have an understanding or do you recall any conversations with Mr. Roberts with regard to his second sentence there where he talks about the complaints are especially from facilities



with large concentrations of personnel?

A No, I don't. I don't have a recollection of that.

Q Do you have any understanding as to why those facilities with larger concentrations of personnel would have more of a complaint in the restocking of supplies?

A My guess is, they're running out of toilet paper.

Q And so because the customer in the field was dissatisfied with the service under the contract, as the contracting officer, you sent a letter to the contractor?

A Correct.

Q And you cite to the contractor paragraph C.5.3.10.2 from the contract?

A Yes, that is the citation there.

Q Do you recall if there was other complaints, besides the one that we've talked about in Exhibit 29, concerning the performance of the contractor?

A It's my recollection that people on this installation complained about the custodial service, yes, sir.

Q The contract that we've been talking





25d4ffe5-a6bc-477b-b893-935a0b2820af

about, Exhibit 28, did it have a single base year, then -- and option years after that?
A Yes.
Q Were all the option years exercised? Do you recall?
A I do not recall.
(Exhibit 30 marked for identification.)
Q (By Mr. Hickman) Let me hand you what I've marked as Exhibit 30. Do the documents that I've marked as Exhibit 30 appear to be a true and correct copy of those from the contract file?
A I'm not through all of them yet, so just a second.
Q Sorry.
A Do you have two copies -- two pages of -- the last two pages, are they exactly the same?
Q It's definitely possible.
A Okay.
Q You know how these files are. There are duplicates in there.
A Okay. But yes, this appears to be a copy of something that would have come out of that -- that contract file.
Q And do the documents in Exhibit 30 essentially deal with the -- deal with a



modification to the contract?
A Yes, that is correct.
Q And can you summarize for me what is being proposed to be modified?
A The contractor is being asked to prepare a price reduction for delete -- or changing square footage on routine work.
Q And I'm looking at the letter from you to Pure Services dated March 26, 1998?
A Right. It's the last one or the next-to-the-last one, depending on which page you're on.
Q And was one of the proposals or requests of the proposal to modify the contract to discontinue all of the direct cost customer building services?
A Yes, that's what subparagraph A is. "All service provided to these buildings will be discontinued."
Q And in the letter, do you also advise the contractor, Pure Service Corporation, that the third option period under the contract will not be exercised?
A That is what that paragraph states.
Q And was that decision to not exercise the



third option under the contract based in part on the complaints and the performance of the contractor, as we discussed in relationship to Exhibit 29?
A I don't recall what the reason was for the discussion of issuing a new solicitation.
Q Could the performance of the contractor have been one of the considerations of not continuing on with the option years?
A Certainly, the performance of the contractor could have been one of those things.
(Exhibit 31 marked for identification.)
Q (By Mr. Hickman) Hand what you I've marked as Exhibit 31.
A Okay.
Q Do the documents or the e-mail marked as Exhibit 31 appear to be a true and correct copy as it would have been maintained in the ordinary course of business in the contract file?
A Yes, considering that there's only one -- one date there that I see that would be May 13th, '98. The --
Q I'm not sure why there wasn't a date on that initial e-mail.
A On the response, yeah. Okay.
Q Do you see -- I guess you're copied on the



top e-mail that contains the information about the average number of supplies used by the contractor.
A Right.
Q Why was that information requested from the contractor?
A Why was it requested from the contractor? Is that what -- is that what you asked? Why --
Q Yes.
A Why would we have asked this?
Q Yes.
A Nancy Smith of resource management is trying to determine the cost of prisoner-cleaned buildings, and so she's asking, you know -- I have estimates on toilet paper that she had provided, and so Nancy is then just saying, you know, any information on amounts would help, and so Laurie -- Laurie Wheeler's response back is, "This is what the contractor provided to me."
Q Okay. So the information on the average number of supplies each month being used by the contractor was obtained by the government to help in doing a cost analysis, essentially, of the -- the existing contract with -- maybe going with the prisoner-provided contract or services?
A I don't remember if this is the time when





25d4ffe5-a6bc-477b-b893-935a0b2820af

Page 58

some of the buildings were cleaned by prisoners, but I know that there has been a time when Ft. Sill was using prisoner labor, and so that -- that may have been the reason for this, if that was what your question was.

Q Yes.

A Okay.

(Exhibit 32 marked for identification.)

Q (By Mr. Hickman) Provide you what I've marked as Exhibit No. 32. Do the documents marked as Exhibit 32 appear to be a true and correct copy as kept in the ordinary course of business in the government contracting file?

A Yes, they do.

Q Is Exhibit 32 essentially another complaint from building customers on the restocking of supplies in the latrines?

A Yes.

Q And you again advised the contractor of these complaints and -- did --

A Yes.

Q Okay.

(Exhibit 33 marked for identification.)

Q (By Mr. Hickman) Hand you what I've marked as 33. Do the documents marked as Exhibit 33

Page 59

appear to be true and correct copies as kept in the ordinary course of business in the contract file?

A Yes.

Q Is Exhibit 33 essentially or is it actually a contract discrepancy report?

A Yes, it is.

Q And what is a contract discrepancy report?

A What is it?

Q Yes.

A It's the formal documentation of some failure to perform.

Q Okay. And with regard to Exhibit 33, what were you documenting with regard to the failure of performance by the contractor?

A We were documenting that the contractor did not service some building -- buildings.

Q Were you documenting that he had failed to provide latrine service, cleaning, as well as failed to provide supplies for the latrines?

A The only documentation here is the failure to provide a service. It was noted that, you know, in addition, during the last week of each month, running out of latrine supplies is a continuing problem, but the deduct for the money is strictly for failure to perform.

Page 60

Q So there was a deduction of money for the failure to perform the service, but then there was a note in the actual contracting discrepancy report of the running out of latrine supplies being a continuing problem.

A A continuing problem, yes.

(Exhibit 34 marked for identification.)

Q (By Mr. Hickman) Hand you what I marked as Exhibit 34. Do the documents in Exhibit 34 appear to be true and correct copies of the records kept in the ordinary course of business in the contractor file?

A Yes.

Q Are these documents monthly statements of the number of manhours performed by Pure Service Corporation on the contract we've marked as Exhibit 28?

A Number of manhours, yes.

Q And are these manhour reports routinely provided to the Directorate of Contracting office --

A Correct.

Q -- on this contract, Exhibit 28?

A Yes.

Q What did you do with these reports, if anything?

Page 61

A They're a requirement to assure that the individuals employed by the contractor are being paid the correct rate and that they are receiving the proper health and welfare rates that are required under the contract.

Q Okay. Do you make any review or consideration of the number of manhours actually being worked by the contractor in the providing of their services pursuant to the requirements of the contract marked as Exhibit 28?

A No.

Q Let me hand you what has been previously marked as Exhibit No. 17. I want to try to begin to transition from the prior contract that's marked as Exhibit 28 into the pre-award phase of the H & R Services contract.

A Okay.

Q And I've given to you what's been previously marked, like I said, as Exhibit 17, and it's my understanding that this is the identification of the government's requirement that then leads to the development of the solicitation that's put out for bid and ultimately results in a contract. Is that a fair summary?

A That's a fair summary.



25d4ffe5-a6bc-477b-b893-935a0b2820af

Page 62

Q Have you seen Exhibit 17 prior to today?
A Yes.
Q Would've been something you would've seen in the performance of your services with regard to the pre-award phase of the H & R contract?
A Yes.
Q Do these documents appear to be true and correct copies of the records from the government contracting file?
A Yes.
Q Do you recall having any conversations with Mr. Riemer about the government's needs in the preparation of the solicitation that resulted in the H & R Services contract?
A Nothing specific. No, I don't recall any conversation specifically with Mr. Riemer.
Q Okay. How about any -- what do you remember in general in your discussions with him about the government's needs?
A It's Mr. Riemer's responsibility to prepare a fair estimate of what the government's needs are, and I would have simply asked him, "Is this the latest up-to-date, you know, to the best of your knowledge, estimate of what the government needs?"

Page 63

Q Okay. During the time that you were the administrator on the prior custodial contract, the one marked Exhibit 28 --
A Yes.
Q -- did you work with Mr. Riemer in that -- did you work with Mr. Riemer while you were in that administrative phase in any fashion?
A In the -- in the same manner that I would have -- with this particular solicitation? I can't recall if he was the -- the specialist, the engineering tech on that, but he may have been, and we may have worked on that.
Q I guess my question is, do you know whether or not Mr. Riemer worked the administrative side of the contract that we've marked as Exhibit No. 28?
A He wasn't the inspector, so I'm going -- I'm going to ask you exactly --
Q Well, during the time you were administering the contract that we've marked as Exhibit 28, do you recall Mr. Riemer having any role or involvement in the administration of that contract?
A For exam -- yes, yes.
Q Okay. What do you recall?

Page 64

A That he would have been working through Mr. -- under Mr. Price to make that one change where we said we wanted to remove completely the requirement for that one contract line item.
Q Okay. So he may have been involved in any modifications or that modification that dealt with adding square footage or removing square footage from the contract?
A He might have been working on something like that where there was a change to the contract line item. He probably wasn't working with adding a building.
Q Okay.
A But he would -- but where there would have been a change to the -- the bid schedule, he probably drafted that.
Q Okay. But Mr. Riemer would not have any knowledge of any complaints about the performance of the contractor doing work under the contract that's marked Exhibit 28. Right?
A I can't think of how he would have been involved in that. He may have, but I can't -- that's -- that's not the way those documents are running as far as the signature blocks and such on them.

Page 65

Q Typically, that would be the inspector. Is that correct?
A And the inspector's supervisor and then his supervisor, et cetera.
Q Okay. And to your knowledge, Mr. Riemer wouldn't have been aware of the complaints about the inadequacy of supplies, as we've discussed previously, by the prior contractor on the contract marked Exhibit 28. Right?
A He might have made one of those complaints. I can't -- I can't say that he did or didn't. It's a small -- it's a small city here.
Q But as the formal -- but as a part of the formal process of -- I'm not talking about him being a -- as a user.
A Okay. Not the user.
Q But as far as being a part of the formal contracting team of individuals that administer these government contracts, Mr. Riemer was not involved directly in that regard as far as having knowledge of the complaints concerning the inadequacy of supplies in the latrines.
A It's my recollection of how that worked at that time that he would not have been in that particular chain of command.





25d4ffe5-a6bc-477b-b893-935a0b2820af

Page 66

Q And he may not have known of any contractor deficiency reports that we talked about earlier being issued against that contractor?
A I just don't see -- I just don't see that as his -- his chain of command. He might have because people might have discussed that with him, but that wouldn't have normally been how a complaint was handled.
Q You didn't discuss it with him. Correct?
A Oh, probably not.
Q Okay. In the --
A From the viewpoint of contract administration --
Q I understand.
A -- I can't -- I can't think of, you know, why I would have -- I can't remember why I would have talked to him.
Q In Exhibit No. 17, do you see there's a Technical Exhibit No. 4 entitled, "Supply Items"?
A Okay. Yes, TE 4-1.
Q And this was part of the information that was provided by Mr. Riemer as part of the government requirements?
A Okay.
Q Correct?

Page 67

A It's in this package. Yes, that is correct. It's --
Q And there's also a Technical Exhibit No. 3 identifying tools.
A Yes.
Q Does the information contained in a document such as Exhibit No. 17 here typically go into the solicitation that's sent out to bidders?
A Trying to see if there's something in here that wouldn't normally have been included.
Okay. Now, ask me again.
Q Would the information contained in Exhibit 17 -- excluding the top couple of pages here --
A Uh-huh.
Q -- that are the internal government documents, would the scope of work and the exhibits and the requirement information typically be incorporated into the solicitation that is then sent out to prospective bidders?
A Typically, yes.
Q That's the typical process. Correct?
A That what comes down in the package can be used to build a solicitation.
Q Now, are there sometimes meetings or discussions or changes to the statement of work and

Page 68

to the documents that are initially provided by the entity identified in the government requirement that causes there to be differences in what is actually put into the solicitation?
A Yes. There are different reasons to put in more documents.
Q With regard to this H & R Services contract and the information provided in Exhibit 17, were you the contracting person involved in that process of taking Exhibit No. 17 and putting it into the final form that resulted in the solicitation?
A I am the con -- I am the contracting officer -- I was the contracting officer, that is correct.
Q Okay. And if you need to take a break at any time, please let me know.
A Okay.
Q If you want to do that now, we can, or we can press on.
A Press on.
(Exhibit 35 marked for identification.)
Q (By Mr. Hickman) Provide to you what I have marked as Exhibit No. 35 and represent to you that these were copies made by my -- by me out of the contract file here, the file of pre-solicitation

Page 69

documents relating to the H & R Services contract and Exhibit 17. I'll give you a minute to take a look at those.
Do the documents contained in Exhibit 35 appear to be true and correct copies of the records kept in the ordinary course of business in the government contracting file?
A Yes.
Q If you look at the second page that's entitled, "Bid Schedule," there's some handwriting in the bottom left-hand corner. Do you recognize that handwriting?
A Yes.
Q Whose handwriting is that?
A That's Laurie Wheeler's. Laurie Wheeler-Arvey. Sorry.
Q What was her position at the time of this pre-solicitation phase of the H & R contract?
A I don't recall the time that she left our organization, but her position was a contract specialist.
Q So she was a contract specialist working for you, as the contracting officer.
A Right.
Q And can you read her handwriting?

Page 70

A Yes.
Q What does it say?
A "Approval of cleaning supplies," question mark. "Stocking bathrooms," exclamation mark.
Q Do you know what she meant by that or do you recall any conversations with her or others about those questions?
A No, I don't recall a conversation.
Q Based on your knowledge of the administration of the prior contract, did that maybe relate to the issues that we've previously discussed on the prior contract, on the cleaning supplies and the stocking of bathrooms being a problem and trying to address them now in the new contract, in the follow-on contract?
A I honestly don't know why she made the note.
Q Okay. Do you know where Ms. Wheeler is at currently?
A No, not absolutely.
Q Do you have an idea?
A But I would expect where she works.
Q Where's that?
A Here in this building.
Q In the Directorate of Contracting

Page 71

building?
A Yes.
Q The next page also has some handwriting on it and strikeouts. Do you recognize the handwriting?
A Yes.
Q Is that the same person, Ms. Wheeler?
A Ms. Arvey, yes.
Q Who?
A Ms. Arvey. She was Laurie Wheeler when she worked for me. She's Laurie Arvey now.
Q How do you spell that last name?
A A-r-v-e-y.
Q Thank you. I would have been confused all day.
Do you see on page number six, the bottom, paragraph 26, she's written in, I guess, "The contractor shall furnish, as a minimum, supplies listed," and the sentence goes on?
A What page? On six?
Q Right here.
A Oh, up there. Okay.
Q Do you recall any conversations with her or anyone else, during the time the scope of work was being modified, about the inclusion of those

Page 72

words, "as a minimum"?
A I don't remember specifically a conversation saying, you know, that we should put that language in.
Q And on the next page, page seven, there's additional handwriting. Do you recognize that handwriting?
A "As indicated on the floorplans." Yes, that's Ms. Arvey's.
Q Do you know who made these strikeouts and the other markings?
A No, I don't, because there would be other people reviewing these.
Q And if we skip over to -- it has "page nine" down at the bottom. Do you see the handwriting where the buildings are written in?
A Yes.
Q Do you recognize that handwriting?
A Yes, I do.
Q Whose is it?
A That's Ms. Arvey's handwriting.
Q And then the next two pages with Technical Exhibit No. 1, the deliverables reports, it appears that they are marked through.
A Yes, it does appear they're marked

Page 73

through.
Q Do you recall whether or not the Technical Exhibit No. 1 was deleted or marked out?
A No, I don't recall that.
Q Do you recall any discussions about the removal or the deletion of Technical Exhibit 1, as contained here in Exhibit 35, being removed from the information that would be provided in the solicitation?
A I can't recall that discussion.
Q If it was removed from the solicitation, do you have any recollection or understanding of why it would've been removed, this Technical Exhibit No. 1?
A Ask me that again.
Q Well, if Technical Exhibit No. 1 that we're looking at here in Exhibit No. 35 was removed -- was removed and not included in the solicitation --
A Uh-huh.
Q -- do you recall why that would be, why it would have been removed?
A I can only conjecture.
Q What would your conjecture be, then?
A That we received some new guidance as to a

different format to put something in or that certain reports were no longer needed or, you know, that there is something in the latest and greatest, had a change.
Q In Exhibit No. 17, the government requirement that we talked about before --
A Uh-huh.
Q -- the Technical Exhibit No. 1 is included. Right?
A Right. Correct.
Q So if this would have been -- if it's being struck out here, it would've been removed or struck out during the time that the government was going from the identification of the requirement that's marked as Exhibit 17 to the issuance of the solicitation?
A That's exactly right.
Q And do you recall whether or not the government requirement identified as Exhibit 17 was ever modified or changed such that Technical Exhibit No. 1 would no longer be necessary?
A Do I recall the specific instance of that?
Q Yes.
A No, I don't.
Q If there are no documents evidencing a



change in the government's requirement that's been identified in Exhibit 17, but it's still been struck and removed, Technical Exhibit No. 1, can you conjecture as to why it would have been removed in that kind of a situation?
A There are many meetings that are held among the team members of -- on the government side between the time that a solicitation request is received and the time that the actual solicitation goes out on the street, and so there could have been many reasons why the team sat and looked at language or technical exhibits or something like that and said, "Okay. We may have used this before, but it's something that we want to either delete or add to as we go through," so there could've been lots of reasons why the package that comes down doesn't represent a mirror image of what goes out on the street.
Q Okay. If you look still in Exhibit 35, the next set of documents are the Technical Exhibit -- or the next document is Technical Exhibit No. 2. Do you recognize the handwriting on this page?
A Technical Exhibit 2. Yes, I do.
Q Whose handwriting is that?



A That is Mr. Steve Hovis's handwriting.
Q How do you spell that last name?
A H-o-v-i-s.
Q What was his position in this March, April, May 2000 time frame?
A My recollection is, he is one of the team that we might have asked to look at this and -- and give comments back on the package.
Q Did Mr. Hovis have any official position with regard to the prior contract?
A Yes, he did.
Q Was he the inspector?
A He was an inspector.
Q Okay. And then the next document is Technical Exhibit No. 3, and do you see the handwriting on there? Says, "Delete," question mark.
A Uh-huh.
Q Do you recognize that handwriting?
A Yes, I do.
Q Whose is that?
A That is Ms. Arvey's.
Q Do you recall any conversations about this question of whether Technical Exhibit 3 should be deleted?



A I don't recall any specific conversation about it.
Q What do you recall in general?
A Well, as I said, whenever the team met, we might have already gone through this individually and marked notes for ourselves to ask in the team or to go back to Mr. Riemer or to anyone else and say, you know, "Is this a technical exhibit we want to include?"
Q And then the next page is the Technical Exhibit 4, the supply items. Do you recognize that handwriting at the top there?
A Yes, I do.
Q Whose is that?
A That's Ms. Arvey's handwriting.
Q Do you recall any conversation about striking out any of the supply items listed?
A No, I don't recall any conversation specifically about striking out supply items.
Q Do you recall any conversations in general about any changes to Technical Exhibit No. 4?
A I do not recall any conversation in general about Technical Exhibit 4.
Q When you have these meetings of these team members that you've told me about, are there minutes


25d4ffe5-a6bc-477b-b893-935a0b2820af

taken of those meetings?
A Not normally.
Q Would there be notes of those meetings taken by you or any other attendees, potentially?
A I don't recall if -- if there were notes, per se. As a person had the package in front of them, and, say, Mr. Riemer was there, he would go through and make changes on his part of the document. If it was a -- if it was contract language, then I can see that Ms. Arvey or I might have made comments and marks, et cetera.
Q Okay. Well, somebody has to gather all those comments together from multiple people. Right?
A Right.
Q And so what I'm trying to understand is, if we have six people sitting around a table with the document in their lap, as you've indicated, and I understand that, and each person is maybe making marks or comments on it, who would be -- either who would be the person or what office would have the task of gathering those comments together into one?
A Traditionally, as I recall, the contract language would reside for correction or changes with the contracting officers and the contract



specialist, where the technical side would reside with the engineering tech.
Q So, for example, any changes in these technical exhibits we've been talking about, are you telling me that those changes would've been as a result of the engineer or a technical person?
A Traditionally, the technical side of the contract or the package was prepared by the engineering.
Q And then the next page is the contract discrepancy report, and it has an "X" through it, Technical Exhibit No. 7.
A Right.
Q Do you recall any conversations in general about the removal of Technical Exhibit No. 7 from the solicitation?
A No, I don't recall any specific discussion about including it or not.
Q How about any general conversations?
A Not even any general conversation.
Q Okay. And then the next page has some handwriting on it. Do you recognize that handwriting?
A Yes, I do.
Q Whose is it?



A That -- the handwriting is Mr. Hovis's.
Q How about the question mark?
A That, I can't gauge who that was.
Q Okay. The next page also has some handwriting on it. Do you recognize that?
A The handwriting on number 26 I recognize as Mr. Hovis's.
Q And I think what I might be figuring out here -- might be an explanation, at least -- is, you might notice here in Exhibit No. 35, there's -- we're going over some pages again, and the first set of times -- the first set of pages we went over -- let's take, for example, page six out of the scope of work. I think you told me the handwriting there was from Ms. Arvey?
A The first time, yes.
Q And now looking at this page six, which both pages are in the actual file --
A Right.
Q -- you're telling me that the handwriting is Mr. Hovis's?
A On 26, I recognize that. Right there under 26, yes.
Q So is maybe what I have here people have turned in their markings, and they've been put into



the contract file, and this is Mr. Hovis's markings in this back section of Exhibit 35 that we're looking at, and it was Mrs. Arvey's markings in the front portion of Exhibit No. 36?
A I suspect you -- go ahead.
Q Or 35, I mean.
A I suspect you do have two people's -- at least two people's review of the package.
Q Do you know where Mr. Hovis is currently employed?
A DPW.
Q Do you know what his position is there?
A Contract inspector.
Q Okay. If you look over at the next page, page seven --
A But on -- is it the second set of sevens?
Q Yes, ma'am, back where we were.
A Okay.
Q There's a little bit of small handwriting at the top there. Do you recognize that?
A "Or dumpster"?
Q Yes.
A Yes. That's Mr. Hovis's.
Q Okay. And then the next page, page eight, I don't know if there's any handwriting on that one.





25d4ffe5-a6bc-477b-b893-935a0b2820af

Page 82

A I can't tell you who --
Q Okay. The next page, page nine.
A Yes.
Q Do you recognize that handwriting?
A Well, there's two different people on that page, on page nine.
Q Okay. The words, "On regular service days"?
A That's Ms. Arvey.
Q And then the "3166," question mark?
A Is Ms. Arvey.
Q And then the buildings?
A Those are Mr. Hovis's.
MR. McNAMARA: Stapler.
MR. HICKMAN: Oh.
(Exhibit 36 marked for identification.)
Q (By Mr. Hickman) Let me hand you what I have marked as Exhibit No. 36.
MR. HICKMAN: I don't have an extra.
Q (By Mr. Hickman) Does Exhibit No. 36 appear to be a true and correct copy of the solicitation number DABT39-00-B-1001 as those records would be kept in the ordinary course of business in the government contracting file?
A It does appear that.

Page 83

Q And is this the solicitation that resulted in the H & R Services contract that brings us here today?
A I believe so.
Q And this would be the solicitation that would have developed from the initial identification of the government requirement in Exhibit 17?
A Yes.
Q Now, if you can kind of set Exhibit 17 kind of beside you here with the solicitation that we've marked as Exhibit 36, and I want to focus on the technical exhibits.
A Okay.
Q In Exhibit No. 17, the first technical exhibit is the deliverables. Can you tell me whether or not a technical exhibit for deliverables was included in the solicitation?
A I do not see a deliverables in the solicitation that was released.
Q Do you recall why that decision would've been to not include a technical exhibit for deliverables in the solicitation that we've marked as Exhibit 36?
A At the time -- okay. Ask your question again, please.

Page 84

Q Why was a technical exhibit for deliverables not included in the solicitation marked as Exhibit 36?
A I don't know, but I have a guess.
Q Okay. What's your understanding?
A My understanding is, at the time that elapsed from the issuance of the solicitation in '95 to the issuance of the solicitation in '00, that the custodial contract went to a different kind of solicitation. It's noted here that this is going to be paid by credit card and that there are some different clauses that are included here, so my guess is that this is one of the contracts that was changed between '95 and 2000 to use the more simplified acquisition process, and for that reason, some of the technical exhibits would have been revised or even deleted. For example, the deliverables reports.
Q Okay. Do you know if any of these deliverables reports were still required by the contractor under the contract and maybe just were not set out as a technical exhibit?
A No, I don't know that.
Q And in looking at Exhibit 17, the next technical exhibit was the workload task and

Page 85

frequency chart, which has the list of the buildings included with it, and without worrying about whether or not the list of buildings are exact, you would agree that there is a list of buildings in the solicitation we've marked as Exhibit 36. Correct?
A Yes, there is a list of buildings in Exhibit 36.
Q And then if you look at Exhibit 17, there is a Technical Exhibit 8, which is, I think, actually the task and frequency schedule.
A 8?
Q 8-1.
A Ah, yes.
Q And does it appear to be similar, if not identical, to the Technical Exhibit No. 2, task and frequency schedule, contained in the solicitation marked as Exhibit 36?
A Yes, it appears to be the same.
Q Okay. Then the next exhibit in -- the next technical exhibit in Exhibit No. 17 is Technical Exhibit No. 3, the tools.
A Yes. In the -- in 17 is the tools.
Q Was that technical exhibit incorporated into the solicitation?
A I don't see that technical exhibit there.

Q Do you know why the tools technical exhibit was not included in the solicitation marked Exhibit 36?
A I don't know or remember a conversation, but I can guess why that it wasn't in there.
Q Okay.
A That a contractor that bids on a service contract is supposed to know what kind of tools, et cetera, are going to be required for performance of -- of the service, and that this would only -- this would be of no advantage, and if a contractor relied on this and bought snow shovels and we went through a period of time here in Oklahoma like we have where we don't have snow, say, in a year, then that it would just be to a disadvantage to the contractor to have relied on this if, indeed, all he's supposed to do is to know what kinds of tools he needs to -- to perform the work.
Q Okay. And then the next exhibit in -- the next technical exhibit in Exhibit No. 17 is the supply item exhibit?
A Yes.
Q Was that technical exhibit incorporated into the solicitation marked as Exhibit 36?
A Not as a technical exhibit. I don't see



it.
Q Well, were those estimated monthly usage of supply numbers, information, that's on the technical exhibit incorporated in any fashion in the -- into the solicitation marked as Exhibit 36?
A As far as I know. Now, in your document B-1001 on page 10 of 34, there is a number that -- number 18 that says, "The following list of supplies required is for informational purposes only. It is not meant to be all-inclusive." And there you see some of the things, such as toilet paper, rolled towels, single-fold towels, multi-fold towels. So as a technical exhibit, no, but the government did include that information in the statement of work.
Q Okay.
A And it says "for informational purposes only."
Q Now, if you recall from our discussion before, the solicitation that's marked Exhibit 26 for the prior contract, it did contain a technical exhibit concerning supply items. Correct?
A Yes.
Q So who would've been the person that would've made the decision not to include the technical exhibit that was identified in Exhibit 17,



the supply item exhibit, who would have been the person that would've decided not to incorporate that exhibit into the solicitation marked Exhibit 36?
A Well, as the administering con -- I mean -- excuse me. As the procuring contracting officer, it is my responsibility. I am the one. But as I explained, whenever the team gets -- or got the package, it would've been the team that went through and looked at all the various items, with the understanding that in '00, we were putting together a package that was different from the one that was released in '95 because we were using a -- for us, for Ft. Sill, a different kind of simplified acquisition.
Q And did that simplified acquisition process require the elimination of a certain number of technical exhibits?
A Oh, no, sir.
Q Okay. Did it require the exclusion of information that might have been helpful or previously provided to contractors or bidders?
A Well, if you see that the same information, roughly, that -- some of the same information that was provided in the technical exhibit was included in the statement of work. The



things that were looked at was, okay, this is a way to look at a contractor who is supposed to know what they're doing as far as what kind of cleaning supplies, what kind of toilet paper, or how many rolls of toilet paper, et cetera, are there, and so just to say these are for informational purposes only -- which is what, basically, a technical exhibit is.
Q Well, are you telling me, then, that it would be your understanding that from a practical -- practical matter, even though the solicitation marked as Exhibit 36 did not have the numbers next to it like, for example, "13 cases" next to the word "toilet paper," that the bidders that receive this solicitation probably likely had that information anyway through some other source, whether it was actually from the government's requirement document we talked about, Exhibit 17, or from maybe the prior contract, the prior solicitation?
A I missed the transition there. Would you repeat that again to make sure that I understand exactly what we're talking about here?
Q Well, you're telling me, it sounds like, that you feel like Technical Exhibit No. 4 has essentially been incorporated into the contract, and

Page 90

you're referring me to paragraph --
A 18.
Q -- 18 in the solicitation --
A Right.
Q -- that we've marked Exhibit 36.
A In the scope of work.
Q Correct. Now, what I'm wanting to make sure I understand is, would that also, as a -- even though it's not in the solicitation in writing, per se, from a practical matter, the bidders out there that were receiving this solicitation, would it be your understanding that they, more than likely, had in their knowledge these estimated supply items, the numbers -- like for toilet paper, 13 cases, that they would have had that information provided to them by the government through maybe the prior contract or in discussions with government personnel or maybe even seeing the information in Exhibit 17?
A They -- oh, they wouldn't have seen the information in Exhibit 17. 17 is government only. That's not released to the contractor.
Q Okay.
A To any contractor. But as we have talked, yes, a contractor can, under the Freedom of Information Act, request any of the contract award

Page 91

documents that are not proprietary, and they could've certainly had that. They could not have relied on anything that they had from a verbal discussion with any government employee.
Q Now, if you'll just look briefly at Exhibit 35 again.
A 35.
Q Do you see in Exhibit 35 any notation --
A These are the markups. Okay.
Q Yes. Any notation in those markups where Technical Exhibit No. 4 identified in Exhibit 17 is struck out, is shown to be removed from the solicitation?
A I don't see any note here that says, "Remove this from the solicitation."
Q Or any note like there is a note on Technical Exhibit 3, "Delete," question mark.
A Uh-huh.
Q Do you see any note like that on Technical Exhibit No. 4?
A No, I don't see that mark.
Q In fact, on Technical Exhibit No. 4 in Exhibit 35, there's actually language being added to the exhibit.
A But if you notice -- ah --

Page 92

Q Correct? There is language being added to the exhibit?
A Okay. Which one are we talking about? We're talking about --
Q Exhibit --
A -- 35 or 17?
Q Exhibit 35. The Technical Exhibit 4 page that's in Exhibit 35.
A Right.
Q It actually has language being added to it. Correct?
A No. It has things being marked out.
Q No, we're talking about -- no, at the top here.
A Okay.
Q There's language being added?
A "List of supplies may not be all-inclusive." Okay. And you see that exact language over here on page 10 of 34, item 18, where it says, "It is not meant to be all-inclusive," and it's the following list of supplies.
Q Okay. And is it your understanding from looking at this Technical Exhibit No. 4 that's in Exhibit No. 35, that where it has the numbers, 13 cases, eight cases, et cetera --

Page 93

A Uh-huh.
Q -- that somebody is marking those out?
A In this review, it looks as if someone is marking those out, yes.
Q And do you know who did that?
A No, I can't tell from the "X" whether that's my markout, whether that's Ms. Arvey's markout, you know, who might have marked that out.
Q Do you recall any conversations about removing the information?
A No, I don't recall any conversation about removing the -- the 13 cases of toilet paper.
Q Do you have an understanding of whether or not that information, estimated monthly usage of supply items, would be helpful to potential bidders in preparing their bids in response to the government?
A Do I have an opinion? Is that what you said? Do I have an opinion --
Q Or an understanding.
A An understanding about whether or not that would be --
Q Helpful information.
A Yes, I do have an opinion on that.
Q Okay. And what is your opinion?



25d4ffe5-a6bc-477b-b893-935a0b2820af

A That a contractor should not rely on that information if it's marked out here.
Q That's not my question.
A Oh, okay. Ask again.
Q If this information as it was in the prior contract --
A Uh-huh.
Q -- and as you may or may not be aware was in the follow-on contract provided to bidders --
A Okay.
Q -- and the information I'm referring to is the actual numbers that represent the estimated monthly usage of supplies was provided to bidders, would it be helpful to them in preparing their bid and submitting a response to the government?
A No, because as the contracting officer, the procuring contracting officer here, I did not include it.
Q Okay. I think there's two answers there.
A Oh.
Q My first question was, do you have an understanding of whether or not the estimated monthly usage of supply items, the numbers, would be helpful to a bidder in preparing their bid?
A Do I have an understanding?



Q An understanding. If that information was given to them, would it be helpful?
A No.
Q Okay. Have you ever been involved in preparing a government estimate for requirements of the government?
A For a contractor or for the --
Q For the government.
A -- government.
Q The government estimate.
A I don't believe that I have ever had the responsibility for preparing an independent government estimate. I'd have to think because that's many years, but I don't recall preparing the independent government estimate.
Q Okay. Do you recall if, during this pre-award time with regard to the H & R Services contract, if any potential bidders inquired of you or anyone, I guess, for that matter, of the estimated monthly supplies used on the prior contract, the prior janitorial services contract?
A Oh, do I recall if they requested it?
Q Yes.
A No, I don't recall at all.
Q Do you recall if it was a question asked



during this pre-solicitation phase of the H & R contract?
A No, I don't recall that it was a question asked.
Q Did you guys have a pre-solicitation site visit -- that may not be the exact right terminology, but did you have any type of a meeting or site visit with prospective bidders prior to the award of the H & R Services contract?
A I don't recall if we did.
Q Is it possible that you did, then?
A Oh, yes. A lot of times, there's information that states, you know, when it's going to be. If there's one that's scheduled, it's provided to everyone.
Q Do you recall having any conversations with any representatives of H & R about the estimated supply usage for the solicitation that's marked Exhibit 36?
A No, I don't recall having any conversation with any H & R person about the supply, either offline or online.
Q How about with any other potential bidder about supply usage? Do you recall any conversations?



A I don't recall any conversation with any of the contractors that were interested bidders here about supply numbers or amounts.
Q If you had had any such conversation, is there a document or something you would've recorded it on?
A Absolutely. If we get a written request for a piece of information, we are required to put that in writing out to all of the interested bidders that we have on the bidders mailing list, and if it requires a change to the solicitation package, it's required to be noted as an amendment to the solicitation. So it would be in writing.
Q What if the request for information wasn't provided to you in writing, was just a verbal question?
A And our response always is, "Any information that you want to rely on to prepare your bid package must be based on something that's in writing, either an amendment or the basic solicitation."
Q And what efforts, as the contracting officer, do you put in place to ensure that others besides yourself are not making statements to potential bidders advising them or telling them of





25d4ffe5-a6bc-477b-b893-935a0b2820af

potential supply usage and other things?
A Uh-huh. If we have any way of communicating that information to a prospective bidder, we say, "If you're going," for example, "on a site visit, do not use the information that any person gives you, even though that person may be in uniform and may be the commanding general of Ft. Sill, that unless you have that document in writing in your hand as an amendment to the solicitation, it is to your detriment to rely on it."
Q When you made the decision not to include Technical Exhibit No. 4 from Exhibit No. 17, did you have any conversations with Mr. Riemer or Ms. Waller or Mr. -- or Colonel Wright or Mr. Price, the individuals who signed the DA Form 3953 identifying the government requirement?
A I wouldn't have had a discussion with Ms. Waller or Colonel Wright because those -- it would've not been in their chain of command, et cetera, to have that, but --
Q Well, which of the people that I -- names I mentioned or that are identified on Exhibit 17 would you consider to be the technical or engineering people?



A Mr. Riemer is the technical person that we dealt with, just like he would have dealt with Ms. Arvey.
Q Okay. Now, you've told me that you're the one that made the decision to not include the Technical Exhibit No. 4 from Exhibit 17. What I'm trying to ascertain is whether or not you spoke to Mr. Riemer, as the technical person, about your decision not to include that exhibit, Exhibit No. 4.
A I don't recall that we had this specific discussion about that particular technical exhibit. As again, I tried to explain that we went from a solicitation package that looked like this through simplified acquisition to a solicitation package that looks like this, and to try to work with our technical activity to make sure that we got the information in it, you know, that was correct, but through the simplified acquisition process, there were going to be some things that were -- that were streamlined.
Q So then am I understanding that in an effort to streamline the documentation provided to prospective bidders, information was elected not to be included?
A It was determined that there was an



appropriate place to put the supplies, and that would have been on page 10 of 34, item 18.
Q But there was still information not included even on page 10 of 34 that was included on Exhibit 4 from Exhibit 17.
A I believe we indicated that the deliverables were not a requirement in this streamlined acquisition.
Q Wouldn't you agree with me that it would've been more appropriate to have Mr. Riemer make the decision about whether or not Technical Exhibit No. 4 in Exhibit No. 17 should've been or should not have been included in the solicitation that is marked Exhibit 36?
A I didn't think so at the time.
Q Is that because you were just simply trying to streamline the information provided to prospective bidders?
A The team got together, looked over the requirement, as far as Exhibit 17 is, as far as the package goes, what needed to go in there as a part of the simplified streamlined acquisition, and that, you know, in this case, there would be a listing of the supplies, et cetera, and it would be included. It just wouldn't look like that.



Q Who is Laurie Wheeler?
A That's Ms. Arvey before she married.
Q I hand you what I've marked as Exhibit No. 36 (sic). Does this appear to be a true and correct copy of the records as kept in the ordinary course of business in the government contracting file?
A Yes, sir.
Q Is this a verification of a bid submitted by H & R Services?
A Yes, that's what it looks to be.
Q Hand you what I've marked as Exhibit No. 37 (sic).
(Off the record.)
(Exhibit 37 marked for identification.)
Q (By Mr. Hickman) I believe we -- I made a mistake in my numbering of exhibits. Let me hand to you what I've marked as Exhibit No. 37. It's the letter from H & R Services, dated July 17th, 2000, which is the verification of bids that I previously, I believe, identified as Exhibit 36.
A And yes.
Q It is now properly marked as Exhibit 37?
A And it does appear to be a verification of a bid.
(Exhibit 38 marked for identification.)

Page 102

Q (By Mr. Hickman) Okay. Now let me hand you what I've marked as Exhibit 38. Does that appear to be a true and correct copy of the records kept in the ordinary course of business in the government contracting file?
A Okay. Now, the question is, does this appear to be a document that would be in the contract file?
Q Correct.
A Yes.
Q True and correct copy of such a contract or such a document?
A Uh-huh.
Q Okay. And in this little note from Ms. Wheeler, it says, "The contracting officer has made a request." Who was the contracting officer at this point in time? Is it still you?
A 2000 July, that's still me.
Q Okay. Why were you concerned that the bid price may be unrealistically low?
A Oh, I don't have that.
THE WITNESS: Do you have the price as bid?
MR. ALFORD: The bid schedule?
THE WITNESS: Uh-huh.

Page 103

A What we have is just the blank one here.
Q (By Mr. Hickman) I believe behind tab number two is what's referred to as the bid abstract. It's marked as Exhibit No. 2, and the various bid information is contained in there. Is that helpful?
A Well, I'll sure see here. Okay. Here's H & R. Okay. Without going into too much, looking back here -- okay. It appears that the government estimate is -- on this original -- on 17, on Exhibit 17, that the government estimate was $300,520, and the contract bid for that time from H & R appears to be $228,921.38, and when there was a difference of approximately 72,000, roughly, dollars for the -- for the base year, it was just a request from the contractor to, you know, make sure that that, indeed, was what they intended to bid since it was $72,000 less than what the government estimate was.
And so, you know, "include the number of personnel and working hours proposed" would just give the opportunity to the contractor to re-look that and make sure that that, indeed, was the correct number that they intended to bid. And then same for the references and suppliers and financial institutions. Those are very typical questions that

Page 104

we ask -- we asked at that time.
(Exhibit 39 marked for identification.)
Q (By Mr. Hickman) Provide you with what I've marked as Exhibit No. 39.
A Okay.
Q Do the documents contained in Exhibit 39 appear to be true and correct copies of the records contained in the ordinary course of business in the government contracting file?
A Yes, they do.
Q Is this Exhibit 39 the response from H & R to the letter we discussed that's marked Exhibit No. 38 to provide information requested?
A Well, it's referencing a fax of 7-20-2000, and this is a fax of July 20, 2000, so it's --
Q It's related to --
A Quite possibly be the answer to that, yes.
Q Relating to Exhibit 38.
A That 39 relates to 38, yes.
Q And when you received Exhibit 39, the projected labor used to meet requirements, the hours, and the personnel, did you look to see, based on the government estimate or your experience as the contract administrator on the prior contract, whether or not those numbers seemed to be

Page 105

reasonable?
A Typically, that would have been sent to DPW to look at that. We did have information that we have received, if you remember, on the -- the manhour report in '99, so I don't know that we did, but we might have had a chance to -- you know, to look at that.
Q The government had in its possession the information on the manhours being worked by the prior contractor?
A Right.
Q That's what you're referring to as Exhibit 34. Is that correct?
A Right.
Q And you just don't know whether or not anybody went back and looked at those numbers, such as the ones in Exhibit 34, to determine if H & R's estimated manhours was reasonable or not?
A You may have a document there in -- in the file, but I don't remember at what level we checked that, but we usually made calls, and you can see handwriting here where a point of contact for two contractors was made and -- let's see. What did --
Q And on Exhibit --
A Provide financial information, yes.


25d4ffe5-a6bc-477b-b893-935a0b2820af

Page 106

Q On Exhibit 39, the second page, there is handwriting. Do you recognize that handwriting? On the second page.
A Oh, I'm sorry. I thought you said -- yes, I recognize that as Ms. Arvey's handwriting.
Q Okay. And in general, can you ascertain what she is writing here and what she's writing about?
A I can guess that this is about the mess attendant contract that was -- since I don't know whether this was from Florida -- oh, it would have been the -- well, "mess attendant," it just says. Awarded October '96. And said that they had good performance. They had some union labor problems, but the organization here for the mess attendant did exercise all options.
Q I mean, basically, you got the information from H & R that's contained in Exhibit 39, you or your people working for you called and checked on these references, and you satisfied yourself that H & R had a good past performance history and would be a responsible company to award the contract to. Is that right?
A No. Unfortunately, the only notes here that -- just pertain to the mess attendant contract,

Page 107

so I don't know what else -- what other phone calls might have been made. You know, we did -- it apparently looks like we tried to fax something to the financial organization, but very typically, either the contracting officer or one of the specialists makes calls to whoever's provided here with the information.
Q Did you ultimately determine that H & R was a responsible bidder and award the contract to them?
A Yes, we ultimately decided that.
Q And would you have made that decision if you had not satisfied yourself that they had good past performance on other government contracts?
A Again, would I have --
Q Would you have made the determination that they were a responsible bidder and awarded the contract to them if you had not satisfied yourself -- satisfied yourself in checking either past performance and them being a good contractor, providing good performance on other government contracts?
A Okay. What I think you're saying is that if they had no outstanding contract deficiency reports, then we would have awarded to them. If we

Page 108

had a contractor that had defaulted or was in some way -- if there was an option that wasn't going to be exercised, we would not have.
Q And I believe the actual contract that was awarded to H & R is marked as Exhibit No. 1.
A Okay.
Q And I'm not sure if I've done this or not, but just out of an abundance of caution, if you could take a brief moment and look at Exhibit 1 and advise me, for the record, if the documents marked as Exhibit 1 appear to be true and correct copies of the documents that would be contained in the ordinary course of business in the contracting file.
A With the exception of some of the handwritten marks on here, this appears to be what would have been a proper contract award.
Q Okay. And is there in or attached to the contract marked Exhibit 1 a technical exhibit for list of estimated supplies as contained in Exhibit No. 17?
A No, there is no technical exhibit as it appears in Exhibit 17, not a technical exhibit.
Q Okay. And if you can flip over here under tab two, Exhibit 2, the bid abstract, and at the bottom, you'll see these numbers. I believe it's

Page 109

page 255.
A 255. Performance assessment report?
Q Yes. You see the handwriting in the bottom there on page 255?
A Yes, I do.
Q Is that -- whose handwriting is that?
A That is Ms. Arvey's handwriting.
Q And is this further evidence of her research, if you will, on the past performance of H & R Services?
A Yes. This would be more information other than what you have.
Q And what can you ascertain from her handwriting was she being told by H & R's past performance on other government contracts?
A What it appears here is that it says, "Easy to deal with on mods." That would be on modifications. "No real problems with the company. In the third year of a three-year contract," so the organization here has exercised the options. "Don't have a problem running low on supplies, but they try to cut corners," and I don't know -- "now and then, but easy -- easily -- but something work problem out." It says, okay, so they don't have a problem running out of supplies, but they try to cut corners

now and then.
Q Okay. "But they easily work problems out." Is that correct?
A That could be what that is. I can't tell for sure. Can't read all of that.
Q Okay.
MR. HICKMAN: Can we take a break?
MR. McNAMARA: Yes, sure.
(Recessed from 12:55 p.m. to 1:19 p.m.)
Q (By Mr. Hickman) Ma'am, if you'll look under Exhibit No. 1, page 20. You made a statement earlier -- when I asked you about Exhibit 1 being a true and correct copy, you made a caveat or comment about the handwritten markings. Do you recall that?
A Yes, I do.
Q And do you see where there's some handwriting in here on page 20, dates, I believe it is, that are marked in here?
A Yes, I see that.
Q Do you see the first one, I believe, is next to clause 52.1212-4, "Contract terms and conditions, dash, commercial items"?
A Yes.
Q The typewritten part of the contract says, "May 1999."



A Right.
Q And there's a handwritten note in here that says "2001"?
A Well, I can see that it's 2000, but I wasn't sure about that last digit. So one. Okay.
Q Okay. Then down below that, a similar kind of thing. The May '99 is struck through and May '01 is put in.
A Right.
Q Are you familiar with the commercial items clause of the Federal Acquisition Regulation that's 52.212-4?
A Not anymore.
Q So you don't know or you wouldn't know what the changes have been from the May 1999 version of that clause to the May '01 version of that clause?
A No, I wouldn't know what that was.
Q Why was the clause 52.212-4 included in the contract initially, at least?
A It would have been a required clause.
Q Required by?
A The Federal Acquisition Regulation.
Q And what is the purpose of that clause, then?



A What is the purpose? I honestly do not remember what the purpose of that clause is.
Q Okay. Do you know if that clause deals with changes to the contract?
A No, I don't know.
Q Let me ask you to look, if you will, at Exhibit No. 20, document previously marked Exhibit No. 20.
A Yes.
Q Do the documents marked as Exhibit No. 20 appear to be a true and correct copy of the records that would be kept in the ordinary course of business in the government contracting file?
A Right.
Q And are the documents marked Exhibit No. 20 -- do they relate to a pre-performance conference held here at Ft. Sill Army Base on September 19th, 2000?
A Yes, that's what the information says.
Q And were you in attendance at that meeting?
A Yes, I was.
Q And is the second page of Exhibit No. 20 the agenda for that conference?
A Yes, it is.



Q What was your role or involvement at the pre-performance conference? What did you do?
A I'm not sure exactly what you're saying, but I would have been the person that was the chairman of the -- the conference and introduced the people and then gone down to various other topics.
Q Okay. Whose handwriting is on this piece of paper?
A Oh, that's Ms. Arvey's.
Q Okay. With regard to -- let's talk about number nine. Were you the one that discussed, "Additions and deletions of buildings during the month," parentheses, "confirmed telephonically," close parentheses, "period"?
A I don't remember if that would have been one of my topics or not, but it would have been a topic that the government would have been responsible for discussing.
Q Do you recall if there were any issues or problems or concerns that arose from the pre-performance conference?
A No, I don't remember any problems or issues that arose during the pre-performance conference.
Q I assume this was the first time that


25d4ffe5-a6bc-477b-b893-935a0b2820af

maybe you met Mr. Hall or Ms. Hall with H & R Services in person. Is that --
A It may have been. They may have been at the bid opening, but I honestly don't remember. It very likely could have been the first time that I met them.
Q If you'll look under tab number three, near the back of that exhibit, you'll see -- at the bottom of page 645, if you'll flip over to that page for me real quick. Do the pages 645 through 661 appear to be true and correct copies of the documents kept in the ordinary course of business in the government contracting file? And I believe these are the documents that have been produced to me that relate to modification number one to the H & R Services contract.
A Yes, this looks like a document that would be in the contract file.
Q And you're the one that signed modification number one. Correct?
A That is my signature, yes.
Q And just in a summary fashion, what was the purpose of modification number one?
A It appears that the purpose was to add and delete specific building numbers and the square



footage that accompanied each building.
Q Okay. And was this a modification that was actually done and went into effect at the same time that the contract actually itself went into effect?
A Well, you have me at a disadvantage here because I don't know what our date was for the award.
Q Yeah, that's fine. You can -- on Exhibit --
A Okay. 8-22, and this is -- the date signed is 25 -- so it does not look like --
Q And what was the effective date of the contract?
A Oh, the effective date. I'm sorry.
Q I'm sorry.
A The effective date of the contract was 1 October and the effective date of this modification was 1 October.
Q Okay.
A Okay. I misunderstood, then.
Q That's what I thought. That's what I thought. So the effective date of the contract that's marked as Exhibit No. 1 --
A Uh-huh.



Q -- coincides with the actual first modification to the contract?
A The effective date, yes. The effective dates of both, yes.
Q And now if you will flip back to page 580, if my notes here are correct, and kind of hold your hand there at the page that we were on.
A Okay. 580, and hold my hand on 4 -- 645.
Q Yes. Do the documents marked from page 580 to page 644 appear to be true and correct copies of the records kept in the ordinary course of business in the government contracting file?
A Well, from 580 to 645, there's a modification in there plus some backup documentation plus messages, et cetera, and they would not have accompanied, per se, the modification, but yes, all of these things would very likely have been in a contract file.
Q And what was the effective date of this modification?
A Effective date, 1 October, 2000.
Q Which also corresponds with the effective date of the contract?
A Yes.
Q What was --



A And --
Q What was the date that the modification was actually signed by the contracting officer?
A May 4th, 2001.
Q Okay. And who signed as the contracting officer?
A Ray Dryz.
Q Okay. And so would the May 2001 time frame been approximately when Mr. Dryz would've taken over for you as the CO on the H & R contract?
A No, not necessarily.
Q Okay. Do you recall when that transition occurred?
A No, I don't recall exactly when it occurred.
Q If you look at page 581 --
A Yes.
Q Do you see paragraph two?
A "The following changes"?
Q Yes.
A Uh-huh.
Q Do you see the reference there to the FAR clause 52.243-1, parens, alt 1, close parens, changes? Do you see that reference?
A Yes.



25d4ffe5-a6bc-477b-b893-935a0b2820af

Q And then there are certain changes, also, then, being made to the scope of work paragraphs?
A No. Where would --
Q Under number two, where it says the A, B, C, D?
A A is just deleting a building.
Q Okay. So the changes being made by modification number two are basically the addition and deletion of buildings, square footage?
A Well, okay. 2A is a deleted building, 2B is a deleted building, 2C is a deleted building, 2D is an added building, 2E is a deleted building, and 2F is an added building. So these are additions and deletions from buildings with an effective date that are -- there's a 1 November effective date. There's a 12 March effective date.
Q Okay. And on that page 581, we talk about that FAR clause.
A 243-1?
Q Yes.
A Okay.
Q And the statement here says that the changes that you described to me are being made in accordance with that FAR clause. Do you know whether or not that FAR clause is included in the



contract? Can you flip back to Exhibit 1 and see if you can find it for me?
A I don't know that it's there. Let's see. We're talking about 243-1.
No. Without -- without studying the entire time, I couldn't tell you where in here it is.
Q Do you have a recollection or understanding of what the purpose of the FAR clause 53.243-1 that we've been talking about is?
A No, I don't recall what the topic of that clause is.
Q Is the government essentially incorporating that clause into the contract by virtue of this modification number two by utilizing it?
MR. McNAMARA: Objection. Calls for a legal conclusion.
Q (By Mr. Hickman) You can go ahead and answer the question to the extent you can.
A Oh, I'm sorry.
MR. McNAMARA: I'm sorry.
Q (By Mr. Hickman) It's a form -- it's just between us lawyers. It's a form thing.
A So ask me the question again, then. I'm



sorry.
Q Well, in this modification number two on page 581, you would agree with me, wouldn't you, that the government is relying upon the FAR clause 52.243-1 to make changes to the contract. Correct?
MR. McNAMARA: Objection. Calls for a legal conclusion.
A To my knowledge, that's what we're doing.
Q (By Mr. Hickman) Okay. And so if the government is relying on that clause to make changes to the contract, then that clause is essentially being incorporated into the contract for purposes of changes to the contract.
MR. McNAMARA: Objection.
Q (By Mr. Hickman) Correct?
MR. McNAMARA: Objection. Calls for legal conclusions.
A It's been my experience that, you know, a clause that is included by reference is in there in its entirety, and until it gets added by a statement that says, "Effective 1 October, this clause is added," then it was either there either in full text or by reference.
Q (By Mr. Hickman) I mean, this modification -- and I appreciate and agree with what



you're saying. This modification marked Exhibit No. 2 on page 580 is signed off on by both parties. Correct?
A Yes, it is.
Q It's a mutual agreement of the parties?
A Right. There are both parties signing this document.
Q And to try to expedite things a little bit, based on your experience and knowledge as a contracting officer, if you could look at Exhibit No. 3, beginning with page number 260, and let's just now encompass the rest of Exhibit No. 3 up to where we were at, which would be --
A Oh, mercy.
Q -- page 579. Do these appear to be the types of records and documents that would be kept in the ordinary course of business in the government contracting file as related to modifications of supporting documents relating to modifications to the contract? And I'll represent to you that this was what was produced to me by the government.
A These appear to be documents that would be in a contract file, yes.
(Exhibit 40 marked for identification.)
Q (By Mr. Hickman) Let me hand you what





25d4ffe5-a6bc-477b-b893-935a0b2820af

Page 122

I've marked as Exhibit No. 40. Does Exhibit No. 40 appear to be a true and correct copy of the type of records kept in the ordinary course of business in the government contracting file?
A Yes, this appears to be a document that would be in a contract file.
Q Does this appear to be a standard form type of a letter sent to a contractor, advising them of the renewal of an option period?
A It appears to be a letter that would be sent in the normal process of business.
Q And as a part of the government determining to exercise the option in a contract, does the government have to do certain things, make certain determinations?
A Yes. In the normal process of exercising an option, the government has certain responsibilities.
(Exhibit 41 marked for identification.)
Q (By Mr. Hickman) Okay. Now, I've handed to you what I've marked as Exhibit 41, and does Exhibit 41 identify some of the justifications for the exercising of the option period on the H & R Services contract?
A Yes.

Page 123

(Exhibit 42 marked for identification.)
Q (By Mr. Hickman) Hand you what what's been marked as Exhibit No. 42. And I think I forgot to ask you this question on Exhibit 41, but are the documents and records marked as Exhibits 41 and 42 the type kept in the ordinary course of business in the government contracting file?
A Yes.
Q And Exhibit 42 is a letter from you to H & R expressing appreciation for the services for the employees of H & R for their work?
A Passing on a remark or a comment, et cetera, from some other organization, yes. This would not be to my knowledge, but this would be reported by someone else.
Q For the period of time that you were involved with the H & R contract while services were being provided by H & R, did you form an opinion as to the quality of the services being provided by H & R?
A No.
Q You didn't have an opportunity --
A No.
Q -- to form an opinion one way or the other?

Page 124

A No.
Q You deferred to other people to express that opinion, like the inspector, for example?
A Like the inspector, like his supervisor, like the people out in the field.
(Exhibit 43 marked for identification.)
Q (By Mr. Hickman) Let me hand to you what I've marked as Exhibit No. 43. Does this appear to be the type of records kept in the ordinary course of business in a government contracting file?
A Yes, it does.
Q Does this appear to be a memorandum or a record to support the determination to exercise the option on the H & R Services contract?
A It appears.
(Exhibit 44 marked for identification.)
Q (By Mr. Hickman) Hand to you what I've marked Exhibit 44. Is Exhibit 44 requesting information from H & R Services concerning adjustment to the prepriced option year line items based on the wage determination?
A Yes, that's what this document is.
(Exhibit 45 marked for identification.)
Q (By Mr. Hickman) Let me hand you what I've marked Exhibit 45. Does Exhibit 45 appear to

Page 125

be H & R's proposal for the Department of Labor wage revision?
A Oh, it looks like that documentation.
Q Okay. On Exhibit No. 45, on the fourth page, there's some handwriting. Do you recognize that handwriting?
A No, I don't.
Q How about on the next page? There's some additional handwriting.
A No, I don't recognize that handwriting, either.
Q On the first page --
A On the first page, not the cover sheet or --
Q I'm sorry. On the cover sheet.
A On the cover sheet? Okay.
Q Of page 45 -- or Exhibit 45, do you recognize the handwriting there and the signature or the name of the individual?
A The signature block is Steve Anthony, and I know Mr. Anthony.
Q Okay. Does it appear -- is Mr. Anthony a government employee?
A Yes, he is.
Q Okay. Is he the price analyst? I believe

that's what it says.
A Yes. Or he was at the time. I don't know that he still is, but he was at the time, I believe.
Q Does this appear to be Mr. Anthony's -- it says, "I have reviewed the proposal and it is acceptable."
A That's -- that appears to be his handwriting.
Q Okay. And are Exhibits 44 and 45 documents kept in the ordinary course of business in the government contracting file?
A Yes.
(Exhibit 46 marked for identification.)
Q (By Mr. Hickman) Give to you what I've marked Exhibit 46.
A Yes, sir.
Q Was Exhibit 46 -- a letter similar to Exhibit 46 sent to -- this one was sent to H & R Services. Correct?
A It appears that way.
Q Okay. Do you know if such a form letter was sent to other contractors?
A I don't recall that it was.
Q Do you have a recollection or understanding of why the letter marked Exhibit 46



was sent to H & R?
A I'm not sure I understand what you're asking, but the date here is November the 8th, 2001, and so the action would have been in direct response to the attack on World Trade Center, the Pentagon, and the plane that went down in Pennsylvania, requiring a government -- you know, requiring some way to determine who's on our installation.
Q So were there changes in security measures at Ft. Sill after the attacks of September 11th, 2001?
A I'm sure there were.
Q And does this letter identify additional requirements of a contractor, such as identification and display of ID badges, those kinds of things?
A That appears to be the reason for the letter.
Q And does the letter, in fact, actually state that, "If you believe a contract price adjustment is needed, request you provide a rough estimate of the increased price"?
A Can we wait just a second here?
Q Sure.
A I'm looking for something.
In the pre-performance meeting that we



had, it was discussed that name badges and uniform shirts for all contractor personnel were a part of the contract, but this may have required a photo ID, so that's --
Q I believe if you look at the second paragraph, it says, "Although your company policy may already dictate such a practice, your contract currently does not require employees to wear photo IDs."
A To require photos (sic) to wear photo ID. Okay.
Q So I believe the letter does indicate that they're asking the contractor here, H & R, to do something that's not covered by the contract and is asking H & R that, "If you think you need more money for doing this, let us know."
A Okay. I am not Mr. Dryz, and so I don't know exactly what the intent was here because we had already said that, you know, uniform and ID, so I don't know if there was -- you know, if there came a memo down from -- oh, from security or someone like that -- and you may have that -- that says everybody has to have some kind of photo ID, but it does look like this is saying, you know, "You need to get your people with a photo ID."



Q And this letter that's marked as Exhibit No. 46 is not a formal modification to the contract. Correct?
A Right, right, at this point.
(Exhibit 47 marked for identification.)
Q (By Mr. Hickman) Show what you I've marked as Exhibit 47.
A Okay.
Q Is Exhibit 47 a memorandum concerning the request for the second option year of the H & R Services contract to be exercised?
A Yes, that does appear that that's what this is.
(Exhibit 48 marked for identification.)
Q (By Mr. Hickman) Let me give to you what's been marked as Exhibit No. 48. Is this a letter to H & R Services from the Directorate of Contracting advising H & R that the government is renewing the H & R contract for option year two?
A Yes.
Q Who's William Stark?
A A contracting officer. I know that's a rather flip answer.
Q Do you know his role or involvement with regard to the H & R contract?

A No, I'm not familiar with what he was -- you know, why he was the signature here, but he was a contracting officer here at Ft. Sill.

Q Okay. Do you know if he still is a contracting officer here at Ft. Sill?

A He is not.

Q Do you know if he still works at Ft. Sill?

A He does not.

Q Do you know where he works currently?

A Tinker Air Force Base, Oklahoma City.

(Exhibit 49 marked for identification.)

Q (By Mr. Hickman) Hand you what I've marked as Exhibit No. 49. Are the documents that I've marked as Exhibit 49 -- is this the type of document, the format of documents, that would typically be sent to the contracting office by -- I'll refer to them as the user --

A Uh-huh.

Q -- identifying requested modifications and changes to the contract?

A Yes, this is a document that might be used for that purpose, to make changes.

Q And do the documents contained in Exhibit 49 and 48, 47, and the prior ones maybe I haven't asked about up to this point, do they appear to be



true and correct copies of the records that'd be ordinarily kept in the contracting file?

A They appear to be records that would be kept in the file.

Q And if you can flip open that book there under tab three and go to page 541, and just to kind of close the loop with some of our discussions about this FAR clause, if you look under paragraph 3B, is this where the FAR clause 52.212-4 is modified to be changed from May 1999 to the May 2001 version of that FAR clause?

MR. McNAMARA: Objection. Calls for a legal conclusion.

A Okay. Which clause was it that you were talking about?

Q (By Mr. Hickman) It's referred to in paragraph 3B.

A In three. Okay.

Q And page 541 is a part of modification number five to the contract. Correct?

A Okay. All right. Yes, it is to modify. Okay.

Q Okay. And when we looked at the contract that's part of Exhibit 1, you might remember there was the handwriting on there --



A Yes.

Q -- changing the dates. Does it appear that through modification number five, that the date is being formally changed -- that the date for the FAR clause referenced here is being formally or officially changed from the May 1999 version of that FAR clause to the May 2001 version of that FAR clause?

A Yes.

MR. McNAMARA: Objection. Calls for a legal conclusion.

A Yes, that is the -- it appears that there's a date change.

Q (By Mr. Hickman) Do you know when Annette took over as the contracting officer on the H & R contract?

A No, I don't.

Q Okay. If you could, under tab three, flip over to page 485. I believe page 485 begins the section dealing with modification number ten.

A Yes, modification number ten.

Q And what is, if I look on page 46 and paragraph one, the reason or one of the reasons for modification number ten?

A It says, "The reason for this modification



is to adjust the funding on line items 0002 through 0002AD of the contract."

Q And why are those adjustments required?

A Okay. "They're required to bring the contract up to date with changes in the service verbally agreed to between 1 April, '02, through 30 September, '02.

(Exhibit 50 marked for identification.)

Q (By Mr. Hickman) Provide you what I've marked as Exhibit No. 50, and is Exhibit No. 50 a memorandum similar to ones we've previously looked at requesting consideration of the exercising of the third option year on the H & R Services contract?

A Yes, that appears to be what this is.

Q And do you recall -- strike that.

(Exhibit 51 marked for identification.)

Q (By Mr. Hickman) Hand you what I've marked as Exhibit 51. Does Exhibit 51 contain a letter from the government to H & R Services, advising them that the government's considering renewal of the H & R contract similar to the ones we've talked about before?

A It appears that we have a similar letter here considering renewal of the -- of the options.

Q Do you recognize the name Patricia





25d4ffe5-a6bc-477b-b893-935a0b2820af

Wilkinson?
A Yes, I do.
Q Who is she?
A She has been a contracting officer here.
(Exhibit 52 marked for identification.)
Q (By Mr. Hickman) Hand you what I've marked as Exhibit 52. Is this a memorandum provided to Miss Wilkinson concerning the H & R Services contract, requesting a modification to that contract for underpayment of custodial services?
A That appears.
Q Do you know what Miss Wilkinson's relationship or role was with regard to the H & R Services contract?
A No. I'm sorry. I don't.
(Exhibit 53 marked for identification.)
Q (By Mr. Hickman) Hand you what I've marked as Exhibit 53. Is this a letter from the government to the contractor, H & R, advising them of a six-day notice of intent to renew the option on the contract for year four, for option year four?
A This does appear to be the subject of that document.
Q Okay. If you -- I just want you to take a minute or take the time that you think you need and



look at Exhibits 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, and 15. These are all exhibits, it's my understanding, are -- involve facts and circumstances after you were gone and no longer involved with the H & R contract, but I'd like for you to let me know. I'm trying to simplify things, if I can. Let you look at those, or if you want to take a break and talk to your lawyer.
What I want to know is whether or not you can tell me that as to those exhibits and the contents of those exhibits, you don't have any knowledge, you weren't involved, and you don't intend to testify about the contents of those exhibits.
MR. McNAMARA: You want to just take a little break for a second, have her --
MR. HICKMAN: Yeah. Is that okay?
MR. McNAMARA: That's -- yes.
(Recessed from 2:12 p.m. to 2:19 p.m.)
Q (By Mr. Hickman) Have you had an opportunity to review Exhibits 4 through 15?
A Yes, I have.
Q And have you seen anything in Exhibits 4 through 15 that you have any knowledge or involvement -- that you had any -- that you have any



knowledge about or regarding the contents of Exhibits 4 through 15?
A I have no knowledge or information about 4 through 15.
Q Did you have any involvement in any form or fashion in the matters that were discussed in the documents marked in Exhibits 4 through 15?
A I know of no involvement that I had, 4 through 15.
Q Is it fair to say that by that point in time, in approximately March of 2005 up through present time, you don't -- you no longer worked for the Directorate of Contracting and no longer had any involvement with regard to the services performed by H & R under the contract?
A That is correct.
Q Do you know how many contracting officers worked on the H & R contract?
A No, I don't.
Q Do you have any reason to believe that H & R underestimated its bid price at the time it submitted its bid for the contract marked Exhibit No. 1?
A Do I have any reason to believe?
Q Yes.



A As the documents show that you've brought up, we asked that question of H & R, and they verified their bid, so I have no reason to doubt the contractor.
Q Well, as a contracting officer, do you have an obligation to satisfy yourself that the contractor that you're awarding a contract to is going to be able to provide the services requested at the price requested?
A Ask that again, please.
Q Well, let me ask the question this way as a hypothetical. You're the contracting officer in a pre-award situation, and you're trying to decide the awarding of the contract to a certain bidder. Would you look at the price that that bidder has submitted and satisfy yourself that they were going to be able to provide the services required by the contract for the price they say that they're going to provide those services for so that you can avoid a situation where you get the government into a bad contract or into a contract where the contractor's maybe going to be difficult to deal with because they've underbid the price for the work that's required?
A The contracting officer contacted the contractor, asked them if they looked for -- you





25d4ffe5-a6bc-477b-b893-935a0b2820af

know, if they wanted to verify their bid, and they did. I am not, nor is any contracting officer, an expert in all fields. The contractor said they could do the job.
Q Okay. Well, would you have the opinion that because there were other bidders that submitted higher bids, that that might evidence the fact that H & R submitted a price that was below the cost necessary to do the work?
A Based on other bidders?
Q Correct.
A No.
Q That the price of those other bidders would have nothing to do with whether or not H & R's bid was a reasonable price to do the job?
A Whether or not H & R understood what the bid -- what the bid represented would be of no consequence to another bidder.
Q Do you recall if there was actually a bidder that submitted a bid lower than H & R in response to the solicitation?
A I don't -- I don't recall that.
Q I believe if you look in tab two, page 250 at the bottom --
A 250?



Q And page 252, if we could just look at those two pages.
A Okay.
Q And in particular, let's look at page 252. Does this page bear your signature?
A Uh-huh.
Q And this is a memorandum for record where you're identifying that the apparent low bidder, W. D. Enterprises, requested withdrawal of their bid?
A Yes.
Q So there was a bidder that was lower --
A Okay.
Q -- than H & R Services. Is that correct?
A That's what this looks like right here.
Q And that you made the determination in paragraph five here on page 252 that the proposal of H & R was determined not to be materially unbalanced.
A Uh-huh.
Q What does that mean, "materially unbalanced"?
A That it was not front-loaded in certain areas.
Q Okay. And in this memorandum for record



on page 252, did you also determine that the H & R Services prices were fair and reasonable in comparison of bid prices of other bidders and in comparison of the proposed prices with the independent government estimate?
A That's what that indicates right there.
Q So yes, you did make that determination?
A Yes, I did.
Q During the time that you were involved in the administration of the H & R contract, were you aware of any complaints by H & R of, you know, excessive supply usage or additional services having to be provided by them to do their job under the contract?
A I was not aware of any. Let me put it this way. I don't remember having that brought to my attention.
Q And I think when we initially started our discussion, I wrote down February of 2002 as when you took the position as the -- when you were no longer the chief of the co-located Directorate of Contracting.
A Right.
Q So February of 2002 is when you no longer worked for the Directorate of Contracting. Is that



correct?
A That is.
Q So as of February 2002, you would have no longer had any involvement with -- or any direct involvement with the H & R contract?
A As of February 2002, I would have had no direct involvement with the H & R contract.
Q And so -- strike that.
At any time, did you have any knowledge or understanding of the uses being conducted in the buildings covered by the contract, the H & R contract?
A At any time -- say that again, please.
Q At any time that you were involved with the H & R contract, did you have an understanding of the uses, the activities going on in each of the buildings covered by the contract?
A No, I did not have an understanding of each and every activity going on in each building under the contract.
Q Do you know if there are reports or documents in the government's possession that would identify the occupants at various times during the course of the H & R contract that occupied each of the buildings covered by the H & R contract?





25d4ffe5-a6bc-477b-b893-935a0b2820af

Page 142

A No, I'm not aware of any document like that.
Q Are you aware or do you know whether or not the number of occupants of any of the buildings covered by the H & R contract changed during the course of the contract performance?
A No, I'm not aware of any document that talks about the change in population.
Q Are you aware or do you recall any conversations with anybody about the change in population, the change in occupants in any of the buildings covered by the contract?
A I don't recall any conversation about changes in population.
Q Do you recall any conversations about any changes in the volume of supplies used in any of the buildings during the contract performance?
A I don't recall any conversation about the change in the volume of supplies in the buildings.
Q During the time that you administered the H & R contract, do you recall ever having to make any interpretations of the contract?
A During the time that I was the administering contracting officer?
Q Yes.

Page 143

A I don't remember any discussion of inter -- I don't recall any discussion of interpretation of the contract.
Q During the time that you were the contracting officer on the H & R contract, did you ever have to deal with any complaints about the services or performance of H & R?
A I don't recall any complaints, but as I mentioned earlier, everybody always thinks they're an expert on this contract, so I -- but I don't recall any specific complaint about performance.
Q Do you recall making any representations to any representatives of H & R concerning the solicitation or the H & R contract?
A I don't recall making any representation to any person about the -- during the solicitation period or the early administration.
Q Do you recall any conversations with any other government officials concerning any representations that may have been made to H & R concerning the contract marked as Exhibit No. 1 or the solicitation marked Exhibit 36?
A I don't remember any of those conversations.
Q Do you have any knowledge concerning the

Page 144

supplies provided by H & R during the course of contract performance?
A I have no knowledge of information about counting supplies, anything of the performance.
Q Did the government, pursuant to the H & R contract, have any mechanism in place to have the contractor report the supplies that were being delivered to the base, have that information reported to them?
A No.
Q Do you have any knowledge concerning the services provided by H & R during the course of performance by H & R on the contract?
A Would you ask that again?
Q Sorry. Do you have any knowledge concerning the services provided by H & R during the course of the contract performance for the period of time that you were involved with the H & R contract?
A Are you asking about the quality of services or just services in general or --
Q Let's start with just in general.
A I don't remem -- I don't recall any discussions about services with -- about H & R.
Q Would it be safe, then, for me to assume that your knowledge of the services provided by

Page 145

H & R during the course of the contract performance would be that -- your understanding would be that they provided the services required by the contract because you don't recall any complaints or nothing sticks out to you?
A I think that would be a supposition on my part as to whether or not -- I have no knowledge of a conversation about the -- I don't remember a conversation about performance.
Q Well, if I asked you what you knew about the services provided by H & R during the course of the contract performance, what can you tell me?
A I have no -- no memory of their service during the time that I was contracting officer.
Q Are you aware that there was a contract awarded for janitorial and custodial services similar to the H & R contract after the option years ended on the H & R contract?
A I have no knowledge of it. I assume that bathrooms are being cleaned on the installation, but I --
Q You weren't involved in any --
A I wasn't involved in any of that.
Q Do you know if there was any -- strike that.

MR. HICKMAN: I don't think I have any further questions for you at this time. Thank you very much for your time. I appreciate it.
THE WITNESS: Uh-huh.
MR. HICKMAN: Do you want to say on the record about reading and signing?
MR. McNAMARA: Yes. If we could have a copy of the deposition, we'll read it and sign it.
(DEPOSITION CONCLUDED AT 2:44 P.M.)



ERRATA SHEET
DEPOSITION OF SHAREL SUE McADOO
REPORTED BY: JEAN BAYSINGER, CSR RPR CMR
DATE DEPOSITION TAKEN: NOVEMBER 8, 2007
PR FILE NO. 12464

PAGE LINE IS SHOULD BE

______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________



JURAT

I, SHAREL SUE McADOO, do hereby state under oath that I have read the above and foregoing deposition in its entirety and that the same is a full, true and correct transcription of my testimony so given at said time and place.

______________________________
Signature of Witness

Subscribed and sworn to before me, the undersigned Notary Public in and for the State of Oklahoma by said witness, SHAREL SUE McADOO, on this ________day of__________________, 2007.

______________________________
NOTARY PUBLIC
MY COMMISSION EXPIRES:___________
(JB) PR FILE #12464



C E R T I F I C A T E

STATE OF OKLAHOMA )
) SS:
COUNTY OF OKLAHOMA )

I, Jean Baysinger, Certified Shorthand Reporter within and for the State of Oklahoma, do hereby certify that the above-named SHAREL SUE McADOO was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth, in the case aforesaid; that the above and foregoing deposition was by me taken in shorthand and thereafter transcribed; and that I am not an attorney for nor relative of any of said parties or otherwise interested in the event of said action.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal this 15th day of November, 2007.

______________________________
Jean Baysinger, CSR RPR RMR

JURAT

I, SHAREL SUE McADOO, do hereby state under oath that I have read the above and foregoing deposition in its entirety and that the same is a full, true and correct transcription of my testimony so given at said time and place.

Sharel Sue McAdoo

Signature of Witness

PURSUANT TO 28 U.S.C. § 1746.

Subscribed and sworn to before me, the undersigned Notary Public in and for the State of Oklahoma by said witness, SHAREL SUE McADOO, on this _________day of__________________, 2007.

______________________________

NOTARY PUBLIC

MY COMMISSION EXPIRES:___________

(JB) PR FILE #12464

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

H & R SERVICES, INC.,
an Alabama corporation,

Plaintiff,

vs. No. 06-582 C

THE UNITED STATES OF AMERICA,

Defendant.

DEPOSITION OF ANNETTE ARKEKETA-RENDON

TAKEN ON BEHALF OF THE PLAINTIFF

ON NOVEMBER 13, 2007, BEGINNING AT 10:12 A.M.

IN FT. SILL, OKLAHOMA

REPORTED BY: Jean Baysinger, CSR RPR RMR



ea5b7e32-84c2-4bad-9aa3-6c43fe9fe465

APPEARANCES

On behalf of the PLAINTIFF:
William H. Hickman, Attorney at Law
HICKMAN & FITZPATRICK
119 N. Robinson, Suite 250
Oklahoma City, Oklahoma 73102
(405)605-2375
hickman@hickmanfitzpatrick.com

On behalf of the DEFENDANT:
Sean B. McNamara, Attorney at Law
U.S. Department of Justice
Civil Division
1100 L Street N.W.
Washington, DC 20530
(202)305-7573
sean.mcnamara@usdoj.gov

Joe Alford, Attorney at Law
U.S. Army
Building 4621, Room 208
Ft. Sill, Oklahoma 73503
(580)442-1096



INDEX

Page
Direct Examination by Mr. Hickman............... 7

Exhibits

Page
54 Memorandum for record dated 8/17/04 setting forth justification to exercise option year four on the H & R contract............ 27
55 Memorandum for record dated 8/20/04 for custodial services -- Summary of a comparison of prices for routine cleaning at Ft. Sill with three other military installations............................. 27
56 Letter of notification to the contractor of the government's intent to exercise the option for year four and asking government to send in any change in the pricing due to wage determination rates................ 29
57 E-mails dated 11/30/04 and 12/2/04 from Shari Greggs to Peter Webb verifying square footage............................ 31
58 E-mail exchanges dated 12/3/04 regarding health and welfare increases and new rates for H & R contract.................. 33
59 Fax dated 12/2/04 from DOC to H & R........ 33
60 Proposal dated 12/7/04 from H & R to DOC providing proposal for increase............ 34
61 Memorandum dated 3/15/05 from Raineye Holmes to DPW with attachments............. 86
62 Purchase request and commitment dated 5/6/05.................................... 95



Exhibits (Continued)

Page
63 Independent government estimate dated 6/6/05 for follow-on custodial services.... 98
64 Memorandum for record dated 8/4/05 concerning determination and finding for the type of contract for the follow-on custodial service contract................. 99
65 Solicitation dated 8/8/05.................. 101
66 Record of attendance dated 8/18/05 for the pre-proposal meeting................... 101
67 Record of attendance dated 9/7/05 for the source selection evaluation board...... 105
68 Freedom information request dated 9/14/05.. 108
69 Competitive commercial services price negotiation memorandum..................... 109
70 Custodial services contract................ 110
71 Memorandum dated 10/11/05 designating the contracting officer representative..... 112
72 Memorandum dated 10/14/05 designating the alternative contracting officer representative............................ 112
73 Memo to file dated 10/27/05 concerning a teleconference relating to follow-on contract.................................. 114



Exhibits (Continued)

Page
74 Memo to file dated 10/28/05 concerning issues surrounding complaints against Crystal Clear Maintenance.................. 115
75 Memorandum for record dated 8/10/06 regarding market survey.................... 116
76 Modification No. 3......................... 116
77 Handwritten notes setting forth Bates range numbers for the copies that correspond to the original contract file... 119
78 Litigation report.......................... 122
79 Modification breakdown of Cost-Per-Copy services.................................. 123
80 Series of e-mails concerning Modification No. 39 ...................... 124
81 Summary of modification for the Training Service Center contract.................... 125



ea5b7e32-84c2-4bad-9aa3-6c43fe9fe465

STIPULATIONS

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys, that the deposition of ANNETTE ARKEKETA-RENDON may be taken pursuant to agreement and in accordance with the Rules of the Court of Federal Claims on November 13, 2007, at Ft. Sill Army Base, Directorate of Contracting, Building 1803, Ft. Sill, Oklahoma, before Jean Baysinger, CSR RPR RMR.



WHEREUPON,
ANNETTE ARKEKETA-RENDON,
after having been first duly sworn, deposes and says in reply to the questions propounded as follows, to-wit:

DIRECT EXAMINATION

BY MR. HICKMAN:
Q Please state your name for the record.
A Annette Arkeketa-Rendon.
Q Okay. And what is your home address and phone number?
A 2809 Northwest Morningside Drive, Lawton, Oklahoma, 73507.
Q And home phone?
A Home phone number is 580-354-0712.
Q And your work address and work phone number?
A Directorate of Contracting office, Ft. Sill, Oklahoma, 580-442-6222.
Q And by whom are you presently employed?
A Department of the Army, Directorate of Contracting.
Q And that's the Directorate of Contracting at Ft. Sill Army Base?
A Yes.



Q And what is your present position or title?
A I'm a contracting officer.
Q And as a contracting officer, are you assigned to certain contracts as your responsibility?
A Yes.
Q Are those contracts that you are assigned to based on the type of contract that it is, like a service contract or a construction contract?
A Yes.
Q And what types of contracts are you presently the contracting officer for?
A Services contracts, and I'm doing contract specialist work on construction.
Q What is your warrant authority as a contracting officer?
A It's unlimited.
Q On a services contract, it's unlimited?
A Yes. I believe that applies to all contract actions.
Q All contract actions for which you are identified the contracting officer for?
A Yes.
Q And how long have you been a contracting



officer on services-type contracts?
A Since my employment here at the -- Ft. Sill. I began in April of 2003.
Q So since April of 2003, you started working in the Directorate of Contracting at Ft. Sill?
A Yes.
Q And when you came on board at that time, you were immediately made a contracting officer?
A Yes.
Q And you are a contracting officer on services contracts?
A Yes. I was assigned to them.
Can I go back?
Q Sure.
A You said "immediately." When I was -- when I was hired on, I didn't have my warrant here at Ft. Sill, so --
Q Okay.
A It took about maybe two months to get it, and then I was assigned.
Q So you started working in April of '03 at Ft. Sill. Right?
A Yes.
Q And a --





ea5b7e32-84c2-4bad-9aa3-6c43fe9fe465

Page 10

A That's the best date I can remember.
Q Okay.
A May have been the 4th, but --
Q And a couple months later, like in June or July of 2003, you obtained your warrant to be a contracting officer at Ft. Sill?
A I can't remember how long it took, but it wasn't -- it was shortly thereafter.
Q And where were you employed before you came to Ft. Sill?
A I worked at the Corpus Christi Army Depot in Corpus Christi, Texas, in the contracting office there.
Q What was your position at that job?
A I was a contract specialist.
Q How long were you employed at the Corpus Christi facility?
A I was in contracting since December of 1999, and before that, I was there -- I began in July of '91 as a parts manager.
Q So from July of 1991 until December of '99, you were a parts manager at the Corpus Christi facility?
A Yes.
Q And during your time in the contracting

Page 11

office at the Corpus Christi facility, were you a contracting officer?
A No.
Q What were the circumstances by which you moved from the Corpus Christi facility to Ft. Sill?
A Oh, I'm sorry. Let me go back. I transferred to Tinker Air Force Base. I was there for approximately eight months before coming here. I forgot about that.
Q Okay. When were you at Tinker?
A I was a -- I was in the -- I was a contract negotiator there for eight months.
Q Do you remember the approximate time frame for when you were in that position at Tinker?
A I trans -- well, when I was -- I applied for this job. I came from Tinker. It was in April. But previous to that, June 6 was when I started at Tinker.
Q Of 2002?
A Yes.
Q So you would have been in the contracting office in Corpus Christi from December of 1999 until June of 2002?
A Yes.
Q And then June of 2002 until April of 2003,

Page 12

you were a contract negotiator at Tinker Air Force Base?
A Yes.
Q Prior to July of 1991 when you started being a parts manager at Corpus Christi, how were you employed?
A I was laid off from the federal government for approximately two-and-a-half months, and previous to that, I was at Tinker Air Force Base. That's where I started my federal service.
Q When did you start your federal service?
A 1988 of October.
Q At Tinker Air Force Base?
A Yes.
Q So from October of 1998 (sic) up to approximately --
A May of --
Q -- May of '91, you worked at Tinker?
A Yes.
Q And then you were laid off a couple months and then you --
A I was in a RIF.
Q -- went to Corpus Christi?
A Yes.
Q What did you do at Tinker Air Force Base

Page 13

during that time from 1988 to 1991?
A I was on an administrative career program, and I was a production management specialist.
Q Okay. What is your -- give me an overview of your education, please.
A I have a Bachelor of Business Administration from University of Central Oklahoma now -- it was Central State University -- in Edmond, and I graduated in 1986.
Q Okay.
A And then I have a Master's of Arts from Texas A&M University in Corpus Christi. I graduated in 2002.
Q And during the time you were in the contracting career field, did you attend any training --
A Yes.
Q -- seminars, those types of classes?
A Yes.
Q Are you -- do you have any levels of certification by the federal government as a -- in the contracting career field?
A Yes. I'm a level III certified contracting officer.
Q Do you hold any other certifications


ea5b7e32-84c2-4bad-9aa3-6c43fe9fe465

relating to the contract field?
A No.
Q Are you a member of the National Contract Management Association?
A No.
Q When you arrived at Ft. Sill in April of 2003, what contracts do you recall working on?
A The food service contract.
Q Any others during that time or initially?
A I recall that one the best. There were others that were assigned to me, but I can't tell you the exact time frame because they came gradually, so --
Q Does a contract have a single contract officer assigned to it or multiple contracting officers assigned to it?
A They have multiple. Just depends because when you look at the file, you'll see different contracting officers, but we administer those individually. It's not like two contracting officers have -- have -- are assigned the same one at the same time.
Q Well, I guess that was my question. At any one time, is there a single contracting officer responsible for a contract or multiple contracting



officers responsible for a contract potentially at the same time?
A Not the ones that I've worked on, no.
Q Okay. And I guess that's what I'm trying to ascertain. Once you arrived at Ft. Sill and a couple months pass and you actually were a warranted contract officer, you told me --
A The -- oh, I'm sorry.
Q -- the food service contract was a contract that you were the contracting officer on?
A Yes. It was assigned to me. There was another contracting officer that was administering it, but they transferred it to me, my supervisors.
Q Who was the other contracting officer?
A Diane Rojenas -- Rodenas. Rodenas.
Q Who was the contractor on the food service contract? Do you remember?
A Oh, you -- okay. You just asked who was the contracting officer?
Q Well, who was the other contracting officer that you worked with, I guess, for a period of time or that you took over for?
A It was Diana Rodenas.
Q Okay. That was on the food service contract?



A Yes.
Q Who was the contractor for the food service contract?
A Oh, okay. I'm sorry. I misunderstood. It's the Oklahoma Department of Rehabilitation Services.
Q And how long do you recall being the contracting officer for that contract?
A I'm still the contracting officer for that contract.
Q Okay. What other contracts, besides the food service contract, do you recall being assigned the contract officer to?
A Let's see. At one time, I had 13, so I'm trying to remember, so -- I had refuel and defuel. Can't remember when I had that, but that was reassigned later. I eventually got wearing apparel. I can't remember when, but I still have that one, I'm still contract officer for that. Let's see. I had laundry contracts for a brief period. I had copier service for a brief period. I had the cable contract. I had grease traps and exhaust.
Oh, okay. Let's see. I had a donut contract, and I also had a -- there was a cake and pie contract. I had a barracks custodial contract.



I also had a contract at Snow Hall that was custodial for that building. And now I have the TSC contract, the wearing apparel contract, food service. Let's see. There was -- that's all I can recall right now.
Q Okay. What was the TSC contract you mentioned?
A It's the Training Service Center contract.
Q So you're still the CO on that contract?
A Yes.
Q What was the Snow Hall custodial contract? Is that a separate building that has its own contract?
A Yes.
Q And are you still the contracting officer for that?
A No.
Q How long were you the contracting officer for that -- the Snow Hall contract?
A My guess was -- and this is a guess. It was about a year, I would think -- I'm thinking. I'm not absolutely sure, but --
Q Well --
A It was about -- I'm thinking it was at least a year. Could've been more.

Q About when do you think that might have been? 2004, '05, '06?
A I'm thinking 2005. I'm not sure right now, but that's my best guess, is 2005.
Q How was the pricing on the Snow Hall custodial contract structured? Do you recall?
A Let's see. They had -- it was based on square footage and frequency and the type of supplies.
Q So there's a component to the pricing for the Snow Hall custodial contract relating to the frequency by which the custodial services were rendered?
A Yes.
Q Like how many times a week the building was cleaned, or like each time they cleaned, they got paid?
A Well, what I recall the best on that contract was the buffing of the floors and the floor cleaning process on that, and that's -- without looking at it, I'm not -- I can't be sure right now without going back and looking at it.
Q Then there was a pricing component on the Snow Hall custodial contract concerning the type or volume of supplies provided?



A I -- I can't answer that right now. I'd have to look at what -- what it had in there, but that's always a part of the pricing strategy, and to be able to sit down and tell you exactly how it was set up, I'd have to look at the contract because -- I'm not even going to try to guess on that one.
Q Okay.
A On how that was --
Q And are you familiar with the H & R Services custodial contract?
A Yes.
Q How did you become involved with the H & R Services contract?
A That was assigned to me in August of 2004.
Q When you say assigned to you, you were assigned to the -- as the contracting officer to that --
A Yes.
Q -- contract at that time?
A Yes.
Q Who had been the CO on the contract previously?
A Ray Dryz.
Q Do you know what period of time Mr. Dryz was the contracting officer?



A The period of time?
Q Yes.
A No. I -- I know when he -- when I got it was in August, but when he started it, I'm -- I know it was -- I don't know the exact or an approximate time that he got it.
Q Okay.
A I know it had -- Sharel was one of the contracting officers.
Q Prior to?
A Prior. And to the best of my knowledge, that was who had it previous to him.
Q So is it fair to say that prior to August of 2004, you had no involvement or no knowledge of the performance or the modifications or the negotiations involving the H & R Services custodial contract?
A Yes.
Q Have you had an opportunity to have your deposition taken before?
A Before?
Q Have you been deposed in another situation?
A To do a deposition?
Q Yes.



A No.
Q So you've not given a deposition before.
A Oh, yes, I have. I'm sorry. I have, but my role in it was to ask questions. I was involved as a representative for an EEO case in Corpus Christi, but I wasn't the one being questioned. I did the questioning --
Q Okay.
A -- in the -- in that process.
Q Okay. And if today -- during the course of our discussion, if I refer to the "H & R Services contract," you understand that I'm referring to the H & R Services janitorial contract, which I believe we have previously marked as Exhibit No. 1? Is that okay?
A Yes.
Q If I refer to "H & R," you'll understand that I'm referring to H & R Services, the contractor on the contract marked as Exhibit No. 1?
A Okay. Yes.
Q Now, prior to the contract marked as Exhibit No. 1, there was a previous custodial services contract for Ft. Sill Army Base. Is that correct?
A Yes.

Q Did you have any involvement with the contract prior to Exhibit No. 1?
A No.
Q Do you have any knowledge concerning any aspect of the performance, negotiation, the changes, the modifications, the supplies provided, the work performed on that prior contract, the contract prior to Exhibit No. 1?
A No.
Q If I refer to the "pre-award" period of time, what does that mean? Do you have an understanding what that means?
A Yes.
Q The time for a period when the requirements are being identified, the solicitation prepared, negotiations with potential bidders, all those kinds of things?
A Yes.
Q Were you involved in any fashion, with regard to this pre-award period of time, relating to the contract that we've marked as Exhibit No. 1?
A No.
Q So if I ask you to look at Exhibit 2, which I believe has been identified by the government as the bid abstract as related to the



contract marked as Exhibit No. 1, do you have any knowledge of the documents marked as Exhibit No. 2 or the facts or circumstances involved in those documents? If you want to take a minute to look at it, you can.
A When you ask that, can I have -- are you asking me if I have knowledge about these documents or if I had anything to do with executing the documents?
Q Both.
A Okay. I didn't have anything to do with the execution of the documents. I do have knowledge because I'm the contracting officer on the contract now -- or was, and my review of them is the only knowledge that I have.
Q Well, in your review of the documents marked as Exhibit No. 2, did you ask any questions or seek any input from anybody after you reviewed the documents?
A About what?
Q About anything you saw in those documents marked as Exhibit No. 2.
A I'm not clear about your question.
Q Well, I guess what I'm wondering is, you said you looked over the documents marked as Exhibit



No. 2.
A Uh-huh.
Q And after you looked over those documents, did you see anything that made you have any questions in your mind that you went and maybe asked somebody about?
A Not that I recall. Nothing in particular.
Q For what purpose did you look over the documents marked as Exhibit No. 2?
A When I was assigned this contract in August of 2004, I reviewed the -- all the documents in the file at that time because I needed to get -- as a contracting officer, to be familiar with the contract, so I didn't -- that's what I did as administrator for it.
Q If you look under tab three, those have been identified as the modifications to the H & R contract. If you look at the first two pages, the bottom that has page 260 and 261, which of these modifications or at what point in time did you become directly involved in the modification process?
A Modification 16. From looking at this -- yeah.
Q If you flip over to page 418 under tab



three -- the number is down there at the bottom, in the center -- I think that's where modification 16 begins. On page 418, whose signature is that down at the bottom?
A Down here?
Q Yes, as the contracting officer.
A There is --
Q Or I guess it's under the -- is that contract or -- is that --
A Over here in 15A?
Q 15A and 15B.
A Roger Hall and probably his signature.
Q And then I think over on page 427, is that where your signature is for the government on modification number 16?
A Yes.
Q And what was the purpose of modification 16?
A To add additional work. On page 428, it has the reason for the modification.
THE REPORTER: If you could speak up a little --
THE WITNESS: Oh, I'm sorry. Yeah, I can.
THE REPORTER: Thanks.
Q (By Mr. Hickman) And additional work, is



Def. App. 733

ea5b7e32-84c2-4bad-9aa3-6c43fe9fe465

that additional square footage to be cleaned or --
A Yes.
Q And that modification was in September of 2004?
A Yes.
Q And it relates to Building --
A 4908.
Q Okay.
A That's on page 428.
Q Okay. If you can look over at page 390, is this modification number 17? Is that correct?
A 390?
Q Yes.
A Yes.
Q And what was the purpose of modification 17?
A To exercise an option, option to extend the term of the contract, October 1st through -- 2004, through September 30th, 2005.
Q Okay. And was there also FAR clauses that were updated or changed?
A Yes. And then also, there was another CLIN added to remove trash from the break room of DFAS Building 4700, on Monday, Wednesday, and Thursday, paragraph three.



(Exhibit 54 marked for identification.)
Q (By Mr. Hickman) Let me hand you what I've marked as Exhibit 54. Can you describe to me what Exhibit 54 is?
A It's a memoranda for record.
Q Does it set forth your justification to exercise option year four on the H & R contract?
A Yes.
Q And at the time you executed Exhibit No. 54, did you determine that the prices on the H & R contract were fair and reasonable?
A Yes.
Q Did you determine that H & R's performance was satisfactory under the contract?
A It doesn't say that specifically.
Q Would you look at paragraph 2G?
A Oh, yeah. Yes.
Q So at the time in August 17 of 2004, when you prepared this justification for exercise of option year four, did you determine that H & R's performance was satisfactory under the contract?
A Yes.
(Exhibit 55 marked for identification.)
Q (By Mr. Hickman) Hand to you what I've marked as Exhibit 55. Can you describe this



document for me?
A It's a memorandum for record for custodial services.
Q And is this memorandum for record marked Exhibit 55 dated August 20th, 2004?
A Yes.
Q And is this a summary of a comparison of prices for routine cleaning at Ft. Sill with three other military installations?
A Yes.
Q And in this memorandum for record marked Exhibit 55, do you identify that the Ft. Sill contract may be significantly lower than the price for similar services at other installations?
A Yes.
Q Based on that identification, what did you do, if anything?
A I signed the memorandum to that statement.
Q Did you do any further research or talk to H & R about their prices or --
A No. No, I didn't.
Q After Exhibit 55, did you speak to any of the prior contracting officers or the contract specialist who had worked on the H & R contract?
A Did I speak to them?



Q Yes, about the pricing or any concerns that you might have after you prepared Exhibit 55.
A I did not call them. The contract specialist did and prepared the market research report.
Q Is Exhibit 55 the market research report?
A I would say yes.
Q Okay. I guess my question is, after Exhibit 55 was signed by you, did you speak to the prior contracting officers or contract specialists that had worked on the H & R contract?
A No.
(Exhibit 56 marked for identification.)
Q (By Mr. Hickman) Let me hand to you what I marked as Exhibit 56. Can you describe for me what Exhibit 56 is?
A It's a letter of notification to the contractor that the government intends to exercise the option for the period of October 2004 through September 2005, and it also asks them to send in any kind of change in the pricing due to wage determination rates.
Q Okay. So was the option year five on the H & R contract exercised?
A Yes.

Q And was that the final year of the contract?
A Yes.
Q Okay. And under tab three, if you could flip on over to page 387 -- actually, 386 -- is that where modification 18 begins?
A Yes.
Q And is modification 18 the correction of an administrative error?
A Yes.
Q And if you look over on page 373, is that where modification number 19 begins?
A Yes.
Q What's the date of modification number 19?
A December 2nd. The effective date is November 30th.
Q November 30th of 2004?
A Yes.
Q And what was the purpose of modification number 19?
A The purpose was to correct option year four on modification 17.
Q And what needed to be corrected?
A On the CLIN's 50 -- or 5AA, 5AB, 5AC, 5AD, 5AF, 5AG. The square footage was changed on 5AA, on



5AB, on 5AC, 5AF --
Q And were these --
A There was a change and -- let me see. There was also a price change increase on that.
Q Now, you say "a price change." Is that a price change based on the service contract, wage rates, and health benefits?
A I believe what happened on this one was, the contract specialist used the incorrect prices on there, plus the incorrect square footage, and that's what we corrected. The wage increases didn't come until subsequent modifications, from what I remember. But as I recall, the system that we have, the PD2 system, picked up the incorrect information, and when we discovered it, we corrected it, and that was the reason for this modification.
(Exhibit 57 marked for identification.)
Q (By Mr. Hickman) Okay. Let me hand you what I marked as Exhibit 57.
A Okay.
Q See if that goes along with what you were just telling me about correcting the square footage on these CLIN's you've identified.
A Let's see. When was this? November 30th? Oh, I'm sorry. I'm mumbling to myself.



Yes, but there must have been a -- because her -- and this 469 does not -- it's 467 in here, so there must have been a clarification.
Q Okay. And --
A And we were verifying that -- you know, that the square footage was correct to make all the corrections here.
Q Exhibit 57 is an e-mail exchange between Shari Greggs -- that's Shari, S-h-a-r-i -- and Peter Webb, is that correct, Wednesday, November 3rd, 2004, and Wednesday, December 2nd, 2004?
A I've got Tuesday, November 30th, 2004, and Thursday, December 2nd.
Q Correct.
A Okay.
Q And the two e-mails are Exhibit 57. Is that right?
A Yes.
Q Who is Shari Greggs?
A She was the contract specialist for this at that time.
Q It says down here she's a contracting officer, on Exhibit 57. Is that not correct?
A When I was administering this, she was the contract specialist for me on this.



(Exhibit 58 marked for identification.)
Q (By Mr. Hickman) Let me hand you what I've marked as Exhibit 58. Exhibit 58 appears to be e-mail exchanges about the H & W, health and welfare, increases and new rates for the H & R Services contract. Do you see that?
A Yes.
Q And there's an attached spreadsheet that appears to be the increase due to wage determination increase for the H & R Services custodial contract. Is that right?
A Yes.
Q Who is Patricia Highsmith?
A She's a contract specialist, and she was assigned to this contract for a brief period.
Q Is there one contract specialist assigned to a contract or two, or how does that work?
A There usually is one assigned to a contract.
(Exhibit 59 marked for identification.)
Q (By Mr. Hickman) Hand you what I've marked as Exhibit 59. Is Exhibit 59 a fax from the Directorate of Contracting to H & R, dated December 2nd, 2004?
A Yes, that's what it looks like.





ea5b7e32-84c2-4bad-9aa3-6c43fe9fe465

Page 34

Q And this fax marked as Exhibit 59 is from Shari Greggs, is that right, to Roger Hall?
A Yes.
(Exhibit 60 marked for identification.)
Q (By Mr. Hickman) Hand you what I marked as Exhibit 60. Is Exhibit No. 60 a proposal from H & R to Patricia Highsmith with the Directorate of Contracting providing the proposed increase based on the modification because of the wage increases?
A Yes.
Q Let me have you take a look at Exhibit No. 24 dated November 18, 2004. Did you draft Exhibit No. 24?
A Yes.
Q Do you know? Does Exhibit No. 24 discuss a meeting that was held?
A Yes.
Q What was the purpose of the meeting?
A The purpose of the meeting was to meet the DPW personnel that had responsibilities to this custodial contract, and we had some process problems with them, and I wanted to meet to make sure everybody was on the same sheet of music as far as the process that we have to follow here when they make their request to our office for custodial

Page 35

requirements, and that was the purpose of the meeting.
Q What type of process problems did you have?
A Let's see. The PR -- there was some questions about PR generation, which is our system, PD2 specifically, from getting the request from Pat Hicks, who's on here, DPW, point of contact.
THE REPORTER: Excuse me. You're going to have to speak up.
THE WITNESS: Oh, I'm sorry.
A The purpose was to go over the process between our customer, DPW, on how to get the request for services over here properly so that we wouldn't miss anything or to make sure that they had all the correct documentation attached to the request.
Q (By Mr. Hickman) Okay.
A So that was basically the -- and to verify their requirements.
Q And did you also have a discussion or a concern about the process with regard to authorization for additional work?
A Yes. Yes, we did.
Q And was there concern, based on prior conduct of some of the DPW personnel, that the

Page 36

contractor was being told to perform work without modifications -- written modifications being put in place in advance?
A There -- I can't be sure there was. That's just something that I normally go over with the customer so that they don't get the government in a bind, to make sure that everything's clear here on our request because -- I'm -- I can't be certain, but I think when they added our airfield requirement, which was one of the previous mods, I think that's what really -- that's why I wanted to have this discussion with the DPW folks, was to clarify these requirements that we have to have and the process that we follow here.
But that is something that I discuss with the contract -- or the -- with our customer, which would be DPW, and it's something that I always just stress to them, because sometimes contractors will assume that somebody has authorization over the contract, and if somebody says that they want a service done, then sometimes a contractor will do the service without it being an official request, so that -- this particular circumstance is -- I'm not real sure what that was.
Q Do you know if -- do you know if, with

Page 37

regard to the H & R contract, the contractor was requested to perform work and did perform work prior to a written modification being put in place?
A I don't know if they performed work, but I know they -- they were requested. Like, for instance, at 4700, one of the ladies over there asked them to do -- to empty their trash, and we subsequently made a new mod to cover that requested work. I don't know if the contractor actually did the work or not, but I know -- to my -- to the best that I recall, somebody called me and asked -- and said that they wanted increased services at 4700, and we made a modification. But for anything specific that relates to that in there, I believe it was just an overall briefing of -- for them to understand that, and that's something I do -- that's just something I do as a KO.
Q When you say in here that, "We realize situations come up when there's an urgent need for services. Again, I emphasize we need to follow step two in processing your request," what do you mean by "urgent need for services"?
A The best I can recall, the -- I believe when we added the airfield, that was considered an urgent request because we had a -- oh, that's

another contract. We opened the airfield, and they requested custodial services there.
Q What building was that?
A It's in here. The one we added? On 17, I believe. We can check it. Where they added a bathroom and square footage. No, it's 16. Building 4908 for helicopter support. That's when we opened the airfield.
Q Okay. So when you refer to "the airfield," you're referring to the Building 4908 that was added --
A Yes.
Q -- to the custodial contract?
A Yes.
Q After you had this meeting on November -- what was the date of the meeting?
A Let's see. November 17th.
Q At or about the time you had that meeting of November 17th of 2004 that's described in your e-mail marked as Exhibit 24, did you have any conversations with the contractor about the process for additional work or for modifications?
A I don't recall. I don't think so. Nothing comes to mind right now.
Q Okay. Get that back.



Let me hand you what's been previously marked as Exhibit No. 25. Are you familiar with Exhibit No. 25? Have you seen it prior to today?
A I don't remember.
Q And is Exhibit No. 25 a letter from H & R Services, dated October 20th, 2004 --
A Yes.
Q -- to the Directorate of Contracting?
A Yes.
Q And who at the Directorate of Contracting was it directed to?
A Vicky Highsmith.
Q And what was her position in October of 2004?
A She was -- she's a contract specialist.
Q And was she the contract specialist working on the H & R contract?
A I believe at that time, she was.
Q Do you recall any conversations with Ms. Highsmith about Exhibit No. 25?
A Let's see. I do remember this.
Q What do you remember?
A Let's see.
Q Did you say you do or do not recall Exhibit 25?



A I remember seeing the -- this and the letter.
Q And to make sure you don't get -- there's no confusion, there's a -- I want you to look at Exhibit No. 4 --
A Uh-huh.
Q -- and make sure that what you think you might be remembering is not what we have previously marked as Exhibit No. 4. There are similarities, but they're different letters, different time frames.
A What I remember is, I went back and looked at the record where -- tried to find something that Mr. Dryz -- because they said -- if he had anything in the record based on their conversation, and I didn't have anything, and I believe that's all I did, because I couldn't find anything on that, just to, you know, say he had this conversation.
Q So you looked in the contract file to see if there was any documents evidencing --
A To support what he was saying, that Mr. Dryz had this conversation with him.
Q To support the statements made in Exhibit 25 by Mr. Hall?
A Yes.



Q And did you find anything in the contract file to support the statements of Mr. Hall?
A Not saying this, specifically. There were some records in there that Mr. Dryz had on different conversations that they had.
Q Did you attempt to call Mr. Dryz --
A No.
Q -- at or about the time of Exhibit 25?
A No, I didn't.
Q Have you talked to Mr. Dryz since October of 2004?
A About this contract?
Q About the H & R contract, yes.
A No.
Q So as you sit here today, do you know whether or not Mr. Dryz had a conversation as described in Exhibit 25 with Mr. Hall?
A Not to my knowledge right now, no.
Q You don't know one way or the other. Is that right?
A I know there were some records in there, and I'd have to see them, but for right now, the answer is no.
Q No, you do not know one way or the other if the conversation happened?





ea5b7e32-84c2-4bad-9aa3-6c43fe9fe465

Page 42

A Correct.
Q Do you recall if you or Ms. Highsmith responded to the Exhibit 25?
A I don't -- I don't think I responded to this.
Q Why would you not have responded?
A I didn't find anything, based on what I remember, that they had this conversation, and also because this is a -- a contract -- let me think about this a minute.
When I looked at this, what I saw was that this contract was awarded as a sealed-bid contract, and because of that, the cost increases -- to me, it didn't justify -- on a sealed-bid contract, it's the lowest cost -- or it's based on the contractor with the lowest cost, and from what I remember, going back and looking at the competition that was -- that -- and the reason this was awarded, because of that, there -- it probably -- the amount of money here would have affected the next lower bidder on -- on the contract.
So I looked at it and analyzed it from the view that it was a sealed-bid contract, and because it wasn't a official claim, that's the reason I didn't answer it. And subsequently, after that was

Page 43

when -- I don't know how long after that, it was brought up again, and that's what I recall.
Q Okay. You mentioned that you went back and looked at the bidders from when the -- the source selection, the pre-award time frame relating to the contract.
A Yes.
Q Do I understand that correctly?
A Uh-huh.
Q If the -- as a hypothetical, if the amount of money that H & R Services had requested in Exhibit 25 would not have been more than the next lowest bidder, would you have agreed to H & R's request?
A I don't know. I don't know that.
Q Do you recall having any conversations with anyone about Exhibit 25?
A When I -- I believe I talked to -- let's see. I know I talked to my supervisor, but I can't remember at what point.
Q You don't remember if it was at this point or it'd be later in the process?
A It was either at this point -- which I'm thinking it probably was because I wanted to get -- I wanted to get some more advice on it.

Page 44

Q Who was your supervisor?
A Linda Lankford. But like I said, I don't know what -- I have to say that because I usually do, you know, confer with her on things and --
Q Do you recall your conversation with Ms. Lankford about Exhibit 25 in general or in detail, whatever you might recall?
A It had to be because of the way that this contract was structured as a sealed bid, and that they would have to submit it as a claim, and that had to be the general -- because I followed that after that, the process of that, and that was --
Q So is that the --
A -- what I knew had to take place.
Q So is that the general process advice that you received from Ms. Lankford, as best you can recall?
A Yes.
Q If you can, look back under tab three, page 364. Is page 364 where modification number 20 starts?
A 364.
Q Is that correct? Page 364 is where modification 20 starts?
A Yes.

Page 45

Q And is modification number 20 signed by you on January 10th, 2005, and was it for the purpose of reflecting the correct health and welfare rates?
A Yes.
MR. McNAMARA: Objection.
THE WITNESS: Pardon?
MR. McNAMARA: If you understand the question, you can answer.
A Repeat the question.
Q (By Mr. Hickman) Did you sign modification number 20 on January 10, 2005?
A Yes.
Q And was modification number 20 for the purpose of -- strike that.
Was modification number 20 for the purpose of reflecting the correct health and welfare rates?
A Yes.
Q If you can look over on page 353, is page 353 where modification number 21 starts? Is that correct? Page 353 is where modification 21 starts?
A Yes.
Q And did you sign modification 21 on January 31st, 2005?
A Yes.

Q And was modification 21 for the purposes of adding buildings and square footage as identified?
A Yes.
Q If you'll look back now at page 347, is that where modification 22 starts?
A Yes.
Q And did you sign modification 22 on April 6, 2005?
A Yes.
Q And was the purpose of this modification to decrease square footage in Building 467 for the remaining term of the contract?
A Yes.
Q If you'll look over at page 343, is page 343 where modification 23 starts?
A Yes.
Q And did you sign modification 23 to the contract on June 14, 2005?
A Yes.
Q And was the purpose of modification 23 to correct the APC in the line of accounting?
A Yes.
Q What does "APC" stand for?
A It's an accounting fund site that the



budget sends over, an accounting code. It's an accounting code that had to be corrected, and that's -- you can see it down here, also. It's an administrative correction.
Q Okay. If you could look under tab four, and page 664 of tab four appears to be a letter from Mr. Hall with H & R Services to you. Do you see that?
A Yes.
Q Do you recall receiving the information contained in tab four from Mr. Hall?
A Yes.
Q Do you recall any conversations with Mr. Hall about the documents contained in Exhibit No. 4?
A Yes.
Q What do you recall?
A I recall -- Mr. Monroe brought me in a stack of invoices, and my conversation with Mr. Hall was -- Mr. Monroe brought me in a stack of invoices, and there was a request for money for supplies, and he brought me in the stack, but they didn't correlate to any specific buildings to show where the increases were, and I remember telling him that in the contract, the supplies were paid for in their



unit price, and everything was -- that was -- if there was an increase to services, they were compensated for it based on the square footage. Increases or decreases.
Q Well, they were compensated for increases or decreases in square footage. Correct?
A Based on their price, the price that they proposed and was accepted on the contract.
Q The modifications that we've looked at --
A Yes.
Q -- were modifications based on changes in square footage. Correct?
A Yes.
Q They weren't --
A Well, there were some where -- it just depends on -- the prices are different depending on the frequency, and that's also tied into that price. If they're direct customer or reimbursed customer, 4700 had a different requirement, so they were -- the pricing was different on each one of those based on that. Frequency and their labor, their supplies and all of that were inclusive in their proposed pricing, so therefore, the government had compensated them for all the increases.
Q Okay. I guess my question is, in the



modifications that you were involved in, were there any changes to the prices except for changes that might relate to the health and welfare benefits pursuant to the Service Contract Labor Act?
A I believe on one modification where the airfield -- there was a different price on that one, as I recall. Let me think a minute. Open welfare -- when we made that correction on mod 16 or 17 -- on that one we talked about previously where there was a correction to the mod.
Q Is that modification 16 or 17?
A Yes. Go back and look. 17. Yeah, 16 was the helicopter support. On -- let's see. 17? What was that? That was to exercise an option. Okay. 17, exercise the option. 18 was to correct 16. On modification 19.
Q Okay. Tell me about modification 19.
A Okay. The square footage changed, and also, the price was increased.
Q Okay. And what was the basis for the cost increasing?
A It was a correction to option year four, modification 17, where we discussed previously that the system picked up, from the best I recall, the wrong price in there and we corrected it.

Page 50

Q So --
A Because when you have an increase to your health and welfare -- and I'm trying to remember. On this contract, there was an increase -- at each option year, with the health and welfare increases, your price will change.
Q Okay. And I guess my initial question was whether or not -- setting aside those health and welfare changes to the price, did the government ever negotiate with H & R to adjust the cost per square foot?
A No.
Q So when you say that when increases occurred and H & R was paid, you're making that statement assuming that they were paid based on just the square footage that was added to the contract, not based on any change to the actual price. Right?
A Yes.
Q And you mentioned the invoices provided by H & R that were a part of tab four. Are those the Empire Paper Company invoices that are attached as Exhibit 4? Is that correct?
A Yes.
Q If the invoices that are included with Exhibit 4 specifically identified the buildings

Page 51

where the supplies were being delivered, would that have changed your opinion of whether or not H & R should have received any additional compensation?
A If they correlated and showed something specific, I would have considered it.
Q Would it have changed your opinion? Would you have agreed that they should be compensated?
A If -- I made this request over and over. If they had correlated to those buildings and they showed a increase as claimed, I would have considered it, yes, but H & R never did.
Q I guess let me ask the question this way. Did you consider the request made by H & R that's marked as Exhibit No. 4?
A Did I consider it? What do you mean, did I consider it?
Q Well, did you look at the information and --
A Yes, I reviewed it, and I considered it, yes. I felt like it wasn't to the satisfaction that it needed to be, and I made the request over and over in writing, and nothing was ever sent to me specifically showing and tying in those increases that was claimed.
Q Okay. And then when I asked you before,

Page 52

you mentioned that the invoices did not correlate with any specific buildings where the increases occurred, and you told me that -- when I asked you that if those invoices did correlate to specific buildings, would that have changed your opinion, and you told me that you would consider it, so I'm trying to find out would that have changed your mind and would you have agreed with H & R to pay them additional monies if these invoices from Empire were correlated to specific buildings? Because you've already considered the invoices, you just told me.
A Yes. Yes.
Q And so if the invoices were tied to specific buildings, that would have changed your opinion about whether or not H & R should have received compensation?
MR. McNAMARA: Objection. Vague.
Q (By Mr. Hickman) Let me restate the question. If the invoices marked as Exhibit 4 --
A Uh-huh.
Q -- were correlated with specific buildings showing where supplies were being delivered, would you have approved H & R's request for additional monies?
MR. McNAMARA: Objection. Speculation.

Page 53

THE WITNESS: Do I --
MR. McNAMARA: No, you can answer, if you understand.
THE WITNESS: Okay.
A If those -- if that claim had come to me and showed me specifically where the increases were, yes, I was -- like I said, I would have considered it, and that would've changed my mind, but they never did, and I requested it over and over.
Q (By Mr. Hickman) Do you recall any conversations with any other government personnel about Exhibit No. 4?
A The payroll and quarterly summary?
Q You're talking about on page 663?
A Oh, you're talking about the whole thing?
Q Yes. I guess let me ask the question this way. When you got Exhibit No. 4, did you talk to any other contracting personnel? Did you talk to Peter Webb, anybody else that works with the government that was involved with the H & R contract?
A Yes.
Q Who did you speak to?
A I talked to Carl Riemer, because there was a list in here that they sent.

Page 54

Q I'm not sure if that was with this submission or not. The list of buildings, is what you're thinking of?
A Yes.
Q Okay. I don't think that was a part of Exhibit 4, this initial submission.
A Oh, okay.
Q So we don't confuse the record.
A Okay. Because I know at one point, they brought that in. I know the first stack of invoices didn't even have pricing on it, so I mentioned that to Mr. Hall. I remember that.
Q Well, do you recall in March of 2005, when you received this submission from H & R, if you talked to any government employees about the request being made by H & R in Exhibit 4?
A I had to have talked to my supervisor about it because, like I said, I always ask opinions and --
Q Who would have been your supervisor in March of --
A Linda Lankford.
Q In March of 2005, Linda Lankford was your supervisor?
A Yes.

Page 55

Q Does she still work with the Directorate of Contracting?
A Yes.
Q Anybody else you can recall that you may have spoken to in March of 2005 about Exhibit 4?
A I can't remember right off. Let's see.
Q Okay. Let's go ahead and flip on over, then, and look at Exhibit No. 5. Do you recall -- strike that.
Is Exhibit No. 5 a letter dated March 14, 2005, signed by you to H & R Services?
A Yes.
Q What was the purpose of the letter?
A It denied the request to provide their increase and cited the reasons why.
Q What are the cited reasons why?
A Because, "The contractor shall provide labor, management, supervision, personnel, tools, chemicals, equipment, materials, and supplies required to perform custodial services at Ft. Sill, Oklahoma. The work shall be conducted in accordance with the terms and conditions of the contract and standard commercial practices for custodial services. Facilities to be serviced consist of major headquarters, administrative areas, libraries,

Page 56

and latrines."
"Paragraph 18 lists the supplies you agreed to provide in your proposal and accepted upon award and subsequent exercised options. This is a fixed contract which was solicited as an IFB award. The government accepted your proposal based on the prices you proposed. The unit price is based on square footage, which was your proposed price to perform the contract. You agreed to these terms and conditions by accepting the award and exercised options. The government has provided labor increases in accordance with the Service Contract Act determination of the Secretary of Labor."
Q Okay. The first portion of the letter refers to paragraph one of the contract. Is that right?
A Yes.
Q And tab one -- or Exhibit 1 is the contract, but paragraph one is the scope of work of the contract. Correct?
A Yes.
Q It doesn't address the pricing of the contract, does it?
A Paragraph one up here?
Q Paragraph one of the contract. The scope

Page 57

of work paragraph in the contract marked as Exhibit No. 1, it doesn't address pricing, does it?
A No. This is the paragraph that's in here, in the statement of work. Is that what you're referring to?
Q Correct.
A It's a scope of work.
Q And you've referenced paragraph number 18?
A Yes.
Q The list of supplies?
A Yes.
Q Do you know if there was any estimated number of supplies or volume of supplies that was provided or made available to bidders at the time the contract was being awarded?
A No.
Q You don't know?
A No. What I -- what was -- I know is what was here in the solicitation. It's the same.
Q Is there a requirement on the contractor to keep the supplies fully stocked?
MR. McNAMARA: Vague. Objection. Vague.
Q (By Mr. Hickman) Well, let me rephrase it. Is there a requirement on the contract that supplies be maintained in the facilities?





ea5b7e32-84c2-4bad-9aa3-6c43fe9fe465

MR. McNAMARA: Objection. Calls for a legal conclusion.
A They're -- they're to provide it, and it's that statement here. "Supplies are required to perform the custodial services."
MR. McNAMARA: The witness is referring to page 948 of Exhibit 5.
Q (By Mr. Hickman) Well, how is the contractor to know the supplies required to perform custodial services?
A He's a custodial contractor. He should know. Otherwise, we wouldn't award it to him. And it's -- and also, in this statement here, it says that they're to provide it. They're the industry experts. You know, when they read these and they submit a bid, we have to certify that they're a responsible contractor.
Q Well, in paragraph one, under "Scope of Work," where it does refer to the word "supplies," it says, "supplies required to perform custodial services," do you understand that to refer to supplies as in toilet paper and paper towels or supplies like detergent for mopping the floors, the actual supplies used in the cleaning?
MR. McNAMARA: Objection. Calls for a



legal conclusion.
A The supplies were listed in paragraph 18.
Q (By Mr. Hickman) So the reference to "supplies" in paragraph one of the scope of work does not refer to the supplies actually used to stock the latrine and the facilities. Is that right?
MR. McNAMARA: Objection. Calls for a legal conclusion.
A The way you've made your question, I can't answer that because you're asking me to answer something that -- when you read this, it's clear that you have to have supplies. Your custodial contract, and the reference is there that lists the supplies.
Q (By Mr. Hickman) Well, I'm just trying to understand your letter and your basis for denying the claim, and you -- one of which appears to be paragraph one, the scope of work. You referred to paragraph one. What is it -- let me ask the question this way. What is it about paragraph one that supports your decision to deny the claim? I can read what it says, but I need to understand what you understood or how you understand that paragraph as it supports and relates to your denial of the



claim.
A "Paragraph 18 lists the supplies you agreed to provide in your proposal and accepted upon award subsequent exercised options," and it references those two paragraphs, one which says that you have to submit supplies, and B, that they agreed to accept that.
Q Okay. So your reference to paragraph one in a denial of the claim is based upon the use of the term "supplies" in that paragraph. Is that correct?
A Yes.
Q Is there any other part of paragraph one that you're relying upon as a part of your denial of the claim?
A Well, it says, "shall provide labor, management, supervision, personnel, tools, chemicals, equipment, materials, and supplies required to perform custodial services at Ft. Sill, Oklahoma."
Q Okay. So are you relying upon other parts than just the reference to "supplies" in denying the claim?
A It was denied because of their request and all the things that are inclusive of what they --



like the personnel, but the supplies were what they asked for compensation on. And then also, it's a firm-fixed contract which was solicited as an IFB contract.
And then I explained, "The government accepted your proposed based -- your proposal based on the prices you proposed. The unit price is based on square footage, which was your proposed price to perform the contract. You agreed to these contract terms and conditions by accepting the award and exercised options."
And then also, I added that, "The government has provided the labor increases in accordance with the Service Contract Act determination," and it was based on those things.
Q Do you know if the number of occupants -- occupants in the buildings covered by the contract changed from the time you became involved with the contract until the time the contract expired or terminated?
A I didn't -- what I -- the knowledge I had on that was when I requested the information to get it verified through DPW, because when that list was sent to me, they are my customers and they are the ones that know when those fluctuate.





ea5b7e32-84c2-4bad-9aa3-6c43fe9fe465

Q So you didn't have any -- you don't have any direct knowledge, yourself, and you would be relying upon what you were told by Mr. Riemer.
A Yes.
Q Is that correct?
A Yes.
Q Prior to drafting and sending out Exhibit No. 5, did you have any conversations with any government employees about the statements made in your letter of -- marked as Exhibit 5?
A I know at some point, I -- on my response, I have Kay McKenzie review the letters, and I believe on this one, I had Joe review it.
Q Who is Kay McKenzie?
A She's the deputy director.
Q Of contracting?
A Yes, contracting.
Q Did you receive any comments or changes from Ms. McKenzie to the letter marked Exhibit 5?
A I'm sure I did because she'll either concur with my response or she may advise me if there's anything else that needs to be in the letter.
Q Would those comments be contained in the contract file?



A I don't recall. I don't know.
Q Well, where would those comments be if they were not in the contract file?
A They're probably in my e-mail.
Q Are there e-mails on your system that relate to the H & R contract that are not contained in the contract file?
A Yes, I think there are.
Q How do you maintain your e-mails?
A By contract file.
Q Well, what period of time do you keep them?
A It just depends. I keep my current contract files.
Q So you'd have your e-mails for this H & R contract on your e-mail system?
A No, I don't have it on there.
Q Where are they?
A I looked on there, and I had to delete some of my old contracts, so they were probably deleted.
Q When did you delete them?
A I don't know. I know I have some files in my Word documents, of the letters, and those are probably still there.



Q When did you no longer work in relationship to the custodial contract here at Ft. Sill, the H & R contract or its follow-on contract?
A The follow-on contract, I worked on, and we didn't exercise the option this new fiscal year of '08, and the custodial was reassigned.
Q Would you have deleted the e-mails before August 2006 or after August 2006?
A I don't know. I -- I just -- I don't know.
Q Did you ask your supervisor or anybody about whether or not you should delete these e-mails?
A No, I didn't ask.
Q At the time you deleted these e-mails, were you aware that H & R's rights to appeal your denial of their claims were still pending?
A Yes, I knew that.
Q Have you removed any documents from the contract file?
A From this contract file?
Q From the H & R contract file.
A No.
Q Do you know if anybody has removed any



documents from the H & R contract file?
A No. No. Just you.
Q Do you know if Mr. Dryz's e-mails would still be in the computer system?
A The computer system?
Q In the e-mail system.
A I don't -- I don't know.
Q Well, when you said -- previously in your testimony, you told me you looked in the record, the file, to see if there was any evidence of Mr. Dryz's conversation with Mr. Hall.
A Yes.
Q Did you look at any e-mails?
A I looked at everything that was in there.
Q You're referring to everything in the hard copy contract file.
A Yes.
Q My question is, did you look at the e-mail system to see if anything was in the e-mail system that might evidence this conversation between Mr. Dryz and Mr. Hall?
A Yes.
Q So you actually were able to access Mr. Dryz's e-mail?
A I had a disk that -- and I think I still





ea5b7e32-84c2-4bad-9aa3-6c43fe9fe465

Page 66

have it, but there was a disk that was left by Mr. Dryz, and I looked through that.
Q What was on this disk?
A When I reviewed it, everything that was in the file was in that -- because I wanted to go back and make sure that there was -- when I got that letter from Mr. Hall, I wanted to make sure that there was that conversation letter in there, and when I went through it, everything that he had in there, there wasn't anything in there, from what I recall, that had any relation to that letter. There wasn't anything that referred to that conversation --
Q Okay.
A -- on that disk.
Q On the disk, was it e-mails or Word files?
A Word files, from what I remember. There were Word files, and that's what I remember.
Q Okay. My question, though, is, you've indicated to me that you would have had an e-mail folder set up for the H & R contract file. Correct?
A Yes. Yes, I did.
Q And you would have had e-mails stored in that folder for the H & R contract. Correct?
A E-mail folder?

Page 67

Q Yes. You would have had some sort of folder on your e-mail system in which you would have put e-mails dealing with the H & R contract as a storage mechanism.
A Yes.
Q When Mr. Dryz left, would an assistant administrator or somebody have been able to have accessed his e-mail system to see what e-mails were on his system that might relate to the H & R contract?
A I don't know for sure.
Q You haven't?
A But I have that disk.
Q Okay. Besides the disk --
A Okay.
Q -- which doesn't sound like it had e-mails on it, did you make any effort to look at Mr. Dryz's e-mails as they may relate to this H & R contract?
A I don't recall doing that.
Q Do you know if Mr. Dryz's e-mails have been deleted?
A I don't know.
Q Who would know?
A Probably the system administrator.
Q Who is that?

Page 68

A Steve Anthony.
Q How long has Mr. Anthony been the system administrator?
A He was the system administrator when I started working here. As far as how long, I don't know.
Q During the time that you administered the H & R contract, did you send or receive e-mails concerning the H & R contract?
A E-mails on the H & R contract? Say that again. I'm sorry.
Q During the time that you administered the H & R contract, did you send or receive e-mails concerning the H & R contract?
A Yes.
Q Go to tab number six. Do you recall receiving this e-mail from Mr. Hall?
A Yes.
Q Do you recall any conversations with Mr. Hall about the e-mail marked as Exhibit 6?
A This is the e-mail.
Q Did you talk to Mr. Hall about it? After you received it, did you call him up or anything?
A Let me see. I can't remember if I called him or -- because his reference to the revised

Page 69

request in a claim format -- I think I did because I think I explained to him that it had to be in a claim format, and it seems like I sent him -- let's see. It was -- this looks like a reply, but I did talk to him or I sent him that letter about the claim format, the proper claim format as addressed under the dispute, claims and disputes.
Q Okay.
A And that's when I got this.
Q Okay. And then Exhibit 7, is this the --
A Let's see. March --
Q -- claim, the official claim, submitted by H & R for an equitable adjustment under the contract?
A Yes, but they didn't have the certification part of it correct.
Q And I think if you look at tab nine, is that the certification you're referring to?
A Yes, yes.
Q And the claim under Exhibit 7, does it relate to the -- all the invoices that we talked about earlier under Exhibit No. 4?
A Let's see. Can you repeat the question again?
Q Oh, the claim that's under Exhibit No. 7,

it's based upon and related to the invoices for supplies that we talked previously about that are included with Exhibit 4?
A Let's see. Yes.
Q Okay. When you received Exhibit No. 7, do you recall having any conversations with Mr. Hall about Exhibit No. 7?
A Let's see. I believe I talked to him about the claim process, which was -- then he resubmitted.
Q Did you speak to him about the additional requirements needed to support Ft. Sill in the war effort?
A No, I don't recall discussing that with him.
Q Do you recall discussing the additional requirements needed to support Ft. Sill in the war effort with any government personnel?
A That's a really broad question. What do you mean specifically? I'm not -- if you're referring to this letter, no, I don't -- I don't recall talking about that with anybody, if you're referring to this.
Q As it relates to Exhibit 7 and the statements by Mr. Hall in his letter, which is a



part of Exhibit 7, and the claim for additional compensation under the H & R contract, do you recall discussing the additional requirements needed to support Ft. Sill in the war effort with any government personnel?
A For custodial services?
Q Yes.
A Okay. No, I don't remember --
Q Okay.
A -- having a conversation with anybody about --
Q Do you recall any conversations with Mr. Hall about the buildings that he identified in Exhibit No. 7 where there was the increased service?
A No, I don't remember talking to him.
Q Okay. And do you recall any conversations with any government personnel in response or relationship to Exhibit No. 7 and the H & R contract relating to the increased service in the buildings identified by Mr. Hall?
A Yes. I sent that list to Carl Riemer and had him verify it.
Q Okay. Let's look at tab number ten real quick. And is this what you're referring to in Exhibit No. 10, where you sent the list of buildings



to Mr. Riemer for him to review?
A Yes.
Q And you sent that to him on August 9, 2005?
A Yes.
Q And then on August 10th, 2005, he sent you an e-mail response. Is that correct?
A Yes.
Q Where he addressed the buildings identified by H & R?
A Yes.
Q Other than what Mr. Riemer has stated in his e-mail, do you have any other knowledge concerning the occupants of the buildings, the increased service that may or may not have been required in those buildings, or any increased supplies that might have been provided to those buildings?
A No, I don't.
Q Do you recall any oral conversations with Mr. Riemer concerning the list of buildings that are identified in Exhibit 10?
A Yes, because when I was preparing my response, I called the --
Q What do you recall about --



A I asked him if he was absolutely sure about this, and he said he was absolutely sure, that these were administrative buildings and there was no significant change, and he provided his response here, and he was absolutely sure about it. And I don't remember the day or anything, but --
Q And so you relied upon the statements of Mr. Riemer?
A Yes.
Q Did you have any conversations with Mr. Webb about these buildings and the increased usage within the buildings?
A I may have, but just to say that -- well, I -- my conversations with Pete were sporadic, so it's hard to remember. Let's see. Specifically, no, I don't recall anything, because he was -- he's our quality inspector on the buildings.
Q Uh-huh.
A But for this, this is -- this is what I -- the best I can remember talking to anybody --
Q Okay.
A -- about these specific buildings.
Q Okay. Why did you make the request of Mr. Riemer for information about the buildings?
A Because he's the one that gives us our





ea5b7e32-84c2-4bad-9aa3-6c43fe9fe465

requirements from DPW on this contract.
Q Okay. And then looking back over at Exhibit No. 7 again, do you know if Ft. Sill had any involvement with the war in Iraq?
A Yes, they do.
Q What type of a role has Ft. Sill played with regard to the war in Iraq?
A We have soldiers here, military personnel. It's a military installation.
Q Are they the type of military personnel that sit at a desk?
A Not all. I couldn't give you a breakdown of who does what, but -- it's a training facility for soldiers.
Q So are there soldiers from other installations that come to Ft. Sill for training on their way to the war in Iraq?
A Yes.
Q Are there permanent party military personnel who are stationed at Ft. Sill that may have been mobilized and sent to the war in Iraq?
A That, I don't know. I don't have the knowledge about all that.
Q You don't have that kind of understanding about the various missions on the base?



A Right.
Q Okay. In Exhibit No. 8, is this your letter to Mr. Hall dated December 27 of 2005, responding to the first claim of H & R Services?
A Yes.
Q And does this letter set forth all of the grounds upon which you denied H & R's claim?
A Yes.
Q Paragraph one addresses the fact that the government has compensated H & R for the various times that there's been an increase in the square footage requirements on the contract. Is that right?
A Yes.
Q As well as the increase or changes to the labor rates based on the Service Contract Act. Correct?
A Yes.
Q And then the second paragraph deals with the contract being a firm-fixed-price contract which was solicited as an IFB award. Is that right?
A Yes.
Q What significance does your statement in paragraph two have on your decision to deny the claim?



MR. McNAMARA: Objection. Vague.
A Can you repeat that?
Q (By Mr. Hickman) What significance does paragraph two of Exhibit 8 have on your decision to deny H & R's claim?
A Because these were the terms and conditions accepted on the award and exercise of the options that the contractor, H & R, agreed to.
Q Is there a situation in which a firm-fixed-price contract which was solicited as an IFB award could be changed?
MR. McNAMARA: Objection. Speculation.
THE WITNESS: Do I have to answer that?
MR. McNAMARA: If you understand it.
A I understand the question, but I can't say yes or no because if you're referring -- I mean, if you're referring to contracts overall, well, of course, there's always situations. On this particular contract, there was never the specific justification for those increases that I asked for that were given by the contractor. If there had been, yes, it could've changed, but they never satisfied me, as a contracting officer, that it was justified.
Q (By Mr. Hickman) Okay. What were those



specific considerations that you asked for that would have justified H & R's claim?
A In paragraph three, it says, "Your letter and documents do not support an increase of services that correlate to an increase of requirements at Ft. Sill, but they're a listing of supplies. Furthermore, you state in tab three that the supplies you have listed were delivered to Ft. Sill. The packing delivery invoice slips you provided show the delivery at a company at H & R Services' address in Lawton, Oklahoma, 1920 Ferris Street. Please reference a statement of work paragraph which states the contractor will provide which includes supplies to meet the terms and conditions of this contract."
But mainly is that the request for the increase or the request for additional funds never correlated to anything specific to show that there was an increase of supply usage at those buildings.
Q So this goes back to our prior discussion a little bit ago and some of your statements here in paragraph three here on Exhibit 8 that if H & R had tied the supply usage --
A Yes.
Q -- and the delivery of those supplies in Exhibit No. 4, those supply invoices to specific

buildings --
A Yes.
Q -- then you would've changed your opinion as far as granting the claim?
A Where it says, "services that correlate to an increase of requirements at Ft. Sill."
Q So yes, you would have changed your opinion?
A Yes.
Q Do you recall any conversations with any government personnel prior to sending out this letter dated April 27, 2005, marked as Exhibit No. 8?
A Any conversations?
Q Did you talk to anybody about the letter, have them look at a draft of it, that kind of thing?
A Like I said, I always let Kay look at all my letters, and then --
Q Anybody else you can think of?
A Joe Alford.
Q Anyone else?
A That's probably it. I can't remember sending it to anybody else.
Q Do you recall if you made any changes to the letter marked Exhibit 8 based on any comments



from Kay?
A I don't recall right offhand.
Q Would she have sent those changes to you via e-mail?
A Yes.
Q Do you recall if you would have printed that e-mail off and put it in the file?
A No. I --
Q No, you don't recall, or no, you wouldn't have?
A No, I wouldn't have.
Q Did I ask you, do you recall if she made any changes?
A Yes, you asked me that, but --
Q And you didn't recall.
A I don't recall right offhand.
Q Okay. If you look at Exhibit No. 9 -- and we talked about this exhibit before. This is the certification statement you requested on the claim submitted by H & R. Is that correct?
A Yes.
Q And Exhibit No. 10, we've spoken about. It's the list of buildings and the comments from Mr. Riemer. Correct?
A Yes.



Q And then Exhibit No. 11 is a letter from you, dated August 11, 2005, to Mr. Hall, and it's referred to as, "the final decision to contractor's certified claim submitted on July 5th, 2005." Is that correct?
A Yes.
Q I'm trying to -- the July 5th, 2005, reference, that date, do you know, in your letter of August 11, 2005, Exhibit No. 11 -- let me see if I can maybe simplify this. It appears to me that your letter that's marked as Exhibit No. 11 is denying the claim that's Exhibit No. 7 submitted by H & R on April 12, 2005, and then certified by H & R under Exhibit No. 9 on June 15th, 2005.
A Yes, because we received it, if you'll see that stamp date, July 5th.
Q You received the certification which is Exhibit No. 9 on July 5th, 2005.
A Yes. Yes.
Q And your basis for denying the claim as set forth in Exhibit No. 11, in the August 11, 2005, letter, in paragraph three, you make reference to, "The submitted documents do not correlate to any specific increase supporting H & R Services' claim."
A Yes.



Q So if I asked you that same series of questions about the basis for your denial and the information that was provided, but not correlated to specific buildings, would your answers be the same with regard to this Exhibit 11 letter?
A Yes.
Q And with regard to this Exhibit 11, the first sentence in paragraph one says, "The government has compensated increase requirements through the life of this contract." Are you referring to the payments based on price per square foot for the increased square footage added to the contractor modifications?
A Yes.
Q Did you have an understanding of whether or not it was taking H & R more time to clean the buildings because of additional number of occupants in the building or a change in use or utilization of the buildings?
A No.
Q You did not have any understanding of that?
A No.
Q And if you'll look at tab 12, tab 12 is a letter from my firm on behalf of H & R concerning an





ea5b7e32-84c2-4bad-9aa3-6c43fe9fe465

additional or second claim for additional monies for the period of time from January 2005 through September 2005. Is that correct?
A Yes.
Q Do you recall having any conversations with any government personnel concerning the letter marked Exhibit 12?
A Yes.
Q Who did you speak to?
A Kay McKenzie and Joe Alford.
Q Do you recall what you and Kay spoke about?
A No. It wasn't -- it was just to notify her, basically, that I had gotten this letter, so -- that's what I remember.
Q And Exhibit 13 is a letter from you to counsel for H & R --
A Yes.
Q -- requesting, in part, additional information. Is that correct? You say at the beginning up there --
A Yes. Yes.
Q -- that you don't have enough adequate information. Do you recall any conversations with any government personnel about the letter marked



Exhibit 13?
A The letter I sent?
Q Yes.
A I -- I just made sure that Kay, my supervisor, was aware of the letter and sent her a copy, and Joe.
Q Do you recall if Kay had any comments on the letter marked Exhibit 13, any changes to it?
A I don't believe so, because it was basically the same response that we had been given on the other denial.
Q Okay.
A So I don't think there were any -- just because really, it's just -- it's the -- it goes back to the same reason why it was denied in the first place.
Q The same reasons you've told me about before --
A Yes.
Q -- also relate to the letter marked Exhibit 13.
A Yes, because it still didn't -- wasn't specific enough to justify an increase.
Q And then Exhibit 14 is a letter from my firm as counsel for H & R to you, enclosing



documents for your consideration, including invoices from Empire Paper Company and payroll information from H & R.
A Yes.
Q Is that correct?
A Yes.
Q Do you recall any conversation with any government personnel about the letter and attachments marked as Exhibit 14?
A Once again, it was Kay and Joe, and it was the same situation where I just wanted them to be aware of what was in there and my response and --
Q Okay. And Exhibit 15 is a letter from you to counsel for H & R, dated June 20th, 2006, as the final decision denying the claim, the second claim submitted by H & R for the period of time from January 2005 through September 2005. Is that correct?
A Yes.
Q And is the basis for the denial of the second claim the same as our prior discussion about the basis for denial of the initial claim submitted by H & R?
A Yes.
Q As you sit here today, has your opinion



about the denial of these claims changed?
A Based on this, on this information?
Q Based on whatever you've learned since the letter dated June 20, 2006.
A I'm -- I still hold to what -- the decision I made on these claims, so nothing's changed about that.
Q Okay. At the time you sent out the letter marked Exhibit 15, did you have any conversations with any government employees?
A It was the same. Kay and Joe.
Q Besides the one conversation we talked about with regard to Mr. Riemer in Exhibit No. 10, did you have any additional conversations with Mr. Riemer as related to the claim submitted by H & R?
A If there was one, just going back -- the only thing I asked him to do was to verify his response, and that was it.
Q How about Mr. Webb? Do you recall any conversation with Mr. Webb about the claims and the statements or allegations made by H & R regarding their claims?
A I think I mentioned to him that there was one.


ea5b7e32-84c2-4bad-9aa3-6c43fe9fe465

Q Did you ask for any assistance from him or any input from him?
A No.
MR. HICKMAN: Do you want to take a break?
MR. McNAMARA: Sure.
MR. HICKMAN: Do you want to take just a ten-or-so-minute one, or do you want to break for a little bit longer since we've been going for a while?
MR. McNAMARA: Why don't we go off the record.
(Recessed from 1:19 p.m. to 2:07 p.m.)
Q (By Mr. Hickman) Were you involved in the follow-on contract for custodial services, the contract that was subsequent to the H & R contract we've been talking about this morning?
A Crystal Clear Maintenance was the follow-on contract, and the Southwest Regional Contracting Center at San Antonio did the solicitation for the follow-on contract.
(Exhibit 61 marked for identification.)
Q (By Mr. Hickman) Hand you what I've marked as Exhibit No. 61.
A Okay.
Q Is Exhibit 61 --



A And I -- oh, go ahead.
Q Is Exhibit 61 a memorandum from Raineye Holmes, the contracting officer down at the Southern Region Contracting Center West to the Directorate of Public Works here at Ft. Sill Army Base, dated March 15, 2005?
A Yes.
Q And you see attached to her memorandum are some writings and changes to scope of -- the performance work statement and technical exhibits? Do you see that?
A Yes.
Q Do you recognize any of the handwriting on these pages that are contained within Exhibit 61?
Do you recognize the handwriting on any of the pages contained in Exhibit 61?
MR. McNAMARA: Don't worry too much about what it says. Just --
THE WITNESS: Well, I'm trying to --
A A couple of these look like my handwriting, but I'm not sure.
Q (By Mr. Hickman) Which page are you pointing to?
A Page two, paragraph seven.
Q So you were involved in the process of



revising the scope of work, performance work statement, and technical exhibits that are included in Exhibit 61?
A Let's see. Let me think about this. Raineye was the one that did all the requirements for the -- she did the final performance work statement. If -- what we did were -- we provided as a liaison for them between the customer, and we held the site visit here and coordinated that. But as far as this document's concerned, you're asking me if I recognize any of the writing. The only thing I recognize is on number seven.
We met with the DPW because their staff had to come up from San Antonio. Trying to remember that meeting. We probably went over this, and because I had the last contract and was familiar with the previous contract, I may have had some input as -- but the final document was -- Raineye Holmes was the one that did the final document, so it was -- I did have a small part in that, but the final decisions were made by Raineye.
Q All right.
A Because she did the solicitation, and we just kind of helped facilitate that, that process.
Q Okay. You attended the meeting with the



DPW folks when the requirements, the scope of work, and the technical exhibits were being finalized for the follow-on contract. Is that right?
A Not finalized. I believe -- right at the beginning of the process because their staff didn't know the DPW folks, so we just kind of acted like a liaison with them to bring them together.
Q Okay.
A And if there was any kind of liaison work as far as what Ft. Sill had to do with their contracting office, we -- we provided that support.
Q Okay. You did attend at least a meeting with DPW folks in preparation of the solicitation for the follow-on contract.
A Yes.
Q Okay. Do you know if there were other meetings with DPW folks that you did not participate in in preparation of the requirements for the follow-on solicitation to the H & R contract?
A No, I don't -- they may have had some, but I didn't attend. I remember that initial meeting and the site visit.
Q Okay. There may have been some that you didn't attend. You just don't know?
A Let me think about it. We had that





ea5b7e32-84c2-4bad-9aa3-6c43fe9fe465

initial meeting. Did the site visit with them. That was the same meeting. We coordinated the site visit with the -- for the pre-proposal conference, but they weren't there. They -- we did it by teleconference, and they asked all the questions, and I believe that was the only meetings that I attended with them.
Q Okay. Look over on page four of the scope of work that is attached to Exhibit 61. Do you see paragraph 18? Do you see paragraph 18?
A Yes.
Q Do you see where the handwriting says, "Contractor or government furnished," question mark?
A Yes.
Q Do you recognize that handwriting?
A Yes. That looks like mine.
Q Do you recognize the question underneath paragraph 18, "What about the other items," question mark? Do you recognize that handwriting?
A That looks like mine, but I'm not certain.
Q Do you recall the circumstances by which you would have written those comments?
A Is TE-2 in here?
Q Yes. Is that a question?
A Yeah.



Q Yeah. TE-2 is part of these attached documents, yes.
A Okay. Let me look at that because I can tell you for sure.
Q And I was going to ask you if that's your handwriting at the top of Technical Exhibit No. 2 that's attached to Exhibit 61. Do you recognize the handwriting on Technical Exhibit 2?
A It looks like mine, but I'm not sure. But that's an appropriate question in relation to the technical exhibit.
Q Yes, ma'am.
A So --
Q Okay. With regard to the handwriting on the Technical Exhibit 2 and the handwriting we discussed next to paragraph 18 in Exhibit 61, why did you write those comments?
MR. McNAMARA: Objection. Mischaracterizes the witness's prior testimony, I believe, that she testified that she did write these comments and assumes that she did write those comments.
Q (By Mr. Hickman) To the extent that you recall or believe you wrote these comments, do you recall why they were written, or do you recall any



conversations, if this is not your handwriting, in which this issue, "Contractor or government furnished," was discussed in any meetings you would've attended with DPW officials?
A That Technical Exhibit 2 and question mark, question mark, that doesn't look like my writing, but just to make sense of it, it's -- you know, it should've -- from what I'm seeing, it should've referred to Technical Exhibit 2, so that was a clarification.
Q Well, I guess --
A That's just a question of who's going to -- who's going to provide this equipment and these supplies.
Q And is that a question that you raised as the person who had been administering the contract?
A If I had been looking at this, looking and reviewing this, it's making a reference, and it says, "Technical Exhibit 4," which I don't know what that is right off.
Q Which I think was corrected to be Technical Exhibit 2.
A Okay. So it should've been 2, and the question raised is because the items that are listed are not the same items that are listed here, and



that's why the question was raised, and that's just to clarify on the requirement.
Q Are you saying it would've been -- or you were recommending, I guess, to add paragraph 18, a statement or identification of whether or not the supplies identified were to be provided by the contractor or the government?
A Yes.
Q Because as paragraph 18 reads in Exhibit 61, it doesn't specify whether they're contractor or government furnished. Right?
A Right.
Q And what about the statement where it says, "What about other items?" Is that where you're referring to there's a difference between the items in paragraph 18 and the items on the Technical Exhibit 2?
A Yes.
Q Okay.
A That's all that is.
Q Because government-supplied items, are they treated differently than contractor-furnished items?
A Yes.
Q Do you recall any conversations with other





ea5b7e32-84c2-4bad-9aa3-6c43fe9fe465

government employees, when the scope of work was being prepared, about the providing of supplies?
A No, I don't recall.
Q Did Ms. Holmes ask you any questions about how the contract you'd been administering worked, if there were any problems with the way the contract was structured that you would recommend changing in the follow-on contract?
A She didn't really ask me any -- what I'm recalling is that we had a difference of opinion on the contract format, and since they issued the contract, they decided to make that a delivery order contract, and I -- to the best that I recall, that's the only thing that we really discussed doing anything different.
Q And what did -- what was the difference -- what did you recommend for the type of contract?
A The way it was set up as a -- it's still a fixed-price contract. The only difference on that is that the funds are obligated by a delivery order, and that was basically the only difference.
Q So each time a building customer wants their building cleaned, they have to put an order in?
A No. In this situation, the contract is



still the -- pretty much the same way. The only -- the time that we obligate the funding, it goes on a delivery order to obligate that funding.
Q Okay. How is that delivery order different from like a modification that we may have looked at that was done at the beginning of the fiscal year, where money is obligated through the modification to the contract?
A It's really the same thing, except when you add like more requirements like you saw on the modifications where it increased, you have to -- you have to -- just -- it's really a duplicate of the -- the modification, which is what we call our P0001, and this is what you're looking at on this contract. Well, on a delivery contract, it's a delivery order that's cut, but all -- what it basically did was just repeat what the mod had on it on this contract.
Q Did the delivery orders have supplies on them?
A It's all the same as whatever your contract requirements were, the way it's set up like this. There wasn't any -- let me see. There wasn't anything separate for supplies.
(Exhibit 62 marked for identification.)
Q (By Mr. Hickman) Let me hand you what



I've marked as Exhibit 62.
A Okay.
Q And is this the purchase request and commitment from the DPW folks here at Ft. Sill, dated May 6, 2005, being sent to the contracting folks at Fort Sam Houston, Texas, to initiate the solicitation process?
A Yes, this -- this one is.
Q And if you look on page four, the performance work statement that's attached to Exhibit 62, do you see paragraph 16 there at the top? It's on page four, on the bottom there. It's actually -- actually not Bates numbered. Keep on flipping to where it says, "Performance Work Statement" at the top. It's page four of that performance work statement. Now, you see there at the top, paragraph 16?
A Yes.
Q You might recall our conversation a minute ago about Exhibit 61 and the written comments. Does paragraph 16 appear to incorporate some of those comments in that it provides that, "The following is a list of supplies that should be furnished by the contractor"? Is that right?
A That's the same -- except they corrected



that Technical Exhibit 2 reference.
Q Yes, and they've incorporated the language about the supplies being furnished by the contractor. Correct?
A Yes.
Q Do you recall any comments or conversations with government employees in the preparation of the performance work statement for the follow-on contract in which estimated monthly usage of supplies was being prepared?
A I don't recall anything specific other than just the review of this, because these are the customer's requirements, so I don't recall having any specific questions.
Q And you see over on -- I see you're looking at that page, Technical Exhibit 6-1, the page we were just --
A Uh-huh.
Q -- looking at? Do you see at the top there where they've added in the contractor-furnished equipment supplies? I should say the contractor part of it's added in to identify that these supplies will be provided by the contractor.
A Yes.

Page 98

Q And at the bottom, it has an estimate of the -- estimated monthly usage of supply items. Do you see that at the bottom?
A Yes.
Q Do you have any reason to believe that those are not the appropriate estimated monthly usage of supply items?
A No, because the customer is the one that determines the requirements of the usage.
Q Did you recommend that an estimated monthly usage of supplies be included as a part of the solicitation for the follow-on contract?
A No.
Q Would that have been the government technical person who identifies the requirement?
A Yes.
(Exhibit 63 marked for identification.)
Q (By Mr. Hickman) Hand you what I marked as Exhibit 63. Does Exhibit 63 appear to be the independent government estimate prepared by Carl Riemer on June 6, 2005, for the follow-on custodial service contract at Ft. Sill?
A Yes.
Q Do you know why Mr. Riemer would have had estimated supplies as a part of his independent

Page 99

government estimate?
A When you have a independent government estimate, you try to identify everything that will go into the cost of that contract, and that's why I believe he listed that, because you're supposed to -- when you give an estimated -- independent government estimate, all the things that go into the cost of the contract should be there for us to have, as contracting officers, to determine if your price is fair and reasonable.
Q Is that because the information set out here in this independent government estimate that's Exhibit 63 is the same type information that would be used by a bidder to put together their pricing?
MR. McNAMARA: Objection. Speculation.
A They should. They should.
(Exhibit 64 marked for identification.)
Q (By Mr. Hickman) Hand you what I've marked as Exhibit 64. Is Exhibit 64 a memorandum for record prepared by Raineye Holmes, contracting officer, dated August 4, 2005, concerning the determination and finding for the type of contract for the follow-on custodial services contract at Ft. Sill Air Force Base -- Ft. Sill Army base?
A Yes.

Page 100

Q And is one of her findings that the firm-fixed-price or cost-type contracts will not provide the flexibility needed for this type of requirement?
A Yes.
Q And does she go on to say that the indefinite-quantity and indefinite-delivery-type contract gives greater flexibility to meet the changing demands of the requirement?
A Yes.
Q Do you know what information she reviewed in making that finding?
A It says FAR 16.5.
Q Did she look at the contract file for the H & R contract?
A Yes. She had all that information.
Q Did she have the contract file for the contract that preceded the H & R contract?
A No.
Q She didn't -- she did not have a copy of the contract file for the janitorial custodial services contract before the H & R contract?
A To the best of my knowledge, no, because that contract had already been closed down.
(Off the record.)

Page 101

(Exhibit 65 marked for identification.)
Q (By Mr. Hickman) Let me hand you what I've marked as Exhibit 65. Does Exhibit 65 appear to be the solicitation dated August 8, 2005, issued by the Southern Region Contracting Center West for the follow-on custodial services contract for Ft. Sill?
A Yes.
Q And if you look at page 20 of 68 of the solicitation, does it contain the paragraph concerning the list of supplies -- the list of supplies to be furnished by the contractor?
A Yes.
Q And does the solicitation marked as Exhibit 65 contain the Technical Exhibit -- contractor-furnished equipment and supplies as Technical Exhibit E to the solicitation?
A Yes.
(Exhibit 66 marked for identification.)
Q (By Mr. Hickman) Let me hand you what I've marked as Exhibit 66. Is Exhibit 66 the roster of attendance for the pre-proposal conference for the solicitation marked as Exhibit 65 that was held at Ft. Sill?
A Yes.

Q I believe this is the meeting we talked briefly about before where it was held here at Ft. Sill and you and your office facilitated it on site?
A Yes. We had a teleconference with Raineye and Diane Cook.
Q Do you recall if, in that meeting, that pre-proposal conference, there were any questions about the supplies to be provided by the contractor?
A Yes, there were.
Q What do you recall about that?
A They wanted to know what the supplies were, the listing, and we referred them to the technical exhibit.
Q Did you find that unusual, that they asked those questions?
A No, that's not unusual.
Q Were the contractors or the prospective bidders given an opportunity to go through any of the buildings?
A Yes. We -- on our site visit, they went to several of the buildings. Not all of them, but several of them.
Q And was that unusual?
A No, it's not unusual.



Q And why did you do that?
A The site visit?
Q Why did you take the bidders through some of the buildings?
A So they could see where the areas were and what the facilities looked like.
Q Did you do this during normal business hours?
A Yes.
Q When the normal number of occupants that would be in the building would be in the building?
A Yes.
Q And do you recall if there were any questions about the uses of the buildings that were to be -- or that were covered by the solicitation?
A Not anything specific right offhand, but that's not an unusual question. I can't recall anything right offhand, anything specific.
Q Well, would it be typical to you for the bidder to be curious as to what the building is used for as it may affect how much difficulty there may or may not be in cleaning the building?
A I'm not really sure I understand your question.
Q Okay. Well, when you were doing the site



visit --
A Uh-huh.
Q -- I assume that the bidders, it would make a difference to them if the building was being used by troops that were training in the field and maybe bringing dirt and sand and things in from the field into their building as opposed to it being an office building where simply office work was being done.
A It was explained to them that most of these are administrative buildings, and that's what their use is mainly for. And as I recall, that was in the pre-proposal conference that was told to them by Mr. Riemer.
Q Do you know whether or not a pre-proposal conference was held prior to the award of the H & R contract?
A I've looked at that file a hundred times. Let's see.
Q If you can recall.
A The reason I can't answer is because I just assume there was, and I'm just guessing that there was, but I'm trying to --
Q Do you recall, when you were working on the solicitation for the follow-on contract and you



mentioned Mr. Riemer's name a minute ago, any conversation with Mr. Riemer about how they conducted the pre-proposal conference on the prior solicitation? Do you recall any of those kind of conversations that might help jog your memory, if any -- if there were any of those types of conversations?
A I don't remember because -- I just don't remember, no. I can't answer that.
(Exhibit 67 marked for identification.)
Q (By Mr. Hickman) Let me hand you what I've marked as Exhibit 67.
(Off the record.)
Q (By Mr. Hickman) Does Exhibit 67 appear to be the record of attendance of the source selection evaluation board members for the solicitation that was for the follow-on custodial services contract?
A September 7th. Well, it's titled that.
Q And it was -- appears the attendance roster was taken on September 7, 2005?
A Yes. My name's on there.
Q Your name's on there?
A Uh-huh.
Q Do you recall being a part of the source

selection evaluation board for the solicitation marked Exhibit 65?
A We didn't make any final decision on how they awarded that last contract. If we were there, it was, again, to be as acting liaison and maybe if they had a question about the contract, but we weren't -- we didn't make any decision. It was Raineye and DPW folks.
Q Were you involved in the reviewing of the proposals and evaluating the proposals?
A For the follow-on contract?
Q Yes, for the follow-on contract.
A No. They had like 13. No.
Q Were you requested to provide a past performance report on H & R as a part of the source selection process for the follow-on contract based on their performance on the contract you were administering?
A We do our past performance on -- yearly, on a yearly basis, and I can't recall being asked on that. I may have, but -- which isn't unusual.
Q Do you recall what your evaluation on H & R would've been for the period of time that you administered the H & R contract?
A On their past performance?



Q Yes, or on their performance on their contract.
A What I recall that was in their past performance is that their services were -- were good. The administration, we had a -- in the last year, we had a complaint from their employee that their paycheck -- their payment from H & R had bounced, and so I documented the file that -- we had to notify the Department of Labor because of their employees' checks bouncing, so they investigated H & R, and the outcome of it was, we withheld some of the -- H & R's final payment regarding that complaint, initial complaint.
Q And did you ultimately issue that money you held back to H & R?
A The -- we paid them minus what the Department of Labor had asked us to send them by court order.
Q Do you remember approximately how much we're talking about here?
A I think it was 1,300. I'm just guessing, because the initial was for 3,400, and it -- after everything was finalized by the Department of Labor --
Q So H & R had to make minor adjustments in



its wage rates based on the Department of Labor's review?
A Well, that was also something that they found, that -- Department of Labor said that they owed, and from their discussion with Department of Labor, I believe what happened was that they paid for those bounced checks in the meantime, and what was withheld was the -- what the Department of Labor further found on the wage determination.
Q And so H & R did end up paying its employees.
A Yes. Yes, they did.
Q And with regard to the -- you used the term "bounced check." Were you provided any information that those checks not clearing was the result of the bank's mistake as opposed to an H & R issue?
A No. I had no knowledge of that.
Q You don't recall being provided any documentation that the bank made a mistake?
A Let's see. I -- I can't remember. I can't remember.
(Exhibit 68 marked for identification.)
Q (By Mr. Hickman) Hand you what I've marked as Exhibit 68. Is this a freedom of



information request prepared by Shari Greggs, dated September 14, 2005?
A September 14, 2005? Yes.
Q And the way I'm looking at number one here on Exhibit 68, it appears to me that this is a Freedom of Information Act inquiring about the follow-on contract to the H & R Services contract, looking at paragraphs one and two in particular. Would that be your understanding?
A Yes.
Q And that in this Freedom of Information Act, the government is saying that the proposed contract specifications in the follow-on contract are basically the same as the H & R Services specifications. Is that right?
A Yes.
Q Who is Shari Greggs?
A She's the -- she was a contract specialist on the -- for the custodial contract at that time.
(Exhibit 69 marked for identification.)
Q (By Mr. Hickman) Let me hand you what I've marked as Exhibit 69. Do you recall reviewing or being involved in discussions concerning the facts and issues raised in the documents marked Exhibit 69?

A No, I didn't -- this is Raineye's. We sent her this, you know, like the information that they have cited in here that -- but no, this is -- this is her document.
Q What information are you referring to that's cited in here?
A Like October 1st through September 30th. Just previous contract information at that time. Let's see. No.
(Exhibit 70 marked for identification.)
Q (By Mr. Hickman) Let me hand you what I've marked as Exhibit No. 70. Is Exhibit No. 70 the custodial services contract that followed the H & R Services contract?
A Yes.
Q And was this contract signed and effective -- or let's say signed September 22nd, 2005?
A Yes.
Q And is the contract with Crystal Clear Maintenance?
A Yes.
Q And if you look at page 39 of 44 of the contract, does it contain paragraph 16 that is in the same form as we talked about in Exhibit 65



concerning the supplies being furnished by the contractor?
A Yes.
Q And does the contract marked Exhibit 70 contain the Technical Exhibit E setting forth the contractor-furnished equipment and supplies, the estimated contractor-furnished supplies?
A Yes.
Q If you'll flip over to tab one -- or Exhibit 1, I mean, in this three-ring binder and look at page 15 of Exhibit 1. Exhibit 1 is the H & R contract. Correct?
A Yes.
Q If you'll look at paragraph 18, does it appear to be similar to paragraph 16 in Exhibit 70, the follow-on contract?
A Can you restate that?
Q Does paragraph 18 in Exhibit No. 1 appear to be similar to paragraph 16 we were discussing in Exhibit No. 70?
A Let's see.
Q I believe it's page 39 of 44 of Exhibit 70. Are they similar?
A They're similar, but this one has, "The following is a list of supplies that shall be



furnished by the contractor," and then --
Q That statement you read, that's in Exhibit 70. Correct?
A Yes.
Q And does Exhibit No. 1 contain a statement, at least in paragraph 18, that identifies who was to furnish the supplies?
A No. Doesn't have the same one.
(Exhibit 71 marked for identification.)
Q (By Mr. Hickman) Let me hand you what I've marked as Exhibit 71. Is Exhibit 71 a memorandum dated October 11, 2005, designating the contracting officer's representative for the contract marked as Exhibit 70?
A Yes.
Q And who is that contracting officer representative?
A Evans P. Warner.
Q Were you involved in the process of Mr. Warner being selected as the contracting officer representative?
A No, not -- not for this one.
(Exhibit 72 marked for identification.)
Q (By Mr. Hickman) Hand you what's been marked as Exhibit 72. Is this a memorandum dated



October 14, 2005, designating the alternative contracting officer representative?
A Can you repeat the question? I'm sorry. Getting kind of --
Q That's okay. Is Exhibit 72 a memorandum dated October 14, 2005, designating the alternative contracting officer's representative?
A Yes.
Q And who is that person?
A Joe Krachinsky.
Q What does the contracting officer's representative or their alternate do?
A They act for the contracting officer in overseeing the job site and making decisions for the contracting officer, but within -- based on the guidelines that are published here.
Q Did your office, the Directorate of Contracting here at Ft. Sill, take over the administration of the contract marked as Exhibit 70?
A Yes.
Q And were you the contracting officer on that contract?
A Yes.
Q Do you know if there was a contracting officer designated on the H & R Services contract?



Def. App. 755

MR. McNAMARA: Objection. I think you mean contracting officer's representative.
MR. HICKMAN: Yeah. Sorry.
Q (By Mr. Hickman) Do you know if there was a contracting officer's representative designated on the H & R Services contract?
A I don't recall. I always asked, when I called over there, Carl specific questions, and I knew that Pete, he signed off as the quality inspector, and those were the two I was referred to when I got the contract.
Q But do you know if the formal process as set out in Exhibit 71 and Exhibit 72 was followed to officially designate a contracting officer's representative for the H & R contract?
A No, because that's not always required, from what I understand, and I believe I brought that up at one point, and it was explained to me that it wasn't required, so --
(Exhibit 73 marked for identification.)
Q (By Mr. Hickman) Hand to you what I've marked as Exhibit 73. Does Exhibit 73 appear to be a memo to the file prepared by Diane Cook on October 27 of 2005, concerning a teleconference relating to the contract marked as Exhibit 70, the



follow-on custodial services contract?
A Let's see. This document was generated by the contract specialist at Fort Sam Houston.
Q That's where Diane Cook is located?
A Yes.
Q Okay. Were you aware of complaints about the performance of the contractor, Crystal Clear Maintenance?
A Yes.
Q What was your understanding of those complaints in those reports?
A There were four CDR's issued against them through their contract when they had it for two years, and they were quality complaints.
Q What's a -- did you say "CDR"?
A Oh, I'm sorry. Contract discrepancy reports.
Q And what's the purpose of a CDR?
A It's a record of contractor complaints.
Q Or complaints about the contractor?
A Yes.
Q And is Exhibit 74 a memo to the file concerning some of the issues surrounding the complaints against the contractor, Crystal Clear Maintenance?



A Yes. This was a memo from Raineye Holmes.
(Exhibit 75 marked for identification.)
Q (By Mr. Hickman) Okay. Let me hand you what I've marked as Exhibit 75. Is this a memorandum for record that you signed, dated August 10, 2006, regarding a market survey conducted in relationship to the contract marked Exhibit 70?
A Yes.
Q And were you involved in the preparation of modifications to the contract marked as Exhibit 70?
A Yes.
(Exhibit 76 marked for identification.)
Q (By Mr. Hickman) Let me hand you what I marked as Exhibit 76. Does Exhibit 76 appear to be modification number three to the contract marked Exhibit 70?
A Yes. It's a mod to that, yes.
Q And this modification was effective October 1st, 2005. Is that right?
A Effective date is October 1st, 2005.
Q Now, is the purpose of this modification to realign funds in support of the Global War on Terrorism?
A Yes.



Q Were there conditions on the use of funds that were in support of the Global War on Terrorism?
A Conditions? What do you mean?
Q Like they could only be spent on essential services or essential supplies supporting the Global War on Terrorism, or could you spend monies identified as funds for the Global War on Terrorism on anything?
A They're -- the funding is specifically earmarked for support of Global War on Terrorism.
Q So for the funds to be realigned and added to the contract marked Exhibit 70, it would have to be determined that the services being provided by that contract --
A Supported that.
Q -- were supporting the Global War on Terrorism.
A Yes.
Q And what was the eventual outcome of the contract marked as Exhibit No. 70?
A With Crystal Clear?
Q Yes.
A The contract was not -- was going into the third option year, and we didn't exercise the option.





ea5b7e32-84c2-4bad-9aa3-6c43fe9fe465

Q Why?
A Because of the performance quality of the contractor.
Q So how many years did Crystal Clear have the contract?
A For two years.
Q So the base year and one option year?
A Yes.
Q Earlier, you had an opportunity to look at some copies that were made of the H & R Services contract file.
A Yes.
Q Do you recall the Bates numbers that are contained in those boxes?
A The Bate numbers?
Q The numbers --
A On here?
Q -- on the bottom of the documents.
MR. HICKMAN: Do you have those, Sean?
A Yeah, he explained them to me, but I didn't --
Q (By Mr. Hickman) Okay. Well, I just want to --
A It was like 13 or --
Q Let me tell you kind of what I want, and



then we can --
A Okay.
Q -- take a break, if you want to. What I want to be able to do is have you identify the numbers on the documents that correspond to -- identify the numbers on the copies that then correspond to the originals in the contract file so I can make sure that what I'm looking at in the copies that I have appear to be a true and correct copy of the contract file to the extent you've had an opportunity to look at it. I know you haven't looked at every single page. But that it appears to be a complete set of the contract file. Is that okay?
A Yeah.
MR. HICKMAN: Okay. So why don't we take a break.
(Recessed from 3:33 p.m. to 3:53 p.m.)
(Exhibit 77 marked for identification.)
Q (By Mr. Hickman) Let me hand you what I've marked as Exhibit 77. Is this some handwritten notes that you prepared while we were on break setting forth the Bate range numbers for the copies that correspond to the original contract file?
A Yes.



Q And to the best of your knowledge, are those copies that are represented by those Bate numbers a true and correct --
A Yes.
Q -- duplication of the original H & R contract file?
A Yes.
Q In the contract file, there are two sets of Technical Exhibit No. 1's, list of buildings, Bates range 3156 through 3168. I just want to have you look at those and tell me -- there's handwriting on those pages. Are you familiar with -- start with are you familiar with the handwriting?
A Yes.
Q Whose handwriting is that?
A That's my handwriting.
Q Is that handwriting that you're taking down based on what somebody's telling you?
A Yes.
Q Do you have any knowledge or understanding of the uses being conducted or that may have changed in the buildings identified on the Bate numbered documents that I referred to previously?
MR. McNAMARA: Objection. Compound.
A Can you repeat that again?



Q (By Mr. Hickman) Do you have any knowledge of the uses, what was being done in the buildings that are identified on those documents that I've mentioned the Bate numbers for?
A The way they're identified here --
Q Yes.
A -- that's -- I -- that's the only real knowledge that I have.
Q The only knowledge you have is that which you were being told by somebody else about the uses being conducted in the buildings. Is that right?
A Yes, and it was from Carl Riemer.
Q Okay.
A That's what I based my decision on.
Q And besides what you were told by Carl, did you do any other investigation or speak to anybody else about the uses being conducted in the buildings?
A Yes. I talked to Sharon Roberts, and after talking to Sharon, she wasn't sure. She couldn't give me a firm answer and validation, and Carl was the one that had given me the requirements, and that's the one I had to rely on on making sure that it was true and correct.
Q Who is Sharon?

A Sharon Roberts.
Q Who is she?
A She's the space coordinator for the -- for the activity here at Ft. Sill.
Q Do you know what office she works in?
A I think she's in DPW. I'm not sure, but I think she's there.
Q Do you have any knowledge of whether or not the number of occupants in the buildings described on the Bate numbered documents that I referred to previously changed during the time you were the administrator of the contract?
A No. The only one I was -- was when the airfield came in, and we had to add that and that changed, because there wasn't anybody there previous to that.
Q Okay.
A Now, that's the only one that I had really any knowledge about.
MR. HICKMAN: I'll put those back in there. Let's go off the record.
(Off the record.)
(Exhibit 78 marked for identification.)
Q (By Mr. Hickman) Let me hand you what I've marked as Exhibit 78. Have you seen the



litigation report prepared in relationship to the lawsuit that we're here for today?
A Yes.
Q Did you have some input into preparing the litigation report? Did you have input into preparation the litigation report?
A The part I was involved in with this was to provide the contract information that was there and that these -- that the information was true and correct as to the best of my knowledge.
Q And to the best of your knowledge, at the time this litigation report was prepared, were the contents of it true and correct?
A To the best of my knowledge, yes.
Q Now, I believe earlier, you told me that you were involved with some other service contracts here at Ft. Sill. Correct?
A Yes.
(Exhibit 79 marked for identification.)
Q (By Mr. Hickman) Let me hand what you I marked as Exhibit 79.
A Okay.
Q And I believe this is a listing of modification breakdown of the cost-per-copy services contract that you provided to me. Is that correct?



A Yes.
Q Is this one of the contracts that you are the contracting officer for?
A Yes.
(Exhibit 80 marked for identification.)
Q (By Mr. Hickman) Hand you what I've marked Exhibit No. 80. Is Exhibit No. 80 a series of e-mails concerning modification number 39 on the cost-per-copy services contract?
A Yes.
Q And on August -- strike that.
On May 24th, 2005, an e-mail from you to Mr. David Haggerty. Who is David Haggerty?
A He's the contractor for Minolta.
Q And this e-mail on May 24, 2005, you make the statement to Mr. Haggerty that, "Ft. Sill is expecting a heavy summer surge of mobilization of troops and deployments because of the Global War on Terrorism. Requirements during this time are usually more urgent than the normal contract activity."
A Yes.
Q Since you had arrived at Ft. Sill in April of 2003, had there been an increase in the mobilization of troops and deployments because of



the Global War on Terrorism?
A Yes.
Q And did that increased mobilization of troops and deployments because of the Global War on Terrorism necessitate the modification of certain service contracts?
A Yes.
(Exhibit 81 marked for identification.)
Q (By Mr. Hickman) Hand you what I marked Exhibit 81. Is Exhibit 81 a summary of the modification for the training service center contract?
A Yes.
Q Does modification number 14 reflect that funds were added to the training service center contract for the Global War on Terrorism?
A Yes.
Q Are you involved in the administration of the training service center contract?
A Yes.
Q On modification number 15, it indicates a one-time equitable adjustment. Do you know what that equitable adjustment is for?
A No. It says for DPAS.
Q What does "DPAS" stand for?





ea5b7e32-84c2-4bad-9aa3-6c43fe9fe465

Page 126

A That's the Depot Property Administration System. I didn't have the TSC contract at that time. It was assigned to me in April of 2005. Let me see. To the best of my knowledge, April of 2005, I believe, is when I -- let's see -- I was assigned this contract.
Q Does it appear, on page two of Exhibit 81, that modification 21 added funds to cover costs associated with increased workload assigned to the contractor?
A Let's see. I'd have to look at that narrative on there.
Q Okay.
A Because it looks like it's scooted into modification 22, so I'm not sure what that was.
Q Well, in your experience with the training service center contract, is it fair to say that the contract was modified from time to time to increase funds in relationship to the Global War on Terrorism?
A Yes.
Q Do you know if the government maintains any records that identifies the number of occupants in each of the buildings serviced by the H & R contract?

Page 127

A Can you repeat that?
Q Do you know whether or not the government maintains documents that would identify the number of occupants --
A No.
Q -- in a building covered by the H & R contract?
A No.
Q No, they don't have such documents?
A I don't know of any.
Q I may have asked this already. If I did, I apologize. Do you know if the number of occupants in the buildings covered by the H & R contract changed or varied over the period of time that you administered the contract?
A I don't know.
Q During the time that you administered the contract, did you make any representations to H & R about their payment for services or supplies that were not covered by a written modification?
A Can you repeat that?
Q Let me restate the question. Did you ever say to H & R, "Go ahead and do that work or provide those supplies, and we'll put together the written modification later"? Did you ever say anything to

Page 128

that effect to H & R during the time you administered the contract?
A Not that I recall.
Q Did you make any inquiries of the prior contracting officers if they made any representations to H & R that might relate to the claims asserted by H & R in this lawsuit?
A Did I what?
Q Did you have any conversations with Sharel McAdoo or Ray Dryz concerning any representations they may have made to H & R that relate to the claims asserted by H & R in this lawsuit?
A No.
Q Do you have any understanding of the volume of supplies provided by H & R to the buildings covered by the contract during the period of time that you administered the contract?
A What they submitted in the claim is -- when you're asking if I had knowledge of theirs, that's all I have.
Q The knowledge that you would have regarding the supplies furnished by H & R to Ft. Sill pursuant to the contract would be the receipts or the invoices from Empire Paper Company that we looked at earlier?

Page 129

A It's the claims, the claim information that they submitted. That's -- that's the only knowledge that I have, to answer your question.
Q Do you have any knowledge concerning the services provided by H & R during the course of time you administered the H & R contract?
A The services?
Q Yes.
A Yes.
Q What is your understanding of those services provided by H & R?
A They're custodial services, and they go and clean the facilities that are listed in the contract and --
Q And to your --
A Oh, go ahead.
Q And to your knowledge, did H & R provide the services required and in compliance with the contract?
A Yes.
Q Do you have any knowledge whether or not H & R's -- strike that.
Do you have any knowledge whether H & R had to provide additional services to comply with the terms of the contract because of any change in





ea5b7e32-84c2-4bad-9aa3-6c43fe9fe465

the use or occupation of any of the buildings covered by the contract?
A Yes, and all of that is documented by each modification, if there was a change.
Q I think we talked about this earlier. There were no modifications that addressed increased services required because of change in occupation of the building or change in use of the building. Correct?
A Except for -- the one I'm aware of is when the airfield opened, where the --
Q And they added the square footage for the airfield?
A Yes. And I'm really -- I don't know how many people were working in there. All I know is that because they opened that building, there were going to be personnel in there.
Q Besides that one, you're not aware of -- you don't have any other knowledge about the change in services by H & R?
A No.
Q Do you know a person named John Reed?
A John Reed?
Q Yes.
A No.



MR. HICKMAN: I don't think I have any further questions right now. Thank you.
THE WITNESS: Thank you.
MR. McNAMARA: And again, if we could review the -- request that we have the opportunity to review the transcript and make any changes and then sign.
(DEPOSITION CONCLUDED AT 4:20 P.M.)



ERRATA SHEET
DEPOSITION OF ANNETTE ARKEKETA-RENDON
REPORTED BY: JEAN BAYSINGER, CSR RPR CMR
DATE DEPOSITION TAKEN: NOVEMBER 13, 2007
PR FILE NO. 12464

PAGE LINE IS SHOULD BE
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________



JURAT
I, ANNETTE ARKEKETA-RENDON, do hereby state under oath that I have read the above and foregoing deposition in its entirety and that the same is a full, true and correct transcription of my testimony so given at said time and place.

_________________________________
Signature of Witness

Subscribed and sworn to before me, the undersigned Notary Public in and for the State of Oklahoma by said witness, ANNETTE ARKEKETA-RENDON, on this ________day of_________________, 2007.

_________________________________
NOTARY PUBLIC
MY COMMISSION EXPIRES:___________
(JB) PR FILE #12464

C E R T I F I C A T E

STATE OF OKLAHOMA )
) SS:
COUNTY OF OKLAHOMA )

I, Jean Baysinger, Certified Shorthand Reporter within and for the State of Oklahoma, do hereby certify that the above-named ANNETTE ARKEKETA-RENDON was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth, in the case aforesaid; that the above and foregoing deposition was by me taken in shorthand and thereafter transcribed; and that I am not an attorney for nor relative of any of said parties or otherwise interested in the event of said action.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal this 19th day of November, 2007.

______________________________
Jean Baysinger, CSR RPR RMR



ea5b7e32-84c2-4bad-9aa3-6c43fe9fe465

ERRATA SHEET

DEPOSITION OF ANNETTE ARKEKETA-RENDON

REPORTED BY: JEAN BAYSINGER, CSR RPR CMR

DATE DEPOSITION TAKEN: NOVEMBER 13, 2007

PR FILE NO. 12464

| PAGE | LINE | IS | SHOULD BE |
|---|---|---|---|
| 44 | 2 | Lankford | Langford |
| 44 | 6 | Lankford | Langford |
| 44 | 16 | Lankford | Langford |
| 54 | 22 | Lankford | Langford |
| 54 | 23 | Lankford | Langford |
| 62 | 12 | McKenzie | McKinzie |
| 62 | 14 | McKenzie | McKinzie |
| 62 | 19 | McKenzie | McKinzie. |
| 82 | 10 | McKenzie | McKinzie |
| 126 | 1 | Depot Property Administration System | Depot Property Accounting System |

JURAT

I, ANNETTE ARKEKETA-RENDON, do hereby state under oath that I have read the above and foregoing deposition in its entirety and that the same is a full, true and correct transcription of my testimony so given at said time and place.

Annette Arkeketa-Rendon

Signature of Witness

PURSUANT TO 28 U.S.C. § 1746.

Subscribed and sworn to before me, the undersigned Notary Public in and for the State of Oklahoma by said witness, ANNETTE ARKEKETA-RENDON, on this ________ day of __________________, 2007.

______________________________

NOTARY PUBLIC

MY COMMISSION EXPIRES:____________

(JB) PR FILE #12464

THE UNITED STATES COURT OF FEDERAL CLAIMS

H & R SERVICES, INC.,
an Alabama corporation,

Plaintiff,

vs. No. 06-582 C

THE UNITED STATES OF AMERICA,

Defendant.

DEPOSITION OF ROGER DALE HALL

TAKEN ON BEHALF OF THE DEFENDANT

ON NOVEMBER 14, 2007, BEGINNING AT 9:56 A.M.

IN LAWTON, OKLAHOMA

REPORTED BY: Jean Baysinger, CSR RPR RMR



bf9294bb-829f-472c-b841-7aa1a4300094

APPEARANCES

On behalf of the PLAINTIFF:
William H. Hickman, Attorney at Law
HICKMAN & FITZPATRICK
119 N. Robinson, Suite 250
Oklahoma City, Oklahoma 73102
(405)605-2375
hickman@hickmanfitzpatrick.com

On behalf of the DEFENDANT:
Sean B. McNamara, Attorney at Law
U.S. Department of Justice
Civil Division
1100 L Street N.W.
Washington, DC 20530
(202)305-7573
sean.mcnamara@usdoj.gov
Joe Alford, Attorney at Law
U.S. Army
Building 4621, Room 208
Ft. Sill, Oklahoma 73503
(580)442-1096



INDEX


Page
Direct Examination by Mr. McNamara.............. 4

Exhibits

82 Letter dated 3/9/05 from Annette
Arkeketa-Rendon to Jim Calloway............. 11


STIPULATIONS

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys, that the deposition of ROGER DALE HALL may be taken pursuant to agreement and in accordance with the Rules of the Court of Federal Claims on November 14, 2007, at the U.S. District Court for the Western District of Oklahoma, 410 S.W. Fifth Street, Lawton, Oklahoma, before Jean Baysinger, CSR RPR RMR.



WHEREUPON,
ROGER DALE HALL,
after having been first duly sworn, deposes and says in reply to the questions propounded as follows, to-wit:

DIRECT EXAMINATION

BY MR. McNAMARA:
Q Morning, Mr. Hall.
A Good morning.
Q My name is Sean McNamara. I'm an attorney with the United States Department of Justice. I represent the United States in this case, H & R Services --
A Yes.
Q -- versus United States. Are you represented by counsel?
A Yes.
Q And your counsel is?
A William Hickman.
Q Have you ever had your deposition taken before?
A Yes.
Q And when was that?
A Two or three years back.



Q Just once?
A Once.
Q What was that case?
A It was a civil action case.
Q Were you the plaintiff or the defendant?
A Defendant.
Q What was the -- what was involved in the case?
A Disagreement with ITPE union, labor union, involving a previous contract.
Q Could you state your full name for the record?
A Roger Dale Hall.
Q And what is your home address?
A 127 Tessie Drive, Huntsville, Alabama.
Q And your work address?
A I work out of the office -- out of the house.
Q Out of the house.
A Yes.
Q Okay. And what's your home phone number?
A 256 -- we use cell phones -- 655-1010.
Q Okay. Thank you.
Did you communicate with anyone in preparation for this deposition?





bf9294bb-829f-472c-b841-7aa1a4300094

A No.
Q Okay. Did you review any documents in preparation for this deposition?
A Just --
MR. HICKMAN: Let me -- I'm sorry. Besides talking to me. He and I spoke.
A Yeah, besides talking to the attorney and to our -- to Bill, yeah.
Q (By Mr. McNamara) Okay. Sure.
A No, I didn't. I reviewed our original claim and also reviewed the government's responses and our responses to the interrogatories that I had with me.
Q Okay. Thanks.
Did you communicate with Jeanette Hairston about her deposition today?
A The only -- yeah. I talked to her about the time change.
Q Okay. Did you talk with Wilbert Monroe also about the time change?
A Concerning the time change.
Q Did you talk with them about anything else concerning their depositions?
A No.
Q Okay. How long have you been employed at



H & R?
A Since 1989.
Q And what is your position at H & R Services?
A General manager.
Q What did you do before you were employed at H & R?
A I was a chief warrant officer in the Army, supply and logistics.
Q And how long were you a chief warrant officer with the Army?
A 23 years. Of course, that was my ending rank. I -- you know.
Q Yeah. You were with the Army for 23 years.
A Correct.
Q About how many employees does H & R have right now?
A Zero.
Q Zero? Does H & R Services no longer exist as a corporation?
A It exists as a corporation, but is not actively bidding contracts.
Q Okay. Do you remember, at the time of the contract that's at issue in this case, about how



many employees H & R Services had?
A It's just my best guess. 75 to 85.
Q When did H & R Services come into existence?
A 1989.
Q And when did you stop performing contracts? When did H & R stop performing contracts?
A June 1 of '07.
Q Did H & R Services perform government contracts other than the contract that's at issue in this case?
A Yes.
Q Do you remember how many other government contracts?
A Guess again, somewhere in the area of eight throughout the life of H & R, eight to nine.
Q I'm sure that it fluctuated from year to year, but could you approximate what H & R Services' revenue was, let's say, over the course of this contract in this case per year?
A Again, that would be a guess. 7, 800, 900,000 a year.
Q What type of services did H & R engage in?
A Janitorial contracts and full food



services and mess attendant contracts only for the government. There was no outside contracts. No commercial contracts other than awarded contracts by a particular branch, DOD or whoever it was, Department of the Army.
Q And you were the general manager of the company?
A Correct.
Q What were your duties in that position?
A I would oversee and talk directly to the project managers on the sites to take care of problems, issues. That was my day-to-day task. Overall task was to identify and bid contracts that were in our realm of expertise and submit bids and meet with the government and implement contracts when awarded and do after-action reports on contracts that we did not get to see if we could improve our bid potential.
Q And what is your -- was your wife also employed by H & R Services?
A No. She actually owned the company.
Q Oh, she owned the company. Okay. What was her -- did she play an active role in managing the company, or was she simply an owner of the company?

A She was simply an owner, and she did play an active management role. She paid the bills and saw to the payrolls and all of that, her with a staff of about two other ladies.
Q At the time of this contract, did you or your wife own other businesses aside from H & R Services?
A At the time of this contract, no.
Q Do you own other businesses now?
A Not anymore, no.
Q Okay. Are you employed now?
A As a -- to -- what's known as JY Joint Commission for the Industries for the Blind and the Handicapped. We do bids for them, and we also do bids for a small business, a company called Facilico, minority owned, to where I act as a consultant to them on bidding contracts and doing their proposals and stuff, and that kind of thing.
Q So you don't have -- you don't have your own company, or you do have your own company now?
A Don't have our own company anymore. We're not using H & R Services any longer.
Q Do you have any other corporations? Have you incorporated any other businesses, or are you --
A No.



Q No? Okay. Are you a consultant?
A Yes. Basically, that's my title, a consultant.
Q You're not employed full-time by any other companies.
A No, sir.
Q You're like an independent contractor.
A Correct.
Q And your wife is the same?
A Basically.
Q Essentially the same. Okay. All right. I'm sorry. I think I maybe asked you this, but did you own other businesses while you owned H & R Services?
A No. I didn't, no.
(Exhibit 82 marked for identification.)
Q (By Mr. McNamara) Okay. I'd like to show you what we've marked as Exhibit 82 here.
A Okay.
Q And if you could just look at -- down on the bottom, you'll see page numbers there.
A Correct.
Q Could you just look at page 1994 and 1995?
A (Complies.)
Q On page 1994, this is a -- what is this on



page 1994? What is this document?
A Federal Contract & Associates.
Q Is this a check?
A Correct.
Q Do you recognize this document?
A Yes.
Q And what is Federal Contract & Associates?
A A payment payroll service.
Q Okay. And did Federal Contract & Associates act as a payroll services company for H & R Services?
A Yes.
Q Okay. Do you recognize the signature on this check?
A Correct.
Q You do?
A Yes.
Q And who is that signature?
A My son.
Q Is that -- does that say, "Michael Hall"?
A Correct.
Q And then on page 1995, do you recognize this document?
A Correct.
Q Was this also a payroll services company?



A Correct.
Q And do you recognize the signature?
A Correct.
Q Is that Amanda Hall?
A Correct.
Q Is that your daughter?
A Correct.
Q Were these two companies owned by your son and daughter?
A Correct.
Q Okay. I'd like to talk about the bid that you submitted for this contract. If you could open up that binder in front of you there and take a look at tab number two, and then I believe if you look on page 218 --
A Okay.
Q Do you recognize that document there?
A Yes. Standard Form 1449.
Q Do you recognize --
A Excuse me.
Q -- the signature on that --
A Correct.
Q -- on that page? And whose signature is that?
A My wife's.





bf9294bb-829f-472c-b841-7aa1a4300094

Page 14

Q Okay. Could you just turn the page and look at page 219?
A (Complies.)
Q Do you recognize that handwriting?
A Yes. Probably mine.
Q If we look, just for example, at item number 0001AA on page 219 --
A Okay.
Q This is a pretty broad question, but how did you calculate, in particular, the price per square foot that's here that looks like .0159?
A The 6,333.59 (sic) divided by the 379,471 will give you .0159.
Q Okay. Then how did you calculate the $6,033.59 figure?
A Okay. Based on our estimates of total labor cost and supply cost, it was going to cost to clean that one square foot, based on the solicitation that the government provided.
Q And based only on the solicitation that the government provided, or did you rely on any other information, other than the solicitation?
A Based on the solicitation.
Q Only on the solicitation.
A Correct.

Page 15

Q Okay. How did you calculate your supply costs as they went into this $6,000 number?
A Based on overall square foot and based on the government's provided estimated monthly usage. I call vendors in the local area and get prices per case and utilize that to base the price on, and the labor standards are already set in the solicitation under the Service Contract Act, but the total amount per hour and the weighted average that goes with it.
Q So the labor costs, you didn't really have to do much calculation there in terms of the cost per hour --
A No.
Q -- because that was already set out?
A Established by the wage determination provided in the solicitation.
Q Okay. I'd like you to take a look at Exhibit No. 16. I believe that's in this folder here.
A Okay. 16?
Q 16. I think that's --
A I guess that's the one on top right here.
Q That's the first page, and that's the second page. Do you recognize that document?
A It appears to be the supply -- estimated

Page 16

supply list. I don't remember the format of the supply list. Been quite a while ago.
Q Do you remember if you received that document from the government before you submitted your bid?
A Yes. I don't know -- there again, you know, we're talking seven years ago. If this is the correct document, you know, it -- I did get an estimated usage supply list from the government, yes.
Q Could you take a look at Exhibit Tab 17?
A (Complies.)
Q And this one is a little bit longer, but could you try to find in there -- it's page TE-4-1. You'll have to turn it back. It's pretty far towards the back -- yeah, you got it?
A Yeah, I got it.
Q Do you recognize this document?
A Again, the same thing. It -- you know, it could very well be the original one. I just do not recall the format of the document.
Q So you could have received either this document or the document marked in Exhibit 16 and relied upon one of those documents in preparing your bid.

Page 17

A Correct.
Q And did you receive the estimated supply list in the solicitation?
A I believe we did, yes.
Q Do you remember if you asked separately for such a list?
A I do not remember.
Q Did you retain a copy of the solicitation?
A I did, portions of it, and there was a copy here, as well, on site.
Q Do you have a copy now of the estimated supply usage sheet?
A I don't know. We have had -- we've got people going through a particular storeroom now to see if it's, in fact, in there.
Q Before you submitted your bid, did you speak with the contractor or employees of the contractor performing the custodial contract at Ft. Sill, the contract that preexisted H & R Services' contract?
A I honestly do not remember.
Q Do you remember if you spoke with Mr. Monroe before you submitted your bid?
A No, I don't believe I did, no.
Q Do you remember if you spoke with Miss

Hairston?
A No, I know I didn't.
Q Did H & R Services eventually employ Mr. Monroe and Miss Hairston?
A Yes.
Q Did H & R Services employ them after receiving the contract?
A Yes.
Q You did not employ them before you received the contract?
A No. I didn't know who they were.
Q Okay. How did you learn who they were?
A Once we were awarded the contract and I got the letter from Miss McAdoo or she called me, one, I don't remember which, I asked if it was okay if I talked to the incumbent contractor, and also, I asked her her opinion of the current managing staff, and if I'm -- if my memory serves me right, she said they were good people and they would be retainable. Normally, that's par for just transitions. And at that point, I did call Mr. Monroe and talked with him. I did not meet Miss Hairston until I came out here.
Q Do you remember speaking with anyone in the government before you submitted your bid?



A I do not remember. If I had any technical questions or anything like that, I very well could have called them, but I just simply do not remember.
Q Did you attend a pre-award site visit at Ft. Sill?
A My own. I am retired Army, and I came out here. I was in the area, and I went around and looked at the installation prior to submitting the bid, just to get an idea of the total buildings and then the -- what the post -- how the post was laid out.
Q You did not attend any formal pre-award site visit.
A I -- no, I don't remember attending a pre -- a formal pre-award.
Q Did anyone from H & R Services attend such a site visit?
A No.
Q When you came out to the base, did you go into any of the buildings that were eventually covered by the contract?
A I did go in a couple of them. I just don't remember the building numbers. They were common area buildings. I believe the Red Cross building and one or two more of the buildings that I



went into.
Q Did you speak with anyone when you came up here about the number of people working in the buildings covered by the contract?
A I don't remember.
Q Did you ever visit Ft. Sill again during the course of the contract?
A Two or three different times.
Q Why did you come back?
A Just for site visits. I mean, just to meet with Monroe and Jeanette.
Q Do you remember speaking with Miss McAdoo before you submitted your bid?
A Prior to, I do not remember speaking with Miss McAdoo.
Q Do you remember speaking with her after you submitted your bid?
A We had a pre-performance or a post-award meeting, yes.
Q That you attended?
A Correct.
Q In person?
A Correct.
Q On the base?
A Yes.



Q Was that just you?
A No. My wife, as well, and Mr. Monroe was there with us, and that was after the contract had been awarded to us.
Q Did you talk at that meeting about the number of supplies required under the contract?
A I don't remember.
Q What did you talk about at that meeting?
A It was the normal what I term meet-and-greet, put a face with the voice with the contracting office and the contract specialist. I'm not sure what evaluator was there or the COR or the tech monitor, whatever they had it termed at at that time. I don't remember any major issues of discussion or actually what the contents of the meeting was about other than just, you know, a face with a voice and we were talking.
Q Say, hypothetically, you'd never received a list like this of the number of supplies. Could you have still -- if that happened, could you have still calculated your bid?
A No.
Q Why not?
A Because I don't do that. My policy. Because it's -- to me, it's impossible to guess the





bf9294bb-829f-472c-b841-7aa1a4300094

amount of supplies that are used on an installation if you don't have a guide to go by. Me being retired Army with a logistics background and contract background, we always place utilization of -- I mean, supply estimates in our solicitations we put out.

Q What about -- and this is not hypothetical. How did you calculate the cost of services aside from the per-hour dollar figure? How did you calculate how much time your employees would need to perform the services under the contract?

A There's different levels or different tiers of density, population density, that you use in utilization of buildings. You can get -- a standard employee can do 2,500 square feet an hour, less dense, 3,500 square feet an hour, even less dense, like warehousing areas, 35 to 5,000 square feet an hour, and that's what we use. We use different tiers for different types of buildings and the services those buildings provided. It's like the Red Cross building is a high density area. We would have used 2,500 to 3,000 square feet per hour as a labor standard for cleaning.

Q Is that standard written down anywhere?

A No. It's kind of a learned standard.



Q So -- that you've learned --

A Industrywide. Each and all companies basically use that same tier method to do their bidding.

Q So does that method depend upon the number of people in the building?

A And density of the equipment that's in the building, desks, number of actual cubicles or any of that. What the building does itself, what service it provides.

Q Hypothetically speaking, then, if a building is full of people or full of desks, very dense, does that building typically take longer to clean than a building that is, say, empty?

A Yes.

Anybody care if I eat one of these?

Q I'm okay. Thanks.

Does the building -- does the time required to clean a building sort of incrementally increase as the building gets more dense?

A Yes.

Q Okay. If a building -- strike that.

Does the amount of supplies required to clean a building also increase as density increases?

A Yes.



Q The same as the time it takes to clean the building increases.

A Yes.

Q Okay. Did you ever ask anyone in the government how many people were present in buildings covered by the contract before you submitted your bid?

A I don't remember.

Q Did you make any assumptions, when you were putting together your bid, about the number of people in the buildings?

A I based it on the estimated supply usage. High-density buildings and experience in high-density buildings versus non-dense buildings. Again, what the service of the building provided. If it was like -- again, go back to the Red Cross building. If it was finance and accounting, if it was MWR, if it was DPW, what they did.

Q So you looked at the functions being performed in each building covered by the contract to make your own estimate, essentially, about the density?

A Population, yeah.

Q And you used the supply estimate, also, in that process?



A Well, the supply estimate comes in to the total amount of money that it's going to cost per month to provide the supplies, and then you verse that along with the square footage and the labor rate to come up with that per-square-foot cost per hour, if that's what you're asking.

Q And then the time to perform the services in each building, did you also use the estimated supply list to come up with that portion of the bid?

A No, no. The supply list -- I mean, in one way, the estimated supply usage is a consistent dollar amount that's spread over the entire amount of the contract square footage that the government says they want cleaned. Because it would be without complete detailed information. You know, the government's estimate was a general estimate. It wasn't per building. So I used their estimate as the overall cost of the contract for the supplies and then incorporated that into the total amount of square footage to be cleaned on a monthly basis.

Q And so the time that employees -- that your employees would spend cleaning the buildings, was that based upon your estimates of the building density alone?

A Building service -- what the services of





bf9294bb-829f-472c-b841-7aa1a4300094

the building did and estimate, you know, what they did. Again, MWR, finance and accounting, which is a consistent, large-density building; Red Cross, high density, high usage, and go back to the tier method about the density in the building -- I mean, the amount of time it takes to clean in a building that's being utilized for a particular service.
Q Did you consider, before submitting your bid, the possibility that supply usage could increase over the course of the contract?
A No.
Q Did you consider the possibility that the price of supplies could increase over the course of the contract?
A Yes.
Q Did you consider the possibility that the quantity of services, if that makes sense, could increase over the course of the contract?
A No, because the solicitation is face value on the total amount of square footage. If the contract was going to be modified to incorporate additional square foot or delete square footage, then I anticipated that because that always happens, but as far as services increasing, the government would have to mod the contract.



Q Would the government have to mod the contract if the square footage remained the same, but the usage of the buildings changed?
A In my opinion, yes.
Q Why is that the case?
A Utilization of supplies that was above and beyond the original estimate. Or square -- or additional desks, additional people in the building. Quite naturally, if you've got five people, and they put 20 more in there, you've got additional trash, you've got additional cleanup. It takes more time to go around 15 desks than it does to go around five desks.
Q I believe you said that you considered the possibility that the price of supplies could increase over the course of the contract.
A Right.
Q What, if you remember, was your view about who should bear the risk of such an increase in the price of supplies?
A As far as the cost based on the standards of the actual item, the increase to us for the particular item that was already in the estimate?
Q Yes. Not -- not -- not the amount of the supplies changing, but the price of the supplies.



Say the estimate would -- if we provided an estimate, say it stayed the same throughout the contract, but the price of supplies went up.
A Well, then the ten-percent variance, the way I understand the FAR, that would be -- you know, that would be our responsibility, but anything above that ten percent, then I would simply go back and ask the government to take a look at it to see if we could obtain relief.
Q I may have asked you this, but did you or anyone at H & R speak with any employees of the previous contractor before you submitted your bid?
A No.
Q Okay. I'd like you to take a look at Exhibit 33, and I think if you could just flip to the final page of that --
A The final page of --
Q Of Exhibit --
A -- 33?
Q -- 33.
A Okay. Okay.
Q Do you recognize that document at all?
A No.
Q Do you recognize what it is?
A A CDR, yeah.



Q And what's a CDR?
A Contract discrepancy report.
Q And what -- when does the government use a CDR?
A Normally, when the contractor fails to correct an item found by the tech monitor or the COR.
Q Okay.
A And normally, it's a repeated issue, that they have failed to correct that issue.
Q The government doesn't just issue CDR's for routine --
A No.
Q -- failures?
A I haven't found that to be true, you know.
Q Are you saying that it takes a kind of consistent failure to perform, that sort of thing, to issue a CDR?
A Yeah, on a particular -- may be a particular item. I have seen -- you know, that's all subjected to the contracting officer, as well. They make that determination.
Q Okay. Could you just read this language here that begins with the words -- I think it says --





bf9294bb-829f-472c-b841-7aa1a4300094

A "On Friday"?
Q -- "On Friday, 26 May."
A "On Friday, 26 May, 2000, Pure Service was required to perform latrine service. This service was not performed. In addition, during the last week of each month, running out of latrine supplies is a continuing problem," signed Sharel McAdoo.
Q Were you aware of any complaints about the Pure Service contract before you submitted your bid?
A No, sir.
Q Did you ask about any such complaints or CDR's?
A No, sir.
Q If you had known -- hypothetically speaking, if you had known that the previous contractor was having trouble providing supplies under the contract, would that have changed your bid in any way?
MR. HICKMAN: Object to the form of the question. Calls for speculation.
A I don't know.
Q (By Mr. McNamara) Okay. I'd like you to take a look -- shift gears a little bit -- at Exhibit 14. I don't know which binder it's in.
MR. HICKMAN: The black one?



THE WITNESS: Yeah, it's in the black one.
A Let me put this back.
Q (By Mr. McNamara) Yeah.
A Okay.
Q Do you recognize -- do you recognize Exhibit 14?
A Yes, sir.
Q What is Exhibit 14?
A This is a letter from our attorney to Miss Rendon concerning the adjusted claim -- or a separate claim from the months of January '05 through September '05.
Q Could you look at -- just flip over here.
A (Complies.)
Q Do you recognize the documents contained at pages 1074 to 1112?
A Yes, sir.
Q Do you recognize these?
A These appear to be the delivered supply list from Empire Paper with pricing -- or our order form with pricing.
Q Do those invoices there cover all of the supplies that H & R Services purchased for this contract for the year 2005?
A I would say no because we did buy



supplemental supplies through Sam's Club and other places that Mr. Monroe and Miss Hairston purchased out of petty cash.
Q Beyond the petty cash purchases, did H & R Services purchase any other supplies for the contract?
MR. HICKMAN: Sorry. You're saying supplies other than the ones on the Empire invoices you've identified the Bates numbers?
MR. McNAMARA: That's correct, yes. Thanks.
A Possible. I simply don't remember.
Q (By Mr. McNamara) Do you have any records of any other supplies purchased in 2005, other than the invoices in Exhibit 14?
A I don't know.
Q Could you flip back to the beginning of Exhibit 14?
A (Complies.)
Q Sorry.
A That's okay. Get it a little closer to you.
Q Sorry. I'm just looking for the -- the 2005 letter.
MR. HICKMAN: Tab seven, maybe? Tab four



is where the backup information is, and tab seven is the --
MR. McNAMARA: I'm actually looking for your letter, Mr. Hickman. Okay. Here it is.
Q (By Mr. McNamara) I'd like you to look at Exhibit No. 12.
A Okay. I'm sorry.
Q And do you recognize this document?
A Yes, sir.
Q What is this?
A This is the original amount of the claim going from January '02 through December '04. Original dollar amount of the claim that Mr. Hickman wrote up and sent back to -- as his response to Miss Rendon, I'm assuming.
Q Okay. Does the document cover any other periods?
A No.
Q Could you look at the next two pages, 10 --
A Well, it -- September, yeah. It covers January '05 through September '05, as well.
Q Okay. Could you look at 1068 and 1069 in Exhibit 12?
A Okay.

Q And in particular, on page 1068, if you look under the bold word -- bold and underlined word "supplies" --
A Yes.
Q Do you see that figure?
A Yes.
Q And what is that figure?
A That would have been the total overage of supplies during that period of time from the original estimate, I believe, if my memory serves me right.
Q And what is that dollar number?
A $48,500.
Q And do you remember, did you assist in the preparation of the 2005 claim?
A Yes, sir.
Q Do you remember where that $48,500 figure comes from?
A It's the expenditure for the supplies for that period of time, I believe.
Q Do you know if the exhibits -- I'm sorry -- if the invoices contained in Exhibit 14 contributed to that $48,500 figure?
A I would assume so, yes.
Q Do you know if there are any other



expenses, aside from the invoices in Exhibit 14, that contributed to that $48,000 number?
A I -- fuel cost, which is a supply, petty cash for purchase of those other supplies, and any equipment purchases that was obtained in '05. Replacement of equipment, buffers, vacuum cleaners, such items as that would be in the supply cost.
Q Now, did you buy equipment from a source other than Empire Paper?
A I don't remember.
Q Did you buy at least some equipment from Empire Paper?
A I believe so.
Q If the dollar figure -- if we add up the invoices in Exhibit 14 and we came out with some dollar figure less than $48,000, could you explain why we would come up with a smaller figure?
A No. There has to be -- there has to be some other feeder documents that -- I would assume there would be feeder documents. We're talking, you know, a couple, three years back now, that generated the forty-eight, five total.
Q Do you remember any such documents?
A No. It -- supply cost, equipment cost, fuel cost, petty cash, all of that was rolled up



into this forty-eight, five.
Q Did you retain a copy of any documents that you relied upon to come up with that forty-eight, five number?
A They were on site out here, and they were sent to Miss Arkeketa-Rendon that generated that dollar amount.
Q Were all of the documents that generated that dollar amount sent to the contracting officer?
A I assume so.
Q Would you have added any money to an amount supported by documents for any reason?
A Unsupported by documents or supported by documents?
Q Would you have -- would you have added -- unsupported by documents.
A No.
Q So as far as you know, that $48,500 figure is entirely supported by documentation.
A As far as I know.
Q You reviewed that number before it was submitted to the contracting officer?
A I believe I did, yes.
Q And did you satisfy yourself that that number was based upon supportable costs?



A Yes.
Q During the course of performance of the H & R Services contract, I believe you said that you visited the base a couple of times.
A Two or three different times, I believe.
Q Did you visit any of the buildings serviced under the contract?
A Other than contracting, no.
Q Do you have any personal knowledge of the number of people working in the buildings covered by the contract?
A No.
Q Did your employees ever complain to you or communicate with you in any way about the number of people increasing in the buildings covered by the contract?
A Yes, sir.
Q Do you remember those -- the content of those communications?
A Summary, yes, sir.
Q What's a summary of those communications?
A That people were -- on several occasions, Miss Hairston, Jeanette Hairston, was our supply and quality control person that was on post all the time, and the processing buildings and stuff, she





bf9294bb-829f-472c-b841-7aa1a4300094

Page 38

would make the statement about, "There's so many people in there. They're making messes and more messes, and they're out the door and around the street -- down the street, lined up in this in-and-out processing in different other buildings on the -- on post."
Q You remember her talking specifically about processing buildings?
A I'm -- I'm going to say yes, that I remember her talking about processing buildings as well as the finance building and several other buildings.
Q When you say "processing," do you mean troop processing?
A Troop processing. Training buildings, class buildings, classroom buildings.
Q You remember her telling you about training buildings and classroom buildings?
A Right. Excuse me.
Q Did anyone other than Miss Hairston communicate with you about the number of employees increasing on the base?
A When you're saying "employees," it's not employees. We're talking about troop strength.
Q I'm sorry. The number of -- what I mean

Page 39

is the number of people. Did -- strike that.
Did any other H & R Services employees communicate with you about an increasing number of people on the base?
A Yes, sir. Mr. Monroe.
Q Do you remember any of your communications with Mr. Monroe about --
A Along the same lines.
Q Do you remember approximately when Miss Hairston and Mr. Monroe would have --
A No, sir, I don't.
Q -- made these communications?
A No.
Q I'd like you to take a look at Exhibit No. 4 in that black binder. Do you recognize that document?
A Yes, sir.
Q And what is that document?
A This is the content for the adjustment of training that we submitted.
Q Could you look at page 756?
A Okay.
Q Do you recognize that document?
A Yes, sir.
Q And what is that document?

Page 40

A This is a Empire Paper delivery slip.
Q Was Empire Paper the primary supplier for H & R Services on this contract?
A Yes, sir.
(Off the record.)
Q (By Mr. McNamara) Does that document contain a price for the supplies that it covers?
A No, sir.
Q Does it contain a per-unit price?
A No, sir.
Q Do you possess any invoices or other documents that show the per-unit cost of the supplies purchased for this contract?
A I don't know if we have one still, but it was a price list that Empire Paper had, and these items correlate directly to a price on their price list.
Q So you didn't receive broken-out invoices every time you purchased supplies.
A This is the back slip on it. It was calculated once it got back to the office to Empire Paper, once Miss Hairston signed for it, and then they provided a cost sheet for it.
Q Do you know if those costs for any of those supplies changed over the course of the

Page 41

contract?
A I would venture to say they did.
Q Do you know if they -- the costs increased over the course of the contract?
A Possibly sure they did.
Q Did they possibly decrease, also?
A It's a possibility, but not likely.
Q Did you have facilities at Ft. Sill for storing supplies?
A Yes, sir.
Q Did you have facilities off of Ft. Sill for storing supplies for the H & R Services contract --
A Yes, sir.
Q -- also? Was that like a warehouse off site?
A Office with a supply room.
Q Okay. Is that office the office that is listed on, for example, page 756?
A No. That's the bill pay -- P.O. box where we had bills sent. The office on Ferris Street, "ship to," is our office here in Lawton, or was our office here in Lawton.
Q So all of the supplies for the H & R Services contract, aside from supplies purchased

with petty cash or miscellaneous-type supplies, were delivered to that address, that ship-to address on that invoice?
A Yes, sir.
Q And how were the supplies moved from that address in Lawton to Ft. Sill?
A The employee signed -- this is Miss Hairston. She issued the supplies to the particular people for their responsible building route. Those people transported the supplies to the buildings and stocked the buildings on a daily basis.
Q So each individual employee working at Ft. Sill under the H & R Services contract was responsible for stocking their buildings with supplies.
A I don't know if it was each individual or if Miss Hairston issues to the team leader. I don't remember.
Q You didn't have a truck come and pick up the supplies at the Lawton office every month and bring them in bulk over to Ft. Sill, bring them to another place over here?
A Well, they were our trucks. The supplies were put in the trucks from the office. Our trucks brought them to Ft. Sill.



Q Not employees' personal vehicles?
A That could've happened.
Q How do we -- how do you know -- or strike that.
How did you know, during the course of contract performance, that supplies that H & R Services purchased were actually getting to Ft. Sill?
A Miss Hairston had the individual employee or the individual team leader sign for those documents, sign for the supplies, took them to the post. She acted as quality control. She visited the buildings on a daily basis and verified. I believe she verified service. She verified supplies. That was her responsibility.
Q Did she do that for all of the buildings covered by the contract every day?
A I don't know. I can't say yes or no.
Q Did you retain those records generated by Miss Hairston and the employees?
A We did.
Q Do you have a copy of them presently?
A No.
Q Did you destroy those documents?
A They -- from my understanding, they were



flooded out when there was a flood out here in an office -- in a storage unit where they were being stored, because we left all the original documents here in case -- for this particular issue.
Q So are those invoices contained in Exhibit 4 and the other exhibits the only documentation existing now concerning supplies under this contract?
A Other than the originals that Empire Paper has. They still have the originals in their computers.
Q Did you have any other sort of inventory control system in place for this H & R Services contract?
A That was -- Miss Hairston's control system was really good. She can explain that to you.
Q You didn't have any kind of computerized system --
A No.
Q -- for keeping track of things.
A No.
Q To the best of your knowledge, did all of the supplies listed in the invoices contained in Exhibit 4 and the other invoices reach Ft. Sill?
A Yes, sir.



Q Is it possible that employees could have taken those supplies for themselves?
MR. HICKMAN: Object to the form of the question. It calls for speculation.
A I don't know.
Q (By Mr. McNamara) Did you ever have any problems with employees taking supplies for their own personal use or other use?
A Not that I recall. They were kept under lock and key.
Q Did you -- strike that.
Hypothetically speaking, if the quantities of supplies used under the contract increased over the course of the contract, would that increase your costs under the contract?
A Hypothetically, if supplies -- the supply cost, the actual cost, not number?
Q No, if the -- let's stick with the actual supplies first.
A Okay.
Q If the amount of supplies used, leaving the cost aside, just purely the amount increased, the cost stayed the same, would that increase your costs over the course of the contract?
A Yes, if I'm understanding the question





bf9294bb-829f-472c-b841-7aa1a4300094

correctly. I -- you -- we're going to go, say, the supply -- the supply cost, say, for a roll of toilet paper is a dollar.
Q Yes.
A If we use more rolls, quite naturally, it's going to go -- okay.
Q Yes?
A Yes.
Q Okay.
A To answer your question.
Q If the price of the supplies -- now let's assume the opposite. Let's say the quantity of supplies over the course of the contract stays the same. If the price of those supplies increases, would that also increase your costs?
A If I let that happen, yes.
Q You started to lose money on this contract in 2002. Is that right?
A Correct.
Q Okay. When that started to happen, did you try to figure out why that was happening?
A Yes.
Q What did you do to try to figure out why that was happening?
A Talked to Mr. Monroe and Miss Hairston out



here.
Q And what did they tell you?
A Increase in the utilization. Supply cost, labor cost.
Q Did you ask them about any increase in the cost of the supplies to H & R Services as opposed to an increase in the usage of the supplies?
A We could have discussed it. I don't remember.
Q Did you ever contact any other suppliers, other than Empire Paper, during the course of the contract about the supply -- about providing supplies used under the contract?
A Yes.
Q Why did you do that?
A Competitively shopping.
Q How often did you do that?
A Oh, Mr. Monroe and Miss Hairston would monitor the prices, and if a particular item increased too much, then we would go out and see if we could replace that item at a lower cost and still meet the mill standard that's required.
Q Do you remember if that ever happened under this contract?
A No, I don't remember.



Q Could you take a look at Exhibit No. 2 there, and, in particular, at page number 206 -- I'm sorry. Before we do that, what -- do you recognize that document?
A No, not really. I don't think I've ever seen one of these.
Q Okay. Could you look at --
A Oh, yeah, I did. Okay. I was involved in a source selection committee. I've seen the form.
Q So what is that document there?
A This is just a staff judge advocate's form. If there's any -- they do a search and see if there's any problem with a company as far as availability of funds. For the contract itself, as well, there's a lot of things I think the judge advocate's office does and --
Q Okay. And could you look at page 183?
A Okay.
Q Do you recognize that?
A As being the standard 1449, yes, sir.
Q Okay. Was that the standard 1449 for the H & R Services contract?
A It appears to be.
Q Okay. Could you look at page 206 of Exhibit No. 2?



A (Complies.)
Q Do you recognize that document?
A Wage determination.
Q What is that?
A It is issued by the Department of Labor periodically to -- it establishes the wage rates in a particular region of the country with the job classifications on the left-hand side and the wage rates on the right side.
Q Okay.
A Along with benefits at -- on the -- generally on the last page of the wage determination, health and welfare, vacation pay, sick days, any of that.
Q Could you look at page 208?
A (Complies.)
Q And do you see -- I believe it's number 11150 for janitor on page 208.
A Yes, sir.
Q Was that the job classification, if you remember, for the nonsalaried H & R employees on this contract?
A No, I don't remember. I don't know if we -- in some cases, we used housekeeping I and II, and it just depends on the wage determined itself





bf9294bb-829f-472c-b841-7aa1a4300094

Page 50

and what the wage rates were being paid by the previous contractor, because sometimes they use a particular category, and we certainly would never go in and try to pay them less money than what they were getting.
Q Sure. Just for the -- hypothetically speaking, could you look at the rate for the janitor?
A Okay.
Q And what is that rate?
A Says 6 -- I believe that's 6.72, if my line of sight is okay.
Q Okay.
A Per hour.
Q And now could you flip over to Exhibit No. 3?
A Okay.
Q And page 402.
A Okay.
Q And do you recognize that document?
A Yeah. Appears to be the same thing, the front page of a wage determination.
Q And what is that document dated?
A Date, 7-23-04, as far as being a revision -- a revision. 7-23-04.

Page 51

Q Okay. I should have asked you this before. Could you just flip back to where you were before, page 206 in Exhibit 2, and just look at the date --
A Okay.
Q -- on that one.
A 8-31-99.
Q Okay. And now looking back on page 402 -- could you actually flip over to page 403? I'm sorry. And then look for the janitor classification there.
A Okay. I have it.
Q You got that? And then what is that dollar figure there?
A 7.83.
Q Okay. So does that show, just in general, that the cost of using a janitor increased from the beginning date of that first wage determination to that wage determination?
A Correct.
Q Okay. And is that a -- was that a typical thing for your hourly employees, that their hourly cost increased based upon the Department of Labor determination over the course of the contract?
A Yes.

Page 52

Q And did that happen periodically?
A I don't remember the number of modifications that was done on the contract as far as the wage determinations, but the wage determination that's in the contract at time of solicitation or the contract was awarded is the one that prevails, and then on the annual reconciliation by DOL, DOL or the contracting office requests an updated wage determination, and that's incorporated into the contract by reference under the Service Contract Act. The contractor does not bear that increase. The government mods the contract and pays them the difference.
Q So you're effectively compensated for --
A For the wage determinations that are done that way, but it is not the contractor's responsibility to request a wage increase or anything. That's the government's.
Q It's not the contractor's responsibility?
A No, sir.
Q So -- and I'm probably just being repetitive, but in general, over the course of this contract, the cost of your hourly employees increased.
A I don't remember, like I said, the total

Page 53

amount of modifications that pertained to the wage determination increases. I don't remember that.
Q But in general, do you remember that in general, their costs increased?
MR. HICKMAN: Object to the form of the -- the question.
A I don't know. I'm -- I don't remember the amount of modifications. If the contract was mod'd to put the new wage determination in there, then it was mod'd.
Q (By Mr. McNamara) Okay.
A But I don't remember the number of mods.
Q Okay. Could you look at Exhibit No. 4?
A (Complies.)
Q Do you recognize that?
A Yes, sir.
Q That's -- okay. And could you look at page 668 of that exhibit?
A Okay.
Q And do you recognize that document?
A Yes, sir.
Q What is that document?
A These are the mileage -- let's see. Salary, hourly rates, vacation. These are employee earning summaries for a particular payroll.





bf9294bb-829f-472c-b841-7aa1a4300094

Page 54

Q Does that document there on page 668 show the number of hours worked by your employees?
A Yes.
Q Where does it show that?
A Well, no, it doesn't. I'm sorry. Those are hourly rates. That's the total amount -- hourly rate. That's the gross -- I believe it's the gross amount of their paycheck on that hourly "R" at the top.
Q So it does not show the number of hours specifically that the employees worked.
A No, sir.
Q Do you have any records, either in paper form or electronically, that could show the number of hours that your employees worked from 2002 up until 2004?
A If I am not mistaken, I believe we provided an hourly report monthly to contracting of total hours used for the month. If I'm thinking about the right contract, this one, that we provided that on a monthly basis.
Q So you believe that the government has -- well, you believe that you provided the government with an hourly breakdown --
A Yes, sir.

Page 55

Q -- every month.
A Yes, sir.
Q Do you currently have any such records?
A I don't know.
Q Do you have any records showing how long your employees took to clean particular buildings covered by the contract?
A No, sir.
Q How did you control the number of hours that your employees worked?
A By schedule.
Q Did H & R Services or Mr. Monroe or Miss Hairston dictate the number of hours that your employees were allowed to work?
A Yes, sir.
Q So if an employee came to Miss Hairston or Mr. Monroe and said, "I would like to work 40 hours this week," would they have granted that request or --
A No. If they were needed, if they had shortages, if somebody didn't show up or whatever or we had full-time employees at 40 and we had some part-time employees, it always budgeted on the total amount of hours it was expected to use based on that square footage that we talked about for cleaning on

Page 56

a two-week or one-week cycle. I don't remember how we had that structured, whether it was on a two-week or monthly cycle.
Q So the number of hours that your employees worked was based upon the square footage covered by the contract?
A Yes, sir, and how long it took to do the job.
Q And Miss Hairston or Mr. Monroe would tell the employees at the beginning of the pay cycle or beginning of the month or beginning of the week or beginning of the day, even, how many hours a particular employee was supposed to work?
A They had a schedule, a work schedule, posted. Each employee had a schedule for a two-week period, I believe.
Q If your employees were working more under the contract, that would cost you more money. Is that correct?
A Excuse me. Yes.
Q When you realized that you were losing money under the contract, did you investigate how many hours your employees were working?
A Yes, sir.
Q What did that investigation entail?

Page 57

A That it was taking more time to do the same buildings because of the changes and to meet the standards of the contract.
Q Did you speak with Mr. Monroe or Miss Hairston about the increase in hours?
A Yes.
Q Did you speak with any other employees?
A No.
Q Did you ask Miss Hairston or Mr. Monroe if the employees could do the work in fewer hours?
A I don't remember the discussion, but it's probable that we had the -- we probably had it, and meet the standard.
Q Did you have that same discussion about supplies?
A No.
Q Did you ever ask Mr. Monroe or Miss Hairston if they could meet the standards of the contract and use fewer supplies?
A No.
MR. McNAMARA: Okay. If I could take a short break, I'm almost done. I just want to talk with Mr. Alford for a second.
THE WITNESS: Sure.
(Recessed from 11:25 a.m. to 11:32 a.m.)

MR. McNAMARA: Okay. I have no further questions. Just come back on the record to ask if you would like to read and sign your deposition transcript.

THE WITNESS: Yes, sir, that's fine.

(DEPOSITION CONCLUDED AT 11:33 A.M.)



ERRATA SHEET

DEPOSITION OF ROGER DALE HALL

REPORTED BY: JEAN BAYSINGER, CSR RPR CMR

DATE DEPOSITION TAKEN: NOVEMBER 14, 2007

PR FILE NO. 12464

PAGE LINE IS SHOULD BE

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________



JURAT

I, ROGER DALE HALL, do hereby state under oath that I have read the above and foregoing deposition in its entirety and that the same is a full, true and correct transcription of my testimony so given at said time and place.

______________________________

Signature of Witness

Subscribed and sworn to before me, the undersigned Notary Public in and for the State of Oklahoma by said witness, ROGER DALE HALL, on this ________day of__________________, 2007.

______________________________

NOTARY PUBLIC

MY COMMISSION EXPIRES:___________

(JB) PR FILE #12464



C E R T I F I C A T E

STATE OF OKLAHOMA )

) SS:

COUNTY OF OKLAHOMA )

I, Jean Baysinger, Certified Shorthand Reporter within and for the State of Oklahoma, do hereby certify that the above-named ROGER DALE HALL was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth, in the case aforesaid; that the above and foregoing deposition was by me taken in shorthand and thereafter transcribed; and that I am not an attorney for nor relative of any of said parties or otherwise interested in the event of said action.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal this 20th day of November, 2007.

______________________________

Jean Baysinger, CSR RPR RMR

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

H & R SERVICES, INC.,
an Alabama corporation,

Plaintiff,

vs. No. 06-582 C

THE UNITED STATES OF AMERICA,

Defendant.

DEPOSITION OF JEANETTE HAIRSTON

TAKEN ON BEHALF OF THE DEFENDANT

ON NOVEMBER 14, 2007, BEGINNING AT 11:40 A.M.

IN LAWTON, OKLAHOMA

REPORTED BY: Jean Baysinger, CSR RPR RMR

APPEARANCES

On behalf of the PLAINTIFF:
William H. Hickman, Attorney at Law
HICKMAN & FITZPATRICK
119 N. Robinson, Suite 250
Oklahoma City, Oklahoma 73102
(405)605-2375
hickman@hickmanfitzpatrick.com

On behalf of the DEFENDANT:
Sean B. McNamara, Attorney at Law
U.S. Department of Justice
Civil Division
1100 L Street N.W.
Washington, DC 20530
(202)305-7573
sean.mcnamara@usdoj.gov
Joe Alford, Attorney at Law
U.S. Army
Building 4621, Room 208
Ft. Sill, Oklahoma 73503
(580)442-1096



INDEX


| | Page |
|---|---|
| Direct Examination by Mr. McNamara.............. | 4 |

Exhibits

| | | |
|---|---|---|
| 84 | Jeanette Hairston resume.................. | 6 |


STIPULATIONS

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys, that the deposition of JEANETTE HAIRSTON may be taken pursuant to agreement and in accordance with the Rules of the Court of Federal Claims on November 14, 2007, at the U.S. District Court for the Western District of Oklahoma, 410 S.W. Fifth Street, Lawton, Oklahoma, before Jean Baysinger, CSR RPR RMR.



WHEREUPON,
JEANETTE HAIRSTON,
after having been first duly sworn, deposes and says in reply to the questions propounded as follows, to-wit:
DIRECT EXAMINATION
BY MR. McNAMARA:
Q Morning, Miss Hairston.
A How are you?
Q I'm fine. How are you?
A I'm fine.
Q My name is Sean McNamara. I'm an attorney for the United States Department of Justice, and I'm representing the United States in this case, which is H & R Services versus United States in the Court of Federal Claims. Are you represented by an attorney this morning?
A Yes.
MR. HICKMAN: Well, just so the record is clear, I don't actually represent Ms. Hairston in her personal capacity, but she was a former employee of H & R Services.
Q (By Mr. McNamara) Have you ever had your deposition taken before?
A No, sir.



Q Okay. I'm going to ask you a series of questions, and you are under oath to provide full and complete answers to my questions. If you don't understand any question that I ask, please let me know before you respond, and I will explain or try to rephrase my question. Okay?
A Okay.
Q Our court reporter over here is writing down everything that we say, so she can only record things that we say. She can't record "yeses" and "noes," so please answer each question with a verbal "yes" and a "no" or a verbal answer, not a nod of your head.
A Yes, sir.
Q From time to time, your -- or Mr. Hickman may object to a question that I ask. After he objects, I will ask you to go ahead and answer the question that I've asked unless he tells you not to answer it. Do you under --
A All right.
Q Do you understand that?
A Yes, sir.
Q Okay. So even though he objects, you still have to answer the question, unless he tells you not to.

A Yes, sir.
Q Okay? Could you state your full name for the record?
A Jeanette Hairston.
Q And what is your home address?
A 1514 Southwest Park Avenue, Lawton, Oklahoma, 73501.
Q And your home phone number?
A 580-353-4157.
Q And are you employed right now?
A No, sir.
Q Did you talk with anyone in preparation for this deposition today?
A No, sir.
Q Did you talk with Roger Hall or Hope Hall in preparation?
A No, sir.
Q Did you review any documents in preparation for this deposition?
A No.
(Exhibit 84 marked for identification.)
Q (By Mr. McNamara) I'd like you to take a look at what we have marked as Exhibit No. 84. Is this a copy of your resume or your former resume?
A Yes, it is.



Q Okay. And just so you understand, all of this stuff here that's in front of you, these two binders and then this stack of paper, these are exhibits that we have previously numbered in previous depositions. I may ask you today to look at some of this stuff, so I just wanted to let you know that ahead of time. We may be flipping through and looking at things.
A Yes, sir.
MR. HICKMAN: Sean?
MR. McNAMARA: Yes.
MR. HICKMAN: Did we use Exhibit 83?
MR. McNAMARA: I'm sorry. Yes, I actually -- it's Mr. Monroe's thing.
MR. HICKMAN: Okay.
MR. McNAMARA: So I'll get to that.
MR. HICKMAN: No problem.
MR. McNAMARA: I'll get to that next. I'm sorry. I should have hers first.
Where did I put that? Here it is.
Q (By Mr. McNamara) So this Exhibit 84 shows that you worked for H & R Services -- it says from 2000 to the present. Was that 2000 to 2005?
A Yes.
Q Okay. And in your own words, what did you



do at H & R Services?
A I was a quality control and a key manager and issued our supplies in the morningtime. Also took the invoice to Ft. Sill. I also took a daily report to Ft. Sill every day, Monday through Friday, and let the people use the time clock, sign in and sign out.
Q What did that daily report typically contain?
A Things like buildings locked. We wrote the building number down. If people were working in the building, we wrote the building number where people were working. If any keys were lost or misplaced, I wrote that down.
Q Did that report contain or document the number of hours that H & R employees worked?
A Not on -- not on the daily sheet.
Q Not on that report?
A No.
Q Did it document the number of supplies used?
A Not on that sheet.
Q Okay.
A That was a separate sheet.
Q Okay. Before you worked for H & R



Services, you worked for Pure Service Corporation?
A Yes.
Q Is that correct? And that was also at Ft. Sill?
A Yes.
Q And was that -- in that job, did you do essentially the same thing that you did for H & R Services?
A Yes, same thing.
Q Okay. When you worked for Pure Service Corporation, do you remember people on the base complaining to you about poor service under that contract?
A No, sir.
Q You don't remember any complaints?
A I don't remember.
Q Did anyone on the base complain to you about supply shortages when you worked for Pure Service Corporation?
A No.
Q Do you remember if, when you worked for Pure Service Corporation, that contractor ever failed to provide an adequate amount of supplies under that contract?
A No, sir.





36ef2a95-05fa-4afa-afaa-30e073607108

Q You don't remember that?
A I don't remember, no.
Q Do you remember, in general, any complaints about the performance of Pure Service Corporation?
A No, sir.
Q How did you get hired at H & R Services?
A Mr. Hall called me in for an interview. I'd been assistant manager for several years, so he called me in for an interview.
Q And was that after, if you remember, H & R Services won the contract?
A Yes.
Q Did you communicate with anyone at H & R Services before H & R Services won the contract?
A No, sir.
Q And when I say "the contract," you understand that I mean the contract that was performed by H & R Services from approximately October of 2000 to October of 2005?
A Did I --
Q Do you understand what I mean when I say when I say "the contract" or "the H & R Services contract," I'm talking about the contract that H & R Services had to provide custodial services at



Ft. Sill?
A Did I speak with anyone?
Q No, I'm -- I'll get back to that. I just want to --
A Oh.
Q I just want to make sure we're talking about the same -- we're talking about the same contract here, in general.
A Okay.
Q Right? Do you understand when I say "the H & R Services contract" or "the contract," that I'm talking about the contract that H & R Services had at Ft. Sill from 2000 to 2005?
A All right.
Q Okay. So did you -- did you speak with anybody at H & R Services before H & R won that contract?
A No, sir.
Q Okay. Did you communicate in any way with anyone at H & R Services before H & R Services was awarded the contract?
MR. HICKMAN: Objection. Asked and answered.
A No, sir.
Q (By Mr. McNamara) Are you aware of anyone



else communicating --
A No, sir.
Q Okay. Over the course of H & R's performance of its contract from 2000 to 2005, did you ever enter into buildings that were covered by the contract?
A Yes, I did.
Q And how frequently did you do that?
A Some buildings, every day, Monday through Friday.
Q Do you remember which buildings those were?
A Every day, sir, it could be a different building.
Q Do you remember any particular buildings that you visited every day?
A Building 1850. I had to take my daily report there.
Q Is that the contracting building?
A Yes.
Q Okay. Do you remember any other buildings?
A Every single day? No, sir.
Q Do you remember particular buildings that maybe you didn't visit every day, but that you



visited pretty frequently?
A Yes. It was several buildings.
Q Do you remember which -- could you name those buildings?
A Building 3161, Building 4700, Building 1946, Building 455, Building 3162, 3164, and 3166. That's all I can recall right now, but it was several of them.
Q And you visited these buildings, would you say, at least once a week?
A If not more.
Q Why did you visit them?
A Sometimes Pete Webb would call and have a complaint. Other times, I did, myself, because these were the buildings -- some of the buildings. People were going to Iraq, and I would know that they needed more supplies, and I would stop by. I also did quality control, so that consisted of me going in buildings, too, every so often. In fact, every day, different buildings.
Q So every day, if you didn't go to the same buildings, you were going around to different buildings covered by the contract.
A Yes.
Q How much of your time was typically spent





36ef2a95-05fa-4afa-afaa-30e073607108

doing that?
A Two-and-a-half -- two hours to two-and-a-half.
Q And when you did that, what were you looking for in particular?
A Quality control, which is inspecting the building.
Q What does that mean, "inspecting the building"?
A Seeing if all the trash can liners were clean, the trash was emptied, if the bathrooms were clean and stocked sufficiently, water fountains in the offices, sweeping, mopping, to see if that was done.
Q When you made your inspections, did you write down anything?
A Yes, I would write it down and give it to the employee and go back the next day to see if they have corrected it.
Q Was that only when there was a mistake or a problem?
A Well, it was for every day. I could find something every time I went in people's buildings. My job was trying to catch it before Pete Webb came.
Q Did you record if your employees had



performed successfully?
A Yes.
Q What did you do with those records?
A Record everything and send it to Mr. Hall, or some records, I'd take to Ft. Sill.
Q When you were visiting buildings, do you -- did you observe that there were more people using the buildings that you were visiting?
A Yes.
Q Did you observe more people over the course of the contract in all of the buildings or just some of the buildings?
A Some of the buildings.
Q Do you remember which buildings those were?
A I had them recorded, sir, but I can't remember every building because that's been two years ago and I'm on a lot of medication, but I would say 31 -- Building 3166, Building 455. The Red Cross building, I think, is 1645, if I'm not mistaken. DFAS, 4700, Building 700, Buildings 2869, 70, and 71. Did I say 3164 and 62 and 66? Those. It was more than them, but I just can't think right offhand, but I thought we had them written down, but I'm not sure. Seemed like it was 18 or 21



buildings. And the polo field was -- can't think of the name of the -- the number of the building, but the polo field, also.
Q In these buildings, did you observe more people in the buildings?
A Yes.
MR. HICKMAN: Objection. Asked and answered.
Q (By Mr. McNamara) Did you observe more supplies being used in these buildings?
A Yes.
Q Do you remember which supplies were being used more?
A Toilet tissue, multi-fold towels and roll towels and soap.
Q Who did you observe --
A Who did I --
Q -- in these buildings, what types of people?
A Soldiers.
Q Only soldiers?
A The Red Cross building was civilian people, and DFAS had a lot of civilian people.
Q In the Buildings 3161 and 3162, 64, 66, do you remember what those buildings were?



A 3164 is for military ID cards in there, I know for sure. 3161 was a building where the men were preparing to go to Iraq. They were getting shots up there in the buildings and I don't know what all else, but the building was just jam packed.
Q What about 3162 and 66? Do you remember those?
A I don't remember what's the name of the people, but they were military and civilians.
Q Were they similar processing-type buildings?
A I just know a lot of them I would see from 3161, and when I'd leave from that building to go to 3164 or 66, some of those people would be in there, too. Now, I don't know what they were doing.
Q And in those buildings, the 3161 and 62, 64, 66, did H & R Services, over the course of the contract, provide more supplies?
A Yes.
Q In particular, did H & R Services provide more paper-type supplies, towels and bath tissue?
A Yes.
Q What about the Red Cross building do you remember in terms of increased usage?
A The lady's name is Mona that was in





36ef2a95-05fa-4afa-afaa-30e073607108

charge. She would always tell me on Friday, "Make sure my people have more supplies," because more personnel was working on Saturday and Sunday, and if we didn't leave more than what we usually leave, she was calling me at 7:00 Monday morning, complaining.
Q And so was Mona a civilian --
A Yes, in charge.
Q Was she a Red Cross employee, if you remember?
A I just know she's in charge of the Red Cross building. When they needed stripping and waxing done or anything, she always called me, or if she had a complaint, she called. Mona Brown.
Q Mona Brown. And would you typically -- if she asked you to leave more supplies, would you leave more supplies?
A Yes. I have taken them out to her personally, my own self.
Q Did you do that frequently?
A Yes.
Q Do you have any idea the volume of supplies that you would leave, that she would ask and you would leave?
A I can't remember exactly, sir, but we would leave four or five hand towels, and on the



weekends, when she would request us on Fridays, I would leave nine or 11 in a box. Also, toilet tissue, I would leave more.
Q Would this happen every week?
A Every week.
Q Over the whole contract, or did it start happening at a certain point?
A The best I can say, sir, is after the Iraq deal, because see, it was so many people in there making those calls, you know.
Q What do you mean, making calls?
A The Red Cross, you know, calling families or calling back and forth to Iraq, which was 2001, if I'm not mistaken.
Q And just jump back to the buildings, the 3161 and 3162 and 4 and 6, did people there also ask you to leave more supplies?
A Yes.
Q And did that happen frequently?
A Every week, sir.
Q And whenever someone in buildings 3162 -- 61, 62, 64, and 66 asked you to leave supplies, would you leave supplies?
A Yes.
Q Building No. 455 --



A Yes.
Q -- what was in that building, if you remember?
A The general. The general's main headquarters.
Q The commanding general's?
A Yes.
Q What do you remember about the increase in people in that building?
A It was a lot of them in there, sir, but I don't know which rooms and which floors. I would only go by the employee when she would come in and request she needed more supplies. She would say a major or the major's secretary asked would we leave more supplies, and I would issue her more supplies to put in the building.
Q And was that, again, pretty frequently? Did that happen pretty frequently?
A Yes, sir.
Q Would you say that it happened every week?
A Usually Fridays is our big deal, just about, for her building, on Fridays.
Q Okay. 4700, you said, was DFAS?
A It was then. I think it's different now, yes.



Q Okay. And what do you remember about the increase in people in that building?
A There was a lot of civilians and military, and the man's name was Jack, and I don't know his last name. He personally would call to the office and ask could we leave more supplies, there's more people in the buildings, and I have taken whole cases of toilet tissue out there and whole cases of multi-folds and put them in a storage janitorial closet.
Q And was that, again, a weekly occurrence?
A If not twice a week.
Q In Building No. 700, what was in there?
A 700 has some students for classes. I don't know what kind of class.
Q And do you remember there being more students over the course of the contract?
A Yes. It was a north side and south side to the building, so they needed more.
Q And did someone in Building 700 ask you to come out and drop off more supplies?
A Yes.
Q Do you remember who that was?
A If they didn't ask me, they would ask Pete Webb, and he would call me.

Page 22

Q How often did Pete ask you to go out and put more supplies in a particular building?
A I'd say once a week, he was calling, if not more.
Q Did Pete ask you more, or did the people in the buildings ask you more, in general?
A They were probably about even, sir, because as I was saying, when I checked the buildings, this is when someone in the building would come to me and ask would I leave more. But I let Pete know it, you know.
Q Did you always tell Pete if someone asked you to leave extra supplies?
A I didn't always tell Pete.
Q Did you usually tell Pete?
A No. As I said, I was trying to catch it before Pete does, because that's a complaint, you know.
Q What about Buildings 2869, 70, and 71? What was in those buildings?
A Reserves. So the reserves was, I guess they call it, mobilized here.
Q Did the reserves -- did they live there, the troops, or did they just -- were they offices?
A At first, they were offices, but seemed

Page 23

like 2003, if I'm not mistaken, they were mobilized here, which was a lot of reserve people in the building. Normally, they just come there for once a month, but after this Iraq thing, they started coming down and staying like for a whole year from Oklahoma City.
Q Coming down and living there?
A The men worked in the building every day, and they lived somewhere. I don't know where they lived, where they stayed, but they stayed here at Ft. Sill.
Q Okay. They didn't live in Buildings 2869 and 70 and 71.
A No. Those are offices.
Q Okay. I'm sorry. That's all I was just --
A Those are offices.
Q I didn't know if they were barracks or offices.
A No, they're offices where they work.
Q I see. Okay. And do you remember someone in those buildings coming to you and saying, "We need more supplies"?
A Yes.
Q And was that, again, a weekly occurrence

Page 24

or more so?
A Probably a weekly occurrence.
Q Do you remember who that was?
A It's different ones, sir. Sometimes would be a Colonel Smith and sometimes a civilian female.
Q And again, when they asked you to leave supplies, would you leave supplies?
A I would, yes.
Q Okay. And then the polo field --
A Yes.
Q -- you mentioned that.
A Every July, they have a concert there, and either Pete Webb or someone from the polo field would call us to leave more supplies there, and the doors were unlocked there, so a lot of people would go in and out the polo field.
Q So was that a -- just a July thing that they would need more supplies, or was it --
A Mostly July, once a year for July, on the polo field.
Q And you remember Pete Webb calling you and asking you to deliver more supplies there?
A Yes. I've taken them out there myself.
Q Okay. Did you take all of the supplies to the buildings, or did -- well, let me back up.

Page 25

On a routine basis, who took the supplies to the buildings?
A The employees did.
Q Where did they take them from?
A From the office where I worked. I issued them to them in the morningtime.
Q And where was your office?
A 1930 Northwest Ferris, Lawton.
Q Not on the base.
A No.
Q So the employees -- were your employees responsible for cleaning particular buildings?
A Yes.
Q So just to clarify, particular employees would clean particular buildings every week.
A Yes.
Q Okay. Would the employees come to you and ask you for a certain number of supplies?
A Yes.
Q Would you sometimes tell them how much supplies they needed?
A I have sometimes.
Q Why would you do that?
A For instance, if I gave them five toilet papers on Monday, and Tuesday they would ask for

five, I would ask why do they need five, "Try taking four." If they took four, then someone would call in and complain to me, and I would have to take it out there, make up for that fifth one.
Q So the employees would come to you every day and ask for supplies?
A Yes.
Q Would every employee come to you every day to ask for supplies or only some employees?
A Every one.
Q Every one. And you would issue them the supplies. You'd give them the supplies.
A Yes.
Q And did you write down how many supplies you were giving them?
A Yes.
Q And did the employees sign off on what you wrote down?
A No.
Q Did you sign it?
A Yes.
Q And did you track -- strike that.
Did you match up the supplies that you gave the employee to supplies that ended up in the buildings at Ft. Sill?



A Yes.
Q How did you do that?
A Every end of the week, I would add up how many I gave them in one week's time, and it would go from week to week like that.
Q Did you then come out to Ft. Sill and look in the buildings to determine whether the supplies had made it from your office to the base?
A Yes.
Q Did you do that every week?
A Yes.
Q Did you do that for every building?
A I couldn't do it every building, sir. We had 100-plus buildings. It was just me.
Q Did you pick certain buildings to do that for?
A Yes.
Q How did you pick those buildings?
A Most of those that I gave you because it was more traffic in those buildings, but I did check the others, also, because that's how I did my inventory.
Q Did you do it -- aside from the buildings we already talked about, did you do it on a rolling basis or just a random basis?



A Just randomly.
Q Did you write down -- like you wrote down when you gave out the supplies, did you write down the supplies that were delivered to Ft. Sill?
A Yes.
Q How did you actually track the supplies in a particular building? Did you go into the closet of a building and count?
A Yes.
Q Did you do that with all the buildings that you checked?
A If they had a closet. Some did not have closets.
Q Would you, for example, go into the bathroom and look at the number of rolls of toilet paper or towels?
A Yes.
Q And would you count the number of rolls of paper in a particular building?
A Yes. I had to do that in order to keep up with how many to issue out, you know, the next day.
Q And maybe I asked you this. And you wrote that down? You wrote your results down?
A Yes.
Q Did you write that down on the same sheet



that you used when you gave out the supplies to the employees?
A No. I kept that one separately myself.
Q Did you sign the sheet that you signed -- that you created for Ft. Sill?
A Yes.
Q Do you know, while you were employed by H & R Services, where those records were maintained?
A No, I can't truthfully say.
Q What did you do with them after you created them?
A I would send them to Mr. Hall or take them to Ft. Sill, what I had to take.
Q Did you send all of the records that you created either to Mr. Hall or bring them to Ft. Sill?
A Yes.
Q Did you store any records anywhere else?
A I did not.
Q Did you give any records to Mr. Monroe?
A I left Mr. Monroe in the office. I left the 31st of October '05, so I can't speak for Mr. Monroe.
Q I'm saying over the course of the contract --





36ef2a95-05fa-4afa-afaa-30e073607108

A Right.
Q -- did you ever give any records that you created to Mr. Monroe?
A I didn't give any to him, sir, but what was left in the office, you know, Mr. Monroe was there.
Q Okay. Did you ever have a problem with employees taking supplies from you and not bringing them to the base?
A No.
Q You never had a problem with employees stealing supplies in any kind of way?
MR. HICKMAN: Object to the form of the question.
A No.
Q (By Mr. McNamara) Did you ever speak with -- well, let me back up.
Who was your supervisor at H & R Services?
A Mr. Monroe.
Q Did you also answer to Mr. Hall, or did you answer only to Mr. Monroe?
A Only to Mr. Monroe.
Q When people at the base would ask you to provide more supplies, would you ever talk to Mr. Monroe about that?



A Yes.
Q Did you ask his permission to give more supplies to people at the base?
A Yes.
Q And he gave you that permission?
A Yes.
Q Did you ever talk to Mr. Hall --
A No.
Q -- about that?
I'm going to ask you to -- to guess, basically, a hypothetical. Is it possible that you could have given supplies to your employees and they could have not delivered them to Ft. Sill?
MR. HICKMAN: I'm going to object to the form of the question. Calls for speculation.
A I don't think they would. They would bring them to Ft. Sill. They were honest people.
Q (By Mr. McNamara) But is it possible that they may not have?
MR. HICKMAN: Object to the form of the question. Calls for speculation and asked and answered.
A I don't think so, sir.
Q (By Mr. McNamara) Do you remember, over the course of the contract -- well, let me back up.



I should have asked you this a while ago.
You -- did you supervise -- Mr. Monroe supervised you. Did you, then, supervise the employees, the H & R employees, who were providing the custodial services on the base?
A Yes.
Q So you provided quality control and you also acted as a supervisor.
A Yes.
Q So if people had problems with the amount of time that they were working, they would come to you. If someone needed -- strike that.
If someone wanted a day off, would they come to you?
A Yes.
Q Okay. Were you the H & R Services' only supervisor of the employees at Ft. Sill?
A Yes.
Q Did Mr. Monroe supervise any employees, or did he just supervise you?
A Mainly me.
Q Mainly you?
A Yes.
Q Did he -- what else did he do?
A If we had a problem, I would go to



Mr. Monroe.
Q Do you remember roughly how many employees H & R Services had at the base during this contract?
A I'd say between 17 and 19, if I'm not mistaken.
Q Do you remember your employees, over the course of the contract, working more hours under the contract?
A Say again, sir?
Q Do you remember whether particular employees, over the course of the contract, worked more hours?
A No, sir.
Q Or did people generally work -- well, let me back up.
Were most of your employees part-time employees?
A Yes.
Q Were there a few full-time employees?
A Only sometimes, but not every month. There would be one or two.
Q Did you set the number of hours that they -- your employees worked?
A Mr. Monroe did and gave it to me, yes.
Q Did you help him to figure out how many





36ef2a95-05fa-4afa-afaa-30e073607108

hours the employees should work?
A He did that, basically, himself, and then he would discuss it with me.
Q Okay. Do you -- did H & R Services employees have to work more because of more people being in the buildings covered by the contract?
A It wasn't an everyday thing. Maybe once a week, one or two would.
Q Did they work overtime?
A No, not overtime.
Q Is that because they were part-time employees?
A Right.
Q So to work overtime, you have to work more than 40 hours a week.
A Yes.
Q Is that -- did H & R Services hire more employees over the course of the contract in response to more people being in the buildings covered by the contract?
A I'm not sure, sir.
Q Was that really more Mr. Monroe's kind of area?
A Yes.
MR. HICKMAN: Doing okay?



THE WITNESS: I'm doing fine.
Q (By Mr. McNamara) Okay. I'd like you to take a look at Exhibit No. 16, which I think is actually -- let's just close this up. Okay. This is Exhibit No. 16. Do you recognize that document and the -- I believe it's just two pages -- or the document that follows, TE -- labeled TE-61?
A Yes.
Q Did you ever see that?
A Yes.
Q What is that?
A We call it the supply list.
Q Was that -- do you recognize that supply list in particular?
A This is things that Mr. Monroe would usually order for the supplies.
Q Do you know if that was the supply list for the H & R Services contract or if that was the supply list for the contract before the H & R Services contract?
MR. HICKMAN: Object to the form of the question. Calls for speculation.
A We have used all of the above.
Q (By Mr. McNamara) Did you order the supplies?



A No.
Q Mr. Monroe ordered supplies.
A Yes.
Q Did you ever use that list or a list similar to that list in your work under the H & R Services contract?
A We have used one similar, because like the bags was just more. That's only two there. This is similar.
Q Did your employees ever communicate with you about the number of people in the buildings covered by the contract?
A No.
Q Did they ever complain about it, about the number of people in the buildings covered by the contract?
A Did they complain?
Q Did they say stuff to you like, "There are a lot more people in the buildings, so I need more supplies"?
A Yes, or they couldn't move around much in the building because there was a lot of people there, or they couldn't vacuum.
Q Did they say stuff like, "It's taking me longer to do my work because there are more people



in the buildings"?
A Some have said that, yes.
Q Did they say that frequently?
A Yes.
Q Are you aware of any complaints received by H & R about its performance under the contract?
A No.
Q Did Pete Webb ever talk to you and say particular employees of particular buildings are complaining about the service that H & R provided?
A No.
Q In general, did H & R Services, you, your employees, in your opinion, perform well under the contract?
A I thought we did, sir.
Q Do you think you performed better than the previous contractor?
A Sure. I didn't get a CDR, so -- that's where Pete Webb could take money from the company, so --
Q Did that happen with the previous contractor?
A No, but I've seen it done the years I've been out there.
Q Did anyone -- you stated that sometimes

people in the buildings covered by the contract or sometimes Pete Webb would ask you to provide or instruct you to provide more supplies under the contract. Did anyone in the buildings or Pete Webb or anyone else ever tell you that your employees had to work more under the contract?
A No.
Q Or stay late?
A No.
Q Did anyone ever tell you that your employees had to do their job differently than they were doing it?
MR. HICKMAN: Object to the form of the question.
A No.
Q (By Mr. McNamara) Okay. And I don't mean to pry, but you mentioned that you were on -- taking some medication.
A Yes.
Q Would that medication interfere at all in your ability to remember any of the events in the H & R Services contract?
A No, sir, but I just realized my own self, thinking back two years, I'm forgetting a lot of things.



Q Would that medication at all prevent you from telling the truth today?
A No.
Q Okay.
A No, sir.
Q Just need to make sure.
MR. McNAMARA: Would you like the opportunity to review your deposition transcript and to sign off on it before it's -- before it's final?
THE WITNESS: That would be fine.
MR. HICKMAN: You need to tell her. Say, "Yes, I will read and sign."
THE WITNESS: Yes, please.
(DEPOSITION CONCLUDED AT 12:45 P.M.)



ERRATA SHEET
DEPOSITION OF JEANETTE HAIRSTON
REPORTED BY: JEAN BAYSINGER, CSR RPR CMR
DATE DEPOSITION TAKEN: NOVEMBER 14, 2007
PR FILE NO. 12464

PAGE LINE IS SHOULD BE
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________



JURAT

I, JEANETTE HAIRSTON, do hereby state under oath that I have read the above and foregoing deposition in its entirety and that the same is a full, true and correct transcription of my testimony so given at said time and place.

________________________________
Signature of Witness

Subscribed and sworn to before me, the undersigned Notary Public in and for the State of Oklahoma by said witness, JEANETTE HAIRSTON, on this ________day of__________________, 2007.

________________________________
NOTARY PUBLIC
MY COMMISSION EXPIRES:___________
(JB) PR FILE #12464

C E R T I F I C A T E

STATE OF OKLAHOMA )
) SS:
COUNTY OF OKLAHOMA )

I, Jean Baysinger, Certified Shorthand Reporter within and for the State of Oklahoma, do hereby certify that the above-named JEANETTE HAIRSTON was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth, in the case aforesaid; that the above and foregoing deposition was by me taken in shorthand and thereafter transcribed; and that I am not an attorney for nor relative of any of said parties or otherwise interested in the event of said action.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal this 20th day of November, 2007.

______________________________

Jean Baysinger, CSR RPR RMR





36ef2a95-05fa-4afa-afaa-30e073607108

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

H & R SERVICES, INC.,
an Alabama corporation,

Plaintiff,

vs. No. 06-582 C

THE UNITED STATES OF AMERICA,

Defendant.

DEPOSITION OF WILBERT MONROE

TAKEN ON BEHALF OF THE DEFENDANT

ON NOVEMBER 14, 2007, BEGINNING AT 1:02 P.M.

IN LAWTON, OKLAHOMA

REPORTED BY: Jean Baysinger, CSR RPR RMR



177b893c-7531-42aa-ba35-4924f3afa959

APPEARANCES

On behalf of the PLAINTIFF:
William H. Hickman, Attorney at Law
HICKMAN & FITZPATRICK
119 N. Robinson, Suite 250
Oklahoma City, Oklahoma 73102
(405)605-2375
hickman@hickmanfitzpatrick.com

On behalf of the DEFENDANT:
Sean B. McNamara, Attorney at Law
U.S. Department of Justice
Civil Division
1100 L Street N.W.
Washington, DC 20530
(202)305-7573
sean.mcnamara@usdoj.gov
Joe Alford, Attorney at Law
U.S. Army
Building 4621, Room 208
Ft. Sill, Oklahoma 73503
(580)442-1096



INDEX

Page
Direct Examination by Mr. McNamara.............. 4

Exhibits

83 Wilbert Monroe resume...................... 6

STIPULATIONS

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys, that the deposition of WILBERT MONROE may be taken pursuant to agreement and in accordance with the Rules of the Court of Federal Claims on November 14, 2007, at the U.S. District Court for the Western District of Oklahoma, 410 S.W. Fifth Street, Lawton, Oklahoma, before Jean Baysinger, CSR RPR RMR.



WHEREUPON,
WILBERT MONROE,
after having been first duly sworn, deposes and says in reply to the questions propounded as follows, to-wit:

DIRECT EXAMINATION

BY MR. McNAMARA:
Q Afternoon, Mr. Monroe.
A Afternoon.
Q My name is John McNamara. I'm an attorney with the United States Department of Justice, and I represent the United States in this case, which is H & R Services versus United States. Are you represented by an attorney here today?
A No.
Q Have you ever had your deposition taken before? Have you ever done this before --
A No.
Q -- in any case? No. Okay. Basically, the way it works is that I'm going to ask you a series of questions. You're under oath to provide full and complete answers. If you don't understand any question that I ask you, just let me know, and I will explain or rephrase my question so that you can understand it.



A Okay.
Q The court reporter is writing down everything that we say, so if you can -- when you respond to a question, if you can respond verbally instead of -- a lot of times, people will just nod.
A Yeah, I understand.
Q Occasionally, Mr. Hickman here may object to a question that I ask. After he's finished objecting, I'm just going to ask you to go ahead and answer the question that I asked unless he tells you not to answer it. So even though he may object to it, if you understand the question, you should still answer it. I'm just going to let -- I'm just telling you that now because that'll come up at some point.
Could you state your full name for the record?
A Wilbert Monroe.
Q And what is your home address?
A 5407 Northwest Cottonwood, Lawton, Oklahoma, 73505.
Q Are you currently employed?
A No.
Q Are you retired?
A Yes.



177b893c-7531-42aa-ba35-4924f3afa959

Q Did you speak with anyone in preparation for this deposition today?
A No.
Q Did you review any documents at all in preparation for this deposition?
A I don't have any.
Q Okay. I'd like for you to take a look at -- oh, the other thing is what -- we have all of these -- all this paper in front of you. These are exhibits that we have looked at in other depositions that we've done before you.
A Yes.
Q And we may be referring to these today, and I'll help you flip through.
(Exhibit 83 marked for identification.)
Q (By Mr. McNamara) I'd like you to look at what we have marked as Exhibit No. 83. Do you recognize this document?
A Yes.
Q What is this document?
A My resume.
Q Okay. So you worked for H & R Services from October of 2000 up until October of 2005?
A Yes.
Q Is that right?



A That's right.
Q Okay. And before that, you worked for Pure Service Corporation?
A Yes.
Q And so on with the remainder of these --
A Yes.
Q -- companies listed on your resume?
A Yes.
Q What did you do for H & R Services?
A I was the manager. Controlled all services.
Q What were your typical daily job duties?
A Make sure that all the people that was working under me was doing their job.
Q How many employees did you supervise, roughly, if you remember?
A Between 15 and 18, something like that number.
Q Were you Jeanette Hairston's boss?
A Yes.
Q Did you supervise -- you supervised her directly.
A Yes.
Q Is that right? Did you supervise any other employees directly or any other H & R



employees directly, or did you supervise Jeanette and Jeanette supervised them?
A I supervised Jeanette, and Jeanette supervised them.
Q Okay.
A Unless there was a case where she wasn't around and something happened and I had to take care of it.
Q Yeah. When you worked for H & R Services, was that your only job?
A Yes.
Q How did you get hired at H & R Services?
A Through an interview with H & R -- with Roger Hall.
Q Did that happen --
A At the end of the other contract.
Q After --
A Before that, yes. At the end of Pure Services.
Q Okay. Did you communicate with Mr. Hall or anybody else at H & R Services before H & R Services was awarded the contract at Ft. Sill?
A Will you say that again?
Q Did you talk with or communicate with Mr. Hall or anybody else at H & R Services before



they won the contract at Ft. Sill?
A I don't recall.
Q Did you become employed by H & R Services after they won the contract, if you remember?
A After he came up here and they awarded him the contract, then I was applying for it.
Q He called you after he won the contract and asked you if you wanted to work with him --
A Yes.
Q -- basically?
A Yes.
Q Okay. Do you remember if -- before H & R Services submitted its bid to the government, if you provided H & R Services or Mr. Hall any information about the janitorial services at Ft. Sill?
A No, I did not.
Q You did not?
A No.
Q Where was your office when you worked for H & R Services?
A On Ferris Avenue, downtown here in Lawton.
Q Did you have an office, also, on the base?
A At the beginning, yes, before that. Then they moved me from on post. We had to come downtown and get an office.



177b893c-7531-42aa-ba35-4924f3afa959

Q Do you remember about when that was?
A No, I don't remember.
Q Was it during the H & R Services contract, or was it during the previous contract?
A It was H & R.
Q Was it pretty soon after you started on that contract?
A I'm not sure. Might have been at the beginning of the contract.
Q Okay.
A I'm not sure.
Q Did you visit Ft. Sill during the course of the contract?
A Several times a week.
Q Why did you do that?
A Because a lot of things, I had to go and check. Maybe some buildings -- go to contract and see the contracting officer, QC -- QA, that is.
Q What's that?
A Quality control at Ft. Sill.
Q You were overseeing Jeanette?
A Yes.
Q So you would do quality control on the quality control.
A And sometimes, we'd do it together.



Q Okay. And you would do that several times a week?
A Maybe more than that. It just depends.
Q When you did that, would you go into the buildings on base?
A I most certainly did.
Q Do you go into the buildings on the base pretty frequently over the course of the contract?
A Yes, I'd go in the buildings and make sure that the job's being done proper.
Q When you went into the buildings, did you notice if there were more people working in the buildings or using the buildings over the course of the contract?
A In some cases, yes.
Q Do you remember any particular buildings where you noticed an increase in the number of people using the buildings?
A The number -- the numbers of the buildings is -- I can't recognize them, but there was -- the buildings where they was processing people for Iraq. I don't know the numbers, but there was several, quite a few of them.
Q Like Building Number 3161? Does that number --



A That ring a bell.
Q -- ring a bell?
A Yeah.
Q And 3162 and 64 and 66?
A Yes.
Q Do you remember any other buildings, other than the -- those processing buildings, where there were more people?
A Trying to think of the number of it now. 700.
Q Do you remember who was in 700 or what went on there?
A Yeah. It was a civilian contractor, I believe, was training people.
Q Do you remember any other buildings where there were more people over the course of the contract? And if you don't remember numbers, that's okay, even if you remember --
A Yeah, I remember. There was other buildings, I think.
Q Like 2869 and 27 -- 2870, 27 --
A Yeah. That ring a bell.
Q Any other buildings?
A I can't remember, but it was quite a few buildings. The numbers, I can't remember, but I



would say it was a total of maybe 12, 15 buildings all total, somewhere in that neighborhood.
Q And with the troop processing buildings like 3161 and those, what do you remember about the increase in people using those buildings?
A I remember that people was lined up outside, trying to get in the building. There would be so many people there trying to get in the building. It wouldn't hold them all at one time. There was -- they were lined up, processing so many at a time.
Q Were those soldiers lined up?
A Yes.
Q Do you remember that occurring frequently or how often, that people would be lined up outside?
A Well, every time I'd go by there, period.
Q Did that start to happen at a certain point during contract performance, or was it happening from the beginning?
A That started happening when they started processing people for Iraq.
Q In the other buildings where you observed an increase in the people using them, did you observe soldiers -- more soldiers using the buildings or more civilians using the buildings or





177b893c-7531-42aa-ba35-4924f3afa959

both?
A I'd say both.
Q Do you remember generally people -- just more people working in the buildings aside from the processing buildings? Was it that there were more people working, physically working in the buildings, or was it that people were coming in and out of the buildings and using the buildings?
A Well, in some cases, it takes more people to process the people that was in there being processed. Need more people in the building to do that.
Q What about -- not about the processing buildings, but what about those -- the other buildings where they weren't processing troops? In those buildings, were there more people working in the buildings?
A I'm not sure.
Q Did your employees, meaning either Miss Hairston or the folks actually cleaning buildings, ever complain to you about there being more people using the buildings covered by the contract?
A Sure.
Q What would they say, in general?
A Takes longer to do the building. They



need more supplies.
Q Did those complaints happen often?
A All the time.
Q Did they, again, start happening around the time of the Iraq war, or did they happen before that?
A No, they started happening around the Iraq war.
Q Did anyone working at Ft. Sill, either military or civilian or contracting people or just people working in the buildings, ever ask you, personally, to provide more supplies under the contract at a given time?
A Would you mind repeating that again?
Q Sure. Did anyone on the base at Ft. Sill, either military or civilian, either contracting or people working in the buildings, ever ask you to provide more supplies under the contract?
A I was asked to provide more supplies because the supplies ran out.
Q Sure. But was that -- if you were making rounds with Miss Hairston, for example, would you communicate with people working at the base about the amount of supplies?
A Sometimes, sure, but I had phone calls



that, "Building So-and-So is out of supplies," QA, and I would instruct Miss Hairston or myself or somebody else to replace the supplies.
Q And would those phone calls typically come from Peter Webb?
A Pete Webb.
Q Was he the only one that would call you?
A I might have had some calls from some of the people that worked in the buildings, but normally, they would tell him, and he would call me.
Q And again, I -- how frequently over the course of the contract? Was that a --
A That's all the time.
Q Was that like every week, that would happen?
A Yeah. Sometimes more than one time a week, particularly on -- on Mondays.
Q Did the contracting officer ever call you up and ask you to provide more supplies?
A I don't recall if she did.
Q Do you remember if -- I think there were a couple of -- a few different contracting officers over the course of this contract. Do you remember if Mr. Ray Dryz ever called you up and -- or talked to you in any way and asked you to provide more



supplies?
A I talked to Ray, but I don't -- I can't recall if he asked me to -- to provide more supplies. Mostly, that I remember, Pete Webb was the person that would always call for the supplies.
Q Is that the same with Annette Arkeketa-Rendon?
A Say again?
Q Is that the same with Annette Arkeketa-Rendon? Do you remember ever talking with her --
A Not about any supplies.
Q -- about supplies? Okay.
I'd like you to take a look at Exhibit No. 4. Do you recognize this document, which is numbered page 663, or the second page of Exhibit No. 4, page 664?
A Yeah, I recognize those.
Q You -- have you seen these before?
A Yes.
Q And what are they? What is Exhibit No. 4, I should say?
A It is a letter Mr. Hall wrote, explaining to the people that he needed more supplies than what he was using -- I mean, that he was using more

supply, time and hours, as well.
Q Did you help him put that letter together?
A I sure did.
Q Can you look at page 756?
A 756?
Q Yeah. Do you recognize that document?
A Yes. I gave these to Annette.
Q And what is that document?
A That's supplies I received from -- from -- where we was buying the supplies from.
Q Was that Empire Paper?
A Empire Paper Company.
Q Okay. Did you order the supplies?
A Yes, I did.
Q How did you know how many supplies to order at a given time?
A Because we had the building broken down into routes, and when you total up the amount of building that you have, we would have X number of supplies for each building, and you total all that up together and you knew what you was supposed to order.
Q And did the amount of supplies that you were supposed to order, based on those routes -- did that change, say, every month or every week?



A Yeah, it changed.
Q And how did you know how to change that number?
MR. HICKMAN: Objection. Asked and answered.
Q (By Mr. McNamara) Let me -- let me rephrase that. You said that the -- you ordered supplies based upon what was being used in the buildings.
A Yes.
Q Was someone reporting to you the amount of supplies being used in the buildings?
A Amount of supplies being issued every day to go in the buildings.
Q So would Jeanette Hairston tell you every day or every week?
A We kept a record of it.
Q You kept a record of --
A Supplies.
Q Of how many supplies were -- how many supplies Jeanette issued.
A Right.
Q Did you keep a record of supplies that were used at the base?
A That's the only place we used them.



Q But did you track -- in a particular building, did you have documents that showed, for example, Building No. 3161, they used this amount of toilet paper, this amount of towels? Did you have documents that showed that?
A Yes.
Q Did Miss Hairston and you create those documents?
A Yes.
Q And what did you do with those documents once you created them? Did you keep them here in Lawton, or did you send them to Mr. Hall?
A We kept them in Lawton and sent him a copy of them, too.
Q And did you use those documents and the documents that Jeanette created when she gave out the supplies -- did you use all those documents to decide what to order?
A Well, if I understand you correctly, we ordered supplies once a week. Based on how many supplies I had left in my supply room, that's when I'd make my order up. There was some times that I ran out and I had to buy emergency supplies.
Q When you bought emergency supplies, would you buy those supplies from Empire or somewhere



else?
A We bought them from -- we'd call them and buy them if they could -- sometimes they could make a delivery and sometimes they couldn't, and then sometimes we had to go to Sam's and buy them.
Q And how often did that happen?
A Quite often. Couple times a month, maybe.
Q Did you spend a lot of money on those emergency supplies relative to the routine supplies, would you say?
A Yeah. I had some emergency funds that I could use, and yes, I spent quite a bit.
Q Was that petty cash?
A Petty cash, yes.
Q Was that in the hundreds of dollars, would you say, or was it in the thousands, typically, in a particular month?
A It was, I'd say, during the month, hundreds of dollars.
Q Okay. Did you ever contact other suppliers, other than Empire, not for emergency purposes, but to see if you could get less expensive supplies?
A No, I didn't contact them, but I had some flyers from practically every supply in Lawton. You





177b893c-7531-42aa-ba35-4924f3afa959

know how people -- how they put out flyers advertising their supplies, and I had that information from all the people here in Lawton, and due to the fact that we'd been dealing with Empire with previous contracts, they was giving me a better deal.

Q To the best of your knowledge, did all of the supplies that were ordered and reflected in those invoices end up at Ft. Sill?

A No doubt about it.

Q Why do you say, "No doubt about it"?

A Because I kept close check on it, and I issued it to them, and when you issue supplies to people, when you go to the building to check, you know whether the supplies have been put in the building or not, and we did this regularly enough to make sure that the supplies are being -- going to Ft. Sill, period.

Q Did you ever have problems with employees taking supplies?

A No, never have, that I can recall, when I was managing because in my meetings, I'd always bring this up. If I caught an employee, he was automatically fired.

Q Did that ever happen?



A No, never did.

Q And so you warned -- did you warn your employees --

A Yes, I did.

Q -- pretty frequently not to take supplies?

A I had monthly meetings, and every monthly meeting, I'd bring that up.

Q You stated that you observed more people using particular buildings covered by the contract and that your employees communicated to you that there were more people using particular buildings covered by the contract after the Iraq war or during the course of the contract. Did that increased usage in the buildings require H & R to provide more supplies?

A Sure, it did.

Q I know this is -- it's kind of an obvious question, but why did that -- why did more people being in the buildings require more supplies?

A Why?

Q Why.

A More people in the building, more people use the bathroom.

Q Did you decide every day or every week or every month how many hours your employees would



work?

A There was -- each employee had assigned amount of hours they would have to work, but there was times it had to be extended.

Q Did you decide to extend employees' hours?

A In order to get the job done, I did that, sure.

Q That was your decision?

A Yes.

Q Would employees come to you and tell you that they needed to spend more time doing a particular building or buildings?

A They would make a phone call, and I'd have Jeanette check it out, and we'd make a decision.

Q And would that happen -- I mean, was it typical someone that would get to the end of the day and they would call you and say, "I need to be here two more hours," you know, "Can I work two more hours," or was this more of a, you know, on a monthly basis, someone would call and say, "I'm not working enough hours to finish this building"?

A Well, that started, again, at the beginning of the Iraq training, and after this happened so many times, well, we knew that the guy couldn't finish the building in a certain period of



time, and that created more hours throughout quite a few jobs.

Q Did you hire more people as a result of the Iraq war?

A No. I just extended the people's hours that was already working.

Q Did most of your employees work part-time?

A Yes.

Q So to determine how much time was necessary to clean a particular building, how would you do that?

A Well, basically, an employee can do so many square foot in a certain period of time under normal conditions, and if this had been going on for quite some time, and when it get to the point where he can't do this and we checked on it and I know that it's taking him more time, that's the way we make the decision.

Q Do you remember that happening frequently under this contract?

A Sure, I remember it happening frequently.

Q Did you ever lower an amount of time that an employee had to clean a particular building?

A Not unless part of it was took off the contract.





177b893c-7531-42aa-ba35-4924f3afa959

Q So did you or Jeanette go out to a building -- if it was a problem, did you go out and observe who was in the building?
A Absolutely. We made -- observed them before we make a decision.
Q Did anyone at the government, either Pete Webb or anyone else, ever tell you that you had to make your employees work more hours?
A No, they didn't tell me I had to make more -- employees make more hours, but I know the job had to be done.
Q Did they ever tell you, "The job isn't getting done. You need to get the job done"?
A Did he ever tell me that I need to get the job done?
Q Yeah, Mr. Webb or anyone else.
A He didn't have to tell me that. I mean, I knew that the job had to be done. No, I had nobody tell me that I had to get the job done.
Q So you were able, yourself -- you talked to your employees, your employees talked to Jeanette. You could figure out yourself, in your judgment, in your experience, how much time people should be spending cleaning buildings.
A Sure.



Q Did you realize, at a certain point during the contract, that H & R Services was losing money on the contract?
A Sure, I did.
Q What did you do in response to that?
A I talked to Mr. Hall.
Q What did you talk about?
A I told him that the hours was going up and more supplies were being used.
Q Did you attempt in any way to reduce the number of hours or reduce the amount of supplies being used to save --
A There was no way to do that and do the job that I was required to do.
Q Can you take a look at Exhibit No. 14? Actually, let's take a look at Exhibit No. 7 first. Is this what we figured out -- we just did this. What did we -- oh, 12. That's right. I'm sorry. Exhibit No. 12, yes. Do you recognize Exhibit No. 12, which is page 1067 going up to 1069?
A Yes, I recognize it.
Q Have you seen that particular document before or any draft of that document?
A I've seen the figures. I haven't seen this particular document.



Q Now, could you just flip over and look at Exhibit No. 14?
A (Complies.)
Q Do you recognize this document or the invoices that follow the first page of Exhibit No. 14?
A Yes, I recognize it.
Q Did you assist H & R in the preparation of its claim to the government?
A I assisted H & R Services in any -- everything -- all documents that I had, he had a copy of, period.
Q "He." Who is "he"?
A Roger Hall.
Q Mr. Hall? Those invoices that you're looking at, which run from page 1074 up to page 1112, what are those invoices?
A The amount of supplies that were being used and the cost.
Q And did you provide those invoices to Mr. Hall?
A Yes.
Q Did you provide them to him after he requested you to provide invoices for 2005, or did you just provide them in the normal course of doing



business?
A Every time I purchased supplies, I provided him a copy of the invoice.
Q So --
A In other words, when supplies were delivered to me, I would sign for them, the invoice, and Mr. Hall, I would send him a copy of the invoice.
Q So these particular invoices here relating to 2005, did you collect these invoices and send them to Mr. Hall, or had you already done that?
A I don't follow you.
Q Did you -- in preparing the claim to the government, did you put these invoices together? Did you go --
A No, I didn't put them together.
Q Okay. You had already sent these invoices to Mr. Hall?
A Yeah, he already had the information.
Q Okay. And every time you got an invoice from Empire Paper, you sent them --
A Yeah.
Q -- to Mr. Hall.
A And I filed a copy myself, and this is why I gave Annette the one that she had.





177b893c-7531-42aa-ba35-4924f3afa959

Q When you purchased emergency supplies with petty cash, did you document those purchases?
A Documented it and sent Mr. Hall a copy of it, receipt and all.
Q So if you went to Sam's Club --
A Uh-huh.
Q -- and bought supplies, you'd take the receipt for those --
A Made a copy of the document and faxed it to him.
Q Sent it to him?
A Yeah.
Q Okay. Did you do that every time you --
A Every time.
Q Do you happen to remember, in 2005, if you purchased emergency supplies?
A Do I remember, in 2005, did I --
Q At any time, anytime during that year under the contract.
A Sure, I remember.
Q You purchased emergency supplies. Do you remember -- toward the end of the contract in 2005, do you remember purchasing fewer supplies from Empire than you had purchased previously?
A I don't -- I don't remember. I'm not



sure.
Q Okay. If you purchased fewer supplies -- hypothetically speaking, let's say for the last five months of 2005 -- or the last -- the last five months of this contract, you purchased fewer supplies from Empire, could you just guess about why, maybe, you would have purchased fewer supplies?
MR. HICKMAN: Object to the form of the question. It calls for speculation.
A No, I don't, but I recall purchasing supplies from Empire and Sam's, like I always did, throughout the contract. Most of the contract, anyway.
Q (By Mr. McNamara) Did you have any built-up inventory that you might have run through toward the end of the contract that would've prevented you from purchasing more supplies?
A Built-up inventory?
Q Yes.
A No.
Q You didn't have a lot of inventory sitting in a -- in your office in Lawton?
A No, no.
Q Do you remember -- in 2005, in the last year of the contract, do you remember any decrease



in usage of the buildings covered by the contract?
A No, I don't remember.
Q Do you remember, for example, visiting the base and seeing the troop processing facilities, like Building 3161, and seeing troops lined up out the door in 2005 just like in 2003?
A If I recall, every time I checked that building out, as long as we had the contract, it was -- people were still processing through it.
Q You don't remember any significant decrease in the number of people using the buildings in the last year of the contract?
A No.
Q Okay. Okay. I'd like you to take a look at -- we're going to change binders here. I'd like you to take a look at Exhibit No. 16, which I think is two pages. Do you recognize that document?
A Yes, I recognize it.
Q What is that document?
A Say that again?
Q What is that document?
A A list of supplies we utilized in a month.
Q Could you flip over to Exhibit No. 17 and to the document numbered on the bottom TE4-1?
A (Complies.)



Q Do you recognize that document?
A Yes.
Q And what is that document?
A Monthly usage of supplies.
Q Do you remember ever using either this particular document or the particular document contained in Exhibit 16 to help you calculate the amount of supplies you bought each month under the H & R Services contract?
A No, I don't remember which one I used.
Q Do you remember using either one of those documents or a similar document to help you calculate the amount of supplies you purchased?
A Yeah, some of the figures in here -- in this one comes to my mind, yeah.
Q You're looking at Exhibit No. 17 and --
A 4841.
Q And the 41, and you remember some of those numbers?
A Yes.
Q Did you use -- let's see. Do you remember -- under the previous contract, the contract before the H & R Services contract, do you remember using that -- this document at Exhibit 16, the TE 6-1 document? Do you remember using this for





177b893c-7531-42aa-ba35-4924f3afa959

the previous contract?
A I don't remember, no.
Q Do you remember using -- if not that particular document, do you remember using a similar -- a similar list of supplies on the previous contract?
A Yeah, I remember -- I had a list of supplies, but I don't remember what the amount of supplies I was using because of some of the buildings changing and some of the square footage changed. But I don't recall the contract before that, no.
Q Okay. Do you remember, on the H & R contract, if you used a supply list like the one -- like the ones in Exhibit 16 or in Exhibit 17 to calculate the amount of supplies you needed, or did you have your own method or documents for doing that?
A Would you mind to repeat that again?
Q I'm not sure I can, but let me -- did you -- on the H & R Services contract --
A Uh-huh.
Q -- did you use a list like the ones contained in Exhibit 16 or 17 provided by the government to help you calculate how much supplies



to use under the contract, or did you have your own documents, your own method for doing that?
A I might have used it at the beginning of the contract to buy the initial amount of supplies. I'm not sure, but that would be the thing to do from previous contracts, if I had -- I mean --
Q Could you have come up with a list of supplies -- if the government -- strike that.
If the government didn't give you a list of supplies for the H & R Services contract, could you have -- based on your experience with the previous contract, could you have come up with that list by yourself?
A Sure, you can come up with it. I could have, based on the amount of buildings and the amount of bathrooms you got.
Q Do you remember if you kept a copy of the list of supplies from the old contract to when you started with the H & R Services contract?
A No, because all of the paperwork from the old contract, I never kept any of it.
Q Under the old contract, did --
A I mean, in other words, the contract prior to H & R Service, the contract owner got all the paperwork.



Q You didn't keep any of that.
A No.
Q Okay. And on that contract, you had an office at Ft. Sill?
A Yes.
Q Were you in that same office when the H & R Services contract started?
A That's the point. I said, from the beginning, I'm not sure.
Q Yeah.
A Did we move out -- we moved out later, but I think the biggest -- I think -- I think, now -- I'm not sure -- that when H & R Services started, we started downtown because -- yes, yes. This is coming to me. We moved out. We started downtown.
Q Right from the beginning.
A Yes, because I remember Roger gave me the address to the building downtown.
Q He --
A When the contract was awarded out on post because he and I was -- at the time that they awarded the contract, he gave me the address which is to the office that I had downtown. He'd already found the office.
Q You didn't go find the office.



A No. He did.
Q He did.
A Yes.
Q Now, when you moved from Ft. Sill to that office, you didn't take any paperwork --
A No.
Q -- from the old contract.
A No.
Q Do you think that, in your opinion, H & R Services bid an appropriate amount on this contract?
MR. HICKMAN: Object to the form of the question.
Q (By Mr. McNamara) You can -- you can answer, if you understand.
A Do I think the bid -- well, I can say that, in my own opinion for sure, we wasn't losing any money until the Iraq situation started.
MR. McNAMARA: I have no further questions.
MR. HICKMAN: Mr. Monroe, you just need to tell this lady here that you want to read and sign your deposition, what she's typing up.
THE WITNESS: Tell her that? I'd like to read and sign the deposition that you're typing up.
(DEPOSITION CONCLUDED AT 2:12 P.M.)





177b893c-7531-42aa-ba35-4924f3afa959

ERRATA SHEET
DEPOSITION OF WILBERT MONROE
REPORTED BY: JEAN BAYSINGER, CSR RPR CMR
DATE DEPOSITION TAKEN: NOVEMBER 14, 2007
PR FILE NO. 12464

PAGE LINE IS SHOULD BE



JURAT

I, WILBERT MONROE, do hereby state under oath that I have read the above and foregoing deposition in its entirety and that the same is a full, true and correct transcription of my testimony so given at said time and place.

______________________________
Signature of Witness

Subscribed and sworn to before me, the undersigned Notary Public in and for the State of Oklahoma by said witness, WILBERT MONROE, on this ________day of__________________, 2007.

______________________________
NOTARY PUBLIC
MY COMMISSION EXPIRES:___________
(JB) PR FILE #12464



C E R T I F I C A T E

STATE OF OKLAHOMA )
) SS:
COUNTY OF OKLAHOMA )

I, Jean Baysinger, Certified Shorthand Reporter within and for the State of Oklahoma, do hereby certify that the above-named WILBERT MONROE was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth, in the case aforesaid; that the above and foregoing deposition was by me taken in shorthand and thereafter transcribed; and that I am not an attorney for nor relative of any of said parties or otherwise interested in the event of said action.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal this 20th day of November, 2007.

______________________________
Jean Baysinger, CSR RPR RMR





177b893c-7531-42aa-ba35-4924f3afa959