**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **H & R SERVICES, INC.,** | **)** | |
| **an Alabama corporation,** | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | |
| **v.** | **)** | **Case No. 06-582C** |
| | **)** | **(Judge Wheeler)** |
| **THE UNITED STATES,** | **)** | |
| **Defendant** | **)** | |

## PLAINTIFF'S COUNTER-STATEMENT OF FACTS

Pursuant to Rule 56(h) of the Rules of the United States Court of Federal Claims, Plaintiff H & R Services, Inc. ("H & R") submits the following Response to Defendant's Proposed Findings of Uncontroverted Fact and Plaintiff's Proposed Additional Facts in opposition to Defendant's Motion for Summary Judgment and in support of H & R's Cross-Motion for Summary Judgment.

## I. PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

1. The Department of the Army ("Army") awarded a firm, fixed-price contract (the "Contract") on August 22, 2000, for custodial services performed in various administrative buildings at Fort Sill, an Army base in Oklahoma, to Plaintiff, H & R Services ("H &R"). App. 1, 12.

**RESPONSE:** H & R disagrees with two primary parts of Defendant's Proposed Finding of Uncontroverted Fact No. 1. Defendants state that a "firm, fixed price contract" was awarded. But, the evidence conflicts with this statement. For example, the Contract does not clearly state that it is a "firm, fixed price contract" Plf. App. 1-180. Furthermore, the Contract Line Item Numbers refer to the "estimated cost per year." *Id.* Additionally, the Contract was modified effective September 20, 2002, to provide that, "the cost constraint NTE has been added." Def. App. 304. Defendant also states that

the contract is for custodial services be performed in various "administrative" buildings. But, the Contract actually provides that, "Facilities to be serviced consist of major headquarters, administrative areas, libraries, and latrines." Plf. App. 12. Additionally, the Contract describes the occupants of each building covered by the Contract, including operational units such as the marines and the airfield. Plf. App. 1-180.

2. Services covered by the contract included, among other things, floor maintenance, trash removal, spot cleaning, dusting, vacuuming, and the supplying of toilet paper, towels, trash bags, and hand soap. App. 15-16.

**RESPONSE:** H & R asserts that the Contract does not define the term "supplies," that the Contract does not specifically state what supplies are to be furnished, and that the Contract does not identify what, if any, supplies are to be furnished by the contractor. Plf. App. 1-180. Rather, the custodial contract immediately before the Contract and the janitorial contract immediately after the Contract both specifically identified the supplies to be provided and specified that those supplies were to be furnished by the contractor. Def. App. 598; Def. App. 609. Interestingly, the contracting officer on the H & R Contract, Ms. Arkeketa-Rendon, was involved in the preparation of the solicitation for the janitorial contract that followed the H & R Contract. During the preparation of this solicitation, she raised the question of whether the supplies were to be provided by the contractor or by the Government because it was not clear, from the language in the scope of work. Def. App. 749-750; Plf. App. 1145-1166. As a result, this follow-in custodial contract incorporated Ms. Arkeketa-Rendon's comments to specifically provide that the supplies identified were to be furnished by the contractor. Def. App. 751; Plf. App. 1168-1292. The language that she commented on is the same language in the Contract. Plf. App. 15. Furthermore, the Contract says the supplies to be furnished are those necessary to provide custodial <u>services</u>. Plf. App. 2-12. The

Contract does not say that the contractor is to supply toilet paper, towels, trash bags, and hand soap. Plf. App. 1-180. Ms. Arkeketa-Rendon could not explain the conflict in the use of the term "supplies" in the scope of work paragraph as used in reference to "supplies required to perform custodial services" in contrast to the use of term "supplies" in paragraph 18 of the Contract that identified toilet paper, towels, etc. Def. App. 742; Plf. App. 1-180.

3. The contract provided for a base period of performance lasting from October 1, 2000, to September 30, 2001, followed by four one-year option periods. App. 45-51.

**RESPONSE:** Admitted.

4. Prospective bidders submitted quotations based upon the estimated square footage of buildings to be serviced. App. 1-11, 34-36, 45-51.

**RESPONSE:** H & R submitted its bid based on the solicitation. Def. App. 766. Plf. App. 961-1142.

5. H & R submitted the winning bid, for $1,128,810. App. 11, 67.

**RESPONSE:** Admitted.

6. H & R's bid reflected static or decreasing costs for each of the option periods. App. 2-11.

**RESPONSE:** Admitted.

7. The Government exercised all four of the Contract's options. See, e.g., App. 75-76.

**RESPONSE:** Admitted.

8. The Government agreed to compensate H & R for its increased hourly labor costs during performance, pursuant to the Service Contract Act. App. 492.

**RESPONSE:** H & R admits that it was compensated for increased hourly labor costs pursuant to the Service Contract Act. However, H & R was not compensated for any additional labor costs resulting from the increased population in certain buildings and changes in the usage of certain buildings covered by the Contract. Furthermore, the Contracting Officer, Annette Arkeketa-Rendon, admits that when the "Airfield" was added to the Contract it was considered an urgent request, such that an increased price was modified to the Contract to address the increased services required because of change in occupancy of the building. Def. App. 727-761B.

9. The contract provided that the Government reserved the right to add or subtract space to be maintained. App. 15. The parties did, in fact, agree to such additions and subtractions 12 times over the course of performance. App. 75-476; see, e.g., App. 46-62.

**RESPONSE:** Admitted.

10. The Contract required H & R to "furnish all materials, supplies, and vehicles necessary to comply with the requirements of the contract." App. 14. Although the Contract provided an informational list of potential supplies, the Contract did not specify any estimated quantities for the required supplies. See App. 14. In this respect, the Contract differed from the maintenance contract preceding the H & R contract and the contract following it. Both of these contracts contained monthly supply usage estimates. App. 598; App. 609.

**RESPONSE:** Admitted. In effort to clarify Defendant's Proposed Finding of Uncontroverted Fact No. 10, H & R directs the Court to its response to Defendant's Proposed Findings of Uncontroverted Fact No. 2.

11. A list of estimated supplies was initially included in the internal government requirements package sent by the Directorate of Public Works, which oversaw the technical aspects of the Contract, to the Directorate of Contracting, which assembled the solicitation. See App. 582-594 (excerpts from Exhibit 17 to the deposition of Carl Reimer, who testified to providing the documents in Exhibit 17 to the contracting office, see App. 632-634).

**RESPONSE:** Admitted.

12. Sharel McAdoo, the contracting officer who awarded the Contract, did not remember any "specific discussion" about the list of supplies – or Contract language referring to the list – being removed from the solicitation, but that she did remember that the solicitation issued for the H & R contract was intended to be more "simplified" and "streamlined," which would have led to the deletion of the list and Contract language referring to the list. App. 710-14.

**RESPONSE:** Admitted. In an effort to clarify Defendant's Proposed Finding of Uncontroverted Fact No. 12, H & R states that Ms. McAdoo admitted that traditionally any change in the technical exhibits would be the result of the technical representative, Mr. Reimer. Def. App. 709. Furthermore, Ms. McAdoo stated that the information contained in supply estimate technical exhibit prepared by Mr. Reimer was quoted in the Statement of Work of the Contract. Def. App. 711. Ms. McAdoo, in an attempt to

simplify the acquisition process, made the decision to remove the supply estimate technical exhibit because she assumed that a contractor should know what they are doing as far as what kind of cleaning supplies were necessary, how many rolls of toilet paper are required, etc. *Id.*

13. Ms. McAdoo identified a draft of the solicitation where a list of supply quantities had been crossed out by an Army employee. App. 711-12, referring to App. 620.

**RESPONSE:** Admitted. In an effort to clarify Defendant's Proposed Finding of Uncontroverted Fact No. 13, H & R states that there was hand-writing on the supply list technical exhibit. The hand-writing was adding language to the technical exhibit. Additionally, the technical exhibit supply list was not crossed out; rather, the quantities associated with the supply items were crossed out. Def. App. 712; Plf. App. 944-960.

14. Though no list of supplies was included in the contract, the President of H & R, Roger Hall, testified during his deposition that he used such a list in preparing H & R's bid on the contract. App. 766. Mr. Hall asserted that the Army provided him a supply list in the solicitation. Id. He was unsure about whether H & R still possessed a copy of this list, but he asserted he was looking for it. Id. Mr. Hall could not remember having any conversations with the contracting officer, Ms. McAdoo, before submitting his company's bid. App. 767.

**RESPONSE:** Admitted.

15. In its second claim, covering the months of January, 2005, to September, 2005, H & R asserted that it spent $48,500.00 on supplies. App. 531. In support of this figure, H & R submitted supply invoices. App. 537-575. These invoices show that H & R spent $18,822.80 on supplies, a difference of $29,677.20 between the invoices and H & R's claim amount. Id. In his deposition, Mr. Hall was unable to explain this discrepancy, though he asserted that H & R could support its claim with documents. App. 771.

**RESPONSE:** H & R disputes the characterization of Mr. Hall's testimony. In fact, Mr. Hall stated that this second claim consisted of supply costs that were evidenced by the Empire Paper supply invoices along with fuel costs, petty cash purchases and equipment costs. Def. App. 771.

16. The contract provided for the frequency of the custodial tasks to be performed. App.

**RESPONSE:** Admitted.

17. Certain base occupants, for example, received services every Friday; others received services every Tuesday and Friday. Id.

**RESPONSE:** Admitted.

18. To calculate its bid for the services portion of the contract, Mr. Hall used an industry-wide standard in calculating the amount of time it would take his employees to clean the buildings covered by the contract. App. 768-69. This amount of time was contingent upon two factors, square footage and the "population density" of the buildings, which included both the density of people and the density of equipment in the

buildings. Id. Mr. Hall considered the groups occupying the buildings, e.g., the Red Cross, then made assumptions about their population density, and then calculated his bid based upon those assumptions. Id. Mr. Hall does not remember asking anyone in the Government how many people were present in buildings covered by the contract before submitting his bid. Id. at 768.

**RESPONSE:** H & R disagrees with Defendant's characterization of Mr. Hall's testimony. The primary consideration used by Mr. Hall in the calculation of the services portion of its bid was his reliance on the description of the occupant or use of the building - i.e., what services were being provided in that building as set forth in the solicitation. Def. App. 766, 768. The solicitation described the occupant of the buildings for which services were to be performed. Plf. App. 961-1142. Based on the occupant of the buildings, Mr. Hall was able to calculate the price for H & R's bid considering the population density and equipment density associated with the services rendered in the building. Def. App. 768-769.

19. The Government's witnesses do not know whether the number of occupants in the buildings covered by the contract increased during the life of the contract. See App. 641 (deposition of Carl Reimer, who helped to prepare the technical portion of the solicitation); App. 669 (deposition of Peter Webb, who inspected H & R's work); App. 745 (deposition of Annette Arkeketa-Rendon, the contracting officer who denied H & R's claim).

**RESPONSE:** Admitted.

20. H & R's former employees recall increases in specific buildings associated with the Iraq war effort. App. 782-83 (deposition of Jeanette Hairston, H & R's quality control manager and first-line supervisor); App. 793 (deposition of Wilburt Monroe, H & R's manager of operations for its Fort Sill contract.

**RESPONSE:** Admitted.

## II. PLAINTIFF'S PROPOSED ADDITIONAL FACTS

### A. Pre-Award:

1. The janitorial services contract immediately preceding the Contract contained a technical exhibit that identified the specific supply items to be furnished by the contractor as well as an estimate of the monthly usage for these supply items. Plf App. 785-930; Def. App. 699-701. But, the Government knew that the contractor performing services and providing supplies on this custodial services contract was failing to fulfill the required services and to provide the necessary supplies. Plf. App. 931-932; Plf. App. 935-937; Def. App. 702, 704. In fact, on July 6, 2000, the Government issued a Contract Discrepancy Report ("COR") to the contractor performing janitorial services immediately preceding the Contract. The CDR addressed the contractor's failure to provide the required services and to provide the necessary supplies. Plf. App. 938-943. The Government knew the volume of supplies actually being used by the contractor for the contract that immediately preceded the H & R Contract. Plf. App. 933-934; Def. App. 703.

2. Ms. McAdoo, the contracting officer that issued the CDR to the contractor under the janitorial services contract immediately preceding H & R, did not discuss with Mr. Carl Reimer, the Government's technical representative that prepared the

Government's requirement and estimate for the Contract, the failure of this prior contractor to adequately perform services and provide supplies to meet the Government's requirements. Def. App. 706.

3. Prior to the issuance of the solicitation, the Government prepared an estimated usage of supply items. Def. App. 582-594; Def. App. 632-638. The Government knew that the estimated usage of supply items was the type of information usually provided to prospective bidders and that prospective bidders rely upon this information. Def. App. 632-638. The Government's technical representative, Mr. Carl Reimer, did not know why the estimated usage of supply items would not have been provided to potential bidders. Def. App. 638. Mr. Reimer also testified that the Government's estimated usage of supply items could be helpful to a bidder in pricing and preparing their bid. *Id.*

4. On June 5, 2000, the Government issued the solicitation that resulted in the award to H & R of the Contract. Plf. App. 961-1142. H & R prepared its bid based on the solicitation. Def. App. 766. H & R relied upon the description of the occupants in the buildings provided in the solicitation as representing the services that were being provided in those buildings in the preparation of its bid. Def. App. 768-769; Plf. App. 961-1142. H & R also relied on an estimated supply usage list provided by the Government to prepare its bid. Def. App. 766. H & R could not have calculated its bid without being provided an estimate of the Government's usage of supplies because, as Mr. Hall stated, "it's impossible to guess the amount of supplies that are used on an installation if you don't have a guide to go by." Def. App. 767-768.

5. On June 5, 2000, the contracting officer, Ms. Sharel McAdoo, sent a letter with the solicitation to all prospective bidders providing them information concerning the prior custodial contract. In this letter, she said there were only three areas in which the solicitation differed from the prior custodial contract. Plf App. 756-758. This prior custodial contract contained a provision dealing with mobilization and mobilization support that provided that any work performed in support of base mobilization efforts will be considered a change to the contract and that the contractor will be paid for any increase or decrease in the contractor's cost or the time required for performance. Plf. App. 756-758. But, the June 5, 2000, letter from the contracting officer to the prospective bidders on the H & R Contract did not state that this provision concerning compensation for work in support of mobilization efforts was one of the differences. *Id*.

6. Ms. Sharel McAdoo was the pre-award contracting officer for the Contract. Def. App. 698. Prior to award, Ms. McAdoo, requested H & R to submit its proposed workforce on the Contract, including the number of personnel that would work under Contract and the number of working hours proposed. The Government made this request of H & R because the Government was concerned that H & R's bid price may be "unrealistically low." Plf. App. 1143; Def. App. 715. Furthermore, the Government had in its possession information on the man-hours being worked by the prior contractor. But, Ms. McAdoo did not know if the information submitted by H & R was checked with the information in the Government's possession concerning the man-hours performed by the prior contractor. Def. App. 715.

7. The Government determined that H & R's bid was fair and reasonable based on a comparison of their bid price with other bidders and based on a comparison of the H & R bid with the independent Government estimate thereby awarding H & R the Contract. H & R was the second lowest bidder; but, H & R was awarded the Contract when the apparent low bidder withdrew its bid. Def. App. 67; Def. App. 724.

**B. Contract Performance:**

8. During the performance of the Contract, H & R representatives entered into buildings covered by the Contract on a daily basis. Def. App. 781. The buildings covered by the Contract were visited to ensure compliance with the Contract, to respond to a complaint and/or to provide additional supplies. *Id*. at 781-782. H & R representatives observed that there were more people occupying and using certain buildings covered by the Contract after Fort Sill began to mobilize - i.e. 2002. Def. App. 782-784. H & R representatives also observed more supplies being used in certain buildings covered by the Contract during this same period of time. *Id*. Because H & R tracked the supplies it purchased for the Contract to ensure that all of these supplies were delivered to Fort Sill, H & R was able to determine that the volume of supplies being used was increasing. Def. App. 785.

During the course of performance of the Contract, H & R was directed to provide additional supplies for use on weekends and for use 24 hours-a-day for certain buildings covered by the Contract. *Id*; Def. App. 514. As a result of these changes in occupancy and the increased usage in certain buildings covered by the Contract, H & R had to provide more supplies. Def. App. 796. H & R was also required to provide additional janitorial services. As a result, H & R also had to extend the hours worked by

its employees in certain buildings covered by the contract after repeated requests by employees for additional time to complete their work as a result of the change in occupancy and the increased usage in certain buildings covered by the Contract. Def. App. 796. The primary contracting officer for the Contract, Mr. Ray Dryz, routinely directed H & R to perform services prior to a written modification being executed. Def. App. 663-664, For example, on June 11, 2002, the contracting officer, Mr. Ray Dryz, advised H & R that the letter was a "verbal confirmation of the requested additional service described "and that a formal modification for the additional service" will be issued before the end of this month." Plf. App. 759-762. Additionally, on March 27, 2003, the contracting officer, Ray Dryz, sent a letter to H & R requesting a proposal for the changes in services to the contract. Mr. Dryz stated in this letter that "my purpose in requesting this proposal is to make a modification that definitizes some actions that you have already taken. Therefore if your effective date differs from the effective I show above, I request your proposal show the actual effective date." Plf. App. 763-778. H & R performed additional services and provided additional supplies to support the change in occupation of the buildings and the increased occupancy in the buildings based on conversations with contracting officer Dryz. Plf. App. 781-784.

9. On September 25, 2000, the Government issued Amendment No. 1 to the contract. This amendment was effective October 1, 2000 (the date of the award of contract). Amendment No. 1 included an updated bid schedule, floor plans, and technical exhibit list of buildings to be cleaned. Def. App. 460-476. Furthermore, on May 4, 2001, the Government issued Amendment No. 2 to the contract. This amendment was also effective October 1, 2000. This amendment also deleted the

building list technical exhibit and replaced it with a revised list of buildings to be cleaned under the terms of the Contract. Def. App. 395-401.

10. On May 15, 2001, the Government issued Amendment No. 3 to the contract which required H & R to remove bagged shredded paper. The Government stated in the amendment that this service was outside the current scope of work. Def. App. 385-394.

11. Ms. Annette Arkeketa-Rendon was assigned the Contract approximately in August 2004. Def. App. 732. Mr. Ray Dryz had been the contracting officer on the Contract prior to that time. *Id.* She had no involvement and had no knowledge of H & R's performance, of any modifications to the Contract, or of any negotiations involving H & R concerning the Contract prior to it being assigned to her. Def. App. 732. Ms. Arkeketa-Rendon was not involved in any fashion with regard to the pre-award period of time relating to the contract. Def. App. 733. Ms. Arkeketa-Rendon was not involved in the first 15 modifications made to the contract. *Id.*

12. On October 20, 2004, H & R requested an adjustment to the contract due to increases in the population and usage in certain buildings causing the services and supplies associated with the contract to escalate. However, the contracting officer did not show Mr. Webb H & R's request. Def. App. 686, Plf. App. 781-784. Furthermore, H & R submitted the proposal for a price adjustment at the direction of Contracting Officer Dryz. *Id.* Ms. Arkeketa-Rendon recalls seeing H & R's request, but she did not make any attempt to contact Mr. Dryz, even though he is mentioned in H & R's letter. Furthermore, Ms. Arkeketa-Rendon did not even respond to H & R's letter. Plf. App. 781-784; Def. App. 737-738.

13. On November 18, 2004, the contracting officer, Annette Arkeketa-Rendon, had a meeting with the Government personnel working on the Contract to set forth tighter controls on changes to the Contract providing that additional work will only be by written modification to the Contract. Def. App. 672-673; Plf. App. 779-780. She stated that this process was to be followed to avoid DPW from engaging in unauthorized/illegal acts to obligate the Government. Plf. App. 24; Def. App. 736-737. However, Ms. Arkeketa-Rendon did not advise H & R of the contents of her e-mail or the change in the process relating to additional work being performed on the contract. Def. App. 737. In fact, the Government knew that customers in the buildings probably directed H & R to perform work. Def. App. 672-673.

14. On August 9, 2005, Ms. Arkeketa-Rendon requested Mr. Reimer to review a list of buildings submitted by H & R in support of H & R's claim. Def. App. 523-524. However, Mr. Reimer testified that he did not have any direct knowledge of whether the work in the buildings identified by H & R changed. Def. App. 642-643. Mr. Reimer also admitted that he did not have any knowledge concerning the supplies provided by H & R during the course of contract performance. Def. App. 649. In fact, Mr. Reimer testified that he is not involved in the monitoring the contractor's performance or services rendered under the Contract after award. Def. App. 630. Simply stated, Mr. Reimer did not have anything to do with the Contract after it was awarded. *Id.* And, after receipt of the contracting officer's request of August 9, 2005, Mr. Reimer did not make any independent study or investigation to determine whether or not the contractor was doing

anything different or if there had been any change in the use of the buildings prior to responding to the contract officer's request. Def. App. 645; Def. App. 525-526.

15. On August 10, 2005, Mr. Reimer responded to the contracting officer. But, Mr. Reimer admits that he may have been mistaken in his e-mail response to the contracting officer. Def. App. 637; Def. App. 525-526.

16. Ms. Arkeketa-Rendon relied upon the statements of Mr. Carl Reimer concerning the change in the occupation and use of the buildings identified by H & R to deny H & R's claim. Def. App. 523-526; 527-529; 745-747.

17. Furthermore, Mr. Reimer was never asked during the course of performance of the contract any questions concerning the requirements of the Government relating to the contract. Def. App. 651. Mr. Reimer was also not consulted by the contracting officer when any of the option periods were exercised. Def. App. 635-636.

18. Mr. Peter Webb, the quality control inspector for the Government during the entire period of Contract performance, was also not consulted when any of the option periods were exercised. Def. App. 656, 662, 666-667. Mr. Webb was also not consulted by the contracting officer concerning H & R's claim for additional compensation. Def. App. 675.

19. Mr. Webb concedes that mis-communication may have occurred between the Government and H & R as a result of differing communications from the contracting officer, from him and/or from customers in the buildings to H & R. Def. App. 676. Furthermore, Mr. Webb testified that this breakdown in communication was exasperated after the contracting officer moved to the Directorate of Contracting building as opposed

to being co-located in the Directorate of Public Works ("DPW") building simply because of the ease of communications available as a result of the contracting officer being located next door to him. Def. App. 676-677. The contracting officer function moved back to the Directorate of Contracting building at or near the time Ms. Arkeketa-Rendon became the contracting officer; whereas Mr. Dryz performed his functions as the contracting officer while co-located with DPW - i.e., the Government office on Fort Sill that defined the requirements for the Contract. Def. App. 665.

20. Ms. Arkeketa-Rendon testified that she used her e-mail system for communication purposes during the time that she administered the Contract. But, she is not able to provide those e-mails to H & R because they have been deleted. She testified that she deleted these e-mails without asking authorization from anybody. Def. App. 743-744. Furthermore, she does not know if Mr. Dryz's e-mails have been deleted or are available to confirm the conversation between H & R and Mr. Dryz as referenced in H & R's October 20, 2004 letter to the Government. Def. App. 733-734; Plf. App. 781-784.

21. H & R complied with the terms of the contract in providing supplies and services and the inspector, Mr. Webb, admits that H & R went beyond the requirements of the contract by providing additional supplies and additional services to the Government. Def. App. 682.

22. Since at least 2003, the mission on Fort Sill has grown, including, but not necessarily limited to the Training Service Center Mission, the Public Works Mission, and the Adjutant General's Mission. Def. App. 95-698. The Government knew that there had been an increase in the mobilization and deployments from Fort Sill because of

the global war on terrorism. The Government also knew that because of this increased mobilization of troops and deployments to support the global war on terrorism, the Government would, and did modify certain service contracts. Def. App. 758-759; Plf. App. 1313-1315; Plf. App. 1316-1320; and Plf. App. 1321-1322.

23. On April 27, 2005, the Government denied H & R's first claim. Def. App. 515-520. The contracting officer concedes that there are situations in which a firm, fixed price contract awarded based on IFB could be changed. In fact, she admits that if the request for additional funds established that there was an increase in the supplies used at specific buildings covered by the Contract she would have approved the claim. Def. App. 515-520; 746-747. Ms. Arkeketa-Rendon does not have an understanding of whether or not it was taking H & R more time to clean the buildings because of additional number of occupants in the building or because of a change in the use or the utilization of the buildings. Def. App. 747. The contracting officer, Annette Arkeketa-Rendon, admits that if the claim submitted by H & R had specifically shown the increases in supplies being delivered to specific buildings that she would have changed her mind and approved the claim. Def. App. 577-579; 740; 748; Plf. App. 181-464.

24. Mr. Webb testified that if he had been given a copy of the documents submitted by H & R to support their claim for equitable adjustment he could have prepared a spreadsheet to identify the specific supplies delivered to the base. However, he was not provided with these documents or even requested to provide any assistance. Def. App. 674-676. Mr. Webb also testified that if he had been given the payroll summary information submitted with H & R's claim, he could have cross checked that

information with the man-hour reports submitted by H & R at the time of performance to confirm the hours reported to the contracting officer as being accurate and determine if there was an abnormally high or abnormally low number of hours being worked. Def. App. 680-681.

25. On August 4, 2005, the Government made the determination that because of the varying pattern of customer demand at Fort Sill, the custodial services contract to be awarded after the H & R Contract should be an indefinite quantity-indefinite delivery type contract. The Government stated that a firm, fixed-price contract or a cost-type contract does not provide the flexibility needed for this type of requirement. The H & R Contract file was available to the contracting officer that made the decision to pursue this different type of contract. Def. App. 752; Plf. App. 1167.

26. On October 1, 2005, the Government amended the custodial services contract that followed the H & R Contract to obligate funds on that Contract in support of the global war on terrorism to pay for a portion of the janitorial services provided under this follow-on contract. Def. App. 756; Plf. App. 1293-1307. This funding is specifically to support the global war on terrorism. *Id.*

Respectfully submitted,
HICKMAN & FITZPATRICK, PLLC

s/William H. Hickman
William H. Hickman, OBA No. 18395
119 N. Robinson, Suite 250
Oklahoma City, Oklahoma 73102
Telephone: (405) 605-2375
Facsimile: (405) 605-2374

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the above and foregoing was e-mailed this 18th day of January, 2008, to the following attorneys of record:

Sean B. McNamara
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L St., NW
Washington, D.C. 20005

s/William H. Hickman