NO. 06-582C
(Judge Wheeler)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

H & R SERVICES, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

---

William H. Hickman
Hickman & Fitzpatrick, PLLC
119 N. Robinson, Suite 250
Oklahoma City, Oklahoma 73102

ATTORNEYS FOR PLAINTIFF

March 14, 2008

TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . i, ii

TABLE OF AUTHORITIES . . . . . . . . . . iii, iv, v

PLAINTIFF'S BRIEF . . . . . . . . . . 1

ARGUMENT AND AUTHORITIES . . . . . . . . . . 1

I. Because the Government's interpretation of the Contract required work to be performed beyond the requirements of the Contract, H & R is entitled to recovery . . . . . . . . . . 1

A. Basic Principles of Contract Interpretation . . . . . . . . . . 1

1. The Court should ascertain the intent of the parties . . . . . . . . . . 1

2. The Court should consider the actions of the parties before and during the performance of the Contract to determine the intent of the parties to the Contract . . . . . . . . . . 2

3. The Court should allocate the risk of misinterpretation against the Government - *contra proferentum* rule . . . . . . . . . . 3

B. H & R's interpretation of the Contract is within the zone of reasonableness based on these basic contract interpretation principles such that the rule of *contra proferentum* should be invoked by the Court so that the Contract is interpreted against the Government and in favor of H & R . . . . . . . . . . 4

II. Because the Government failed to disclose its vital superior knowledge, H & R is entitled to an equitable adjustment to the Contract . . . . . . . . . . 14

A. The Government has a duty to disclose to H & R . . . . . . . . . . 14

B. The Government's failure to disclose its superior knowledge caused a change to the Contract for which H & R should be compensated . . . . . . . . . . 15

III. Because the Government ordered a change to the Contract resulting in H & R having to perform work beyond the original contract requirements, H & R is entitled to an equitable adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

A. The Government ordered H & R to perform work beyond the original contract requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

B. H & R complied with the Government's order to perform work not reasonably required by the Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

IV. Because the Government and H & R had an erroneous mutual belief about the requirements of the Contract, the Government should compensate H & R as a result of this mistake . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

A. The Contract should either be reformed or rescinded because a mistake occurred and the Contracting Officer had a duty to verify the bid . . . . . . 21

B. The existence of a mistake warrants equitable relief in favor of H & R . 22

V. Because H & R has evidence of the increased costs for Claim 2, the Government's Motion for Summary Judgment thereon should be denied . . . . . . . . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

## CASES

*AT&T Communications, Inc. v. Perry,*
296 F.3d 1307 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Aero-Abre, Inc. v. U.S.,*
39 Fed. Cl. 654, 657 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Air-A-Plane Corp. v. U.S.,*
408 F.2d 1030 (Ct. Cl. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Aydin Corp. v. U.S.*
61 F.3d 1571, 1577 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Bennett v. U.S.,*
371 F.2d 859 (Ct. Cl. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Blinderman Constr. Co. v. U.S.,*
17 Ct. Cl. 860, 863 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Brezina Constr. Co. v. U.S.,*
449 F.2d 372 (Ct. Cl. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Chemical Technology, Inc. v. U.S.*,
645 F.2d 934 (Ct. Cl. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Coast-to-Coast Fin. Corp. v. U.S.,*
45 Fed. Cir. 796, 801-802 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Corbetta Construction Co. v. U.S.*,
461 F.2d 1330 ( Ct. Cl. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Corman v. U.S.,*
26 Cl. Ct. 1011 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Crown Laundry & Dry Cleaners, Inc. v. U.S.,*
29 Fed. CL. 506, 519 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Dakota Tribal Industries v. U.S.*,
34 Fed. Cl. 593, 595-96 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Dan Rice Constr. Co.*,
ASBCA 52160, 04-1 BCA §32595 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Dawco Construction, Inc. v. U.S.*,
930 F.2d 872 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Efts-Hokin Corp. v. U.S.*,
420 F.2d 716 (Ct. Cl. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Evans Reamer & Machine Co. v. U.S.*,
386 F.2d 873 (Ct. Cl. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Firestone Tire & Rubber Co. v. U.S.*,
444 F.2d 475 (Ct. Cl. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Freund v. U.S.*,
260 U.S. 60 (1922) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Garside v. Osco Drug, Inc.*,
895 F.2d 46, 50(1st Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*General Contracting & Constr. Co. v. U.S.*,
84 Ct. Cl. 570 (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Giesler v. U.S.*,
232 F.3d 864, 870 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Gresham & Co. v. U.S.*,
470 F.2d 542 ( Ct. Cl. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*HNV Cent. River Front Corp. v. U.S.*,
32 Fed. Cl. 547 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Helene Curtis Industries, Inc. v. U.S.*,
312 F.2d 774 (Ct. Cl. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Hol-Gar Mfg Corp. v. U.S.*,
351 F.2d 972 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Hunt Bldg. Co. v. U.S.*,
61 Fed. Cl. 243 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Jansen v. U.S.*,
344 F.2d 363, 369 (Ct. Cl. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Macke Co. v. U.S.*,
467 F.2d 1323 (Ct. Cl. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Massachusetts Port Authority v. U.S.*,
197 Ct. Cl. 721 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Maxwell Dynamometer Co. v. U.S.*,
386 F.2d 855 (Ct. Cl. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Metric Contractors, Inc. v. NASA*,
169 F3d 747, 752 (Fed, Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*National Australia Bank v. U.S.*,
452 F.3d 1321, 1329 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Neal Co. v. U.S.*,
19 Ct. Cl. 463, 473 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*PAVCO, Inc.*,
ASBCA No. 23783, 80-1, BCA ¶ 14, 407 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Peter Kiewet Sons' Co. v. U.S.*,
109 Ct. Cl. 390 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Roseburg Lumber Co. v. Madigan*,
978 F.2d 660, 667 (Fed, Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Ryan Aeronautical Co.*,
ASBCA 13366, 70-1 BCA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Service Technicians, Inc. v. U.S.*
37 Fed. Cl. 383, 386 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Sylvania Electric Prods., Inc. v. U.S.*,
458 F.2d 994 (Ct. Cl. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*TEG-Paradigm Envtl., Inc. v. U.S.,*
465 F3d 1329 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Tecom, Inc. v. U.S.,*
66 Fed. Cl. 736, 771 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Thanet Corp. v. U.S.,*
591 F.2d 629, 633 (Ct. Cl. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*U.S. v. Turner Constr. Co.,*
819 F.2d 283 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*WPC Enterprises, Inc. v. U.S.,*
323 F.2d 874 (Ct. Cl. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Winstar Corp. v. U.S.,*
64 F.3d 1531, 1540 (Fed. Cir. 1995 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Womack v. U.S.,*
389 F.3d 793 (Ct. Cl. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Wunderlich Contracting Co. v. U.S.,*
351 F.2d 956 (Ct. Cl. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **H & R SERVICES, INC.,<br>an Alabama corporation,<br>Plaintiff,** | ) | |
| **v.** | ) | **Case No. 06-582<br>(Judge Wheeler)** |
| **THE UNITED STATES,<br>Defendant** | ) | |

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 5.2 and 56 of the Rules of the United States Court of Federal Claims ("RCFC"), Plaintiff, H & R Services, Inc. ("H & R") submits this Reply to Defendant's Opposition to Plaintiff's Cross-Motion for Summary Judgment (the "Opposition"). Defendant, the United States (the "Defendant" or the "Government") argues that the Court should disregard the intent of the parties to the Contract as well as the long standing legal precedence that an equitable adjustment is due a contractor for a constructive change to a Contract.

**ARGUMENT & AUTHORITIES**

**I. Because the Government's interpretation of the Contract required work to be performed beyond H & R's reasonable understanding of the requirements of the Contract, H & R is entitled to recovery.**

**A. Basic Principles of Contract Interpretation.**

**1. The Court should ascertain the intent of the parties.**

The fundamental goal of contract interpretation is to determine the intent of the parties when they enter into a contract. *Winstar Corp. v. U.S.*, 64 F.3d 1531, 1540 (Fed. Cir. 1995). The courts

look at the evidence, including the words of the contract and the conduct of the parties before and after the contract is executed, to ascertain the parties' intent. *Firestone Tire & Rubber Co. v. U.S.*, 444 F.2d 475 (Ct. Cl. 1971). Thus, the language of the contract must be given the meaning that would be derived by a reasonably intelligent person acquainted with the contemporaneous circumstances. *Metric Contractors, Inc. v. NASA*, 169 F.3d 747, 752 (Fed. Cir. 1999).

The intent of the Government in drafting the language of the contract is not relevant to its interpretation. *Ets-Hokin Corp. v. U.S.*, 420 F.2d 716 (Ct. Cl. 1970). The Court of Claims stated the goal of contract interpretation is to determine the objective intent of the parties:

> A Government contractor cannot properly be required to exercise clairvoyance in determining its contractual responsibilities. The crucial question is "what [the contractor] would have understood as a reasonable [construction] contractor," not what the drafter of the contract terms subjectively intended. *Corbetta Constr. Co. v. U.S.*, 461 F.2d 1330 (Ct. Cl. 1972)

The Court should also consider the actions of the parties to the contract to properly interpret it.

**2. The Court should consider the actions of the parties before and during the performance of the contract to determine the parties intent.**

The courts look to evidence of the pre-bid communications of the parties to confirm that the contract's plain meaning was in accord with the parties' objective understanding of the requirements of the contract. *TEG-Paradigm Envtl., Inc. v. U.S.*, 465 F.3d 1329 (Fed. Cir. 2006). In some decisions, the Court of Claims has given heavy weight to information disseminated by the Government before bid award holding that such information was a binding expression as to the intent of the Government. *Sylvania Electric Prods., Inc. v. U.S.*, 458 F.2d 994 (Ct. Cl. 1972).

Additionally, the actual course of conduct between the parties during contract administration, prior to the dispute, reveals the intended interpretation of the parties. *Macke Co. v. U.S.*, 467 F.2d

1323 (Ct. Cl. 1972). It is a canon of contract construction that the interpretation placed by the parties upon a contract during its performance is demonstrative of their intention. *Jansen v. U.S.*, 344 F.2d 363, 369 (Ct. Cl. 1965). The interpretation of a contract by the parties to it before a contract becomes the subject of controversy is deemed by the courts to be of great, if not controlling weight. *Coast to-to-Coast Fin. Corp. v. U.S.*, 45 Fed. Cir. 796, 801-802 (2000). Furthermore, the Government has been held to be bound by a contractor's interpretation when the Government finds out about the contractor's interpretation but stands by and does not inform the contractor that it disagrees. *Maxwell Dynamometer Co. v. U.S.*, 386 F.2d 855 (Ct. Cl. 1967). Thus, in order to determine whether H & R's interpretation of the contract provision is reasonable, the Court must put itself in the place of a reasonable and prudent contractor. *Neal Co. v. U.S.*, 19 Ct. Cl. 463, 473 (1990).

**3. The Court should allocate the risk of misinterpretation against the Government – *contra proferentum* rule.**

A contract may be said to be ambiguous if it is susceptible to more than one reasonable interpretation. *Blinderman Constr. Co. v. U.S.*, 17 Ct. Cl. 860, 863 (1989). A contract that contains ambiguous language should be construed against its drafter if the interpretation of the other party is reasonable. This rule is frequently described as the *contra proferentum* rule. *Peter Kiewit Sons' Co. v. U.S.*, 109 Ct. Cl. 390 (1947). It is frequently stated that the rule of interpreting the contract language against its drafter will not apply until it has been shown that the language is ambiguous, i.e., there are two or more reasonable interpretations. *Brezina Constr. Co. v. U.S.*, 449 F.2d 372 (Ct. Cl. 1971). However, the nondrafter of the language does not have to prove the ambiguity. If it can be shown that the language is reasonably susceptible of the interpretation given it by the nondrafter, the contention of the drafter that it had an alternate meaning demonstrates the ambiguity. *U.S. v.*

*Turner Constr. Co.*, 819 F.2d 283 (Fed. Cir. 1987). The nondrafter does not have to prove that its interpretation is the only (or most) reasonable one. *Bennett v. U.S.*, 371 F.2d 859 (Ct. Cl. 1967). Thus, the nondrafter – H & R – need only prove that its interpretation of the Contract is "within the zone of reasonableness" to invoke the *contra proferentum* rule. *WPC Enterprises, Inc. v. U.S.*, 323 F.2d 874 (Ct. Cl. 1963). The contractor offering its interpretation of an ambiguous contract must demonstrate that it reasonably relied on the interpretation for which it is contending. *Id.*

B. **H & R's interpretation of the Contract is within the zone of reasonableness based on these basic contract interpretation principles such that the rule of *contra proferentum* should be invoked by the Court so that the Contract is interpreted against the Government and in favor of H & R.**

H & R's interpretation of the Contract is simple - H & R understood that it would be compensated for additional work associated with mobilization efforts. H & R's interpretation of the Contract is based on the language of the Contract, the statements of the Contracting Officer prior to award, the contents of the contract for the same services in place prior to the H & R Contract, and the actions of the Government during the course of performance of the Contract.

**1. H & R reasonably understood the costs associated with mobilization efforts would be paid by the Government as a change to the Contract.**

H & R reasonably understood that the costs associated with any mobilization efforts in the buildings covered by the Contract would be compensated by the Government as a change to the Contract. H & R's interpretation of the Contract is based, in part, on the June 5, 2000 letter from the Contracting Officer, Sharel McAdoo. Ms. Sharel McAdoo was the pre-award contracting officer for the Contract. Def. App. 698.

Prior to the award of the Contract, Ms. McAdoo sent a letter to all prospective bidders on the H & R Contract to provide them with information concerning the prior custodial contract. In this

letter, she states: "The new solicitation [the H & R Contract] differs from the current contract in the following areas." She then proceeds to describe the three areas that are different - (1) acceptance of IMPAC Credit Card; (2) no government furnished facility; and (3) no "project work" will be performed. Plf App. 756-758.

The prior custodial contract did contain an express provision dealing with mobilization and mobilization support. This provision provided that any work performed in support of base mobilization efforts would be considered a change to the contract and that the contractor will be paid for any increase or decrease in the contractor's cost or the time required for performance. Plf. App. 756-758. But, the June 5, 2000, letter from the contracting officer to the prospective bidders on the H & R Contract did not state that this provision concerning compensation for work in support of mobilization efforts was one of the three differences. *Id*. Thus, H & R understood that the Government would interpret the H & R Contract in a manner consistent with the prior custodial contract, even without the express provision set forth in the H & R Contract. A constructive change to the Contract, such as for base mobilization, is within the discretion of the Contracting Officer.

The obvious question is: Why did the Government take the mobilization provision out? Ms McAdoo, the Contracting Officer, provides an illuminating answer to that question. The Government was using a streamlined acquisition process for the H & R Contract. Def. App. 710 - 711, 714. In an effort to implement this streamlined acquisition process, the Government "streamlined" the information that was included in the H & R Solicitation. *Id.* For example, the Government deleted some of the technical exhibits that were in the prior contract from the solicitation requirements for the H & R Contract. *Id.*

With regard to information being removed from the H & R solicitation that was included in the prior contract, Ms. McAdoo stated that "a contractor that bids on a service contract is supposed to know what kind of tools, etcetera, are going to be required for performance." *Id.* Furthermore, a review of the H & R Contract in comparison with the prior contract reveals how "streamlined" the Government made the H & R Contract. Plf. App. 1-180; Plf. App. 785 - 930. Thus, because the Government: (1) "streamlined" the H & R Contract resulting in too many provisions being removed; (2) expressed an intent as evidenced by the Contracting Officer that the bidder [H &R] would have to read requirements into the Contract - i.e., the tools to do the job; (3) expressed an intent as evidenced by the Contracting Officer that the H & R Contract is to be interpreted in the same manner as the prior custodial contract, except for three areas, which did not exclude payment to the Contractor for mobilization costs; and (4) determined unilateral to employ a streamlined acquisition process that is the root of this confusion, the Court should use the rule of *contra proferentum* and interpret the H & R Contract against the Government.

H & R prepared its bid in response to the Solicitation for the H & R Contract. *See* Appendix "1." H & R also prepared its bid based on the terms and conditions of the custodial contract in effect prior to the H & R Contract. *Id.* Furthermore, H & R relied upon the statements contained in the June 5, 2000 letter from Contracting Officer McAdoo regarding the differences between the two acquisitions in preparing H & R's bid for the Contract. *Id.* Based on these materials relied upon to prepare the H & R bid, H & R interpreted the H & R Solicitation [Contract] in accordance with the prior custodial contract - i.e., the Contractor would be compensated for costs related to mobilization. *Id.* H & R's bid was based on this interpretation of the requirements; and, if H & R knew that it was responsible for the costs associated with a contingency effort like mobilization, the prices included

in the bid would have been greater. *Id.* Therefore, the Court should determine H & R's interpretation to be reasonable and grant H & R the relief requested.

**2. The Contract fails to clearly provide that it is firm, fixed price.**

Defendants primary argument against H & R's interpretation is that the Contract is firm, fixed price. Defendants' assert that H & R is not entitled to any more monies because H & R bore the risk of a firm, fixe price contract. However, the intent of the Government in drafting the Contract is not relevant. In fact, the evidence contradicts the Government's statement that the Contract is firm, fixed price.

The Contract does not clearly state that it is a "firm, fixed price contract." Plf. App. 1-180. The only evidence to support Defendant's interpretation of the Contract as being firm, fixed price is Item No. 0001 and 0003. These two items represent the Contract line items for the Base Period - October 1, 2000 through September 30, 2001 - and Option Period 2 - October 1, 2002 through September 30, 2003. The other three Contract line items for option years 1, 3, and 4 do not contain the "FFP" abbreviation. Plf. App. 1-180. Thus, the portion of the Contract that contains a reference to "FFP" also contains contradictions.

Furthermore, on September 22, 2000, Defendant executed Modification No. 1 to the Contract. This modification was effective October 1, 2000 - the commencement date of the Contract. Modification No. 1 replaced all of the Contract line items for the Base Period. In other words, the "FFP" acronym relied upon by Defendant was removed from the Contract with Modification No. 1, effective day of the Contract. Def. App. 460-476. The Contract was also modified effective September 20, 2002, to provide that, "the cost constraint NTE has been added." Def. App. 304. Therefore, the plain language of the Contract contains conflicting statements about the type of

contract. Additionally, the actions of the Government during the course of performance deleting the "FFP" acronym and inserting the cost language evidences the reasonableness of H & R's interpretation of the Contract.

Additionally, Defendants assert that the Contract is not a cost-type contract because it does not contain any of the clauses required by the FAR for cost-type contract. However, the Contract likewise does not contain any clauses for a fixed price type contract. Plf. App. 1-180. Therefore, because the plain language of the Contract does not support the Government's interpretation of the Contract and the actions of the Government during the course of performance are in direct conflict with the Government's interpretation, the Court should reject the Government's argument.

**3. Because the Contract includes the occupants of the buildings, H & R reasonably relied upon this information when interpreting the Contract.**

H & R's interpretation of the Contract is, in part, based on the fact that the Contract includes a description of the occupants in the buildings for which services were to be performed. The primary consideration used by H & R in calculating the cost of its services was its reliance on the description of the occupant or use of the buildings - i.e., what services were being provided in that building as set forth in the solicitation. Def. App. 766, 768. The solicitation describes the occupants of the buildings for which services were to be performed. Plf. App. 961-1142. Based on the occupants of the buildings, H & R calculated the price for H & R's bid considering the population density and equipment density associated with the services rendered in the building. Def. App. 768-769. The population density and equipment density in these buildings can be obtained (or estimated) if the occupants of the buildings are known. By providing this information, the Government knew, or should have known, that bidders such as H & R would rely upon the occupants of the buildings to

determine the costs associated with fulfilling the requirements of the Contract. Thus, the Contract should be interpreted to only require the Contractor to provide the custodial supplies and services necessary for the reasonable use of the buildings identified in the Contract by the occupants of those buildings identified in the Contract. It is illogical and unfair to take the Government's interpretation, which would result in the Contractor assuming unbridled, unlimited, unforeseen, unexpected, and unending liability for untold consequences. Rather, H & R's interpretation of the Contract that the supplies and services required were only those to support the occupants of the buildings reasonable use of those buildings.

**4. The Contract fails to define "supplies."**

The Contract does not define the term "supplies." Plf. App. 1-180. The failure to define the term "supplies" is evident by conflicting provisions in the Contract. In the scope of work paragraph, the Contract provides the supplies to be furnished are those necessary to provide "custodial services." Plf. App. 2-12. The supplies necessary to provide custodial services could be the cleaning products, brooms, mops and other things used to clean (i.e., the term supplies could be interpreted to mean the tools necessary to perform custodial services because the list of tools that was included in the prior custodial contract was removed from the H & R Contract to implement the Government's streamlined acquisition). Def. App. 710 - 711, 714.

The Contract does identify toilet paper, towels, trash bags, and hand soap as supplies in Paragraph 18. Plf. App. 1-180. However, Paragraph 18 is just a list of supplies for "informational purposes only." *Id.* Furthermore, the Contract does not say that the Contractor is to provide the supplies identified in the informational list in Paragraph 18. Plf. App. 1-180. The Contracting Officer, Ms. Arkeketa-Rendon, could not explain the conflict in the use of the term "supplies" in the

scope of work paragraph - i.e., "supplies required to perform custodial services" - in contrast to the use of term "supplies" in paragraph 18 of the Contract. Def. App. 742; Plf. App. 1-180. Her confusion may be because the custodial contract immediately before the Contract and the custodial contract immediately after the Contract both specifically identified the supplies to be provided and specified those supplies that were to be furnished by the contractor. Def. App. 598; Def. App. 609. Ms. Arkeketa-Rendon testified that the H & R Contract was unclear as to whether the Government or the Contractor were to provide supplies. Def. App. 749-751.

**5. The Government's interpretation of the Contract is unreasonable.**

Defendant refers to Paragraph 15 of the Contract to interpret the Contract to deny H & R's claim for compensation. Defendant asserts that Paragraph 15 defines the scope of the work required by the Contract. But, Paragraph 15 only requires the Contractor to "furnish all materials, supplies, and vehicles necessary to comply with the requirements of this contract." The Government's reliance on this Paragraph is misplaced for three reasons. The first issue is that the scope of Paragraph 15 is limited to the scope of the requirements of the Contract. Thus, Paragraph 15 is ineffective to define the scope of the Contract as it simply refers to the requirements of the Contract. Additionally, Paragraph 15 does not define the supplies that are to be provided; and, for any supplies that are to be provided, whether such supplies are to be provided by the Government or the Contractor. Finally, Paragraph 15 is void of any requirement that the Contractor provide any services. Thus, Paragraph 15 does not stand for the broad, all encompassing interpretation that the Government advocates.

**6. The actions of the Government support H & R's position.**

During the performance of the Contract, H & R representatives observed that there were more people occupying and using certain buildings covered by the Contract after Fort Sill began to

mobilize - i.e. 2002. Def. App. 782-784. H & R representatives also observed more supplies being used in certain buildings covered by the Contract during this same period of time. *Id*. As a result of the mobilization, H & R was directed to provide additional supplies, such as for use on weekends and for use 24 hours-a-day for certain buildings covered by the Contract. *Id*; Def. App. 514. As a result of these changes, H & R had to provide more supplies. Def. App. 796. H & R was also required to provide additional janitorial services. As a result, H & R had to extend the hours worked to cover the increased workload caused by the mobilization. Def. App. 796.

The primary contracting officer for the Contract, Mr. Ray Dryz, knew H & R was providing these additional services and supplies in support of the mobilization. Def. App. 663-664. In fact, H & R submitted its initial request for compensation at the direction of Mr. Dryz. H & R and Contracting Officer Dryz had a course of conduct whereby H & R would provide supplies and services and the paperwork would catch up after the fact. For example, on June 11, 2002, Mr. Dryz advised H & R that his letter was a verbal confirmation of the requested additional service described "and that a formal modification for the additional service" will be issued before the end of this month." Plf. App. 759-762. Additionally, on March 27, 2003, Mr. Dryz, sent a letter to H & R requesting a proposal for the changes in services to the contract. Mr. Dryz stated in this letter that "my purpose in requesting this proposal is to make a modification that definitizes some actions that you have already taken. Therefore if your effective date differs from the effective I show above, I request your proposal show the actual effective date." Plf. App. 763-778. The Government knew H & R performed additional services and provided additional supplies in reliance on the Contracting Officer's past practice of completing the necessary paperwork to ensure payment. In the instant case, Contracting Officer Dryz knew H & R was providing additional supplies and services in support of

the mobilization with the understanding that the paperwork was going to catch up. Plf. App. 781-784. Unfortunately, Mr. Dryz retired before the modification to the Contract was prepared. As a result, a new Contracting Officer made the decision on H & R's request for equitable adjustment.

The unreasonable position of the Government is evident based on the Contracting Officer, Ms. Annette Arkeketa-Rendon's, lack of knowledge relating to the Contract and her unfounded reliance on Mr. Carl Reimer to deny the claims of H & R's. Ms. Akeketa-Rendon was assigned the Contract approximately in August 2004. Def. App. 732. Mr. Ray Dryz had been the contracting officer on the Contract prior to that time. *Id.* She had no involvement and had no knowledge of H & R's performance, of any modifications to the Contract, or of any negotiations involving H & R concerning the Contract prior to it being assigned to her. Def. App. 732. Ms. Arkeketa-Rendon was also not involved in the pre-award period of time relating to the Contract. Def. App. 733.

On October 20, 2004, H & R, based on its interpretation of the Contract and course of dealings with Contracting Officer Dryz, requested an adjustment to the Contract due to the mobilization. Ms. Arkeketa-Rendon recalled seeing H & R's request, but she did not make any attempt to contact Mr. Dryz, even though he is mentioned in H & R's letter. In fact, Ms. Arkeketa-Rendon did not even respond to H & R's letter. Plf. App. 781-784; Def. App. 737-738. Thus, the Government ratified by acquiescence H & R's interpretation of the Contract.

On August 9, 2005, Ms. Arkeketa-Rendon requested Mr. Reimer to review a list of buildings submitted in support of H & R's claim. Def. App. 523-524. But, Mr. Reimer testified that he did not have any direct knowledge of whether the work in the buildings identified by H & R changed. Def. App. 642-643. Mr. Reimer also admitted that he did not have any knowledge concerning the supplies provided by H & R during the course of contract performance. Def. App. 649.

On August 10, 2005, Mr. Reimer responded to the Contracting Officer. But, Mr. Reimer admits that he may have been mistaken in his e-mail response. Def. App. 637; Def. App. 525-526. Ms. Arkeketa-Rendon testified that she relied on the statements of Mr. Carl Reimer concerning the change in the occupation and use of the buildings identified by H & R to deny H & R's claim. Def. App. 523-526; 527-529; 745-747.

The inconsistency in the Government's position is further evident from the testimony of the Contracting Officer. Ms. Arkeketa-Rendon admitted that if the claim submitted by H & R had specifically shown the increases in supplies being delivered to specific buildings that she would have changed her mind and approved the claim. Def. App. 577-579; 740; 748; Plf. App. 181-464. She does not know whether it was taking H & R more time to clean the buildings. Her testimony is in striking contrast to the Government's position in this case - H & R is not entitled to any additional compensation as the Contract is firm, fixed price.

Unfortunately for the parties hereto, Ms. Arkekta-Rendon did not provide Mr. Webb with copies of H & R's Claims. Mr. Webb testified that if he had been given a copy of the documents submitted by H & R to support their claim for equitable adjustment he could have prepared a spreadsheet to identify the specific supplies delivered to the base. However, he was not provided with these documents or even requested to provide any assistance. Def. App. 674-676. Mr. Webb also testified that if he had been given the payroll summary information submitted with H & R's claim, he could have cross checked that information with the man-hour reports submitted by H & R at the time of performance to confirm the hours reported to the contracting officer as being accurate and determine if there was an abnormally high or abnormally low number of hours being worked. Def. App. 680-681. If the Contracting Officer had relied on the Government's inspector

for the Contract to assist in her evaluation of the Claim (as opposed to Mr. Reimer who was not involved in the administration of the Contract), the parties may have resolved these claims without the need for litigation.

As one final piece of evidence that the H & R Contract was flawed, the Government made the determination that because of the varying pattern of customer demand at Fort Sill, the custodial services contract to be awarded after the H & R Contract should be an indefinite quantity-indefinite delivery type contract. The Government stated that a firm, fixed-price contract or a cost-type contract does not provide the flexibility needed for this type of requirement. Def. App. 752; Plf. App. 1167.

## II. Because the Government failed to disclose its vital superior knowledge, H & R is entitled to an equitable adjustment to the Contract.

### A. The Government has a duty to disclose to H & R.

The Government has a duty to disclose vital information. The violation of this duty enables the contractor to recover against the Government. *Helene Curtis Industries, Inc. v. U.S.*, 312 F.2d 774 (Ct. Cl. 1963). Additionally, the Government assumes the risk by not disclosing its superior information. For example, the Armed Services Board of Contract Appeals ("ASBCA") held that the Government's failure to disclose at the time of the negotiation is inconsistent with an assumption of the risk on the part of the contractor. *Ryan Aeronautical Co.*, ASBCA 13366, 70-1 BCA ¶ 8287, 12 CG ¶ 349. A constructive change occurs when a contractor is required to perform work that the Government anticipated at the time of contract award but did not reveal to the contractor during the bidding on the contract. *Chemical Technology, Inc. v. U.S.*, 645 F.2d 934 (Ct. Cl. 1981). A change also occurs when the Government has knowledge of specific prior procurement information that is not disclosed. *Evans Reamer & Machine Co. v. U.S.*, 386 F.2d 873 (Ct. Cl. 1967).

**B. The Government's failure to disclose its superior knowledge regarding the prior procurement caused a change to the Contract for which H & R should be compensated.**

The janitorial services contract immediately preceding the Contract contained a technical exhibit that identified the specific supply items to be furnished by the contractor as well as an estimate of the monthly usage for these supply items. Plf App. 785-930; Def. App. 699-701. The Government knew that the contractor performing services and providing supplies on this custodial services contract was failing to fulfill the required services and to provide the necessary supplies. Plf. App. 931-932; Plf. App. 935-937; Def. App. 702, 704. In fact, on July 6, 2000, the Government issued a Contract Discrepancy Report ("COR") to the contractor performing janitorial services immediately preceding the Contract. The CDR addressed the contractor's failure to provide the required services and to provide the necessary supplies. Plf. App. 938-943. The Government knew the volume of supplies actually being used by the contractor for the contract that immediately preceded the H & R Contract. Plf. App. 933-934; Def. App. 703.

A constructive change occurs when the Government has specific knowledge of the prior procurement that is not disclosed. The Government knew the prior contractor was failing to provide the required supplies and services. The failure to disclose is even more magnified considering the fact that the Government provided a supply list based off this prior procurement to bidders for the H & R Contract.

H & R relied on an estimated supply usage list provided by the Government to prepare its bid. Def. App. 766. In fact, H & R could not have calculated its bid without being provided an estimate of the Government's usage of supplies because, as Mr. Hall stated, "it's impossible to guess the amount of supplies that are used on an installation if you don't have a guide to go by." Def. App.

767-768. H & R would have increased its bid if it had known of the performance problems of the prior contractor. *See* Appendix "1." Thus, the Government's failure to disclose the specific information concerning the prior procurement is a breach of the duty to disclose vital information.

## III. Because the Government ordered a change to the Contract resulting in H & R having to perform work beyond the original contract requirements, H & R is entitled to an equitable adjustment.

### A. The Government ordered H & R to perform additional work.

The Government must fairly compensate the contractor for the costs of the constructive change to a contract. *Aydin Corp. v. U.S.*, 61 F.3d 1571, 1577 (Fed. Cir. 1995). If the Government, through the Contracting Officer or other authorized representative, requires the contractor to perform work beyond the requirements of the contract, the Contractor may elect to treat the Government's directive as a constructive change order and prosecute a claim for an equitable adjustment. *Ets-Hokin Corp. v. U.S.*, 420 F.2d 716, 720 (Ct. Cl. 1970). A constructive change entails two components – the change component and the order component. The change component describes work outside of the scope of the contract. The order component describes the reason that the contractor performed the work. Thus, if the Government either expressly or impliedly ordered work outside the scope of the Contract, or if the Government otherwise caused the Contractor to incur additional work, a constructive change arises for the work performed outside of the scope of the contract. *Service Technicians, Inc. v. U.S.*, 37 Fed. Cl. 383, 386 (1997).

The Government's order, however, need not be formal or in writing. *Tecom, Inc. v. U.S.*, 66 Fed. Cl. 736, 771 (2005). The Government breaches its contract if it fails to grant the Contractor an equitable adjustment when the Contract is constructively changed. *Id*.

Like the instant case, in the *Tecom* case, the Court noted:

> This is not a question of a contractor under a fixed price contract having underestimated its expenses for a given quantity of work; rather, the quantity of work was more than the Government represented. *Id*.

Thus, the Government may "order" the Contractor to perform additional work – even if such work was intended to be included in the Contract by the Government – by either expressly or impliedly requiring performance to a specification level beyond that reasonably understood by the Contractor. In fact, the Government's order is even a constructive change to the Contract - even if the Contract is firm fixed-price contract.

In addition to the order from the Government to the Contractor to perform "additional work," the order must be from a Government employee with the authority to legally commit the Government to the change. The Government representative may be the Contracting Officer or some representative of the Contracting Officer. Implied authority exists when the Government intended to grant such authority but failed to do so explicitly due to some oversight or such authority inheres in a particular position. *Aero-Abre, Inc. v. U.S.*, 39 Fed. Cl. 654, 657 (1997). It is generally clear that for some limited purposes – inspection or technical coordination – certain employees are authorized to act for the Contracting Officer during contract administration. These functions cannot be carried out without these employees' applying the specifications and determining whether the Contractor is complying with them. This process ultimately involves an interpretation of the contractual requirements. The courts and appeals boards reason that such Government employees act within the scope of their authority when they interpret the specifications and that the Government is bound by errors made in this process. *Dan Rice Constr. Co.*, ASBCA 52160, 04-1 BCA § 32595.

In addition to the finding of implied authority, an alternative line of reasoning has developed

to establish authority for the change. A Contracting Officer may ratify an after the fact approval of another Government employee's unauthorized commitment to a Contractor. Ratification occurs when the principal, upon learning of an unauthorized act of its agent, acquiesces in, or affirms that act through their conduct. *HNV Cent. River Front Corp. v. U.S.*, 32 Fed. Cl. 547 (1995). Usually, ratification has been found to have occurred through either the Contracting Officer's: (1) knowledge of the activity of the Government employee; or (2) acceptance of the benefits of this activity. *Id.*

A third means of finding Contracting Officer authority (in addition to implied authority and ratification) turns on whether a Contracting Officer can be attributed with knowledge of certain events. For example, the knowledge of Government inspectors in the performance of their duties is imputed to the Contracting Officer. *Gresham & Co. v. U.S.*, 470 F.2d 542 (Ct. Cl. 1972).

**B. H & R complied with the Government's order to perform work not reasonably required by the Contract.**

During the performance of the Contract, H & R representatives observed that there were more people occupying and using certain buildings covered by the Contract after Fort Sill began to mobilize - i.e. 2002. Def. App. 782-784. H & R representatives also observed more supplies being used in certain buildings covered by the Contract during this same period of time. *Id*. As a result of the mobilization, H & R was directed to provide additional supplies, such as for use on weekends and for use 24 hours-a-day for certain buildings covered by the Contract. *Id*; Def. App. 514. As a result of these changes, H & R had to provide more supplies. Def. App. 796. H & R was also required to provide additional janitorial services. As a result, H & R had to extend the hours worked to cover the increased workload caused by the mobilization. Def. App. 796.

The primary contracting officer for the Contract, Mr. Ray Dryz, knew H & R was providing these additional services and supplies in support of the mobilization. Def. App. 663-664. In fact, H & R submitted its initial request for compensation at the direction of Mr. Dryz. H & R and Contracting Officer Dryz had a course of conduct whereby H & R would provide supplies and services and the paperwork would catch up after the fact. For example, on June 11, 2002, Mr. Dryz advised H & R that his letter was a verbal confirmation of the requested additional service described "and that a formal modification for the additional service" will be issued before the end of this month." Plf. App. 759-762. Additionally, on March 27, 2003, Mr. Dryz, sent a letter to H & R requesting a proposal for the changes in services to the contract. Mr. Dryz stated in this letter that "my purpose in requesting this proposal is to make a modification that definitizes some actions that you have already taken. Therefore if your effective date differs from the effective I show above, I request your proposal show the actual effective date." Plf. App. 763-778. The Government knew H & R performed additional services and provided additional supplies in reliance on the Contracting Officer's past practice of completing the necessary paperwork to ensure payment. In the instant case, Contracting Officer Dryz knew H & R was providing additional supplies and services in support of the mobilization with the understanding that the paperwork was going to catch up. Plf. App. 781-784. Unfortunately, Mr. Dryz retired before the modification to the Contract was prepared. As a result, a new Contracting Officer made the decision on H & R's request for equitable adjustment.

In addition to Contracting Officer Dryz, Mr. Webb made scope of contract judgment calls during the course of his inspection of the work performed by H & R. Def. App. 664-665. In order to make these decisions, he would have to determine if H & R's work complied with the scope of the Contract. Id. Mr. Webb knew Fort Sill was experiencing mobilization in support of the war in

Iraq. Def. App. 677. He also knew that the more people in a building, the more time it would take to clean and the more supplies that would be consumed. Def. App. 670.

Furthermore, since at least 2003, the mission on Fort Sill has grown, including, but not necessarily limited to the Training Service Center Mission, the Public Works Mission, and the Adjutant General's Mission. Def. App. 95-698. The Government knew that there had been an increase in the mobilization and deployments from Fort Sill because of the global war on terrorism. The Government also knew that because of this increased mobilization of troops and deployments to support the global war on terrorism, the Government would, and did modify certain service contracts. Def. App. 758-759; Plf. App. 1313-1315; Plf. App. 1316-1320; and Plf. App. 1321-1322.

Mr. Webb concedes that mis-communication may have occurred between the Government and H & R as a result of differing communications from the contracting officer, from him and/or from customers in the buildings to H & R. Def. App. 676. Furthermore, Mr. Webb testified that this breakdown in communication was exasperated after the contracting officer moved to the Directorate of Contracting building as opposed to being co-located in the Directorate of Public Works ("DPW") building simply because of the ease of communications available as a result of the contracting officer being located next door to him. Def. App. 676-677. The contracting officer function moved back to the Directorate of Contracting building at or near the time Ms. Arkeketa-Rendon became the contracting officer; whereas Mr. Dryz performed his functions as the contracting officer while co-located with DPW - i.e., the Government office on Fort Sill that defined the requirements for the Contract. Def. App. 665. Thus, Mr. Webb's testimony evidences the fact that H & R performed additional work to support the mobilization at the direction of an authorized Government representative.

The work ordered was outside the scope of the contract as discuss in the other sections of this Reply.

**IV. Because the Government and H & R had an erroneous mutual belief about the requirements of the Contract, the Government should compensate H & R as a result of this mistake.**

**A. The Contract should either be reformed or rescinded because a mistake occurred and the Contracting Officer had a duty to verify the bid.**

A government contract may be reformed or rescinded if the contracting officer accepts a bid with actual or constructive knowledge that the bid contains an error. *Dakota Tribal Industries v. U.S.*, 34 Fed. Cl. 593, 595-96 (1995). The mistake must be of the type that calls for such relief, and the contracting officer must have actual or constructive notice of the mistake at the time the bid was accepted. *Id*. Furthermore, a misreading of specifications may entitle the bidder to relief. *Id*. For example, when the bid submitted differs from the one intended by the Government based on the Government's understanding of the contract requirements, a mistaken belief that the specifications do not call for certain work may exist. *Id*. In other words, a misreading of the specifications includes a mistaken belief about what is called for in the specifications. *Giesler v. U.S.*, 232 F.3d 864, 870 (Fed. Cir. 2000).

An erroneous belief about the contents of a written agreement is sufficient to constitute a mistake. Reformation is available when the parties, having reached an agreement and having attempted to reduce it to writing, fail to express it correctly in the writing. *National Australia Bank v. U.S.*, 452 F.3d 1321, 1329 (Fed.Cir. 2006). Extrinsic evidence is admissible to prove mutual mistake of fact and, if necessary, to vary and reform a written contract. *Id*.

A contracting officer has a duty to examine all bids for mistakes and in cases of apparent

mistakes and in cases where the contracting officer has reason to believe that a mistake may have been made, the contracting officer shall request from the bidder a verification of bid, calling attention to the suspected mistake. *Id*. The contracting officer should consider variances from the government estimates, prior procurements, market value or other bids. *Id*.

A contract may also be rescinded where the evidence of mistake is clear and convincing, and (1) the mistake was mutual, or (2) the mistake was unilateral, but it was so apparent as to charge the contracting officer with either actual or constructive knowledge of the mistake, but the contracting officer failed to properly verify the bid. *PAVCO, Inc.*, ASBCA No. 23783, 80-1, BCA ¶ 14,407.

The Court of Claims addressed an assumption of risk analysis in *National Presto Industries, Inc. v. U.S.*, 338 F.2d 99 (Ct. Cl. 1964), where the contractor incurred a substantial amount of additional expense because a certain manufacturing method which the parties had assumed to be the basis of performance did not work out as expected. The court, deciding the case under the theory of mutual mistake, found that the Government did not intend that the contractor assume the entire risk and that it would have assumed at least some of the extra cost if it had know of the problem beforehand. *Id*.

**B. The existence of a mistake warrants equitable relief in favor of H & R.**

The primary consideration used by Mr. Hall in the calculation of the services portion of its bid was his reliance on the description of the occupant or use of the building - i.e., what services were being provided in that building as set forth in the solicitation. Def. App. 766, 768. The solicitation described the occupant of the buildings for which services were to be performed. Plf. App. 961-1142. Based on the occupant of the buildings, Mr. Hall was able to calculate the price for H & R's bid considering the population density and equipment density associated with the services

rendered in the building. Def. App. 768-769.

On June 5, 2000, the contracting officer, Ms. Sharel McAdoo, sent a letter with the solicitation to all prospective bidders providing them information concerning the prior custodial contract. In this letter, she identified three areas in which the solicitation differed from the prior custodial contract. Plf App. 756-758. This prior custodial contract contained a provision dealing with mobilization and mobilization support that provided that any work performed in support of base mobilization efforts will be considered a change to the contract and that the contractor will be paid for any increase or decrease in the contractor's cost or the time required for performance. Plf. App. 756-758. But, the June 5, 2000, letter from the contracting officer to the prospective bidders on the H & R Contract did not state that this provision concerning compensation for work in support of mobilization efforts was one of the differences. *Id.*

Ms. Sharel McAdoo was the pre-award contracting officer for the Contract. Def. App. 698. She testified that the H & R Contract was awarded based on a stream-lined process - i.e., a stream-lined solicitation. As a result, the H & R Contract has many fewer clauses and provisions. However, she testified that some items are read into the H & R Contract that may have been clearly stated before.

Prior to award, Ms. McAdoo, requested H & R to submit its proposed workforce on the Contract, including the number of personnel that would work under Contract and the number of working hours proposed. The Government made this request of H & R because the Government was concerned that H & R's bid price may be "unrealistically low." Plf. App. 1143; Def. App. 715. Furthermore, the Government had in its possession information on the man-hours being worked by the prior contractor. But, Ms. McAdoo did not know if the information submitted by H & R was

checked with the information in the Government's possession concerning the man-hours performed by the prior contractor. Def. App. 715. The Government failed to adequately conduct a pre-award bid analysis in light of the Government's position that mobilization costs were not to be compensated as a change. Rather, these costs were to be borne by the bidder in their price. This interpretation of the H & R Contract should have resulted in a substantial increase in the estimate for the H & R Contract and a substantial increase in the H & R Contract over the prior contract. However, the estimate for the H & R Contract was nearly the same as the prior contract and the H & R Contract was near the price of the prior contract.

**V. Because H & R has evidence of the increased costs for Claim 2, the Government's Motion for Summary Judgment thereon should be denied.**

The fundamental rule is that in seeking an equitable adjustment, the contractor has the burden of proof of increased costs. This standard means that the Contractor must present evidence (1) of increased costs and (2) that the costs were incurred as a result of the change. The Court of Claims, in a seminal case, stated the rule as follows in *Wunderlich Contracting Co. v. U.S.*:

> A claimant need not prove his damages with absolute certainty or mathematical exactitude . . . . It is sufficient if he furnishes the court with a reasonable basis for computation, even though th result is only approximate. 351 F.2d 956 (Ct. Cl. 1965).

Furthermore, the Court has the discretion to employ the method to compute and prove the costs due H & R. For example, in the case, *Dawco Construction, Inc. v. U.S.*, the court considered both the jury verdict method and the actual cost method. 930 F.2d 872 (Fed. Cir. 1991). In *Dawco*, the court adopted the actual cost method and stated that the damages are to be based on specific documented figures. *Id*. The court did not enter summary judgment on the claim simply because the contractor did not have every actual dollar documented.

The Government makes an issue about H & R not including certain costs in its first claim. As the Government surely knows, a contractor is only allowed to recover those costs that were incurred as a result of the change. On the other hand, H & R may simply not have included all of the costs that may have increased because of the additional work because it is a small, disadvantaged business that does not have the sophisticated accounting system of a large corporation. In any event, the difference does not matter in light of the purpose of these motions.

The only issue that does matter is whether evidence exists to support the claim. The Government does not dispute the fact that evidence exists to support the claim. Rather, the Government argues that H & R's documents do not reflect 100% of the dollars requested; and, the Government apparently does not believe oral testimony is valid to introduce evidence of damages.

In further support of Claim 2, H & R submits the Affidavit of Roger Hall. *See* Appendix "1." Mr. Hall's statements are based on his personal knowledge, set forth facts that would be admissible in evidence, and show affirmatively that he is competent to testify to the matters in the affidavit. *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990). Additionally, H & R submits herewith receipts from Sam's Club in support of Claim 2. *See* Appendix "2." Therefore, H & R respectfully request the Court deny the Government's request for judgment on Claim 2.

## CONCLUSION

**WHEREFORE**, Plaintiff, H & R Services, Inc. respectfully requests the Court grant the relief requested herein.

Respectfully submitted,
HICKMAN & FITZPATRICK, PLLC

s/William H. Hickman

William H. Hickman, OBA No. 18395
HICKMAN & FITZPATRICK, PLLC
119 N. Robinson, Suite 250
Oklahoma City, Oklahoma 73102
Telephone: (405) 605-2375
Facsimile: (405) 605-2374

**CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of March, 2008, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrant(s):

Sean B. McNamara
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L St., NW
Washington, D.C. 20005

s/William H. Hickman